## LIST OF EXHIBITS

**Exhibit 1**         Exec. Order. No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017)

**Exhibit 2**         Press Release, Office of the Vice President, Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity (June 28, 2017)

**Exhibit 3**         Letter from Kris Kobach, Vice Chair, Presidential Advisory Commission on Election Integrity, to Elaine Marshall, Secretary of State, North Carolina (June 28, 2017)

**Exhibit 4**         *Perkins v. Dep't of Veteran Affairs*, No. 07-310 (N.D. Ala. Apr. 21, 2010)

**Exhibit 5**         Memorandum M-03-22 from Josh Bolten, Dir. of Office of Mgmt. & Budget, to Heads of Exec. Dep'ts & Agencies (Sep. 23, 2003)

**Exhibit 6**         Screenshot: Google Chrome Security Warning for Safe Access File Exchange ("SAFE") Website (July 3, 2017 12:02 AM)

# Exhibit 1


Federal Register

Vol. 82, No. 93

Tuesday, May 16, 2017

# Presidential Documents

Title 3—

The President

Executive Order 13799 of May 11, 2017

## Establishment of Presidential Advisory Commission on Election Integrity

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to promote fair and honest Federal elections, it is hereby ordered as follows:

**Section 1.** *Establishment.* The Presidential Advisory Commission on Election Integrity (Commission) is hereby established.

**Sec. 2.** *Membership.* The Vice President shall chair the Commission, which shall be composed of not more than 15 additional members. The President shall appoint the additional members, who shall include individuals with knowledge and experience in elections, election management, election fraud detection, and voter integrity efforts, and any other individuals with knowledge or experience that the President determines to be of value to the Commission. The Vice President may select a Vice Chair of the Commission from among the members appointed by the President.

**Sec. 3.** *Mission.* The Commission shall, consistent with applicable law, study the registration and voting processes used in Federal elections. The Commission shall be solely advisory and shall submit a report to the President that identifies the following:

(a) those laws, rules, policies, activities, strategies, and practices that enhance the American people's confidence in the integrity of the voting processes used in Federal elections;

(b) those laws, rules, policies, activities, strategies, and practices that undermine the American people's confidence in the integrity of the voting processes used in Federal elections; and

(c) those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting.

**Sec. 4.** *Definitions.* For purposes of this order:

(a) The term ''improper voter registration'' means any situation where an individual who does not possess the legal right to vote in a jurisdiction is included as an eligible voter on that jurisdiction's voter list, regardless of the state of mind or intent of such individual.

(b) The term ''improper voting'' means the act of an individual casting a non-provisional ballot in a jurisdiction in which that individual is ineligible to vote, or the act of an individual casting a ballot in multiple jurisdictions, regardless of the state of mind or intent of that individual.

(c) The term ''fraudulent voter registration'' means any situation where an individual knowingly and intentionally takes steps to add ineligible individuals to voter lists.

(d) The term ''fraudulent voting'' means the act of casting a non-provisional ballot or multiple ballots with knowledge that casting the ballot or ballots is illegal.

**Sec. 5.** *Administration.* The Commission shall hold public meetings and engage with Federal, State, and local officials, and election law experts, as necessary, to carry out its mission. The Commission shall be informed by, and shall strive to avoid duplicating, the efforts of existing government entities. The Commission shall have staff to provide support for its functions.

**22390**     **Federal Register** / Vol. 82, No. 93 / Tuesday, May 16, 2017 / Presidential Documents

**Sec. 6.** *Termination.* The Commission shall terminate 30 days after it submits its report to the President.

**Sec. 7.** *General Provisions.* (a) To the extent permitted by law, and subject to the availability of appropriations, the General Services Administration shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis.

(b) Relevant executive departments and agencies shall endeavor to cooperate with the Commission.

(c) Insofar as the Federal Advisory Committee Act, as amended (5 U.S.C. App.) (the "Act"), may apply to the Commission, any functions of the President under that Act, except for those in section 6 of the Act, shall be performed by the Administrator of General Services.

(d) Members of the Commission shall serve without any additional compensation for their work on the Commission, but shall be allowed travel expenses, including per diem in lieu of subsistence, to the extent permitted by law for persons serving intermittently in the Government service (5 U.S.C. 5701–5707).

(e) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(f) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(g) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*May 11, 2017.*

[FR Doc. 2017–10003

Filed 5–15–17; 8:45 am]

Billing code 3295–F7–P

# Exhibit 2





*the WHITE HOUSE*

☰

## From the Press Office

Speeches & Remarks

Press Briefings

**Statements & Releases**

Nominations & Appointments

Presidential Actions

Legislation

Disclosures

**The White House**
Office of the Vice President

For Immediate Release                                     June 28, 2017

# Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity

This morning, Vice President Mike Pence held an organizational call with members of the Presidential Advisory Commission on Election Integrity. The Vice President reiterated President Trump's charge to the commission with producing a set of recommendations to increase the American people's confidence in the integrity of our election systems.

"The integrity of the vote is a foundation of our democracy; this bipartisan commission will review ways to strengthen that integrity in order to protect and preserve the principle of one person, one vote," the Vice President told commission members today.

The commission set July 19 as its first meeting, which will take place in Washington, D.C.

Vice Chair of the Commission and Kansas Secretary of State Kris Kobach told members a letter will be sent today to the 50 states and District of Columbia on behalf of the Commission requesting publicly-available data from state voter rolls and feedback on how to improve election integrity.



HOME     BRIEFING ROOM     ISSUES     THE ADMINISTRATION     PARTICIPATE     1600 PENN

USA.gov     Privacy Policy     Copyright Policy

# Exhibit 3

## Presidential Advisory Commission on Election Integrity

June 28, 2017

The Honorable Elaine Marshall
Secretary of State
PO Box 29622
Raleigh, NC 27626-0622

Dear Secretary Marshall,

I serve as the Vice Chair for the Presidential Advisory Commission on Election Integrity ("Commission"), which was formed pursuant to Executive Order 13799 of May 11, 2017. The Commission is charged with studying the registration and voting processes used in federal elections and submitting a report to the President of the United States that identifies laws, rules, policies, activities, strategies, and practices that enhance or undermine the American people's confidence in the integrity of federal elections processes.

As the Commission begins it work, I invite you to contribute your views and recommendations throughout this process. In particular:

1. What changes, if any, to federal election laws would you recommend to enhance the integrity of federal elections?
2. How can the Commission support state and local election administrators with regard to information technology security and vulnerabilities?
3. What laws, policies, or other issues hinder your ability to ensure the integrity of elections you administer?
4. What evidence or information do you have regarding instances of voter fraud or registration fraud in your state?
5. What convictions for election-related crimes have occurred in your state since the November 2000 federal election?
6. What recommendations do you have for preventing voter intimidation or disenfranchisement?
7. What other issues do you believe the Commission should consider?

In addition, in order for the Commission to fully analyze vulnerabilities and issues related to voter registration and voting, I am requesting that you provide to the Commission the publicly-available voter roll data for North Carolina, including, if publicly available under the laws of your state, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social

security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information.

You may submit your responses electronically to ElectionIntegrityStaff@ovp.eop.gov or by utilizing the Safe Access File Exchange ("SAFE"), which is a secure FTP site the federal government uses for transferring large data files. You can access the SAFE site at https://safe.amrdec.army.mil/safe/Welcome.aspx. We would appreciate a response by July 14, 2017. Please be aware that any documents that are submitted to the full Commission will also be made available to the public. If you have any questions, please contact Commission staff at the same email address.

On behalf of my fellow commissioners, I also want to acknowledge your important leadership role in administering the elections within your state and the importance of state-level authority in our federalist system. It is crucial for the Commission to consider your input as it collects data and identifies areas of opportunity to increase the integrity of our election systems.

I look forward to hearing from you and working with you in the months ahead.

Sincerely,

Kris W. Kobach
Vice Chair
Presidential Advisory Commission on Election Integrity

# Exhibit 4

FILED
2010 Apr-21 PM 03:1
U.S. DISTRICT COUR
N.D. OF ALABAM

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**JIM HENRY PERKINS and JESSIE FRANK QUALLS, on their own behalf and on the behalf of all others similarly situated,**

    **Plaintiffs,**

**v.**                                   **CV No. 2:07-310-IPJ**

**UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; et al.**

    **Defendants.**

## <u>MEMORANDUM OPINION</u>

This case is before the court upon remand from the Eleventh Circuit to conduct a "claim-by-claim" analysis to determine the validity of plaintiffs' remaining challenges brought under the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.*, and seeking to enforce provisions of the Privacy Act, 5 U.S.C. § 552a; the E-Government Act of 2002, 44 U.S.C. § 3501 note; and the Veterans Benefits, Health Care, and Information Technology Act of 2006, 38 U.S.C. § 5724. Only counts two, five, six, and eight remain, and the court examines each claim in turn.

### Factual Background

On January 22, 2007, an employee of the U.S. Department of Veterans

1

Affairs ("VA") reported an external hard drive containing personally identifiable

information and individually identifiable health information of over 250,000

veterans was missing from the Birmingham, Alabama Medical Center's Research

Enhancement Award Program ("REAP"). VA Office of Inspector General

("OIG") Report, at 7. The IT Specialist responsible for the external hard drive,

"John Doe," used the hard drive to back up data on his computer and other data

from a shared network drive.[1] The hard drive is thought to contain the names,

addresses, social security numbers ("SSN"), dates of birth, phone numbers, and

medical files of hundreds of thousands of veterans and also information on more

than 1.3 million medical providers. VA OIG Report at 7, 9 (doc. 33-2). To date, it

has not been recovered.

John Doe was an IT Specialist working for the Birmingham REAP, a

program that focused on "changing the practices of health care providers to ensure

that they provide the latest evidence-based treatment, and on using VA databases

---

[1]The REAP Director approved the purchase of external hard drives as a means to provide more space to the Medical Center's near-full server. VA OIG Report, at 15. No policy required the protection of sensitive data on removable computer storage devices unless such devices were to be carried outside a VA facility. *Id.* at 16. The REAP Director claimed the Information Security Officer ("ISO") conferred with him in making the decision to purchase the external hard drives, but the ISO claimed he was not involved and did not know of the need for additional server space. The VA OIG concluded no one made a timely request to the ISO for additional space. VA OIG Report, at 15.

