**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | Civil Action No. 1:17-cv-1320 (CKK) |
| Plaintiff, | |
| v. | |
| PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY, *et al.*, | |
| Defendants. | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR
A TEMPORARY RESTRAINING ORDER**

## INTRODUCTION

The Court should deny plaintiff Electronic Privacy Information Center's ("EPIC")
extraordinary request for an emergency injunction prohibiting the Presidential Advisory
Commission on Election Integrity ("the Commission") from collecting, on a voluntary basis,
publicly available voter data from state election officials.

As a threshold matter, the Court lacks jurisdiction to issue a temporary restraining order
because EPIC failed to establish its standing.  EPIC alleged no facts that the organization itself
has suffered any injury, nor did it identify a single member who is suffering injury.  In any event,
EPIC's members could not possibly be injured by the transfer of *public* information from one
sovereign to another.  Its concerns about a possible data breach at some point in the future by
unknown third parties fall well short of an imminent and concrete injury that is traceable to the
Commission and redressable by this Court.

Even assuming the Court has jurisdiction, EPIC has not established its entitlement to
emergency injunctive relief.  EPIC has not shown that it will suffer any harm – much less
*irreparable* harm – in the absence of a temporary restraining order.  The voter data that EPIC
seeks to enjoin the Commission from collecting is already made publicly available by the states.
The Commission has established reasonable measures to protect the security of the voter data by
using a secure method to transfer the data and storing any data in the White House's information
systems.

Nor has EPIC established a substantial likelihood of success on the merits because it has
no viable claims.  Both the Administrative Procedure Act ("APA") and the E-Government Act of
2002 apply only to "agencies," but the Commission is not an "agency" within the meaning of

these statutes because its sole purpose is to provide advice to the President.  EPIC's claim that

the voluntary collection of publicly available voter information violates a constitutional right to

informational privacy is meritless.  Neither the Supreme Court nor the D.C. Circuit has held that

such a right even exists.  Even if such a right did exist, it would not apply to information that is

already publicly available.

Finally, the public interest weighs against emergency injunctive relief.  The President

established the Commission "in order to promote fair and honest Federal elections."  Executive

Order No. 13,799, 82 Fed. Reg. 22,389, 22,389 (May 11, 2017).  By collecting voter data from

the states, the Commission seeks to "enhance the American people's confidence in the integrity

of the voting processes used in Federal elections."  *Id.*  EPIC seeks to halt this important work

with meritless claims and a baseless fear about the states voluntarily submitting publicly

available voter data to the federal government.  Accordingly, EPIC's motion for a temporary

restraining order should be denied.

## BACKGROUND

The President established the Presidential Advisory Commission on Election Integrity in

Executive Order No. 13,799.  82 Fed. Reg. 22,389 (May 11, 2017) [hereinafter Exec. Order No.

13,799]; *see also* Declaration of Kris W. Kobach ("Kobach Decl.") ¶ 3 & Exh. 1.  The

Commission is charged with "study[ing] the registration and voting processes used in Federal

elections," "consistent with applicable law.*"*  Exec. Order No. 13,799, § 3.  Vice President Pence

is the Chairman of the Commission.  *Id.* § 2.  Kansas Secretary of State Kris Kobach is the Vice

Chair of the Commission.  Kobach Decl. ¶¶ 2, 3.  The members of the Commission come from

federal, state, and local jurisdictions across the political spectrum.  *Id.* ¶ 3.

In furtherance of the Commission's mandate, the Vice Chair has sent letters to the states and the District of Columbia requesting publicly available data from state voter rolls and feedback on how to improve election integrity.  Kobach Decl. ¶ 4.  Among other things, the letters sent by the Vice Chair requested:

> the *publicly-available* voter roll data for [the State], including, *if publicly available under the laws of your state*, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information.

*See, e.g.*, *id.*, Exh. 3 (letter to Alabama) (emphasis supplied).

