## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, *Plaintiff*, v. PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY, *et al.*, *Defendants*. | Civil Action No. 17-1320 (CKK) |

### MEMORANDUM OPINION
(July 24, 2017)

This case arises from the establishment by Executive Order of the Presidential Advisory Commission on Election Integrity (the "Commission"), and a request by that Commission for each of the 50 states and the District of Columbia to provide it with certain publicly available voter roll information. Pending before the Court is Plaintiff's [35] Amended Motion for Temporary Restraining Order and Preliminary Injunction, which seeks injunctive relief prohibiting Defendants from "collecting voter roll data from states and state election officials" and directing Defendants to "delete and disgorge any voter roll data already collected or hereafter received." Proposed TRO, ECF No. 35-6, at 1-2.

Although substantial public attention has been focused on the Commission's request, the legal issues involved are highly technical. In addition to the Fifth Amendment of the Constitution, three federal laws are implicated: the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 ("E-Government Act"), and the Federal Advisory Committee Act, codified at 5 U.S.C. app. 2 ("FACA"). All three are likely unfamiliar to the vast majority of Americans, and even seasoned legal practitioners are unlikely to have encountered the latter two.

1

Matters are further complicated by the doctrine of standing, a Constitutional prerequisite for this Court to consider the merits of this lawsuit.

Given the preliminary and emergency nature of the relief sought, the Court need not at this time decide conclusively whether Plaintiff is, or is not, ultimately entitled to relief on the merits. Rather, if Plaintiff has standing to bring this lawsuit, then relief may be granted if the Court finds that Plaintiff has a likelihood of succeeding on the merits, that it would suffer irreparable harm absent injunctive relief, and that other equitable factors— that is, questions of fairness, justice, and the public interest—warrant such relief.

The Court held a lengthy hearing on July 7, 2017, and has carefully reviewed the parties' voluminous submissions to the Court, the applicable law, and the record as a whole. Following the hearing, additional defendants were added to this lawsuit, and Plaintiff filed the pending, amended motion for injunctive relief, which has now been fully briefed. For the reasons detailed below, the Court finds that Plaintiff has standing to seek redress for the informational injuries that it has allegedly suffered as a result of Defendants declining to conduct and publish a Privacy Impact Assessment pursuant to the E-Government Act prior to initiating their collection of voter roll information. Plaintiff does not, however, have standing to pursue Constitutional or statutory claims on behalf of its advisory board members.

Although Plaintiff has won the standing battle, it proves to be a Pyrrhic victory. The E-Government Act does not itself provide for a cause of action, and consequently, Plaintiff must seek judicial review pursuant to the APA. However, the APA only applies to "agency action." Given the factual circumstances presently before the Court—which have changed substantially since this case was filed three weeks ago—Defendants' collection of voter

roll information does not currently involve agency action. Under the binding precedent of this circuit, entities in close proximity to the President, which do not wield "substantial independent authority," are not "agencies" for purposes of the APA. On this basis, neither the Commission or the Director of White House Information Technology—who is currently charged with collecting voter roll information on behalf of the Commission—are "agencies" for purposes of the APA, meaning the Court cannot presently exert judicial review over the collection process. To the extent the factual circumstances change, however—for example, if the *de jure* or *de facto* powers of the Commission expand beyond those of a purely advisory body—this determination may need to be revisited. Finally, the Court also finds that Plaintiff has not demonstrated an irreparable informational injury— given that the law does not presently entitle it to information—and that the equitable and public interest factors are in equipoise. These interests may very well be served by additional disclosure, but they would not be served by this Court, without a legal mandate, ordering the disclosure of information where no right to such information currently exists. Accordingly, upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, Plaintiff's [35] Motion for a Temporary Restraining Order and Preliminary Injunction is **DENIED WITHOUT PREJUDICE**.[2]

---

[1] The Court's consideration has focused on the following documents:

- Mem. in Supp. of Pl.'s Am. Mot. for a TRO and Prelim. Inj., ECF No. 35-1 ("Pls. Am. Mem.");
- Defs.' Mem. in Opp'n to Pl.'s Am. Mot. for a TRO and Prelim. Inj., ECF No. 38 ("Am. Opp'n Mem.");
- Reply in Supp. of Pl.'s Am. Mot. for a TRO and Prelim. Inj., ECF No. 39 ("Am. Reply Mem.").

[2] For the avoidance of doubt, the Court denies without prejudice both Plaintiff's motion for a temporary restraining order, and its motion for a preliminary injunction.

# I. BACKGROUND

The Commission was established by Executive Order on May 11, 2017. Executive Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017) ("Exec. Order"). According to the Executive Order, the Commission's purpose is to "study the registration and voting processes used in Federal elections." *Id.* § 3. The Executive Order states that the Commission is "solely advisory," and that it shall disband 30 days after submitting a report to the President on three areas related to "voting processes" in federal elections. *Id.* §§ 3, 6. The Vice President is the chair of the Commission, and the President may appoint 15 additional members. From this group, the Vice President is permitted to appoint a Vice Chair of the Commission. The Vice President has named Kris W. Kobach, Secretary of State for Kansas, to serve as the Vice Chair. Decl. of Kris Kobach, ECF No. 8-1 ("Kobach Decl."), ¶ 1. Apart from the Vice President and the Vice Chair, there are presently ten other members of the Commission, including Commissioner Christy McCormick of the Election Assistance Commission (the "EAC"), who is currently the only federal agency official serving on the Commission, and a number of state election officials, both Democratic and Republican, and a Senior Legal Fellow of the Heritage Foundation. *Lawyers' Committee for Civil Rights Under the Law v. Presidential Advisory Commission on Election Integrity*, No. 17-cv-1354 (D.D.C. July 10, 2017), Decl. of Andrew J. Kossack, ECF No. 15-1 ("Kossack Decl."), ¶ 1; Second Decl. of Kris W. Kobach, ECF No. 11-1 ("Second Kobach Decl."), ¶ 1. According to Defendants, "McCormick is not serving in her official capacity as a member of the EAC." Second Kobach Decl. ¶ 2. The Executive Order also provides that the General Services Administration ("GSA"), a federal agency, will "provide the Commission with such administrative services, funds, facilities, staff, equipment, and other

support services as may be necessary to carry out its mission on a reimbursable basis," and that other federal agencies "shall endeavor to cooperate with the Commission." Exec. Order, § 7.