2

to link the care of VA patients to more general information on the population as a whole." *Id.* at 3. To reach these goals, the Birmingham REAP collects data on patients and medical providers from multiple sources for dozens of separate research projects." *Id.* The Data Unit of the Birmingham REAP was comprised of the Data Unit Manager, three IT Specialists, and two student program support Assistants. *Id.* at 4. John Doe worked "with national VA databases and design[ed] statistical programs to support Birmingham REAP research projects." *Id.*

The VA OIG identified three projects for which John Doe was conducting research. The first "involved developing a set of performance measures for diabetes management, specifically aimed at intensifying medication to improve glucose levels, cholesterol, and blood pressure"; the second "involved examining the quality of care to patients following myocardial infarction . . ., and attempted to determine whether certain demographic characteristics of the medical providers, such as their age, impacted the care rendered to these patients"; and the third "involved using a patient survey to identify use of over-the-counter medications in patients taking prescription medications and link the information obtained to various VA databases to determine whether patients suffered any adverse effects from the combination of medications." *Id.* at 22, 25, 30. In gathering the information needed to complete these projects, John Doe improperly received

3

access to various databases and stores of information, and various components of the VA improperly released information to John Doe or gave John Doe such access. *Id.* at 22-33. He was therefore able "to accumulate and store vast amounts of individually identifiable health information that was beyond the scope of the projects he was working on. [The OIG] believe[s] much of this information was stored on the missing external hard drive." *Id.* at 22. Accurate reporting of what information was on the external hard drive has been difficult because the hard drive is still missing; John Doe encrypted or deleted multiple files from his computer after reporting the data missing; and John Doe was not initially forthright with criminal investigators. *Id.* at ii.

After John Doe reported the missing hard drive on January 22, 2007, the VA Security Operations Center ("SOC") was immediately notified. *Id.* at 7. The SOC wrote a report and provided it to the VA OIG on January 23, 2007; on that same day, an OIG criminal investigator came to the Birmingham VAMC and conducted an interview. The Federal Bureau of Investigation became involved in the investigation on January 24, 2007. A forensic analysis of John Doe's computer began on January 29, 2007, and on February 1, 2007, the OIG began to analyze what data could have been on the missing hard drive. *Id.* at 8, 9. Press releases dated on February 2 and 10, 2007, discussed the loss of the hard drive and the information it contained.

Subsequent to the reported loss of the Birmingham REAP data but

prior to receiving the results of the OIG analysis of this data on

February 7, 2007, VA senior management concluded that anyone

whose SSN was thought to be contained in any of the missing files,

irrespective of the ability of anyone possessing this data to match an

SSN with a name or any other personal identifier, should be notified

and offered credit protection.  The basis for this decision was a

memorandum issued on November 7, 2006. . . .  The memorandum

states that "in the event of a data loss involving individual and

personal information. . . VA officials have a responsibility to notify

the individual(s) of the loss in a timely manner and to offer these

protection services."

*Id.* at 11.  The VA sent letters to those individuals whose information was thought

to be compromised by the data breach, which gave them the option of one year of

free credit monitoring services.  *Id.* at 12.

   The VA had also requested the Department of Health and Human Services

to perform a risk analysis focusing on the Centers for Medicaid and Medicare

Services ("CMS") data involved in the breach.  *Id.*  The missing external hard

drive contained approximately 1.3 million health care providers' information,

including the SSNs of 664,165 health care providers.  *Id.*  On March 28, 2007, the

CMS Chief Information Officer and Director sent a letter to the VA Assistant

Secretary for Office of Information and Technology  that stated, based on the

CMS's completed independent risk analysis:

> [T]here is a high risk that the loss of personally identifiable
>
> information may result in harm to the individuals concerned.  The
>
> letter requested that "VA immediately take appropriate
>
> countermeasures to mitigate any risk of harm, including notifying
>
> affected individuals in writing and offering free credit monitoring to
>
> individuals whose personal information may have been contained on
>
> the file."

*Id.* From April 17 to May 22, 2007, the VA sent notification letters to the 1.3

million health care providers.  *Id.*  By May 31, 2007, it sent additional letters

offering one year of credit monitoring to the 664,165 health care providers whose

SSNs appeared to be on the hard drive.  VA OIG Report, at 12.

### Analysis

A valid claim under the APA must attack agency action, which is defined as

"includ[ing] the whole or a part of an agency rule, order, license, sanction, relief or

the equivalent or denial thereof, or failure to act."  *Fanin v. U.S. Dep't of*

*Veterans Aff.*, 572 F.3d 868, 877 (11ᵗʰ Cir. 2009) (citing 5 U.S.C. § 551(13)).

> If the claim attacks an agency's action, instead of failure to act, and the statute allegedly violated does not provide a private right of action, then the "agency action" must also be a "final agency action." [5 U.S.C. § 704; *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61-62, 124 S.Ct. 2373, 2379 (2004)]. "To be considered 'final,' an agency's action: (1) must mark the consummation of the agency's decisionmaking process–it must not be of a merely tentative or interlocutory nature; and (2) must be one by which rights or obligations have been determined, or from which legal consequences will flow. *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1280 (11ᵗʰ Cir. 2007)(quoting *Bennett v. Spear*, 520 U.S. 154, 177-78, 117 S.Ct. 1154, 1168 (1997)).

> *Id.* However, if the claim challenges a failure to act, the court may compel "agency action unlawfully withheld or unreasonably delayed. . . only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *Id.* at 877-878 (citing *Norton*, 542 U.S. at 64) (emphasis in original).

Further, the court notes the remaining claims seek only injunctive and

declaratory relief. Such relief may be granted only if the plaintiffs

demonstrate that they are "likely to suffer future injury." *City of Los

Angeles v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 1667 (1983); *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 564, 112 S.Ct. 2130, 2138 (1992)

(citing *Lyons*, 461 U.S. at 102) ("'Past exposure to illegal conduct does not

in itself show a present case or controversy regarding injunctive relief.'");

*Seigel v. LePore*, 234 F.3d 1163, 1176-77 (11th Cir. 2000) (*en banc*) ("As

we have emphasized on many occasions, the asserted irreparable injury

"must be neither remote nor speculative, but actual and imminent.")

(citations omitted). *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985)

(To grant declaratory relief, "there must be a substantial continuing

controversy between parties having adverse legal interests. The plaintiff

must allege facts from which the continuation of the dispute may be

reasonably inferred. Additionally, the continuing controversy . . . must be

real and immediate, and create a definite, rather than speculative threat of

future injury.").

<u>Count Two</u>

The plaintiffs claim that the VA failed "to create and maintain an

accounting of the date, nature, and purpose of its disclosures" pursuant to the

Privacy Act, 5 U.S.C. § 552a(c)(1), when John Doe accessed VA files to complete

8

VA projects.  Joint Status Report ("JSR"), at 8 (doc. 56).  The Privacy Act requires

>    [e]ach agency, with respect to each system of records under its
>
>    control, shall–
>
>    >    (1) except for disclosures made under subsections (b)(1) or
>    >
>    >    (b)(2) of this section, keep an accurate accounting of–
>    >
>    >    >    (A) the date, nature, and purpose of each disclosure of a
>    >    >
>    >    >    record to any person or to another agency made under
>    >    >
>    >    >    subsection (b) of this section; and
>    >    >
>    >    >    (B) the name and address of the person or agency to
>    >    >
>    >    >    whom the disclosure is made. . .

5 U.S.C. § 552a(c)(1).  Under the exception provided in subsection (b)(1),

agencies need not provide an accounting for disclosures made to "officers and

employees of the agency which maintains the record who have a need for the

record in the performance of their duties."  5 U.S.C. § 552a(b)(1).  Accordingly, to

the extent John Doe needed the information that he accessed to perform his duties,

the VA had no obligation to account.

To the extent John Doe had no need for the information contained on the

external hard drive in the performance of his duties, the plaintiffs must show the

disclosure was pursuant to one of the provisions in 5 U.S.C. § 552a(b)(3)-(12).

*See* 5 U.S.C. § 552a(c)(1)(A).  After failing to argue in the JSR that any of those

subsections apply, plaintiffs now claim that the VA's disclosure to John Doe falls

under 5 U.S.C. § 552a(b)(5), which requires accounting when the disclosure is "to

a recipient who has provided the agency with advance adequate written assurance

that the record will be used solely as a statistical research or reporting record, and

the record is to be transferred in a form that is not individually identifiable."

However, the accounting requirement in 5 U.S.C. § 552a(b)(5) is not

triggered by the activity at issue in this case.  An accounting is required only upon

a disclosure to a recipient described in that subsection.  Although "recipient" is not

defined in the Privacy Act, it does not stand to reason that an agency that

maintains records needed by one of its own researchers to fulfill his duties would

be required to provide *itself* with "advance adequate written assurance that the

record will be used solely as a statistical research or reporting record."  Indeed,

pertinent legislative history and Office of Management and Budget ("OMB")

regulations suggest that an accounting was only intended when the disclosures

were to individuals or agencies outside the agency maintaining the record.  *See* S.

Rep. No. 93-1183 (1974) *reprinted in* U.S. Code Congressional and

Administrative News, 6916, 6967 (stating that subsection 201(b)(4) "[r]equires

any federal agency that maintains a personal information system or file to maintain

an accurate accounting of the date, nature, and purpose of nonregular access

10

granted to the system, and each disclosure of personal information made to any

person *outside the agency, or to another agency. . . .*") (emphasis added); H.R. No.

93-1416, 2 (describing the summary and purpose of the Act as "requir[ing]

agencies to keep an accounting of transfers of personal records *to other agencies*

*and outsiders*"); 40 Fed. Reg. 28955 (July 9, 1975) (differentiating between

"agencies disclosing records" and "recipient agencies" in the context of 5 U.S.C. §

552a(b)(5)).

Even if subsection (b)(5) is applicable in this case, the plaintiffs argue only

that John Doe gave an advance adequate written assurance before accessing

information from only one database, the Veterans Integrated Service Network

("VISN") 7 Data Warehouse.  Plaintiff's Response (doc. 64) at 4.  Accordingly,

subsection (b)(5) applies only for John Doe's access to the VISN 7 Data

Warehouse to perform research for "Project 1," which involved diabetes

management research.  *See* VA OIG Report, at 22.  Moreover, the plaintiffs cannot

show that any failure to account for John Doe's access to the VISN 7 Data

Warehouse to research diabetes management is causing  them harm.  Although the

plaintiffs are upset about the loss of their personal information and the prospect of

potential credit fraud in the future, any accompanying harm is attributable to the

loss of the information in the first place, *not* the purported failure to account.[2]

Thus, even assuming *arguendo* that 5 U.S.C. § 552a(b)(5) applies, the plaintiffs

cannot show that the alleged harm is fairly traceable to the VA's conduct, a

deficiency fatal to their claim. *See Allen v. Wright*, 468 U.S. 737, 753 & n.19, 104

S.Ct. 3315, 3325 & n.19 (1984) (plaintiffs do not have standing where they failed

to allege injuries that are caused by the defendants).