The Vice Chair requested responses by July 14, 2017.  Kobach Decl. ¶ 5 & Exh. 3.  He provided two methods for the states to respond.  *Id.*  Narrative responses, not containing data, can be sent via email to the address provided in the letter.  *Id.*  This email is a White House email address (in the Office of the Vice President) subject to the security protecting all White House communications and networks.  *Id.*

For data files, which would be too large to send via electronic mail, states can use the Safe Access File Exchange ("SAFE"), which is a secure method of transferring large files up to two gigabytes in size.  Kobach Decl. ¶ 5 & Exh. 3.  Once received, the Commission intends to maintain the transferred data on the computer systems of the White House.  *Id.* ¶ 5.  SAFE is a tested and reliable method of secure file transfer used routinely by the military for large, unclassified data sets.  *Id.*  It also supports encryption by individual users.  *Id.; see generally* Safe Access File Exchange, https://safe.amrdec.army.mil/safe/Welcome.aspx (last visited July 5,

2017).  Individuals who access the site receive a security warning that the user is accessing a

U.S. government network.  *See id.*  Undersigned counsel were not able to reproduce any error

message indicating that the site was insecure.  *See* Pl.'s TRO Mem. (ECF No. 3), at 7.

The Commission has not yet received any substantive responses or data from the states.

Kobach Decl. ¶ 6.

## ARGUMENT

## EPIC IS NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER

"The standard for issuance of the extraordinary and drastic remedy of a temporary

restraining order or a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v.*

*Nat'l Park Serv.*, 933 F. Supp. 2d 58, 76 (D.D.C. 2013) (citation omitted).  An interim injunction

is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and

"should be granted only when the party seeking the relief, by a clear showing, carries the burden

of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  A party moving for a

temporary restraining order or a preliminary injunction "must demonstrate '(1) a substantial

likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is

not granted, (3) that an injunction would not substantially injure other interested parties, and (4)

that the public interest would be furthered by the injunction.'" *Jack's Canoes,* 933 F. Supp. 2d at

75-76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir.

1995)).

I.    **EPIC HAS NOT ESTABLISHED THAT IT HAS STANDING**

EPIC's request for a temporary restraining order must be denied because it has failed to establish standing to seek such relief.  *See Aamer v. Obama*, 742 F.3d 1023, 1028 (D.C. Cir. 2014) ("We begin, as we must, with the question of subject-matter jurisdiction." (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998))).  The doctrine of standing, an essential aspect of the Article III case-or-controversy requirement, demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  At its "irreducible constitutional minimum," the doctrine requires a plaintiff to establish three elements:  (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

To establish injury-in-fact, a plaintiff must show that the defendant's action affects him or her in a "personal and individual way," *see id.* at 560 n.1, rather than in some generalized way common to the general public, *see United States v. Richardson*, 418 U.S. 166, 176 (1974).  Moreover, a plaintiff must show more than a "possible future injury"; he or she must show that harm has actually occurred or is "certainly impending."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citations omitted).  The Supreme Court has emphasized that "threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S. Ct. 1138, 1147 (2013) (citations omitted).

EPIC claims standing in its own right and as a representative of its members.  Compl. (ECF No. 1) ¶¶ 5, 6; Pl.'s TRO Mem. 2.  To bring suit on its own behalf, an organization must itself meet the requirements for standing.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).  To establish representational standing, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Ass'n of Flight Attendants–CWA v. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009) (citations omitted).

EPIC cannot demonstrate standing either for itself or as a representative of its members. It has not established that the organization has been or will be injured because none of the voting data at issue pertains to EPIC itself.  EPIC has also failed to identify a single member who has suffered or will suffer an injury.  *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) ("When a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured." (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009))); *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("[A]n organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact. . . .  At the very least, the identity of the party suffering an injury in fact must be firmly established.").

Even if a member were identified, any claim of injury would be entirely speculative. EPIC claims that its members may be harmed in the future if the publicly available data is not securely transferred to the Commission and if that data is then breached by an unknown third party.  Pl.'s TRO Mem. 17-18.  To guard against such breaches, the data is intended to be

6

transmitted via a secure method and then maintained on secure White House servers.  *See*

Kobach Decl. ¶ 5 & Exh. 3.  Particularly in view of these safeguards, plaintiff's "highly

attenuated chain of possibilities" is insufficient to establish standing.  *Clapper*, 133 S. Ct. at

1148.