Following his appointment as Vice Chair, Mr. Kobach directed that identical letters "be sent to the secretaries of state or chief election officers of each of the fifty states and the District of Columbia." Kobach Decl. ¶ 4. In addition to soliciting the views of state officials on certain election matters by way of seven broad policy questions, each of the letters requests that state officials provide the Commission with the "publicly available voter roll data" of their respective states, "including, if publicly available under the laws of [their] state, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information." Kobach Decl., Ex. 3 (June 28, 2017 Letter to the Honorable John Merrill, Secretary of State of Alabama). The letters sent by Mr. Kobach also indicate that "[a]ny documents that are submitted to the full Commission will . . . be made available to the public." *Id*. Defendants have represented that this statement applies only to "narrative responses" submitted by states to the Commission. *Id.* ¶ 5. "With respect to voter roll data, the Commission intends to de-identify any such data prior to any public release of documents. In other words, the voter rolls themselves will not be released to the public by the Commission." *Id*. The exact process by which de-identification and publication of voter roll data will occur has yet to be determined. Hr'g Tr. 36:20–37:8.

Each letter states that responses may be submitted electronically to an email address, ElectionIntegrityStaff@ovp.eop.gov, "or by utilizing the Safe Access File Exchange ('SAFE'), which is a secure FTP site the federal government uses for transferring large data files." Kobach Decl., Ex. 3. The SAFE website is accessible at https://safe.amrdec.army.mil/safe/ Welcome.aspx. Defendants have represented that it was their intention that "narrative responses" to the letters' broad policy questions should be sent via email, while voter roll information should be uploaded by using the SAFE system. *Id*. ¶ 5.

According to Defendants, the email address named in the letters "is a White House email address (in the Office of the Vice President) and subject to the security protecting all White House communications and networks." *Id*. Defendants, citing security concerns, declined to detail the extent to which other federal agencies are involved in the maintenance of the White House computer system. Hr'g Tr. 35:2-10. The SAFE system, however, is operated by the U.S. Army Aviation and Missile Research Development and Engineering Center, a component of the Department of Defense. Second Kobach Decl. ¶ 4; Hr'g Tr. 32:6–9. The SAFE system was "originally designed to provide Army Missile and Research, Development and Engineering Command (AMRDEC) employees and those doing business with AMRDEC an alternate way to send files." Safe Access File Exchange (Aug. 8, 2012), *available at* http://www.doncio.navy.mil/ContentView.aspx?id=4098 (last accessed July 20, 2017). The system allows "users to send up to 25 files securely to recipients within the .mil or .gov domains[,]" and may be used by anyone so long as the recipient has a .mil or .gov email address. After an individual uploads data via the SAFE system, the intended recipient receives an email message indicating that "they have been

given access to a file" on the system, and the message provides instructions for accessing the file. The message also indicates the date on which the file will be deleted. This "deletion date" is set by the originator of the file, and the default deletion date is seven days after the upload date, although a maximum of two weeks is permitted.

Defendants portrayed the SAFE system as a conduit for information. Once a state had uploaded voter roll information via the system, Defendants intended to download the data and store it on a White House computer system. Second Kobach Decl. ¶ 5. The exact details of how that would happen, and who would be involved, were unresolved at the time of the hearing. Hr'g Tr. 34:3–35:10; 35:23–36:9. Nonetheless, there is truth to Defendants' description. Files uploaded onto the system are not archived after their deletion date, and the system is meant to facilitate the transfer of files from one user to another, and is not intended for long-term data storage. As Defendants conceded, however, files uploaded onto the SAFE system are maintained for as many as fourteen days on a computer system operated by the Department of Defense. Hr'g Tr. 31:7–32:5; 36:1–9 (The Court: "You seem to be indicating that DOD's website would maintain it at least for the period of time until it got transferred, right?" Ms. Shapiro: "Yes. This conduit system would have it for – until it's downloaded. So from the time it's uploaded until the time it's downloaded for a maximum of two weeks and shorter if that's what's set by the states."). Defendants stated that as, of July 7, only the state of Arkansas had transmitted voter roll information to the Commission by uploading it to the SAFE system. Hr'g Tr. 40:10–18. According to Defendants, the Commission had not yet downloaded Arkansas' voter data; and as of the date of the hearing, the data continued to reside on the SAFE system. *Id*.

Shortly after the hearing, Plaintiff amended its complaint pursuant to Federal Rule

of Civil Procedure 15(a)(1)(A), and added the Department of Defense as a defendant. Am. Compl., ECF No. 21. The Court then permitted Defendants to file supplemental briefing with respect to any issues particular to the Department of Defense. Order, ECF No. 23. On July 10, Defendants submitted a Supplemental Brief, notifying the Court of certain factual developments since the July 7 hearing. First, Defendants represented that the Commission "no longer intends to use the DOD SAFE system to receive information from the states." Third Decl. of Kris W. Kobach, ECF No. 24-1 ("Third Kobach Decl."), ¶ 1. Instead, Defendants stated that the Director of White House Information Technology was working to "repurpos[e] an existing system that regularly accepts personally identifiable information through a secure, encrypted computer application," and that this new system was expected to be "fully functional by 6:00pm EDT [on July 10, 2017]." *Id*. Second, Defendants provided the Court with a follow-up communication sent to the states, directing election officials to "hold on submitting any data" until this Court resolved Plaintiff's motion for injunctive relief. *Id.*, Ex. A. In light of these developments, Plaintiff moved to further amend the complaint pursuant to Federal Rule of Civil Procedure 15(a)(2), to name as additional defendants the Director of White House Information Technology, the Executive Committee for Presidential Information Technology, and the United States Digital Service, which the Court granted. Pl.'s Mot. to Am. Compl., ECF No. 30; Order, ECF No. 31.

Given the "substantial changes in factual circumstances" since this action was filed, the Court directed Plaintiff to file an amended motion for injunctive relief. Order, ECF No. 31. Plaintiff filed the amended motion on July 13, seeking to enjoin Defendants from "collecting voter roll data from states and state election officials" and to require

Defendants to "disgorge any voter roll data already collected or hereafter received." Proposed Order, ECF No. 35-6, at 1–2. Defendants' response supplied additional information about how the voter roll data would be collected and stored by the "repurposed" White House computer system. *See* Decl. of Charles Christopher Herndon, ECF No. 38-1 ("Herndon Decl."), ¶¶ 3–6. According to Defendants, the new system requires state officials to request an access link, which then allows them to upload data to a "server within the domain electionintergrity.whitehouse.gov." *Id.* ¶ 4. Once the files have been uploaded, "[a]uthorized members of the Commission will be given access" with "dedicated laptops" to access the data through a secure White House network. *Id.* ¶ 4–5. Defendants represent that this process will only require the assistance of "a limited number of technical staff from the White House Office of Administration . . . ." *Id.* ¶ 6. Finally, Defendants represented that the voter roll data uploaded to the SAFE system by the state of Arkansas—the only voter roll information known to the Court that has been transferred in response to the Commission's request—"ha[d] been deleted without ever having been accessed by the Commission." *Id.* ¶ 7.