Because of these sufficient and independent reasons, the plaintiffs have not

shown that the VA failed to take discrete agency action that it was required to

take. Accordingly, the court finds that the plaintiffs have failed to state a claim

upon which relief can be granted, and Count Two is due to be **DISMISSED**.

---

[2] The plaintiffs urge, "The Veterans have a right to know what information
[was on the hard drive]. They deserve to know the 'purpose' for which John Doe
was using the information," Plaintiff's Response, at 8 (doc. 64). However, the VA
OIG report details, to the extent determinable, the information on the hard drive
and the purpose for which John Doe was accessing the information. The VA OIG
Report states that the hard drive is believed to contain "personally identifiable
information and/or individually identifiable health information for over 250,000
veterans, and information obtained from the [CMS], on over 1.3 million medical
providers." VA OIG Report, at i. Moreover, it was difficult for the VA to make
such a determination, as John Doe was not candid when he was interviewed; he
deleted or encrypted files from his computer after the hard drive went missing; and
he tried to hide the extent, magnitude, and impact of the missing data. *Id.* at ii.
Lastly, the plaintiffs know that the purpose John Doe was accessing the VISN 7
Data Warehouse was related to his research for "Project 1," *id.* at 22-23, which
"involved developing a set of performance measures for diabetes management,
specifically aimed at intensifying medication to improve glucose levels,
cholesterol, and blood pressure," VA OIG Report, at 22.

<u>Count Five</u>

Count Five involves the VA's alleged failure to establish appropriate safeguards in violation of the Privacy Act, 5 U.S.C. § 552a(e)(10). The plaintiffs have failed to argue that the alleged conduct of the VA constituted a failure of discrete agency action that the VA was required to take, but request that Count Five "move forward as detailed in the Plaintiffs' Statement in the Joint Report." Plaintiff's Brief, at 13 (doc. 64). In the Joint Status Report, the plaintiffs devote just over one page to briefing this issue and cite 5 U.S.C. § 552a(e)(10),[3] arguing that the VA failed to enforce this subsection in the numerous ways listed in their complaint.[4] Joint Status Report ("JSR"), at 10-11 (doc. 56). The plaintiffs then

---

[3]5 U.S.C. § 552a(e)(10) requires the VA to "establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained."

[4]Plaintiffs cite specifically to paragraph 80 of the Second Amended Complaint (doc. 21), which states:

Among other things, Defendants' failures include operating a computer system or database from which an employee, including John Doe, can download or copy information, like the Personal Information and the Medical Information, onto the VA External Hard Drive without proper encryption and when not necessary to perform his or her duties; failing to conduct a data access inventory for John Doe and other VA employees and contractors with access to the VA's office at the Pickwick Conference Center; failing to provide software that would require or enable encryption of data downloaded or copied

ask the court for an injunction forcing full implementation and compliance "with
Handbook 6500 and other procedures and policies put in place in Birmingham by
the VA in response to this incident, to conduct an independent audit of its
compliance, and to file that audit with the court." Plaintiff's Response, at 14 (doc.
64) (footnotes added). Such an injunction is untenable.

Handbook 6500 is a seventy-one page (seven appendices excluded)
document that details the responsibilities of almost two dozen information security
personnel and dozens of policies and procedures. As pointed out by the defense,
policies explained in the Handbook include maintaining the temperature in the
building and proper use of the facsimile machines. In addition, the "other
procedures and policies" put in place at the Birmingham facility are also

---

> to mobile hard drives and devices, like the VA External Hard Drive
> from VA computers and databases at the VA offices and facilities in
> the Birmingham, Alabama area; failing to secure the VA External
> Hard Drive under lock and key when not in the immediate vicinity of
> John Doe; failing to house and protect the VA External Hard Drive to
> reduce the opportunities for unauthorized access, use, or removal;
> failing to provide intrusion detection systems at the VA office at the
> Pickwick Conference Center; failing to store the VA External Hard
> Drive in a secure area that requires proper escorting for access; failing
> to require and conduct appropriate background checks on all VA
> employees and contractors with access to the VA Office in the
> Pickwick Conference Center; and failing to protect against the
> alienation and relinquishment of control over the VA External Hard
> Drive, causing the Personal Information and Medical Information to
> be exposed to unidentified third parties.

Second Amended Complaint (doc. 21), ¶ 80.

14

numerous. *See e.g.*, VA Directive 6504 (doc. 61-3) (governing the transmission,

transportation and use of, and access to, VA data outside VA facilities); VA

Handbook 6500, at 7 (doc. 61-4) (a seventy-one page document "establish[ing] the

foundation for VA's comprehensive information security program and its practices

that will protect the confidentiality, integrity, and availability of information");

Medical Center Memo 00-ISO-02 (doc. 61-5) ("assign[ing] responsibility and

establish[ing] procedures for managing computer files at the Birmingham VA

Medical Center"); Medical Center Memo 00-ISO-05 (doc. 61-6) (requiring VA

employees at the Medical Center to get permission before use of removable

storage media, especially Universal Serial Bus ("USB") devices, and requiring

written permission for the removal of sensitive information from VA facilities);

Information Security Program VISN 7 AIS Operational Security Policy (doc. 61-9)

(establishing procedures to implement a "structured program to safeguard all IT

assets"); Memorandum 10N7-077 of VISN 7 VA Southeast Network (doc. 61-10)

(stating "It is the policy of VISN 7 that no sensitive information ([personal health

information or personal identifiable information]) will be stored on the storage

media of any device without encryption or where the device is not *physically*

*secured* to prevent accidental loss of sensitive information in the event of theft")

(emphasis in original).

    Cases that suggest a broad injunction enforcing all of these policies is

appropriate are "relic[s] of a time when the federal judiciary thought that structural

injunctions taking control of executive functions were sensible.  That time has

past." *Rahman v. Chertoff*, 530 F.3d 622, 626 (7th Cir. 2008).  "The limitation to

discrete agency action precludes the kind of broad programmatic attack [the

Supreme Court] rejected in *Lujan v. National Wildlife Federation*, 497 U.S. 871,

110 S.Ct 3177, 111 L.Ed.2d 695 (1990)."  *Norton v. S. Utah Wilderness Alliance*,

542 U.S. 55, 64, 124 S.Ct. 2373, 2379-2380 (2004); *see Lujan*, 497 U.S. at 891

When presented with similar circumstances in *Lujan*, the Supreme Court

responded:

> Respondent alleges that violation of the law is rampant within this
>
> program-failure to revise land plans in proper fashion, failure to
>
> submit certain recommendations to Congress, failure to consider
>
> multiple use, inordinate focus upon mineral exploitation, failure to
>
> provide required public notice, failure to provide adequate
>
> environmental impact statements. Perhaps so. But respondent cannot
>
> seek *wholesale* improvement of this program by court decree, rather
>
> than in the office of the Department or the halls of Congress, where
>
> programmatic improvements are normally made.

*Lujan*, 497 U.S. at 891.  Courts are not empowered to compel "compliance with

16

broad statutory mandates," *Norton*, 542 U.S. at 66-67, nor can they engage in general review of an agency's day-to-day operations to ensure such compliance. *Id.*; *Lujan*, 497 U.S. at 899.

Even if this court could pass on such a generalized challenge, the court is convinced that Count Five is moot.

"'[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' " *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (quoting *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). The underlying concern is that, when the challenged conduct ceases such that " 'there is no reasonable expectation that the wrong will be repeated,' " *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), then it becomes impossible for the court to grant " 'any effectual relief whatever' to [the] prevailing party," *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895)).

*City of Erie v. Pap's A.M.*, 529 U.S. 277, 287, 120 S.Ct. 1382, 1390 (2000).

Because the evidence submitted to the court shows that new security procedures and policies have been implemented and the deficiencies revealed in the VA OIG Report have been remedied, there is no "live" issue for which this court can grant effectual relief.

### Count Six

In Count Six, the plaintiffs claim that the VA failed to perform a privacy impact assessment ("PIA") pursuant to the E-Government Act of 2002 when it procured the external hard drives.  Pursuant to the E-Government Act, agencies must perform a PIA before "developing or procuring information technology that collects, maintains, or disseminates information that is in an identifiable form." 44 U.S.C. § 3501 note (E-Government Act of 2002, § 208(b)(1)(A)).  The definition of "information technology" includes "any equipment or interconnected system . . . used in the automatic acquisition, storage, analysis, evaluation, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information by the executive agency, if the equipment is used by the executive agency directly . . . ."  40 U.S.C. § 11101(6); *see* 44 U.S.C. § 3501 note, § 201 (applying definitions from 44 U.S.C. §§ 3502, 3601); 44 US.C. § 3502(9) (applying the definition of 40 U.S.C. § 11101(6)).  The disputed issue is whether the purchase of the external hard drives triggered the duty to perform a PIA.

18

The plaintiffs claim that the inclusion of "any equipment" in the definition of information technology brings the hard drives within the meaning of the term, thereby requiring the PIA. However, such an interpretation is implausible, as it would require government agencies that maintain personal information on individuals to conduct or update a PIA each time it purchases any computer, monitor, router, telephone, calculator, or other piece of equipment involved in a system that stores, analyzes, or manages the data. Rather, the purchase of several external hard drives, seems to be a "minor change[] to a system or collection that do[es] not create new privacy risks," and therefore does not require a PIA. *See* M-03-22, Attachment A 2.B.3.g., Office and Management and Budget ("OMB") Guidance Implementing the Privacy Provisions of the E-Government Act of 2002, at Section II.B.3.f (doc. 61-15) (hereinafter "M-03-22").

Lending support to this interpretation is the fact that PIAs are required to address (1) what information is collected and why, (2) the agency's intended use of the information, (3) with whom the information would be shared, (4) what opportunities the veterans would have to decline to provide information or to decline to share the information, (5) how the information would be secured, and (6) whether a system of records is being created. *See* 44 U.S.C. § 3501 note (E-Government Act of 2002, § 208(b)(2)(B)); M-03-22, at Section II.C.1.a. These types of inquiries are certainly appropriate and required when the VA initially

19

created the Birmingham VAMC system and began collecting data, but not where already collected and stored data is simply being transferred from a server to an external hard drive.  The factors above are not relevant for such a transfer and a new PIA would not be informative of what information is being collected, the intended use of the information, or with whom the information would be shared. Under such circumstances, Congress surely did not intend a PIA to be performed.