EPIC further claims that the Commission will publicly disclose its members' voting

information and that the unnamed members could be harmed when this data is then used for

"deviant purposes."  Pl.'s TRO Mem. 17.  EPIC overlooks that the Commission only requested

information that is already publicly available from the states.  The Commission will not publicly

disclose the data in personally identifiable form.  *See* Kobach Decl. ¶ 5.  In any event, EPIC's

amorphous fear of a future data breach by unknown bad actors does not establish imminent and

concrete injury.  *See In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Lit.*, 45

F. Supp. 3d 14, 26 (D.D.C. 2014) (increased risk of identity theft alone does not confer standing

in data-breach cases); *see also Welborn v. IRS*, 218 F. Supp. 3d 64, 77 (D.D.C. 2016) (even an

"objectively reasonable likelihood" of future breach cannot support standing) (quoting *Clapper*,

133 S. Ct. at 1157-48), *appeal dismissed by* 2017 WL 2373044 (D.C. Cir. Apr. 18, 2017)  Nor is

any risk of a data-breach injury fairly traceable to the Commission.  This data is equally

vulnerable (if at all) in the hands of the states.  Securely transferring data to a secure White

House server does not increase the risk of improper disclosure.

In sum, because EPIC lacks standing, the Court lacks jurisdiction to issue a temporary

restraining order.

## II. EPIC HAS FAILED TO ESTABLISH THAT IT OR ITS MEMBERS WILL SUFFER IRREPARABLE HARM

The motion should also be denied because EPIC has not established that it will suffer irreparable injury absent a temporary restraining order.  The D.C. Circuit "has set a high standard for irreparable injury."  *In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) (citation omitted).  It is a "well known and indisputable principle[]" that a "unsubstantiated and speculative" harm cannot constitute "irreparable harm" sufficient to justify injunctive relief. *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

EPIC cannot demonstrate irreparable injury for the same reason it lacks standing.  It cannot establish that the organization or one of its members has suffered or will suffer a concrete or "certainly impending" injury.  EPIC is concerned that the Commission will publicly disclose the information it obtains, but the Commission has only requested data that is *already* publicly available, much, if not all, of it pursuant to the National Voter Registration Act, 52 U.S.C. § 20507(i)(1), or through public access laws of individual states.  *See* National Conference of State Legislatures, States and Election Reform (Feb. 2015) (discussing availability of voter information under state laws), http://www.ncsl.org/Documents/Elections/The_Canvass_ February_2016_66.pdf; *see also Project Vote v. Long*, 682 F.3d 331, 336 (4th Cir. 2012) (holding that 52 U.S.C. § 20507(i)(1) "unmistakably encompasses completed voter registration applications").  The Commission has no intention of publicly disclosing data that are personally identifiable.  Kobach Decl. ¶ 5.  EPIC's speculative fear of a future breach of White House information systems by unknown third parties causing the release of information already available to the public cannot establish irreparable injury.  Even without the Commission's collection of the information, the possibility of a breach will always exist (unfortunately) at the

state level; moreover, as the Commission has only requested information that is otherwise publicly available, there is nothing to prevent members of the public from accessing that information through a lawful request.  Accordingly, the Commission's request for information has done nothing to increase any risk to EPIC's members and certainly does not create "irreparable injury" caused by the Commission and justifying emergency injunctive relief.

EPIC's claim of irreparable injury based on a violation of a supposed constitutional right to informational privacy also fails.  As discussed below, there is no constitutional right to informational privacy for information that is already public.  Because EPIC fails to establish irreparable harm, there is no basis for the Court to invoke its emergency powers at this early stage in the litigation.

## III.  PLAINTIFF HAS NOT ESTABLISHED SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

EPIC has also failed to demonstrate substantial likelihood of success on the merits because it has no viable claim.  First, EPIC has failed to state a claim under the APA or the E-Government Act of 2002 because the Commission is not an "agency" within the meaning of those statutes.  Second, neither the Supreme Court nor the D.C. Circuit has recognized a constitutional right to informational privacy, but even if such a right exists, it would not apply to information that is already publicly available.

### A.  The Commission Is Not an "Agency" for Purposes of the Administrative Procedure Act or the E-Government Act of 2002

As an initial matter, EPIC does not have a valid claim under the E-Government Act. "[T]he E-Government Act of 2002 does not provide a private right of action."  *Greenspan v. Admin. Office of the U.S. Courts*, No. 14-cv-2396, 2014 WL 6847460, at *8 (N.D. Cal. Dec. 4,

2014).  EPIC must therefore use the Administrative Procedure Act's ("APA") cause of action.  5 U.S.C. § 702.  The APA, however, only applies to *agency* action, and the Commission is not an agency for the purposes of the APA.[1]  Accordingly, EPIC has no valid claim under the APA.