## II. LEGAL STANDARD

Preliminary injunctive relief, whether in the form of temporary restraining order or a preliminary injunction, is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (emphasis in original;

quotation marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (quoting *Winter*, 555 U.S. at 20) (alteration in original; quotation marks omitted)). When seeking such relief, "'the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction.'" *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis,* 571 F.3d at 1291 (citation omitted). Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291–92.[3]

## III. DISCUSSION

### A.  Article III Standing

As a threshold matter, the Court must determine whether Plaintiff has standing to

---

[3] The Court notes that it is not clear whether this circuit's sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter. See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring opinion)). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112. In any event, this Court need not resolve the viability of the sliding-scale approach today, as it finds that Plaintiff has failed to show a likelihood of success on the merits and irreparable harm, and that the other preliminary injunction factors are in equipoise.

bring this lawsuit. Standing is an element of this Court's subject-matter jurisdiction under Article III of the Constitution, and requires, in essence, that a plaintiff have "a personal stake in the outcome of the controversy . . . ." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Consequently, a plaintiff cannot be a mere bystander or interested third-party, or a self-appointed representative of the public interest; he or she must show that defendant's conduct has affected them in a "personal and individual way." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The familiar requirements of Article III standing are:

> (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167 (1997) (citing *Lujan*, 504 U.S. at 560–61). The parties have briefed three theories of standing. Two are based on Plaintiff's own interests—for injuries to its informational interests and programmatic public interest activities—while the third is based on the interests of Plaintiff's advisory board members. This latter theory fails, but the first two succeed, for the reasons detailed below.

*1. Associational Standing*

An organization may sue to vindicate the interests of its members. To establish this type of "associational" standing, Plaintiff must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009) (internal

quotation marks omitted). Needless to say, Plaintiff must also show that it has "members" whose interests it is seeking to represent. To the extent Plaintiff does not have a formal membership, it may nonetheless assert organizational standing if "the organization is the functional equivalent of a traditional membership organization." *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002). For an organization to meet the test of functional equivalency, "(1) it must serve a specialized segment of the community; (2) it must represent individuals that have all the 'indicia of membership' including (i) electing the entity's leadership, (ii) serving in the entity, and (iii) financing the entity's activities; and (3) its fortunes must be tied closely to those of its constituency." *Washington Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007) (citing *Fund Democracy*, 278 F.3d at 25).

Plaintiff has submitted the declarations of nine advisory board members from six jurisdictions representing that the disclosure of their personal information—including "name, address, date of birth, political party, social security number, voter history, active/inactive or cancelled status, felony convictions, other voter registrations, and military status or overseas information"—will cause them immediate and irreparable harm. ECF No. 35-3, Exs. 7–15. The parties disagree on whether these advisory board members meet the test of functional equivalency. For one, Plaintiff's own website concedes that the organization "ha[s] no clients, no customers, and no shareholders . . . ." *See* About EPIC, http://epic.org/epic/about.html (last accessed July 20, 2017). Contrary to this assertion, however, Plaintiff has proffered testimony to the effect that advisory board members exert substantial influence over the affairs of the organization, including by influencing the matters in which the organization participates, and that advisory board members are

expected to contribute to the organization, either financially or by offering their time and expertise. Hr'g Tr. 16:1–18:19; *see also* Decl. of Marc Rotenberg, ECF No. 35-5, Ex. 38, ¶¶ 8–12. In the Court's view, however, the present record evidence is insufficient for Plaintiff to satisfy its burden with respect to associational standing. There is no evidence that members are *required* to finance the activities of the organization; that they have any role in electing the leadership of the organization; or that their fortunes, as opposed to their policy viewpoints, are "closely tied" to the organization. *See id.*; About EPIC, http://epic.org/epic/about.html (last accessed July 20, 2017) ("EPIC *works closely with* a distinguished advisory board, with expertise in law, technology and public policy. . . . EPIC is a 501(c)(3) nonprofit. We have no clients, no customers, and no shareholders. We need your support." (emphasis added)); *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 22 (D.D.C. 2014) ("defendant raises serious questions about whether EPIC is an association made up of members that may avail itself of the associational standing doctrine").

Furthermore, even if the Court were to find that Plaintiff is functionally equivalent to a membership organization, the individual advisory board members who submitted declarations do not have standing to sue in their own capacities. First, these individuals are registered voters in states that have declined to comply with the Commission's request for voter roll information, and accordingly, they are not under imminent threat of either the statutory or Constitutional harms alleged by Plaintiff. *See* Am. Opp'n Mem., at 13. Second, apart from the alleged violations of the advisory board members' Constitutional privacy rights—the existence of which the Court assumes for purposes of its standing analysis, *see Parker v. D.C.*, 478 F.3d 370, 378 (D.C. Cir. 2007), *aff'd sub nom. D.C. v. Heller*, 554 U.S.

570 (2008)—Plaintiff has failed to proffer a theory of individual harm that is "actual or imminent, [and not merely] conjectural or hypothetical . . . [,]" *Bennett*, 520 U.S. at 167. Plaintiff contends that the disclosure of sensitive voter roll information would cause immeasurable harm that would be "impossible to contain . . . after the fact." Pl.'s Am. Mem., at 13. The organization also alleges that the information may be susceptible to appropriation for unspecified "deviant purposes." *Id.* (internal citations omitted). However, Defendants have represented that they are only collecting voter information that is already publicly available under the laws of the states where the information resides; that they have only requested this information and have not demanded it; and Defendants have clarified that such information, to the extent it is made public, will be de-identified. *See supra* at [•]. All of these representations were made to the Court in sworn declarations, and needless to say, the Court expects that Defendants shall strictly abide by them.