To the extent the plaintiffs argue that security procedures were not followed or hardware security protocols were breached at the VA facility in Birmingham when the external hard drive went missing, such claims are not actionable under the E-Government Act of 2002.  Rather, those arguments should have been pursued pursuant to the Federal Information Security Management Act (FISMA), 44 U.S.C. §§ 3541 *et seq*., a claim that the plaintiffs waived after not pursuing it on appeal. *Fanin v. U.S. Dep't of Veterans Affairs*, 572 F.3d 868, 876 n.1.

<u>Count 8</u>

The final count  before the court involves the VA's alleged failure to perform an independent risk analysis ("IRA") to determine the risk presented by the loss of the hard drive pursuant to the Veterans Benefits, Health Care, and Information Technology Act of 2006 (VBHCITA), 38 U.S.C. § 5724(a)(1).  The plaintiffs also claim that the VA acted unreasonably by providing only one year of credit monitoring services.

The VBHCITA[5] provides:

In the event of a data breach with respect to sensitive personal

information that is processed or maintained by the Secretary, the

Secretary shall ensure that, as soon as possible after the data breach, a

non-Department entity or the Office of Inspector General of the

Department conducts an independent risk analysis of the data breach

to determine the level of risk associated with the data breach for the

potential misuse of any sensitive personal information involved in the

data breach.


38 U.S.C. § 5724(a)(1).

After John Doe reported the missing hard drive on January 22, 2007, the VA

launched an immediate investigation that culminated in the decision to offer one

year of free credit monitoring services for 198,760 living individuals whose

information was contained on the hard drive.  VA OIG Report, at 12.  The VA

made this decision *before* the completion of the IRA conducted by the Centers for

Medicaid & Medicare Services ("CMS").  On February 7, 2007, VA senior

---

[5]The VBHCITA became effective December 22, 2006.  The data breach
incident at issue occurred on January 22, 2007.  The VA passed regulations that
became effective June 22, 2007, six months after the passage of the VBHCITA
and five months after the loss of the external hard drive.

management decided that anyone whose SSN was on the hard drive should be

notified and offered credit protection. *Id.* at 11.  Approximately one and one-half

months later, on March 28, 2007, the CMS Chief Information Officer and Director

stated that based on the IRA, "There is a high risk that the loss of personally

identifiable information may result in harm to the individuals concerned." *Id.* at

12.  He recommended that the "VA immediately take appropriate countermeasures

to mitigate any risk of harm, including notifying affected individuals in writing

and offering free credit monitoring to individuals whose personal information may

have been contained on the file." *Id.*  Notification letters were sent out to the

health care providers by May 31, 2007. *Id.*

Thus, the VA proactively assumed that the veterans were at risk and

provided the remedy provided in the statute[6] *before* it had confirmation from the

IRA that such a remedy was appropriate under the circumstances.  By presuming a

reasonable risk of harm from the disclosure of personally identifiable information

and providing credit protection services required when an IRA reveals a

"reasonable risk" of harm, *see* 38 U.S.C. § 5724(a)(2), the VA has provided the

---

[6]In addition, VA regulations limit credit monitoring awarded to those who
are subject to a reasonable risk for misuse of sensitive personal information to one
year.  38 C.F.R. § 75.118(a).

plaintiffs with any relief they are due.[7]  Indeed, the IRA conducted by CMS affirmed the propriety of the relief offered by the VA.

Despite having been given such relief, the plaintiffs insist the IRA was insufficient and urge an additional IRA focusing on the veterans must be completed.  However, the statute does not require an *individual* risk analysis as the plaintiffs state in their JSR, *See* JSR, at 12-13, 15, only an *independent* risk analysis.[8]  The VA OIG Report contains multiple groups of individuals whose private information was compromised: veterans, VA OIG Report, at 7;  physicians, *id.* at 10; deceased physicians, *id.*; other health care providers, *id.*; non-veteran, non-VA employees, *id.* at 24; and VA employees, *id.*  Furthermore, some veterans were only identified by their SSNs; others were identified by SSNs and dates of birth; others by their name, SSN, and medical information; and others identified

---

[7] The plaintiffs offer a General Accountability Office report that states that a May 5, 2006, incident involving a missing tape with sensitive information of thousands of individuals on it warranted "credit protection and data breach analysis for 2 years." JSR, at 14.  As the plaintiffs explain, however, only one year of credit protection was offered, while two years of breach analysis was given.  Declaration of Michael Hogan ("Hogan Decl."), ¶¶ 2 (doc. 61-19) and Attachment A (doc. 61-20).

[8] The plaintiffs' argument that the CMS was an inappropriate entity to perform the IRA has no merit, as the statute requires either the VA OIG or a non-Department [of Veterans Affairs] entity to conduct the IRA.  38 U.S.C. § 5724(a)(1).  The CMS is under the purview of the Department of Health and Human Services.

23

by various combinations of seven fields of identifying information. *Id.* at 9.  The health care providers are identified on the hard drive by different combinations of forty-eight different fields of data. *Id.* at 10.  All of this information was on a single external hard drive lost during a single data breach.  The statute only requires an "independent risk analysis of the data breach," not multiple IRAs for each group of individuals whose information was compromised. *See* 38 U.S.C. § 5724(a)(1).

Because the plaintiffs were awarded appropriate relief and because the VA conducted an adequate IRA of the data breach, the court finds that the VA did not fail to take agency action it was required to take with respect to count eight.

**Conclusion**

Having considered the foregoing and being of the opinion that the plaintiffs have failed to properly state any claims challenging final agency action under the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.*, the court finds that Counts Two, Five, Six, and Eight shall be **DISMISSED**.  The court shall so rule by separate order.

**DONE** and **ORDERED**, this the 21st day of April 2010.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

# Exhibit 5

This is historical material, "frozen in time" and not current OMB guidance.
The web site is no longer updated and links to external web sites and some internal pages will not work.




# OFFICE OF MANAGEMENT AND BUDGET

September 26, 2003

M-03-22

MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:   Joshua B. Bolten
        DirectoR

SUBJECT:   OMB Guidance for Implementing the Privacy Provisions of the E-
           Government Act of 2002

The attached guidance provides information to agencies on implementing the privacy provisions of the E-Government Act of 2002, which was signed by the President on December 17, 2002 and became effective on April 17, 2003.

The Administration is committed to protecting the privacy of the American people. This guidance document addresses privacy protections when Americans interact with their government. The guidance directs agencies to conduct reviews of how information about individuals is handled within their agency when they use information technology (IT) to collect new information, or when agencies develop or buy new IT systems to handle collections of personally identifiable information. Agencies are also directed to describe how the government handles information that individuals provide electronically, so that the American public has assurances that personal information is protected.

The privacy objective of the E-Government Act complements the National Strategy to Secure Cyberspace. As the National Strategy indicates, cyberspace security programs that strengthen protections for privacy and other civil liberties, together with strong privacy policies and practices in the federal agencies, will ensure that information is handled in a manner that maximizes both privacy and security.

**Background**

Section 208 of the E-Government Act of 2002 (Public Law 107-347, 44 U.S.C. Ch 36) requires that OMB issue guidance to agencies on implementing the privacy provisions of the E-Government Act (see Attachment A). The text of section 208 is provided as Attachment B to this Memorandum. Attachment C provides a general outline of regulatory requirements pursuant to the Children's Online Privacy Protection Act ("COPPA"). Attachment D summarizes the modifications to existing guidance resulting from this Memorandum. A complete list of OMB privacy guidance currently in effect is available at OMB's website.

As OMB has previously communicated to agencies, for purposes of their FY2005 IT budget requests, agencies should submit all required Privacy Impact Assessments no later than October 3, 2003.

For any questions about this guidance, contact Eva Kleederman, Policy Analyst, Information Policy and Technology Branch, Office of Management and Budget, phone (202) 395-3647, fax (202) 395-5167, e-mail Eva_Kleederman@omb.eop.gov.

Attachments

> Attachment A
> Attachment B
> Attachment C
> Attachment D

## Attachment A

### E-Government Act Section 208 Implementation Guidance

## I. General

A. ***Requirements.*** Agencies are required to:
1. conduct privacy impact assessments for electronic information systems and collections and, in general, make them publicly available (see Section II of this Guidance),
2. post privacy policies on agency websites used by the public (see Section III),
3. translate privacy policies into a standardized machine-readable format (see Section IV), and
4. report annually to OMB on compliance with section 208 of the E-Government Act of 2002 (see Section VII).

B. ***Application.*** This guidance applies to:

1. all executive branch departments and agencies ("agencies") and their contractors that use information technology or that operate websites for purposes of interacting with the public;
2. relevant cross-agency initiatives, including those that further electronic government.

C.

***Modifications to Current Guidance.*** Where indicated, this Memorandum modifies the following three memoranda, which are replaced by this guidance (see summary of modifications at Attachment D):

1. Memorandum 99-05 (January 7, 1999), directing agencies to examine their procedures for ensuring the privacy of personal information in federal records and to designate a senior official to assume primary responsibility for privacy policy;
2. Memorandum 99-18 (June 2, 1999), concerning posting privacy policies on major entry points to government web sites as well as on any web page collecting substantial personal information from the public; and
3. Memorandum 00-13 (June 22, 2000), concerning (i) the use of tracking technologies such as persistent cookies and (ii) parental consent consistent with the Children's Online Privacy Protection Act ("COPPA").

## II. Privacy Impact Assessment

A. ***Definitions.***

1. *Individual* - means a citizen of the United States or an alien lawfully admitted for permanent residence.[1]
2. *Information in identifiable form*- is information in an IT system or online collection: (i) that directly identifies an individual (e.g., name, address, social security number or other identifying number or code, telephone number, email address, etc.) or (ii) by which an agency intends to identify specific individuals in conjunction with other data elements, i.e., indirect identification. (These data elements may include a combination of gender, race, birth date, geographic indicator, and other descriptors).[2]
3. *Information technology (IT)* - means, as defined in the Clinger-Cohen Act[3], any equipment, software or interconnected system or subsystem that is used in the automatic acquisition, storage, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information.
4. *Major information system* - embraces "large" and "sensitive" information systems and means, as defined in OMB Circular A-130 (Section 6.u.) and annually in OMB Circular A-11 (section 300-4 (2003)), a system or project that requires special management attention because of its: (i) importance to the agency mission, (ii) high development, operating and maintenance costs, (iii) high risk, (iv) high return, (v) significant role in the administration of an agency's programs, finances, property or other resources.
5. *National Security Systems* - means, as defined in the Clinger-Cohen Act[4], an information system operated by the federal government, the function, operation or use of which involves: (a) intelligence activities, (b) cryptologic activities related to national security, (c) command and control of military forces, (d) equipment that is an integral part of a weapon or weapons systems, or (e) systems critical to the direct fulfillment of military or intelligence missions, but does not include systems used for routine administrative and business applications, such as payroll, finance, logistics and personnel management.
6. *Privacy Impact Assessment (PIA)*- is an analysis of how information is handled: (i) to ensure handling conforms to applicable legal, regulatory, and policy requirements regarding privacy, (ii) to determine the risks and effects of collecting, maintaining and disseminating information in identifiable form in an electronic information system, and (iii) to examine and evaluate protections and alternative processes for handling information to mitigate potential privacy risks.
7. *Privacy policy in standardized machine-readable format*- means a statement about site privacy

practices written in a standard computer language (not English text) that can be read automatically by a web browser.