The APA defines an "agency" as "each authority of the Government of the United States," subject to several limitations not applicable here.  5 U.S.C. § 551(1).  It is well established that the President and his close advisors do not fall within the APA's ambit.  *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (holding that "[o]ut of respect for the separation of powers and the unique constitutional position of the President," he is not subject to the APA).  In *Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993), the D.C. Circuit laid out a three-factor test to determine whether a group within the Executive Office of the President constituted an "agency": "(1) how close operationally the group is to the President, (2) whether it has a self-contained structure, and (3) the nature of its delegated authority."  *Armstrong v. Exec. Office of the Pres.*, 90 F.3d 553, 558 (D.C. Cir. 1996) (quoting *Meyer*, 981 F.3d at 1293); *see also id.* ("The closer an entity is to the President, the more it is like the White House staff, which solely advises and assists the President, and the less it is like an agency to which substantial independent authority has been delegated.").[2]

---

[1]  Although the General Services Administration ("GSA") is named as a defendant to this action, the present motion seeks to enjoin the collection of data, in which only the Commission is involved.  *See* Pl.'s TRO Mot.; Kobach Decl. ¶ 4.

[2]  This guidance comes mainly in the context of case law interpreting the definition of "agency" for purposes of the Freedom of Information Act ("FOIA"), which is broader than the definition of "agency" for purposes of the APA.  The APA defines an "agency" as "each authority of the Government of the United States."  5 U.S.C. § 551(1).  The FOIA, in turn, incorporates the definition set out in section 551(1) of the APA, and then expands the definition, stating that it "includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory

In applying this test, courts look at whether the entity has "substantial independent authority," including regulatory or funding powers. *Citizens for Resp. & Ethics in Wash*. ("*CREW*") *v. Office of Admin*., 566 F.3d 219, 222-23 (D.C. Cir. 2009). For example, this Circuit has held that the Council of Economic Advisors is not an "agency" because it lacks regulatory power or independent authority, *id.* at 223, the National Security Council is not an "agency" because it plays only a "coordinating role on behalf of the President," *id.* (quoting *Armstrong*, 90 F.3d at 565), and the Office of Administration within the Executive Office of the President is not an "agency" because it provides "operational and administrative" tasks in "direct support of the President," *id.* at 224-25. *See also Armstrong*, 90 F.3d at 558-59 (collecting cases). Plaintiff does not even acknowledge, let alone attempt to distinguish, this line of cases.

Like these other White House entities, the Commission is an entity that "serve[s] solely to advise and assist the President," *Armstrong*, 90 F.3d at 558, and is not, therefore, an agency subject to the APA. The Commission reports directly to the President and is "solely advisory," Exec. Order No. 13,799; *see also* Charter, Presidential Advisory Commission on Election Integrity ¶ 4 ("The Commission will function solely as an advisory body.") (Kobach Decl., Exh. 2). It is chaired by the Vice President, a constitutional officer (and not, of course, an agency head). Exec. Order No. 13,799, at § 2. Its purpose is to "submit a report to the President" that identifies rules and activities that enhance and undermine the "American people's confidence in the integrity of the voting processes used in Federal elections" and to identify vulnerabilities in voting systems that could lead to improprieties. *Id.* § 3(a)-(c). The Commission has no

---

agency." 5 U.S.C. § 552(f)(1). *See also* Aaron J. Saiger, *Obama's 'Czars' for Domestic Policy and the Law of the White House Staff*, 79 Ford. L. Rev. 2577, 2599 (2011) ("FOIA uses a definition of 'agency' more expansive than used under the rest of the APA . . . .").

regulatory or funding powers, nor does it have any independent administrative responsibilities. Instead, it exists solely to provide research and advice to the President.  *CREW*, 566 F.3d at 222-23.  It is not, therefore, an "agency" subject to the APA, and the plaintiff's APA claim fails for that threshold reason alone.

Nor has EPIC stated a valid claim that the Commission was required to conduct a Privacy Impact Assessment under Section 208 of the E-Government Act, even if EPIC were able to assert a claim directly under the statute (which it cannot).  E-Government Act of 2002, Pub. L. No. 107-347, § 208, 116 Stat. 2899.  The E-Government Act applies to "agencies," as defined in 44 U.S.C. § 3502(1), which uses the same definition of "agency" as the FOIA (and is therefore subject to the same limitations as the D.C. Circuit has above defined).  *See* E-Government Act § 201, 116 Stat. 2899.  Because the Commission, which provides only advice and assistance to the President, is not an agency, it was not required to perform a Privacy Impact Assessment.[3]