Under these factual circumstances, however, the only practical harm that Plaintiff's advisory board members would suffer, assuming their respective states decide to comply with the Commission's request in the future, is that their already publicly available information would be rendered more easily accessible by virtue of its consolidation on the computer systems that would ultimately receive this information on behalf of the Commission. It may be true, as Plaintiff contends, that there are restrictions on how "publicly available" voter information can be obtained in the ordinary course, such as application and notification procedures. Hr'g Tr. 8:2–21. But even granting the assumption that the Commission has or will receive information in a manner that bypasses these safeguards, the only way that such information would be rendered more accessible for nefarious purposes is if the Court further assumes that either the Commission systems are

more susceptible to compromise than those of the states, or that the de-identification process eventually used by Defendants will not sufficiently anonymize the information when it is publicized. Given the paucity of the record before the Court, this sequence of events is simply too attenuated to confer standing. At most, Plaintiff has shown that its members will suffer an increased *risk* of harm if their already publicly available information is collected by the Commission. But under the binding precedent of the Supreme Court, an increased risk of harm is insufficient to confer standing; rather, the harm must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143 (2013). Indeed, on this basis, two district courts in this circuit have concluded that even the disclosure of *confidential*, *identifiable* information is insufficient to confer standing until that information is or is about to be used by a third-party to the detriment of the individual whose information is disclosed. *See In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 25 (D.D.C. 2014); *Welborn v. IRS*, 218 F. Supp. 3d 64, 77 (D.D.C. 2016). In sum, the mere increased risk of disclosure stemming from the collection and eventual, anonymized disclosure of already publicly available voter roll information is insufficient to confer standing upon Plaintiff's advisory board members. Consequently, for all of the foregoing reasons, Plaintiff has failed to show that it has associational standing to bring this lawsuit.[4]

---

[4] This obviates the need to engage in a merits analysis of Plaintiff's alleged Constitutional privacy right claims, which are based on the individual claims of its advisory board members. *See generally* Pl.'s Am. Mem., at 30. Nonetheless, even if the Court were to reach this issue, it would find that Plaintiff is unlikely to succeed on these claims because the D.C. Circuit has expressed "grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information." *Am. Fed'n of Gov't Emps., AFL-CIO v. Dep't of Hous. & Urban Dev.*, 118 F.3d 786, 791 (D.C. Cir. 1997).

*2. Informational Standing*

In order to establish informational standing, Plaintiff must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). "[A] plaintiff seeking to demonstrate that it has informational standing generally 'need not allege any additional harm beyond the one Congress has identified.'" *Id.* (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1544 (2016)). Plaintiff has brought suit under the APA, for the failure of one or more federal agencies to comply with Section 208 of the E-Government Act. That provision mandates that before "initiating a new collection of information," an agency must "conduct a privacy impact assessment," "ensure the review of the privacy impact assessment by the Chief Information Officer," and "if practicable, after completion of the review . . . , make the privacy impact assessment publicly available through the website of the agency, publication in the Federal Register, or other means." E-Government Act, § 208(b).  An enumerated purpose of the E-Government Act is "[t]o make the Federal Government more transparent and accountable." *Id.* § 2(b)(9).

Plaintiff satisfies both prongs of the test for informational standing. First, it has espoused a view of the law that entitles it to information. Namely, Plaintiff contends that Defendants are engaged in a new collection of information, and that a cause of action is available under the APA to force their compliance with the E-Government Act and to require the disclosure of a Privacy Impact Assessment. Second, Plaintiff contends that it has suffered the very injuries meant to be prevented by the disclosure of information

pursuant to the E-Government Act—lack of transparency and the resulting lack of opportunity to hold the federal government to account. This injury is particular to Plaintiff, given that it is an organization that was "established . . . to focus public attention on emerging privacy and civil liberties issues and to protect privacy, freedom of expression, and democratic values in the information age." About EPIC, https://www.epic.org/epic /about.html (last accessed July 20, 2017). Plaintiff, moreover, engages in government outreach by "speaking before Congress and judicial organizations about emerging privacy and civil liberties issues[,]" *id.*, and uses information it obtains from the government to carry out its mission to educate the public regarding privacy issues, Hr'g Tr. 20:12–23.

Defendants have contested Plaintiff's informational standing, citing principally to the D.C. Circuit's analysis in *Friends of Animals*. *See* Am. Opp'n Mem., at 14–20. There, the court held that plaintiff, an environmental organization, did not have informational standing under a statute that required the Department of the Interior ("DOI"), *first*, to make certain findings regarding whether the listing of a species as endangered is warranted within 12 months of determining that a petition seeking that relief "presents substantial scientific or commercial information," and *second*, after making that finding, to publish certain information in the Federal Register, including under some circumstances, a proposed regulation, or an "evaluation of the reasons and data on which the finding is based." *Friends of Animals*, 828 F.3d at 990–91 (internal quotation marks omitted) (citing 16 U.S.C. § 1533(b)(3)(B)). For example, part of the statute in *Friends of Animals* required that:

> (B) Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings: . . .
>
>> (ii) The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

16 U.S.C. § 1533(b)(3)(B)(ii). At the time plaintiff brought suit, the 12-month period had elapsed, but the DOI had yet to make the necessary findings, and consequently had not published any information in the Federal Register. In assessing plaintiff's informational standing, the D.C. Circuit focused principally on the structure of the statute that allegedly conferred on plaintiff a right to information from the federal government. *Friends of Animals*, 828 F.3d at 993. Solely on that basis, the court determined that plaintiff was not entitled to information because a right to information (e.g., a proposed regulation under subsection (B)(ii) or an evaluation under subsection (B)(iii)) arose only *after* the DOI had made one of the three findings envisioned by the statute. True, the DOI had failed to make the requisite finding within 12 months. But given the statutorily prescribed sequence of events, plaintiff's challenge was in effect to the DOI's failure to make such a finding, rather than to its failure to disclose information, given that the obligation to disclose information only arose after a finding had been made. As such, the D.C. Circuit concluded that plaintiff lacked informational standing.