B. **When to conduct a PIA:**[5]

1. *The E-Government Act requires agencies to conduct a PIA before:*
   a. developing or procuring IT systems or projects that collect, maintain or disseminate information in identifiable form from or about members of the public, or
   b. initiating, consistent with the Paperwork Reduction Act, a new electronic collection of information in identifiable form for 10 or more persons (excluding agencies, instrumentalities or employees of the federal government).

2. *In general, PIAs are required to be performed and updated as necessary where a system change creates new privacy risks. For example:*
   a. Conversions - when converting paper-based records to electronic systems;
   b. Anonymous to Non-Anonymous - when functions applied to an existing information collection change anonymous information into information in identifiable form;
   c. Significant System Management Changes - when new uses of an existing IT system, including application of new technologies, significantly change how information in identifiable form is managed in the system:
      ▪ For example, when an agency employs new relational database technologies or web-based processing to access multiple data stores; such additions could create a more open environment and avenues for exposure of data that previously did not exist.
   d. Significant Merging - when agencies adopt or alter business processes so that government databases holding information in identifiable form are merged, centralized, matched with other databases or otherwise significantly manipulated:
      ▪ For example, when databases are merged to create one central source of information; such a link may aggregate data in ways that create privacy concerns not previously at issue.
   e. New Public Access - when user-authenticating technology (e.g., password, digital certificate, biometric) is newly applied to an electronic information system accessed by members of the public;
   f. Commercial Sources - when agencies systematically incorporate into existing information systems databases of information in identifiable form purchased or obtained from commercial or public sources. (Merely querying such a source on an ad hoc basis using existing technology does not trigger the PIA requirement);
   g. New Interagency Uses - when agencies work together on shared functions involving significant new uses or exchanges of information in identifiable form, such as the cross-cutting E-Government initiatives; in such cases, the lead agency should prepare the PIA;
      ▪ For example the Department of Health and Human Services, the lead agency for the Administration's Public Health Line of Business (LOB) Initiative, is spearheading work with several agencies to define requirements for integration of processes and accompanying information exchanges. HHS would thus prepare the PIA to ensure that all privacy issues are effectively managed throughout the development of this cross agency IT investment.
   h. Internal Flow or Collection - when alteration of a business process results in significant new uses or disclosures of information or incorporation into the system of additional items of information in identifiable form:
      ▪ For example, agencies that participate in E-Gov initiatives could see major changes in how they conduct business internally or collect information, as a result of new business processes or E-Gov requirements. In most cases the focus will be on integration of common processes and supporting data. Any business change that results in substantial new requirements for information in identifiable form could warrant examination of privacy issues.
   i. Alteration in Character of Data - when new information in identifiable form added to a collection raises the risks to personal privacy (for example, the addition of health or financial information)

3. *No PIA is required where information relates to internal government operations, has been previously assessed under an evaluation similar to a PIA, or where privacy issues are unchanged, as in the following circumstances:*
   a. for government-run websites, IT systems or collections of information to the extent that they do not collect or maintain information in identifiable form about members of the general public (this includes government personnel and government contractors and consultants);[6]
   b. for government-run public websites where the user is given the option of contacting the site operator for the limited purposes of providing feedback (e.g., questions or comments) or

obtaining additional information;
   c. for national security systems defined at 40 U.S.C. 11103 as exempt from the definition of information technology (see section 202(i) of the E-Government Act);
   d. when all elements of a PIA are addressed in a matching agreement governed by the computer matching provisions of the Privacy Act (see 5 U.S.C. §§ 552a(8-10), (e)(12), (o), (p), (q), (r), (u)), which specifically provide privacy protection for matched information;
   e. when all elements of a PIA are addressed in an interagency agreement permitting the merging of data for strictly statistical purposes and where the resulting data are protected from improper disclosure and use under Title V of the E-Government Act of 2002;
   f. if agencies are developing IT systems or collecting non-identifiable information for a discrete purpose, not involving matching with or retrieval from other databases that generates information in identifiable form;
   g. for minor changes to a system or collection that do not create new privacy risks.

  4. *Update of PIAs:* Agencies must update their PIAs to reflect changed information collection authorities, business processes or other factors affecting the collection and handling of information in identifiable form.

## C. *Conducting a PIA.*

  1. *Content.*
    a. PIAs must analyze and describe:
      i. what information is to be collected (e.g., nature and source);
      ii. why the information is being collected (e.g., to determine eligibility);
      iii. intended use of the information (e.g., to verify existing data);
      iv. with whom the information will be shared (e.g., another agency for a specified programmatic purpose);
      v. what opportunities individuals have to decline to provide information (i.e., where providing information is voluntary) or to consent to particular uses of the information (other than required or authorized uses), and how individuals can grant consent;
      vi. how the information will be secured (e.g., administrative and technological controls[7]); and
      vii. whether a system of records is being created under the Privacy Act, 5 U.S.C. 552a.
    b. Analysis: PIAs must identify what choices the agency made regarding an IT system or collection of information as a result of performing the PIA.
  2. Agencies should commence a PIA when they begin to develop a new or significantly modified IT system or information collection:
    a. *Specificity.* The depth and content of the PIA should be appropriate for the nature of the information to be collected and the size and complexity of the IT system.
      i. *IT development stage.* PIAs conducted at this stage:
        1. should address privacy in the documentation related to systems development, including, as warranted and appropriate, statement of need, functional requirements analysis, alternatives analysis, feasibility analysis, benefits/cost analysis, and, especially, initial risk assessment;
        2. should address the impact the system will have on an individual's privacy, specifically identifying and evaluating potential threats relating to each of the elements identified in section II.C.1.a.(i)-(vii) above, to the extent these elements are known at the initial stages of development;
        3. may need to be updated before deploying the system to consider elements not identified at the concept stage (e.g., retention or disposal of information), to reflect a new information collection, or to address choices made in designing the system or information collection as a result of the analysis.
      ii. *Major information systems.* PIAs conducted for these systems should reflect more extensive analyses of:
        1. the consequences of collection and flow of information,
        2. the alternatives to collection and handling as designed,
        3. the appropriate measures to mitigate risks identified for each alternative and,
        4. the rationale for the final design choice or business process.
      iii. *Routine database systems.* Agencies may use a standardized approach (e.g., checklist or template) for PIAs involving simple systems containing routine information and involving limited use and access.
    b. *Information life cycle analysis/collaboration.* Agencies must consider the information "life cycle" (i.e., collection, use, retention, processing, disclosure and destruction) in evaluating how information handling practices at each stage may affect individuals' privacy. To be

comprehensive and meaningful, privacy impact assessments require collaboration by program experts as well as experts in the areas of information technology, IT security, records management and privacy.

    3. *Review and publication.*

        a. a. Agencies must ensure that:

            i. the PIA document and, if prepared, summary are approved by a "reviewing official" (the agency CIO or other agency head designee, who is other than the official procuring the system or the official who conducts the PIA);

            ii. for each covered IT system for which 2005 funding is requested, and consistent with previous guidance from OMB, the PIA is submitted to the Director of OMB no later than October 3, 2003 (submitted electronically to PIA@omb.eop.gov along with the IT investment's unique identifier as described in OMB Circular A-11, instructions for the Exhibit 300[8]); and

            iii. the PIA document and, if prepared, summary, are made publicly available (consistent with executive branch policy on the release of information about systems for which funding is proposed).

                1. Agencies may determine to not make the PIA document or summary publicly available to the extent that publication would raise security concerns, reveal classified (i.e., national security) information or sensitive information (e.g., potentially damaging to a national interest, law enforcement effort or competitive business interest) contained in an assessment[9]. Such information shall be protected and handled consistent with the Freedom of Information Act (FOIA).

                2. Agencies should not include information in identifiable form in their privacy impact assessments, as there is no need for the PIA to include such information. Thus, agencies may not seek to avoid making the PIA publicly available on these grounds.

D. *Relationship to requirements under the Paperwork Reduction Act (PRA)*[10].

    1. Joint Information Collection Request (ICR) and PIA. Agencies undertaking new electronic information collections may conduct and submit the PIA to OMB, and make it publicly available, as part of the SF83 Supporting Statement (the request to OMB to approve a new agency information collection).

    2. If Agencies submit a Joint ICR and PIA:

        a. All elements of the PIA must be addressed and identifiable within the structure of the Supporting Statement to the ICR, including:

            i. a description of the information to be collected in the response to Item 1 of the Supporting Statement[11];

            ii. a description of how the information will be shared and for what purpose in Item 2 of the Supporting Statement[12];

            iii. a statement detailing the impact the proposed collection will have on privacy in Item 2 of the Supporting Statement[13];

            iv. a discussion in item 10 of the Supporting Statement of:

                1. whether individuals are informed that providing the information is mandatory or voluntary

                2. opportunities to consent, if any, to sharing and submission of information;

                3. how the information will be secured; and

                4. whether a system of records is being created under the Privacy Act)[14].

        b. For additional information on the requirements of an ICR, please consult your agency's organization responsible for PRA compliance.

    3. Agencies need not conduct a new PIA for simple renewal requests for information collections under the PRA. As determined by reference to section II.B.2. above, agencies must separately consider the need for a PIA when amending an ICR to collect information that is significantly different in character from the original collection.

E. *Relationship to requirements under the Privacy Act of 1974, 5 U.S. C. 552a.*

    1. Agencies may choose to conduct a PIA when developing the System of Records (SOR) notice required by subsection (e)(4) of the Privacy Act, in that the PIA and SOR overlap in content (e.g., the categories of records in the system, the uses of the records, the policies and practices for handling, etc.).

    2. Agencies, in addition, may make the PIA publicly available in the Federal Register along with the Privacy Act SOR notice.