Although not a basis for the present motion, EPIC's assertion that the Commission violated section 10(b) of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 § 10(b), by failing to publish a Privacy Impact Assessment or make one available for public inspection fares no better.  *See* Compl. ¶ 41, 45-49.  Defendants do not concede that FACA applies to the Commission or that EPIC has a cause of action under FACA here.  *See In re Cheney*, 406 F.3d 723, 728 (D.C. Cir. 2005) (construing FACA statute strictly); *Ass'n of Am.*

---

[3] Even apart from the functional test establishing that the Commission exists to advise and assist the President, and is therefore not an "agency" under the APA, it is clear that an entity cannot be at once both an advisory committee and an agency.  *See Heartwood, Inc. v. U.S. Forest Serv.,* 431 F. Supp. 2d 28, 36 (D.D.C. 2006) (noting that an "'advisory committee cannot have a double identity as an agency'" (quoting *Wolfe v. Weinberger,* 403 F. Supp. 238, 242 (D.D.C. 1975))).

*Physicians & Surgeons, Inc. v. Clinton*, 997 F.3d 898, 909-10 (D.C. Cir. 1993) (application of

FACA to presidential advisory groups can raise constitutional concerns).  Regardless, EPIC's

FACA claim is meritless because the Commission – which is not an agency – is not required to

conduct a Privacy Impact Assessment, nor has it done so, and therefore there is no report to

publish.  Accordingly, EPIC has failed to establish any violation of FACA.

> **B.**      **Neither the Supreme Court Nor the D.C. Circuit Has Recognized a Constitutional Right to Informational Privacy, But Even If There Were, It Would Not Prohibit the Federal Government From Requesting Publicly Available Information From States**

EPIC's claim of a constitutional right to informational privacy fails because neither the

Supreme Court nor the D.C. Circuit has held that a federal constitutional right to informational

privacy exists.  Although the Supreme Court has assumed, without deciding, that the

Constitution protects the individual "interest in avoiding disclosure of personal matters," *Nat'l*

*Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 138 (2011), the Court has not specifically

held that a supposed constitutional right to informational privacy actually exists.[4]  For its part,

the D.C. Circuit has expressed "grave doubts as to the existence of a constitutional right of

privacy in the nondisclosure of personal information."  *Am. Fed'n of Gov't Emps., AFL-CIO v.*

*Dep't of House. & Urban Dev.,* 118 F.3d 786, 791 (D.C. Cir. 1997).

---

[4] Several justices have criticized that approach and expressly questioned the existence of a constitutional right to informational privacy.  *See Nelson*, 562 U.S. at 159-60 (Scalia, J., concurring in the judgment) ("'[I]nformational privacy' seems like a good idea . . . [b]ut it is up to the People to enact those laws, to shape them, and, when they think it appropriate, to repeal them.  A federal constitutional right to 'informational privacy' does not exist."); *id.* at 169 (Thomas, J., concurring in the judgment) ("I agree with Justice Scalia that the Constitution does not protect a right to informational privacy.  No provision in the Constitution mentions such a right." (internal citations omitted))).

13

Even assuming such a right exists, EPIC's claim would still fail because the Commission has only requested information that is "publicly available."  Kobach Decl., Exh. 3, at 1-2. Whatever the bounds of a supposed constitutional right to informational privacy, it does not extend to matters already in the public record.  Indeed, courts have repeatedly held that "there is no question that an individual cannot expect to have a constitutionally protected privacy interest in matters of public record."  *Doe v. City of N.Y.*, 15 F.3d 264, 268 (2d Cir. 1994) (citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 493-96 (1975)); *see also Doe v. Lockwood*, No. 95-3499, 1996 WL 367046, at *4 (6th Cir. June 27, 1996) (table) ("In order to sustain their claim that John Doe has a federal constitutional right to informational privacy, the Does must allege facts to show that the information regarding John Doe's HIV status was not already in the public realm."); *Lewis v. Delarosa*, No. C-15-2689, 2015 WL 5935311, at *3 (N.D. Cal. Oct. 13, 2015) ("Plaintiff's allegations that his right to informational privacy was violated when his non-private identification information was published on the internet is not included in even the outer confines of a federal right to informational privacy."); *Jones v. Lacey*, 108 F. Supp. 3d 573, 584-85 (E.D. Mich. 2015) (no right to informational privacy with respect to information that had been publicly released); *Pelosi v. Spota*, 607 F. Supp. 2d 366, 373 (E.D.N.Y. 2009) (same).