The statutory structure here, however, is quite different.  The relevant portion of Section 208 provides the following:

> (b) PRIVACY IMPACT ASSESSMENTS.—
> > (1) RESPONSIBILITIES OF AGENCIES.
> > > (A) IN GENERAL.—An agency shall take actions described under subparagraph (B) before
> > > > (i) developing or procuring information technology that collects, maintains, or disseminates information that is in an identifiable form; or
> > > > (ii) initiating a new collection of information that—
> > > > > (I) will be collected, maintained, or disseminated using information technology; and
> > > > > (II) includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government.
> > > (B) AGENCY ACTIVITIES.—To the extent required under subparagraph (A), each agency shall—
> > > > (i) conduct a privacy impact assessment;
> > > > (ii) ensure the review of the privacy impact assessment by the Chief Information Officer, or equivalent official, as determined by the head of the agency; and
> > > > (iii) if practicable, after completion of the review under clause (ii), make the privacy impact assessment publicly available through the website of the agency, publication in the Federal Register, or other means.

E-Government Act, § 208(b). As this text makes clear, the statutorily prescribed sequence

of events here is reversed from the sequence at issue in *Friends of Animals*. There, the DOI

was required to disclose information only *after* it had made one of three "warranted"

findings; it had not made any finding, and accordingly, was not obligated to disclose any

information. Here, the statute mandates that an "agency *shall* take actions described under

subparagraph (B) *before* . . . initiating a new collection of information . . . ." *Id.* (emphasis

added). Subparagraph (B) in turn requires the agency to conduct a Privacy Impact

Assessment, to have it reviewed by the Chief Information Officer or his equivalent, and to

publish the assessment, if practicable. The statute, given its construction, requires all three

of these events, including the public disclosure of the assessment, to occur *before* the

agency initiates a new collection of information. Assuming that the other facets of Plaintiff's interpretation of the law are correct—namely, that Defendants are engaged in a new collection of information subject to the E-Government Act, that judicial review is available under the APA, and that disclosure of a privacy assessment is "practicable"— then Plaintiff is presently entitled to information pursuant to the E-Government Act, because the disclosure of information was already supposed to have occurred; that is, a Privacy Impact Assessment should have been made publicly available before Defendants systematically began collecting voter roll information. Accordingly, unlike in *Friends of Animals*, a review of the statutory text at issue in this litigation indicates that, under Plaintiff's interpretation of the law, Defendants have already incurred an obligation to disclose information.

Defendants make three further challenges to Plaintiff's informational standing, none of which are meritorious. First, Defendants contend that Plaintiff lacks standing because its informational injury is merely a "generalized grievance," and therefore insufficient to confer standing. Am. Opp'n Mem., at 15 (citing *Judicial Watch, Inc. v. FEC*, 180 F.3d 277, 278 (D.C. Cir. 1999)). Plainly, the E-Government Act entitles the public generally to the disclosure of Privacy Impact Assessments, but that does not mean that the informational injury in this case is not particular to Plaintiff. As already noted, Plaintiff is a public-interest organization that focuses on privacy issues, and uses information gleaned from the government to educate the public regarding privacy, and to petition the government regarding privacy law. *See supra* at [•]. Accordingly, the informational harm in this case, as it relates to Plaintiff, is "concrete and particularized." Moreover, the reality of statutes that confer informational standing is that they are often not targeted at a

particular class of individuals, but rather provide for disclosure to the public writ large. *See, e.g.*, *Friends of Animals*, 824 F.3d at 1041 (finding that public interest environmental organization had standing under statutory provision that required the Department of the Interior to publish certain information in the Federal Register). Even putting aside the particularized nature of the informational harm alleged in this action, however, the fact that a substantial percentage of the public is subject to the same harm does not automatically render that harm inactionable. As the Supreme Court observed in *Akins*: "Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found 'injury in fact.'" *FEC v. Akins*, 524 U.S. 11, 24 (1998). The Court went on to hold, in language that is particularly apt under the circumstances, that "the informational injury at issue . . . , directly related to voting, the most basic of political rights, is sufficiently concrete and specific . . . ." *Id.* at 24–25.

Defendants next focus on the fact that the information sought does not yet exist in the format in which it needs to be disclosed (i.e., as a Privacy Impact Assessment). Am. Opp'n Mem., at 17. In this vein, they claim that *Friends of Animals* stands for the proposition that the government cannot be required to create information. The Court disagrees with this interpretation of *Friends of Animals*, and moreover, Defendants' view of the law is not evident in the controlling Supreme Court and D.C. Circuit precedents. As already detailed, the court in *Friends of Animals* looked solely to the statutory text to determine whether an obligation to disclose had been incurred. No significance was placed by the D.C. Circuit on the fact that, if there were such an obligation, the federal government would potentially be required to "create" the material to be disclosed (in that case, either a

proposed regulation, or an evaluative report). Furthermore, *Friends of Animals* cited two cases, one by the D.C. Circuit and the other by the Supreme Court, as standing for the proposition that plaintiffs have informational standing to sue under "statutory provisions that guarantee[] a right to receive information *in a particular form*." *Friends of Animals*, 828 F.3d at 994 (emphasis added; citing *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 615–19 (D.C. Cir. 2006), and *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–75 (1982)). Furthermore, in *Public Citizen*, the Supreme Court found that plaintiff had informational standing to sue under FACA, and thereby seek the disclosure of an advisory committee charter and other materials which FACA requires advisory committees to create and make public. Presumably those materials did not exist, given defendants' position that the committee was not subject to FACA, and in any event, the Court made no distinction on this basis. *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 447 (1989). And in *Akins*, the information sought was not in defendants' possession, as the entire lawsuit was premised on requiring defendant to take enforcement action to obtain that information. 524 U.S. at 26. Ultimately, the distinction between information that already exists, and information that needs to be "created," if not specious, strikes the Court as an unworkable legal standard. Information does not exist is some ideal form. When the government discloses information, it must always first be culled, organized, redacted, reviewed, and produced. Sometimes the product of that process, as under the Freedom of Information Act, is a production of documents, perhaps with an attendant privilege log. *See, e.g., Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 146 (D.C. Cir. 2006) (explaining the purpose of a *Vaughn* index). Here, Congress has mandated that disclosure take the form of a Privacy Impact Assessment, and that is what Plaintiff has standing to

seek, regardless of whether an agency is ultimately required to create the report.