3. Agencies must separately consider the need for a PIA when issuing a change to a SOR notice (e.g., a change in the type or category of record added to the system may warrant a PIA).

## III. Privacy Policies on Agency Websites

A. *Privacy Policy Clarification.* To promote clarity to the public, agencies are required to refer to their general web site notices explaining agency information handling practices as the "Privacy Policy."

B. *Effective Date.* Agencies are expected to implement the following changes to their websites by December 15, 2003.

C. *Exclusions:* For purposes of web privacy policies, this guidance does not apply to:
1. information other than "government information" as defined in OMB Circular A-130;
2. agency intranet web sites that are accessible only by authorized government users (employees, contractors, consultants, fellows, grantees);
3. national security systems defined at 40 U.S.C. 11103 as exempt from the definition of information technology (see section 202(i) of the E-government Act).

D. *Content of Privacy Policies.*
1. Agency Privacy Policies must comply with guidance issued in OMB Memorandum 99-18 and must now also include the following two new content areas:
    a. *Consent to collection and sharing*[15]. Agencies must now ensure that privacy policies:
        i. inform visitors whenever providing requested information is voluntary;
        ii. inform visitors how to grant consent for use of voluntarily-provided information; and
        iii. inform visitors how to grant consent to use mandatorily-provided information for other than statutorily-mandated uses or authorized routine uses under the Privacy Act.
    b. *Rights under the Privacy Act or other privacy laws*[16]. Agencies must now also notify web-site visitors of their rights under the Privacy Act or other privacy-protecting laws that may primarily apply to specific agencies (such as the Health Insurance Portability and Accountability Act of 1996, the IRS Restructuring and Reform Act of 1998, or the Family Education Rights and Privacy Act):
        i. in the body of the web privacy policy;
        ii. via link to the applicable agency regulation (e.g., Privacy Act regulation and pertinent system notice); or
        iii. via link to other official summary of statutory rights (such as the summary of Privacy Act rights in the FOIA/Privacy Act Reference Materials posted by the Federal Consumer Information Center at www.Firstgov.gov).
2. Agency Privacy Policies must continue to address the following, modified, requirements:
    a. Nature, purpose, use and sharing of information collected . Agencies should follow existing policies (issued in OMB Memorandum 99-18) concerning notice of the nature, purpose, use and sharing of information collected via the Internet, as modified below:
        i. *Privacy Act information.* When agencies collect information subject to the Privacy Act, agencies are directed to explain what portion of the information is maintained and retrieved by name or personal identifier in a Privacy Act system of records and provide a Privacy Act Statement either:
            1. at the point of collection, or
            2. via link to the agency's general Privacy Policy[18].
        ii. *"Privacy Act Statements."* Privacy Act Statements must notify users of the authority for and purpose and use of the collection of information subject to the Privacy Act, whether providing the information is mandatory or voluntary, and the effects of not providing all or any part of the requested information.
        iii. *Automatically Collected Information (site management data).* Agency Privacy Policies must specify what information the agency collects automatically (i.e., user's IP address, location, and time of visit) and identify the use for which it is collected (i.e., site management or security purposes).
        iv. *Interaction with children:* Agencies that provide content to children under 13 and that collect personally identifiable information from these visitors should incorporate the requirements of the Children's Online Privacy Protection Act ("COPPA") into their Privacy Policies (see Attachment C)[19].
        v. *Tracking and customization activities.* Agencies are directed to adhere to the following modifications to OMB Memorandum 00-13 and the OMB follow-up guidance letter dated September 5, 2000:
            1. *Tracking technology prohibitions:*

a. agencies are prohibited from using persistent cookies or any other means (e.g., web beacons) to track visitors' activity on the Internet except as provided in subsection (b) below;

b. agency heads may approve, or may authorize the heads of sub-agencies or senior official(s) reporting directly to the agency head to approve, the use of persistent tracking technology for a compelling need. When used, agency's must post clear notice in the agency's privacy policy of:
   - the nature of the information collected;
   - the purpose and use for the information;
   - whether and to whom the information will be disclosed; and
   - the privacy safeguards applied to the information collected.

c. agencies must report the use of persistent tracking technologies as authorized for use by subsection b. above (see section VII)[20].

2. *The following technologies are not prohibited:*

a. Technology that is used to facilitate a visitor's activity within a single session (e.g., a "session cookie") and does not persist over time is not subject to the prohibition on the use of tracking technology.

b. Customization technology (to customize a website at the visitor's request) if approved by the agency head or designee for use (see v.1.b above) and where the following is posted in the Agency's Privacy Policy:
   - the purpose of the tracking (i.e., customization of the site);
   - that accepting the customizing feature is voluntary;
   - that declining the feature still permits the individual to use the site; and
   - the privacy safeguards in place for handling the information collected.

c. Agency use of password access to information that does not involve "persistent cookies" or similar technology.

vi. *Law enforcement and homeland security sharing:* Consistent with current practice, Internet privacy policies may reflect that collected information may be shared and protected as necessary for authorized law enforcement, homeland security and national security activities.

b. *Security of the information*[21]. Agencies should continue to comply with existing requirements for computer security in administering their websites[22] and post the following information in their Privacy Policy:

i. in clear language, information about management, operational and technical controls ensuring the security and confidentiality of personally identifiable records (e.g., access controls, data storage procedures, periodic testing of safeguards, etc.), and

ii. in general terms, information about any additional safeguards used to identify and prevent unauthorized attempts to access or cause harm to information and systems. (The statement should be at a level to inform the public that their information is being protected while not compromising security.)

E. *Placement of notices.* Agencies should continue to follow the policy identified in OMB Memorandum 99-18 regarding the posting of privacy policies on their websites. Specifically, agencies must post (or link to) privacy policies at:
   1. their principal web site;
   2. any known, major entry points to their sites;
   3. any web page that collects substantial information in identifiable form.

F. **Clarity of notices.** Consistent with OMB Memorandum 99-18, privacy policies must be:
   1. clearly labeled and easily accessed;
   2. written in plain language; and
   3. made clear and easy to understand, whether by integrating all information and statements into a single posting, by layering a short "highlights" notice linked to full explanation, or by other means the agency determines is effective.

## IV. Privacy Policies in Machine-Readable Formats

A. **Actions.**
   1. Agencies must adopt machine readable technology that alerts users automatically about whether site privacy practices match their personal privacy preferences. Such technology enables users to make

an informed choice about whether to conduct business with that site.

2. OMB encourages agencies to adopt other privacy protective tools that become available as the technology advances.

B. **Reporting Requirement.** Agencies must develop a timetable for translating their privacy policies into a standardized machine-readable format. The timetable must include achievable milestones that show the agency's progress toward implementation over the next year. Agencies must include this timetable in their reports to OMB (see Section VII).

## V. Privacy Policies Incorporated by this Guidance

In addition to the particular actions discussed above, this guidance reiterates general directives from previous OMB Memoranda regarding the privacy of personal information in federal records and collected on federal web sites. Specifically, existing policies continue to require that agencies:

A. assure that their uses of new information technologies sustain, and do not erode, the protections provided in all statutes relating to agency use, collection, and disclosure of personal information;

B. assure that personal information contained in Privacy Act systems of records be handled in full compliance with fair information practices as set out in the Privacy Act of 1974;

C. evaluate legislative proposals involving collection, use and disclosure of personal information by the federal government for consistency with the Privacy Act of 1974;

D. evaluate legislative proposals involving the collection, use and disclosure of personal information by any entity, public or private, for consistency with the Privacy Principles;

E. ensure full adherence with stated privacy policies.

## VI. Agency Privacy Activities/Designation of Responsible Official

Because of the capability of information technology to capture and disseminate information in an instant, all federal employees and contractors must remain mindful of privacy and their obligation to protect information in identifiable form. In addition, implementing the privacy provisions of the E-Government Act requires the cooperation and coordination of privacy, security, FOIA/Privacy Act and project officers located in disparate organizations within agencies. Clear leadership and authority are essential.

Accordingly, this guidance builds on policy introduced in Memorandum 99-05 in the following ways:

A. Agencies must:

1. inform and educate employees and contractors of their responsibility for protecting information in identifiable form;

2. identify those individuals in the agency (e.g., information technology personnel, Privacy Act Officers) that have day-to-day responsibility for implementing section 208 of the E-Government Act, the Privacy Act, or other privacy laws and policies.

3. designate an appropriate senior official or officials (e.g., CIO, Assistant Secretary) to serve as the agency's principal contact(s) for information technology/web matters and for privacy policies. The designated official(s) shall coordinate implementation of OMB web and privacy policy and guidance.

4. designate an appropriate official (or officials, as appropriate) to serve as the "reviewing official(s)" for agency PIAs.

B. OMB leads a committee of key officials involved in privacy that reviewed and helped shape this guidance and that will review and help shape any follow-on privacy and web-privacy-related guidance. In addition, as part of overseeing agencies' implementation of section 208, OMB will rely on the CIO Council to collect information on agencies' initial experience in preparing PIAs, to share experiences, ideas, and promising practices as well as identify any needed revisions to OMB's guidance on PIAs.

## VII. Reporting Requirements

Agencies are required to submit an annual report on compliance with this guidance to OMB as part of their annual E-Government Act status report. The first reports are due to OMB by December 15, 2003. All agencies that use information technology systems and conduct electronic information collection activities must complete a report on compliance with this guidance, whether or not they submit budgets to OMB.

Reports must address the following four elements:

A. *Information technology systems or information collections for which PIAs were conducted.* Include the mechanism by which the PIA was made publicly available (website, Federal Register, other), whether the PIA was made publicly available in full, summary form or not at all (if in summary form or not at all, explain), and, if made available in conjunction with an ICR or SOR, the publication date.

B. *Persistent tracking technology uses.* If persistent tracking technology is authorized, include the need that

compels use of the technology, the safeguards instituted to protect the information collected, the agency official approving use of the tracking technology, and the actual privacy policy notification of such use.

C. *Agency achievement of goals for machine readability:* Include goals for and progress toward achieving compatibility of privacy policies with machine-readable privacy protection technology.

D. *Contact information.* Include the individual(s) (name and title) appointed by the head of the Executive Department or agency to serve as the agency's principal contact(s) for information technology/web matters and the individual (name and title) primarily responsible for privacy policies.

---

**Attachment B**
**E-Government Act of 2002**
**Pub. L. No. 107-347, Dec. 17, 2002**

## SEC. 208. PRIVACY PROVISIONS.

A. PURPOSE. — The purpose of this section is to ensure sufficient protections for the privacy of personal information as agencies implement citizen-centered electronic Government.