EPIC has not pled – much less established – that the Commission's explicit request only for "publicly available voter roll data," Kobach Decl. ¶ 4, encompasses *private* sensitive personal information not already available to the general public as a matter of public record.[5]  Nor has

---

[5]  The last four digits of a social security number are not generally considered private information.  For example, Federal Rule of Civil Procedure 5.2(a)(1) provides that filings on an public docket may include "the last four digits of a social-security number."  Fed. R. Civ. P. 5.2(a)(1).  Furthermore, 52 U.S.C. § 21083(c), which governs computerized statewide voter registration list requirements as part of the Help America Vote Act, states that the last four digits

EPIC challenged the states' collection of that voter data or their designation of that information

as publicly available.  Because the Commission has only requested public information from the

states, EPIC could never show that a constitutional right to informational privacy – even if it

were to exist – has been violated.[6]

---

of a social security number may be used as part of the voter registration process for an election
for federal office without running afoul of the Privacy Act.

[6] The Supreme Court's decision in *U.S. Department of Justice v. Reporters Committee
for Freedom of the Press*, 489 U.S. 749 (1989), is not to the contrary.  There, the Court held that
for purposes of the Freedom of Information's Act's statutory limitation on the release of
information that "could reasonably be expected to constitute an unwarranted invasion of personal
privacy," 5 U.S.C. § 552(b)(7)(C), federal "rap sheets" need not be disclosed.  The Court
concluded that "[a]lthough much rap-sheet information is a matter of public record, the
availability and dissemination of the actual rap sheet to the public is limited."  *Reporters Comm.*,
489 U.S. at 743.  Additionally, the fact that there was a "web of federal statutory and regulatory
provisions that limits the disclosure of rap-sheet information," *id.* at 764-65, combined with "the
fact that most States deny the general public access to their criminal-history summaries," *id.* at
767, permitted an agency to withhold the requested information under FOIA.

The *Reporters Committee* Court was explicit, however, that "[t]he question of the
statutory meaning of privacy under the FOIA is, of course, not the same as . . . the question of
whether an individual's interest in privacy is protected by the Constitution."  *Id.* at 762 n.13
(citing *Paul v. Davis*, 424 U.S. 693, 712-14 (1976) (no constitutional privacy right affected by
publication of name of arrested but untried shoplifter)).  Following this direction, courts have
"repeatedly stressed that *Reporters Committee* is inapposite on the issue of those privacy
interests entitled to protection under the United States Constitution."  *A.A. v. New Jersey*, 176 F.
Supp. 2d 274, 305 (D.N.J. 2002) (citing *E.B. v. Verniero*, 119 F.3d 1077, 1100 n.21 (3d Cir.
1997)), *aff'd in part, remanded in part sub nom. A.A. ex rel. M.M. v. New Jersey*, 341 F.3d 206
(3d Cir. 2003); *see also Cutshall v. Sundquist*, 193 F.3d 466, 481 (6th Cir. 1999) (holding that
*Reporters Committee* did not establish a constitutional right to prevent disclosure).

In any event, the instant case may be distinguished on its facts.  Here, the Commission
requested only publicly available information from the states, and plaintiff has not pled, much
less proved, that such information is restricted or available to the public only for limited access.

15

**IV.     A TEMPORARY RESTRAINING ORDER WOULD HARM THE PUBLIC INTEREST**

A party seeking a temporary restraining order or preliminary injunction must also demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009).

Here, the public interest cuts against an injunction.  The President charged the Commission with the important task of "study[ing] the registration and voting processes used in Federal elections."  Exec. Order No. 13,799, § 3.  The Commission must prepare a report that identifies laws that either enhance or undermine the American people's confidence in the integrity of the voting processes used in Federal elections.  The Commission must also investigate "those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting."  *Id.*

As a necessary first step toward achieving these objectives, the Commission has begun to request information from the states, to be provided on a voluntary basis.  EPIC seeks to enjoin these first steps, which will prevent the Commission from even beginning its work.  The public interest lies in favor of allowing the Commission to begin collecting data so it can accomplish its important mission.

## CONCLUSION

For the foregoing reasons, the Court should deny EPIC's emergency motion for a temporary restraining order.

Dated:  July 5, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Carol Federighi*
CAROL FEDERIGHI
Senior Trial Counsel
JOSEPH E. BORSON
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 514-1903
Email: carol.federighi@usdoj.gov

*Counsel for Defendants*

17