Lastly, Defendants contend that Plaintiff lacks informational standing because Section 208 only requires the publication of a Privacy Impact Statement if doing so is "practicable." Am. Opp'n Mem., at 17 n.2. As an initial matter, Defendants have at no point asserted that it would be impracticable to create and publish a Privacy Impact Assessment; rather, they have rested principally on their contention that they are not required to create or disclose one because Plaintiff either lacks standing, or because the E-Government Act and APA only apply to federal agencies, which are not implicated by the collection of voter roll information. Accordingly, whatever limits the word "practicable" imposes on the disclosure obligations of Section 208, they are not applicable in this case, and therefore do not affect Plaintiff's standing to bring this lawsuit. As a more general matter, however, the Court disagrees with Defendants' view that merely because a right to information is in some way qualified, a plaintiff lacks informational standing to seek vindication of that right. For this proposition, Defendants again cite *Friends of Animals*, contending that the D.C. Circuit held that "informational standing only exists if [the] statute 'guaranteed a right to receive information in a particular form . . . .'" *Id.* (citing *Friends of Animals*, 828 F.3d at 994). That is not what the D.C. Circuit held; rather that language was merely used to describe two other cases, *Haven* and *Zivotofsky*, in which the Supreme Court and D.C. Circuit determined that plaintiffs had informational standing. *See supra* at [•]. One only need to look toward the Freedom of Information Act, under which litigants undoubtedly have informational standing despite the fact that the Act in no way provides an unqualified right to information, given its numerous statutory exemptions. *See Zivotofsky*, 444 F.3d at 618. Moreover, the available guidance indicates that the qualifier "practicable" was meant

to function similarly to the exemptions under the Freedom of Information Act, and is therefore not purely discretionary. *See* M-03-22, OMB Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002 (Sept. 26, 2003) ("Agencies may determine to not make the PIA document or summary publicly available to the extent that publication would raise security concerns, reveal classified (i.e., national security) information or sensitive information (e.g., potentially damaging to a national interest, law enforcement effort or competitive business interest) contained in an assessment. *Such information shall be protected and handled consistent with the Freedom of Information Act . . . .*" (footnote omitted; emphasis added)). Accordingly, for all of the foregoing reasons, the Court concludes that Plaintiff has satisfied its burden at this stage regarding its informational standing to seek the disclosure of a Privacy Impact Assessment pursuant to Section 208 of the E-Government Act.

Moreover, because the Court assumes the merits of Plaintiff's claims for standing purposes, the Court also finds that Plaintiff has informational standing with respect to its FACA claim, which likewise seeks the disclosure of a Privacy Impact Assessment. *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 583 F.3d 871, 873 (D.C. Cir. 2009) ("Here the injury requirement is obviously met. In the context of a FACA claim, an agency's refusal to disclose information that the act requires be revealed constitutes a sufficient injury.")

### 3. Organizational Standing Under PETA

For similar reasons to those enumerated above with respect to informational standing, the Court also finds that Plaintiff has organizational standing under *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015). In this circuit, an organization may establish standing if it has "suffered a concrete and demonstrable injury to its activities, mindful that,

under our precedent, a mere setback to . . . abstract social interests is not sufficient." *Id.* at 1093 (internal quotation marks and alterations omitted) (citing *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987) ("The organization must allege that discrete programmatic concerns are being directly and adversely affected by the defendant's actions.")). "Making this determination is a two-part inquiry—we ask, first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (internal quotation marks and alterations omitted). In *PETA*, the D.C. Circuit found that an animal rights organization had suffered a "denial of access to bird-related . . . information including, in particular, investigatory information, and a means by which to seek redress for bird abuse . . . ." *PETA*, 797 F.3d at 1095. This constituted a "cognizable injury sufficient to support standing" because the agency's failure to comply with applicable regulations had impaired PETA's ability to bring "violations to the attention of the agency charged with preventing avian cruelty and [to] continue to educate the public." *Id.*

Under the circumstances of this case, Plaintiff satisfies the requirements for organizational standing under *PETA*. Plaintiff has a long-standing mission to educate the public regarding privacy rights, and engages in this process by obtaining information from the government. Pl.'s Reply Mem. at 17 ("EPIC's mission includes, in particular, educating the public about the government's record on voter privacy and promoting safeguards for personal voter data."). Indeed, Plaintiff has filed Freedom of Information Act requests in this jurisdiction seeking the disclosure of the same type of information, Privacy Impact Assessments, that it claims has been denied in this case. *See, e.g.*, *Elec. Privacy Info. Ctr.*

*v. DEA*, 208 F. Supp. 3d 108, 110 (D.D.C. 2016). Furthermore, Plaintiff's programmatic activities—educating the public regarding privacy matters—have been impaired by Defendants' alleged failure to comply with Section 208 of the E-Government Act, since those activities routinely rely upon access to information from the federal government. *See* Hr'g Tr. at 20:8–16. This injury has required Plaintiff to expend resources by, at minimum, seeking records from the Commission and other federal entities concerning the collection of voter data. *See* Decl. of Eleni Kyriakides, ECF No. 39-1, ¶ 6. Accordingly, Plaintiff has organizational standing under the two-part test sanctioned by the D.C. Circuit in *PETA*.

### B.  Likelihood of Success on the Merits

Having assured itself of Plaintiff's standing to bring this lawsuit, the Court turns to assess the familiar factors for determining whether a litigant is entitled to preliminary injunctive relief; in this case, a temporary restraining order and preliminary injunction. The first, and perhaps most important factor, is Plaintiff's likelihood of success on the merits.

The E-Government Act does not provide for a private cause of action, and accordingly, Plaintiff has sought judicial review pursuant to Section 702 of the APA. *See Greenspan v. Admin. Office of the United States Courts*, No. 14CV2396 JTM, 2014 WL 6847460, at *8 (N.D. Cal. Dec. 4, 2014). Section 704 of the APA, in turn, limits judicial review to "final agency action for which there is no other adequate remedy . . . ." As relevant here, the reviewing court may "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The parties principally disagree over whether any "agency" is implicated in this case such that there could be an "agency action" subject to this Court's review. *See* Pl.'s Am. Mem., at 19–30; Am. Opp'n Mem., at 20–33.

"Agency" is broadly defined by the APA to include "each authority of the

Government of the United States, whether or not it is within or subject to review by another agency . . . ." 5 U.S.C. § 551(1). The statute goes on to exclude certain components of the federal government, including Congress and the federal courts, but does not by its express terms exclude the President, or the Executive Office of the President ("EOP"). *Id*. Nonetheless, the Supreme Court has concluded that the President is exempted from the reach of the APA, *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992), and the D.C. Circuit has established a test for determining whether certain bodies within the Executive Office of the President are sufficiently close to the President as to also be excluded from APA review, *see Armstrong v. Exec. Office of the President*, 90 F.3d 553, 558 (D.C. Cir. 1996) (citing *Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993)). In determining whether the Commission is an "agency," or merely an advisory body to the President that is exempted from APA review, relevant considerations include "whether the entity exercises substantial independent authority," "whether the entity's sole function is to advise and assist the President," "how close operationally the group is to the President," "whether it has a self-contained structure," and "the nature of its delegated authority." *Citizens for Responsibility & Ethics in Washington v. Office of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) ("*CREW*") (internal quotation marks omitted). The most important consideration appears to be whether the "entity in question wielded substantial authority independently of the President." *Id*.