B. PRIVACY IMPACT ASSESSMENTS.—

  1. RESPONSIBILITIES OF AGENCIES.—
    a. IN GENERAL.—An agency shall take actions described under subparagraph (b) before—
      i. developing or procuring information technology that collects, maintains, or disseminates information that is in an identifiable form; or
      ii. initiating a new collection of information that—
        1. will be collected, maintained, or disseminated using information technology; and
        2. includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government.
    b. AGENCY ACTIVITIES. —To the extent required under subparagraph (a), each agency shall—
      i. conduct a privacy impact assessment;
      ii. ensure the review of the privacy impact assessment by the Chief Information Officer, or equivalent official, as determined by the head of the agency; and
      iii. if practicable, after completion of the review under clause (ii), make the privacy impact assessment publicly available through the website of the agency, publication in the Federal Register, or other means.
    c. SENSITIVE INFORMATION. —Subparagraph (b)(iii) may be modified or waived for security reasons, or to protect classified, sensitive, or private information contained in an assessment.
    d. COPY TO DIRECTOR. —Agencies shall provide the Director with a copy of the privacy impact assessment for each system for which funding is requested.
  2. CONTENTS OF A PRIVACY IMPACT ASSESSMENT. —
    a. IN GENERAL. —The Director shall issue guidance to agencies specifying the required contents of a privacy impact assessment.
    b. GUIDANCE. — The guidance shall—
      i. ensure that a privacy impact assessment is commensurate with the size of the information system being assessed, the sensitivity of information that is in an identifiable form in that system, and the risk of harm from unauthorized release of that information; and
      ii. require that a privacy impact assessment address—
        1. what information is to be collected;
        2. why the information is being collected;
        3. the intended use of the agency of the information;
        4. with whom the information will be shared;
        5. what notice or opportunities for consent would be provided to individuals regarding what information is collected and how that information is shared;
        6. how the information will be secured; and
        7. whether a system of records is being created under section 552a of title 5, United States Code, (commonly referred to as the `Privacy Act').
  3. RESPONSIBILITIES OF THE DIRECTOR.—The Director shall—
    a. develop policies and guidelines for agencies on the conduct of privacy impact assessments;
    b. oversee the implementation of the privacy impact assessment process throughout the Government; and
    c. require agencies to conduct privacy impact assessments of existing information systems or ongoing collections of information that is in an identifiable form as the Director determines appropriate.

C. PRIVACY PROTECTIONS ON AGENCY WEBSITES. —

    1. PRIVACY POLICIES ON WEBSITES. —
        a. GUIDELINES FOR NOTICES. —The Director shall develop guidance for privacy notices on agency websites used by the public.
        b. CONTENTS. —The guidance shall require that a privacy notice address, consistent with section 552a of title 5, United States Code—
            i. what information is to be collected;
            ii. why the information is being collected;
            iii. the intended use of the agency of the information;
            iv. with whom the information will be shared;
            v. what notice or opportunities for consent would be provided to individuals regarding what information is collected and how that information is shared;
            vi. how the information will be secured; and
            vii. the rights of the individual under section 552a of title 5, United States Code (commonly referred to as the `Privacy Act'), and other laws relevant to the protection of the privacy of an individual.
    2. PRIVACY POLICIES IN MACHINE-READABLE FORMATS. — The Director shall issue guidance requiring agencies to translate privacy policies into a standardized machine-readable format.

D. DEFINITION. —In this section, the term `identifiable form' means any representation of information that permits the identity of an individual to whom the information applies to be reasonably inferred by either direct or indirect means.

---

## Attachment C

*This attachment is a summary by the Federal Trade Commission of its guidance regarding federal agency compliance with the Children's Online Privacy Protection Act (COPPA).*

The hallmarks of COPPA for purposes of federal online activity are (i) notice of information collection practices (ii) verifiable parental consent and (iii) access, as generally outlined below:

- Notice of Information Collection Practices

    Agencies whose Internet sites offer a separate children's area and collect personal information from them must post a clear and prominent link to its Internet privacy policy on the home page of the children's area and at each area where it collects personal information from children. The privacy policy should provide the name and contact information of the agency representative required to respond to parental inquiries about the site. Importantly, the privacy policy should inform parents about the kinds of information collected from children, how the information is collected (directly, or through cookies), how the information is used, and procedures for reviewing/deleting the information obtained from children.

    In addition, the privacy policy should inform parents that only the minimum information necessary for participation in the activity is collected from the child.In addition to providing notice by posting a privacy policy, notice of an Internet site's information collection practices must be sent directly to a parent when a site is requesting parental consent to collection personal information from a child. This direct notice should tell parents that the site would like to collect personal information from their child, that their consent is required for this collection, and how consent can be provided. The notice should also contain the information set forth in the site's privacy policy, or provide an explanatory link to the privacy policy.

- Verifiable Parental Consent

    With limited exceptions, agencies must obtain parental consent before collecting any personal information from children under the age of 13. If agencies are using the personal information for their internal use only, they may obtain parental consent through an e-mail message from the parent, as long as they take additional steps to increase the likelihood that the parent has, in fact, provided the consent. For example, agencies might seek confirmation from a parent in a delayed confirmatory e-mail, or confirm the parent's consent by letter or phone call[23].

    However, if agencies disclose the personal information to third parties or the public (through chat rooms or message boards), only the most reliable methods of obtaining consent must be used. These methods include: (i) obtaining a signed form from the parent via postal mail or facsimile, (ii) accepting and verifying a credit card number in connection with a transaction, (iii) taking calls from parents through a toll-free telephone

number staffed by trained personnel, or (iv) email accompanied by digital signature.

Although COPPA anticipates that private sector Internet operators may share collected information with third parties (for marketing or other commercial purposes) and with the public (through chat rooms or message boards), as a general principle, federal agencies collect information from children only for purposes of the immediate online activity or other, disclosed, internal agency use. (Internal agency use of collected information would include release to others who use it solely to provide support for the internal operations of the site or service, including technical support and order fulfillment.) By analogy to COPPA and consistent with the Privacy Act, agencies may not use information collected from children in any manner not initially disclosed and for which explicit parental consent has not been obtained. Agencies' Internet privacy policies should reflect these disclosure and consent principles.

COPPA's implementing regulations include several exceptions to the requirement to obtain advance parental consent where the Internet operator (here, the agency) collects a child's email address for the following purposes: (i) to provide notice and seek consent, (ii) to respond to a one-time request from a child before deleting it, (iii) to respond more than once to a specific request, e.g., for a subscription to a newsletter, as long as the parent is notified of, and has the opportunity to terminate a continuing series of communications, (iv) to protect the safety of a child, so long as the parent is notified and given the opportunity to prevent further use of the information, and (v) to protect the security or liability of the site or to respond to law enforcement if necessary.

Agencies should send a new notice and request for consent to parents any time the agency makes material changes in the collection or use of information to which the parent had previously agreed. Agencies should also make clear to parents that they may revoke their consent, refuse to allow further use or collection of the child's personal information and direct the agency to delete the information at any time.

- Access

  At a parent's request, agencies must disclose the general kinds of personal information they collect online from children as well as the specific information collected from a child. Agencies must use reasonable procedures to ensure they are dealing with the child's parent before they provide access to the child's specific information, e.g., obtaining signed hard copy of identification, accepting and verifying a credit card number, taking calls from parents on a toll-free line staffed by trained personnel, email accompanied by digital signature, or email accompanied by a PIN or password obtained through one of the verification methods above.

  In adapting the provisions of COPPA to their Internet operations, agencies should consult the FTC's web site at http://www.ftc.gov/privacy/privacyinitiatives/childrens.html or call the COPPA compliance telephone line at (202) 326-3140.

## Attachment D

### Summary of Modifications to Prior Guidance

This Memorandum modifies prior guidance in the following ways:

* Internet Privacy Policies (Memorandum 99-18):

- must identify when tracking technology is used to personalize the interaction, and explain the purpose of the feature and the visitor's option to decline it.

- must clearly explain when information is maintained and retrieved by personal identifier in a Privacy Act system of records; must provide (or link to) a Privacy Act statement (which may be subsumed within agency's Internet privacy policy) where Privacy Act information is solicited.

- should clearly explain an individual's rights under the Privacy Act if solicited information is to be maintained in a Privacy Act system of records; information about rights under the Privacy Act may be provided in the body of the web privacy policy or via link to the agency's published systems notice and Privacy Act regulation or other summary of rights under the Privacy Act (notice and explanation of rights under other privacy laws should be handled in the same manner).

- when a Privacy Act Statement is not required, must link to the agency's Internet privacy policy explaining the purpose of the collection and use of the information (point-of-collection notice at agency option).

- must clearly explain where the user may consent to the collection or sharing of information and must notify users of any available mechanism to grant consent.

- agencies must undertake to make their Internet privacy policies "readable" by privacy protection technology and report to OMB their progress in that effort.

- must adhere to the regulatory requirements of the Children's Online Privacy Protection Act (COPPA) when collecting information electronically from children under age 13.

\*Tracking Technology (Memorandum 00-13):

- prohibition against tracking visitors' Internet use extended to include tracking by any means (previous guidance addressed only "persistent cookies").? authority to waive the prohibition on tracking in appropriate circumstances may be retained by the head of an agency, or may be delegated to (i) senior official(s) reporting directly to the agency head, or to (ii) the heads of sub-agencies.? agencies must report the use of tracking technology to OMB, identifying the circumstances, safeguards and approving official.

- agencies using customizing technology must explain the use, voluntary nature of and the safeguards applicable to the customizing device in the Internet privacy policy.

- agency heads or their designees may approve the use of persistent tracking technology to customize Internet interactions with the government.

\* Privacy responsibilities (Memorandum 99-05)

- agencies to identify individuals with day-to-day responsibility for implementing the privacy provisions of the E-Government Act, the Privacy Act and any other applicable statutory privacy regime.

- agencies to report to OMB the identities of senior official(s) primarily responsible for implementing and coordinating information technology/web policies and privacy policies.