The record presently before the Court is insufficient to demonstrate that the Commission is an "agency" for purposes of the APA. First, the Executive Order indicates that the Commission is purely advisory in nature, and that it shall disband shortly after it delivers a report to the President. No independent authority is imbued upon the

Commission by the Executive Order, and there is no evidence that it has exercised any independent authority that is unrelated to its advisory mission. Defendants' request for information is just that—a request—and there is no evidence that they have sought to turn the request into a demand, or to enforce the request by any means. Furthermore, the request for voter roll information, according to Defendants, is ancillary to the Commission's stated purpose of producing an advisory report for the President regarding voting processes in federal elections. The Executive Order does provide that other federal agencies "shall endeavor to cooperate with the Commission," and that the GSA shall "provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission." Exec. Order § 7(a). Nonetheless, Defendants have represented that the GSA's role is currently expected to be limited to specific "administrative support like arranging travel for the members" of the Commission, and that no other federal agencies are "cooperating" with the Commission. Hr'g Tr. at 27:25–28:6; 30:10–13. Finally, although Commissioner Christy McCormick of the Election Assistance Commission is a member of the Commission, there is currently no record evidence that she was substantially involved in the decision to collect voter information, or that her involvement in some fashion implicated the Election Assistance Commission, which is a federal agency. Hr'g Tr. 28:24–30:4; *cf. Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 39–40 (D.D.C. 2002) (citing *Ryan v. Dep't of Justice*, 617 F.2d 781 (D.C. Cir. 1980)).

This would have ended the inquiry, but for the revelation during the course of these proceedings that the SAFE system, which the Commission had intended for states to use to transmit voter roll information, is operated by a component of the Department of

Defense. Moreover, the only voter roll information transferred to date resided on the SAFE system, and consequently was stored on a computer system operated by the Department of Defense. Given these factual developments, the Department of Defense—a federal agency—was added as a defendant to this lawsuit. *See* Am. Compl., ECF No. 21, ¶¶ 37–42. Shortly after that occurred, however, Defendants changed gears, and represented that "[i]n order not to impact the ability of other customers to use the [SAFE] site, the Commission has decided to use alternative means for transmitting the requested data." ECF No. 24, at 1. In lieu of the SAFE system, Defendants had the Director of White House Information Technology ("DWHIT") repurpose "an existing system that regularly accepts personally identifiable information through a secure, encrypted computer application within the White House Information Technology enterprise." *Id*. Furthermore, Defendants have represented that the data received from the State of Arkansas via the SAFE system has been deleted, "without ever having been accessed by the Commission." Herndon Decl. ¶ 7. Accordingly, while the legal dispute with respect to the use of the SAFE system by Defendants to collect at least some voter roll information may not be moot—data was in fact collected before a Privacy Impact Assessment was conducted pursuant to the E-Government Act—that potential legal violation does not appear to be a basis for the prospective injunctive relief sought by Plaintiff's amended motion for injunctive relief; namely, the prevention of the further collection of voter roll information by the Commission. In any event, Plaintiff has not pursued the conduct of the Department of Defense as a basis for injunctive relief.

Given the change of factual circumstances, the question now becomes whether any of the entities that will be involved in administering the "repurposed" White House system

are "agencies" for purposes of APA review. One candidate is the DWHIT. According to the Presidential Memorandum establishing this position, the "Director of White House Information Technology, on behalf of the President, shall have the primary authority to establish and coordinate the necessary policies and procedures for operating and maintaining the information resources and information systems provided to the President, Vice President, and the EOP." Mem. on Establishing the Director of White House Information Technology and the Executive Committee for Presidential Information Technology ("DWHIT Mem."), § 1, *available at* https://www.gpo.gov/fdsys/pkg/DCPD-201500185/pdf/DCPD-201500185.pdf (last accessed July 16, 2017). The DWHIT is part of the White House Office, *id*. § 2(a)(ii), a component of the EOP "whose members assist the President with those tasks incidental to the office." *Alexander v. F.B.I.*, 691 F. Supp. 2d 182, 186 (D.D.C. 2010), *aff'd*, 456 F. App'x 1 (D.C. Cir. 2011); *see also* Herndon Decl. ¶ 1. According to the Memorandum, the DWHIT "shall ensure the effective use of information resources and information systems provided to the President, Vice President, and EOP in order to improve mission performance, and shall have the appropriate authority to promulgate all necessary procedures and rules governing these resources and systems." DWHIT Mem., § 2(c). The DWHIT is also responsible for providing "policy coordination and guidance" for a group of other entities that provide information technology services to the President, Vice President, and the EOP, known as the "Presidential Information Technology Community." *Id*. § 2(a), (c). Furthermore, the DWHIT may "advise and confer with appropriate executive departments and agencies, individuals, and other entities as necessary to perform the Director's duties under this memorandum." *Id*. § 2(d).

Taken as a whole, the responsibilities of the DWHIT based on the present record

amount to providing operational and administrative support services for information technology used by the President, Vice President, and close staff. Furthermore, to the extent there is coordination with other federal agencies, the purpose of that coordination is likewise to ensure the sufficiency and quality of information services provided to the President, Vice President, and their close staff. Given the nature of the DWHIT's responsibilities and its proximity to the President and Vice President, it is not an agency for the reasons specified by the D.C. Circuit in *CREW* with respect to the Office of Administration ("OA"). In that case, the D.C. Circuit held that the OA was not an "agency" under FOIA[5] because "nothing in the record indicate[d] that OA performs or is authorized to perform tasks other than operational and administrative support for the President and his staff . . . ." *CREW*, 566 F.3d at 224. Relying on its prior holding in *Sweetland*, the court held that where an entity within the EOP, like the DWHIT, provides to the President and his staff "only operational and administrative support . . . it lacks the substantial