1. Agencies may, consistent with individual practice, choose to extend the protections of the Privacy Act and E-Government Act to businesses, sole proprietors, aliens, etc.
2. Information in identifiable form is defined in section 208(d) of the Act as "any representation of information that permits the identity of an individual to whom the information applies to be reasonably inferred by either direct or indirect means." Information "permitting the physical or online contacting of a specific individual" (see section 208(b)(1)(A)(ii)(II)) is the same as "information in identifiable form."
3. Clinger-Cohen Act of 1996, 40 U.S.C. 11101(6).
4. Clinger-Cohen Act of 1996, 40 U.S.C. 11103.
5. In addition to these statutorily prescribed activities, the E-Government Act authorizes the Director of OMB to require agencies to conduct PIAs of existing electronic information systems or ongoing collections of information in identifiable form as the Director determines appropriate. (see section 208(b)(3)(C)).
6. Information in identifiable form about government personnel generally is protected by the Privacy Act of 1974. Nevertheless, OMB encourages agencies to conduct PIAs for these systems as appropriate.
7. Consistent with agency requirements under the Federal Information Security Management Act, agencies should: (i) affirm that the agency is following IT security requirements and procedures required by federal law and policy to ensure that information is appropriately secured, (ii) acknowledge that the agency has conducted a risk assessment, identified appropriate security controls to protect against that risk, and implemented those controls, (iii) describe the monitoring/testing/evaluating on a regular basis to ensure that controls continue to work properly, safeguarding the information, and (iv) provide a point of contact for any additional questions from users. Given the potential sensitivity of security-related information, agencies should ensure that the IT security official responsible for the security of the system and its information reviews the language before it is posted.
8. PIAs that comply with the statutory requirements and previous versions of this Memorandum are acceptable for agencies' FY 2005 budget submissions.
9. Section 208(b)(1)(C).
10. See 44 USC Chapter 35 and implementing regulations, 5 CFR Part 1320.8.
11. Item 1 of the Supporting Statement reads: "Explain the circumstances that make the collection of information necessary. Identify any legal or administrative requirements that necessitate the collection. Attach a copy of the appropriate section of each statute and regulation mandating or authorizing the collection of information."
12. Item 2 of the Supporting Statement reads: "Indicate how, by whom, and for what purpose the information is to be used. Except for a new collection, indicate the actual use the agency has made of the information

received from the current collection."

13.   Item 2 of the Supporting Statement reads: "Indicate how, by whom, and for what purpose the information is to be used. Except for a new collection, indicate the actual use the agency has made of the information received from the current collection."

14.   Item 10 of the Supporting Statement reads: "Describe any assurance of confidentiality provided to respondents and the basis for the assurance in statute, regulation, or agency policy."

15.   Section 208(c)(1)(B)(v).

16.   Section 208(c)(1)(B)(vii).

17.   Section 208(c)(1)(B)(i-iv).

18.   When multiple Privacy Act Statements are incorporated in a web privacy policy, a point-of-collection link must connect to the Privacy Act Statement pertinent to the particular collection.

19.   Attachment C contains a general outline of COPPA's regulatory requirements. Agencies should consult the Federal Trade Commission's COPPA compliance telephone line at (202)-326-3140 or website for additional information at: http://www.ftc.gov/privacy/privacyinitiatives/childrens.html.

20.   Consistent with current practice, the agency head or designee may limit, as appropriate, notice and reporting of tracking activities that the agency has properly approved and which are used for authorized law enforcement, national security and/or homeland security purposes.

21.   Section 208(c)(1)(B)(vi).

22.   Federal Information Security Management Act of 2002 (Title III of P.L. 107-347), OMB's related security guidance and policies (Appendix III to OMB Circular A-130, "Security of Federal Automated Information Resources") and standards and guidelines development by the National Institute of Standards and Technologies.

23.   This standard was set to expire in April 2002, at which time the most verifiable methods of obtaining consent would have been required; however, in a Notice of Proposed Rulemaking, published in the Federal Register on October 31, 2001, the FTC has proposed that this standard be extended until April 2004. 66 Fed. Reg. 54963.

# Exhibit 6





# Your connection is not private

Attackers might be trying to steal your information from **safe.amrdec.army.mil** (for example, passwords, messages, or credit cards). NET::ERR_CERT_AUTHORITY_INVALID

☐ Automatically send some system information and page content to Google to help detect dangerous apps and sites. Privacy policy



Back to safety

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELECTRONIC PRIVACY INFORMATION CENTER

    Plaintiff,

    v.

PRESIDENTIAL ADVISORY COMMISSION ON
ELECTION INTEGRITY; MICHAEL PENCE, in his
official capacity as Vice Chair of the Presidential Advisory
Commission on Election Integrity; KRIS KOBACH, in his
official capacity as Vice Chair of the Presidential Advisory
Commission on Election Integrity; EXECUTIVE OFFICE
OF THE PRESIDENT OF THE UNITED STATES;
OFFICE OF THE VICE PRESIDENT OF THE UNITED
STATES; GENERAL SERVICES ADMINISTRATION

    Defendants.

Civil Action No. _____

## CERTIFICATION BY MARC ROTENBERG IN SUPPORT OF THE PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

Pursuant to LCvR 65.1(a) of the Rules of the United States District Court for the District of Columbia, I, Marc Rotenberg, certify that I have provided Defendants advance notice of this Emergency Motion for a Temporary Restraining Order by contacting, on the morning of Monday, July 3, 2017, Marcy Berman, Assistant Branch Director of the Federal Programs Branch, Civil Division, United States Department of Justice; Daniel Van Horn, Chief of the Civil Division in the United States Attorney's Office for the District of Columbia; and Daniel Bensing, a senior attorney in the Federal Programs Branch, Civil Division, United States Department of Justice. I have provided copies of all pleadings and papers filed in the action to Ms. Berman, who stated that she would forward said pleadings and papers to the appropriate attorney in the Federal Programs Branch.

These efforts are in addition to service to be effected on defendants by overnight mail as described in the Certificate of Service accompanying this Motion pursuant to LCvR 5.4(d).

Respectfully Submitted,

/s/ Marc Rotenberg
Marc Rotenberg, D.C. Bar # 422825
EPIC President and Executive Director

ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

Dated: July 3, 2017



From: **Marc Rotenberg** rotenberg@epic.org
Subject: Re: TRO - EPIC v. Commission, et al (demand for state voter records)
Date: July 3, 2017 at 11:59 AM
To: Berman, Marcia (CIV) Marcia.Berman@usdoj.gov, Shapiro, Elizabeth (CIV) Elizabeth.Shapiro@usdoj.gov
Cc: Alan Butler butler@epic.org, John Davisson davisson@epic.org

Thanks, Marcy,

We will send you the TRO papers shortly and will be filing with the district court clerk this afternoon.

EPIC Senior Counsel Alan Butler is also on this matter.

—Marc Rotenberg

On Jul 3, 2017, at 11:10 AM, Berman, Marcia (CIV) <Marcia.Berman@usdoj.gov> wrote:

Hi Marc – I'm following up on this message to Dan Bensing and Dan Van Horn.  You can send me the TRO papers, and I'll forward them to the appropriate attorney in Fed. Programs.


Thanks -- Marcy

Marcy Berman
Assistant Branch Director
U.S. Department of Justice, Civil Division
Federal Programs Branch
(202) 514-2205


**From:** Ricketts, Jennifer D (CIV)
**Sent:** Monday, July 03, 2017 11:06 AM
**To:** Berman, Marcia (CIV) <MBerman@civ.usdoj.gov>; Shapiro, Elizabeth (CIV) <EShapiro@CIV.USDOJ.GOV>
**Cc:** Griffiths, John (CIV) <jgriffit@CIV.USDOJ.GOV>
**Subject:** FW: TRO - EPIC v. Commission, et al (demand for state voter records)
**Importance:** High




**From:** Van Horn, Daniel (USADC) [mailto:Daniel.VanHorn@usdoj.gov]
**Sent:** Monday, July 03, 2017 10:26 AM
**To:** Ricketts, Jennifer D (CIV) <jrickett@CIV.USDOJ.GOV>
**Subject:** FW: TRO - EPIC v. Commission, et al (demand for state voter records)
**Importance:** High

Here's the email we just discussed:

**From:** Marc Rotenberg [mailto:rotenberg@epic.org]
**Sent:** Monday, July 3, 2017 10:14 AM
**To:** Van Horn, Daniel (USADC) <DVanHorn@usa.doj.gov>; Bensing, Daniel (CIV) <Daniel.Bensing@usdoj.gov>
**Cc:** Alan Butler <butler@epic.org>; Caitriona Fitzgerald <fitzgerald@epic.org>; John Davisson <davisson@epic.org>

**Subject:** Fwd: TRO - EPIC v. Commission, et al (demand for state voter records)
**Importance:** High

Daniel Van Horn, Chief
Civil Division
Washington, DC

Dear Mr. Van Horn,

We are forwarding a communication sent earlier today to Daniel Bensing regarding a motion we plan to file in D.D.C, seeking emergency relief,. regarding the Presidential Advisory Commission on Election Integrity.

Marc Rotenberg

> Begin forwarded message:
>
> **From:** Marc Rotenberg <rotenberg@epic.org>
> **Subject: TRO - EPIC v. Commission, et al (demand for state voter records)**
> **Date:** July 3, 2017 at 10:09:39 AM EDT
> **To:** Daniel Bensing <daniel.bensing@usdoj.gov>
> **Cc:** Alan Butler <butler@epic.org>, John Davisson <davisson@epic.org>, Caitriona Fitzgerald <fitzgerald@epic.org>
>
> Dear Mr. Bensing,
>
> EPIC is filing suit today against a group of agencies and defendants within the Executive Office of the President, including the Presidential Commission on Election Integrity and the Office of the Vice President. We intend to seek emergency relief and a TRO/Preliminary Injunction.
>
> We would like to establish a line of communication with the attorney at DOJ who will be handling this matter, so that we can ensure that the Defendants have sufficient notice to appear. Can you let us know who would be the appropriate contact in your office or in the DC U.S. Attorneys office.
>
> Sincerely,
>
> Marc Rotenberg, President
> EPIC
> D.C. Bar # 422825
> 202-415-6788

## CERTIFICATE OF SERVICE

I, Marc Rotenberg, hereby certify that on July 3, 2017, I will cause one copy of the

foregoing Emergency Motion for Temporary Restraining Order, including the Memorandum of

Points and Authorities and associated attachments, to be served on each of the following via

overnight mail:

United States Attorney for the District of Columbia
c/o Civil Process Clerk
Department of Justice
555 4th St., N.W.
Washington, D.C. 20530

Attorney General of the United States
Department of Justice 950
Pennsylvania Ave., N.W.
Washington, D.C. 20530

Presidential Advisory Committee on Election Integrity
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

Michael Pence
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

Kris Kobach
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

Executive Office of the President of the United States
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

Office of the Vice President of the United States
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

General Services Administration
1800 F Street, N.W.
Washington, D.C. 20405

Respectfully Submitted,

/s/ Marc Rotenberg
Marc Rotenberg, D.C. Bar # 422825
EPIC President and Executive Director

ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

Dated: July 3, 2017