---

[5] Plaintiff argues that *CREW* and similar cases by the D.C. Circuit interpreting whether an entity is an agency for purposes of FOIA are not applicable to determining whether an entity is an agency for purposes of the APA. *See* Pl.'s Reply Mem. at 2. The Court disagrees. The D.C. Circuit established the "substantial independent authority" test in *Soucie,* a case that was brought under FOIA, but at a time when the definition of "agency" for FOIA purposes mirrored the APA definition. In that case, the D.C. Circuit held that "the APA apparently confers agency status on any administrative unit with *substantial independent authority* in the exercise of specific functions." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971) (emphasis added); *Meyer*, 981 F.2d at 1292 n.1 ("[b]efore the 1974 Amendments, FOIA simply had adopted the APA's definition of agency"); *see also Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997) ("[o]ur cases have followed the same approach, requiring that an entity exercise substantial independent authority before it can be considered an agency for § 551(1) purposes"—that is, the section that defines the term "agency" for purposes of the APA). The *CREW* court applied the "substantial independent authority" test, and the Court sees no basis to hold that the reasoning of *CREW* is not dispositive of DWHIT's agency status in this matter.

independent authority we have required to find an agency covered by FOIA . . . ." *Id.* at 223 (citing *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995)). This conclusion was unchanged by the fact that the OA, like the DWHIT here, provides support for other federal agencies to the extent they "work at the White House complex in support of the President and his staff." *Id.* at 224. Put differently, the fact that the DWHIT coordinates the information technology support provided by other agencies for the President, Vice President, and their close staff, does not change the ultimate conclusion that the DWHIT is not "authorized to perform tasks other than operational and administrative support for the President and his staff," which means that the DWHIT "lacks substantial independent authority and is therefore not an agency . . . ." *Id.* However, to the extent that DWHIT's responsibilities expand either formally or organically, as a result of its newfound responsibilities in assisting the Commission, this determination may need to be revisited in the factual context of this case.

The other candidates for "agency action" proposed by Plaintiff fare no better. The Executive Committee for Presidential Information Technology and the U.S. Digital Service, even if they were agencies, "will have no role in th[e] data collection process." Herndon Decl. ¶ 6. According to Defendants, apart from the DWHIT, the only individuals who will be involved in the collection of voter roll information are "a limited number of . . . technical staff from the White House Office of Administration." *Id.* Finally, Plaintiff contends that the entire EOP is a "parent agency," and that as a result, the activities of its components, including those of the DWHIT and the Commission, are subject to APA review. However, this view of the EOP has been expressly rejected by the D.C. Circuit and is at odds with the practical reality that the D.C. Circuit has consistently analyzed the

agency status of EOP components on a component-by-component basis. *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998) ("it has never been thought that the whole Executive Office of the President could be considered a discrete agency under FOIA"). Accordingly, at the present time and based on the record before the Court, it appears that there is no "agency," as that term is understood for purposes of the APA, that is involved in the collection of voter roll information on behalf of the Commission. Because there is no apparent agency involvement at this time, the Court concludes that APA review is presently unavailable in connection with the collection of voter roll information by the Commission.

The last remaining avenue of potential legal redress is pursuant to FACA. Plaintiff relies on Section 10(b) of FACA as a means to seek the disclosure of a Privacy Impact Assessment, as required under certain circumstances by the E-Government Act. *See* Am. Compl, ECF No. 33, ¶¶ 73–74. That section provides that an advisory committee subject to FACA must make publicly available, unless an exception applies under FOIA, "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by [the] advisory committee . . . ." 5 U.S.C. app. 2 § 10(b). The flaw with this final approach, however, is that FACA itself does not require Defendants to produce a Privacy Impact Assessment; only the E-Government Act so mandates, and as concluded above, the Court is not presently empowered to exert judicial review pursuant to the APA with respect to Plaintiff's claims under the E-Government Act, nor can judicial review be sought pursuant to the E-Government Act itself, since it does not provide for a private cause of action. Consequently, for all of the foregoing reasons, none of Plaintiff's avenues of potential legal redress appear

to be viable at the present time, and Plaintiff has not demonstrated a likelihood of success on the merits.

### C. Irreparable Harm, Balance of the Equities, and the Public Interest

Given that Plaintiff is essentially limited to pursuing an informational injury, many of its theories of irreparable harm, predicated as they are on injuries to the private interests of its advisory board members, have been rendered moot. *See* Pl.'s Am. Mem., at 34–40. Nonetheless, the non-disclosure of information to which a plaintiff is entitled, under certain circumstances itself constitutes an irreparable harm; specifically, where the information is highly relevant to an ongoing and highly public matter. *See, e.g.*, *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006) ("EPIC will also be precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program"); *see also Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Because the urgency with which the plaintiff makes its FOIA request is predicated on a matter of current national debate, due to the impending election, a likelihood for irreparable harm exists if the plaintiff's FOIA request does not receive expedited treatment."). Indeed, the D.C. Circuit has held that "stale information is of little value . . . [,]" *Payne Enters, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988), and that the harm in delaying disclosure is not necessarily redressed even if the information is provided at some later date, *see Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999) ("Byrd's injury, however, resulted from EPA's failure to furnish him with the documents until long after they would have been of any use to him."). Here, however, the Court concludes that Plaintiff is not presently entitled to the information that it seeks, and accordingly, Plaintiff

cannot show that it has suffered an irreparable informational injury. To hold otherwise would mean that whenever a statute provides for potential disclosure, a party claiming entitlement to that information in the midst of a substantial public debate would be entitled to a finding of irreparable informational injury, which cannot be so. *See, e.g., Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 45 (D.D.C. 2014) ("surely EPIC's own subjective view of what qualifies as 'timely' processing is not, and cannot be, the standard that governs this Court's evaluation of irreparable harm").

Finally, the equitable and public interest factors are in equipoise. As the Court recently held in a related matter, "[p]lainly, as an equitable and public interest matter, more disclosure, more promptly, is better than less disclosure, less promptly. But this must be balanced against the interest of advisory committees to engage in their work . . . ." *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, No. CV 17-1354 (CKK), 2017 WL 3028832, at *10 (D.D.C. July 18, 2017). Here, the disclosure of a Privacy Impact Assessment may very well be in the equitable and public interest, but creating a right to such disclosure out of whole cloth, and thereby imposing an informational burden on the Commission where none has been mandated by Congress or any other source of law, is not.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiff's [35] Motion for a Temporary Restraining Order and Preliminary Injunction is **DENIED WITHOUT PREJUDICE**.

An appropriate Order accompanies this Memorandum Opinion.

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge
