**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, <br><br>      Plaintiff, <br><br> v. <br><br> PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY, *et al.*, <br><br>      Defendants. | Civil Action No. 1:17-cv-1320 (CKK) |

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.  FACTUAL BACKGROUND .......................................................................................... 3

II.  LEGAL BACKGROUND .............................................................................................. 7

    A.  The E-Government Act of 2002 ................................................................................ 7

    B.  The Federal Advisory Committee Act ..................................................................... 8

    C.  The Administrative Procedure Act ........................................................................... 8

STANDARDS OF REVIEW ............................................................................................... 9

ARGUMENT .................................................................................................................... 10

I.  PLAINTIFF LACKS STANDING. ............................................................................... 10

    A.  Plaintiff Lacks Standing to Sue in a Representational Capacity. .............................. 11

    B.  Plaintiff Lacks Informational Standing to Sue on its Own Behalf. ........................... 15

    C.  Plaintiff Also Lacks Standing to Sue on its Own Behalf Based on
         Alleged Programmatic Injury. ................................................................................. 20

    D.  Plaintiff's Claims Against DOD are Moot. .............................................................. 24

II.  NEITHER THE COMMISSION NOR THE DIRECTOR OF WHITE HOUSE
    INFORMATION TECHNOLOGY IS AN AGENCY SUBJECT TO THE
    APA AND E-GOVERNMENT ACT, AND ACCORDINGLY PLAINTIFF'S
    E-GOVERNMENT AND FACA CLAIMS FAIL TO STATE A CLAIM UPON
    WHICH RELIEF CAN BE GRANTED. ....................................................................... 24

    A.  Entities Within the Executive Office of the President Are Agencies
         Only if They Exercise Substantial Independent Authority. ..................................... 25

    B.  The "Substantial Independent Authority" Test Applies to Both the APA
         and the E-Government Act. ..................................................................................... 29

    C.  The Presidential Commission is Not an Agency. ..................................................... 31

D.      The Director of White House Information Technology is Not an Agency. .............. 34

E.      The Executive Office of the President is Not a Discrete "Agency." ........................ 36

F.      GSA is Not Obligated to Provide the Commission Data Storage, Nor
        Does the Fact that GSA Is an Agency Transform an EOP Component
        Into an Agency. ..................................................................................................... 37

III.  PLAINTIFF'S CLAIMS THAT ITS MEMBERS' ALLEGED CONSTITUTIONAL
      RIGHTS HAVE BEEN VIOLATED SHOULD BE DISMISSED. .................................... 37

A.      There is no Constitutional Right to Informational Privacy ....................................... 38

B.      Advisory Board Members' Procedural Due Process Rights Are Not Implicated ..... 41

CONCLUSION ..................................................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*A.A. ex rel. M.M. v. New Jersey,*
  341 F.3d 206 (3d Cir. 2003) .................................................................... 40

*A.A. v. New Jersey,*
  176 F. Supp. 2d 274 (D.N.J. 2001) .......................................................... 40

*Al-Owhali v. Ashcroft,*
  279 F. Supp. 2d 13 (D.D.C. 2003) ............................................................ 15

*Alexander v. FBI,*
  691 F. Supp. 2d 182 (D.D.C. 2010) .................................................... 30, 35

*Alexander v. FBI,*
  971 F. Supp. 603 (D.D.C. 1997) ............................................................... 30

*\*American Federation of Government Employees v. Department of Housing and Urban
  Development,*
  118 F.3d 786 (D.C. Cir. 1997) ................................................................. 38

*American Legal Foundation v. FCC,*
  808 F.2d 84 (D.C. Cir. 1987) ................................................................... 21

*American Manufacturers Mutual Insurance Co. v. Sullivan,*
  526 U.S. 40 (1999) .................................................................................. 41

*Armstrong v. Executive Office of the President,*
  90 F.3d 553 (D.C. Cir. 1996) ............................................................ 28, 36

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .............................................................................. 9, 10

*Association of American Physicians and Surgeons, Inc. v. Clinton,*
  997 F.2d 898 (D.C. Cir. 1993) ................................................................. 27

*Association of American Physicians and Surgeons, Inc. v. FDA,*
  539 F. Supp. 2d 4 (D.D.C. 2008) ............................................................. 16

*Association of Flight Attendants—CWA v. Department of Transportation,*
  564 F.3d 462 (D.C. Cir. 2009) ................................................................. 11

*Attias v. CareFirst, Inc.,*
  865 F.3d 620 (D.C. Cir. 2017) .......................................................... 14, 15

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................. 9, 10

*Cary v. Hall,*
    No. C, 05-4363 VRW, 2006 WL 6198320 (N.D. Cal. Sept. 30, 2006) .................................. 19

*Center for Law and Education v. Department of Education*,
    396 F.3d 1152 (D.C. Cir. 2005) ................................................................................... 21

*Citizens for Responsibility and Ethics in Washington v. Office of Administration*,
    566 F.3d 219 (D.C. Cir. 2009) ........................................................................... 27, 28, 35

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .................................................................................................... 24

*Clapper v. Amnesty International USA*,
    133 S. Ct. 1138 (2013) .............................................................................................. 14

*Colorado Environmental Coalition v. Wenker*,
    353 F.3d 1221 (10th Cir. 2004) ..................................................................................... 8

*Common Cause v. FEC*,
    108 F.3d 413 (D.C. Cir. 1997) ............................................................................... 16, 19

*Cox Broadcasting Corp. v. Cohn*,
    420 U.S. 469 (1975) .................................................................................................. 39

*Cutshall v. Sundquist*,
    193 F.3d 466 (6th Cir. 1999) ...................................................................................... 40

*Detroit International Bridge Co. v. Government of Canada*,
    189 F. Supp. 3d 85 (D.D.C. 2016) ............................................................................... 27

*Doe v. City of New York*,
    15 F.3d 264 (2d Cir. 1994) .......................................................................................... 39

*Doe v. United States Department of Justice*,
    753 F.2d 1092 (D.C. Cir. 1985) ................................................................................... 41

*Dong v. Smithsonian Institute*,
    125 F.3d 877 (D.C. Cir. 1997) ........................................................................... 29, 30, 31

*E.B. v. Verniero*,
    119 F.3d 1077 (3d Cir. 1997) ...................................................................................... 40

*Electronic Privacy Information Center v. Department of Education*,
    48 F. Supp. 3d 1 (D.D.C. 2014) ............................................................................. 13, 23

iv

*Energy Research Foundation v. Defense Nuclear Facilities Safety Board*,
   917 F.2d 581 (D.C. Cir. 1990) ................................................................. 32, 33

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ................................................................. 22, 24

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ................................................................................... 9, 27

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) ...................................................................... 17

*Friends of Animals v. Jewell*,
   115 F. Supp. 3d 107 (D.D.C. 2015) ............................................................. 19

*Friends of Animals v. Salazar*,
   626 F. Supp. 2d 102 (D.D.C. 2009) .................................................. 17, 18, 19

*Fund Democracy, LLC v. SEC*,
   278 F.3d 21 (D.C. Cir. 2002) ........................................................................ 12

*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990) ...................................................................................... 10

*Garner v. Jones*,
   529 U.S. 244 (2000) ...................................................................................... 42

*General Electric Co. v. Jackson*,
   610 F.3d 110 (D.C. Cir. 2010) ...................................................................... 41

*Greenspan v. Administrative Office of the United States Courts*,
   No. 14-cv-2396, 2014 WL 6847460 (N.D. Cal. Dec. 4, 2014) ...................... 25

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................................ 11, 21

*Heartwood, Inc. v. United States Forest Service*,
   431 F. Supp. 2d 28 (D.D.C. 2006) ............................................................... 33

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ........................................................................................ 8

*Hunt v. Washington State Apple Advertising Commission*,
   432 U.S. 333 (1977) ...................................................................................... 12

*In re Science Applications International Corp. Backup Tape Data Theft Litigation*,
   45 F. Supp. 3d 14, 26 (D.D.C. 2014) ........................................................... 14

*International Brominated Solvents Association v. American Conference of Governmental Industrial Hygienists, Inc.*, 393 F. Supp. 2d 1362 (M.D. Ga. 2005) ........................................ 8

*International Counsel Bureau v. CIA*,
No. 09-2269 (JDB), 2010 WL 1410561 (D.D.C. Apr. 2, 2010) ............................... 36

*Jerome Stevens Pharmaceuticals, Inc. v. FDA*,
402 F.3d 1249 (D.C. Cir. 2005) .................................................................................. 9

*Jones v. Lacey*,
108 F. Supp. 3d 573 (E.D. Mich. 2015) ...................................................................... 39

*\*Judicial Watch, Inc. v. Department of Energy*,
412 F.3d 125 (D.C. Cir. 2005) ................................................................................... 34

*Judicial Watch, Inc. v. FEC*,
180 F.3d 277 (D.C. Cir. 1999) ................................................................................... 19

*Judicial Watch, Inc. v. National Energy Policy Development Group*,
219 F. Supp. 2d 20 (D.D.C. 2002) ........................................................................ 8, 25

*Kissinger v. Reporters Committee for Freedom of the Press*,
445 U.S. 136 (1980) ................................................................................................... 26

*Lewis v. Delarosa*,
No. C-15-2689 MC (PR), 2015 WL 5935311 (N.D. Cal. Oct. 13, 2015) ................. 39

*Lightfoot v. District of Columbia*,
273 F.R.D. 314 (D.D.C. 2011) ................................................................................... 41

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................................................... 9, 10

*McKinney v. Caldera*,
141 F. Supp. 2d 25 (D.D.C. 2001) ............................................................................. 29

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006) ..................................................................................................... 31

*\*Meyer v. Bush*,
981 F.2d 1288 (D.C. Cir. 1993) ........................................................................... passim

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374  (1992) .................................................................................................. 31

*\*National Aeronautics and Space Administration v. Nelson*,
562 U.S. 134 (2011) ................................................................................................... 38

vi

*National Association of Home Builders v. EPA*,
   667 F.3d 6 (D.C. Cir. 2011) ........................................................................ 21

*National Consumers League v. General Mills, Inc.*,
   680 F. Supp. 2d 132 (D.D.C. 2010) ........................................................... 23

*National Security Archive v. Archivist of the United States*,
   909 F.2d 541 (D.C. Cir. 1990) .................................................................... 29

*National Taxpayers Union, Inc. v. United States*,
   68 F.3d 1428 (D.C. Cir. 1995) ............................................................. 21, 23

*National Treasury Employees Union v. United States*,
   101 F.3d 1423 (D.C. Cir. 1996) ........................................................... 11, 21

*Pacific Legal Foundation v. Council on Environmental Quality*,
   636 F.2d 1259 (D.C. Cir. 1980) .................................................................. 28

*Paul v. Davis*,
   424 U.S. 693 (1976) .................................................................................... 42

*Pelosi v. Spota*,
   607 F. Supp. 2d 366 (E.D.N.Y. 2009) ........................................................ 39

*People for the Ethical Treatment of Animals v. Department of Agriculture*,
   797 F.3d 1087, 1095 (D.C. Cir. 2015) .................................................. 20, 22

*Project Vote/Voting for America, Inc. v. Long*,
   682 F.3d 331 (4th Cir. 2012) ...................................................................... 39

*Propert v. District of Columbia*,
   948 F.2d 1327 (D.C. Cir. 1991) .................................................................. 41

*Public Citizen v. FTC*,
   869 F.2d 1541 (D.C. Cir. 1989) .................................................................. 16

*Renne v. Geary*,
   501 U.S. 312 (1991) ...................................................................................... 9

*Rushforth v. Council of Economic Advisers*,
   762 F.2d 1038 (D.C. Cir. 1985) ...................................................... 26, 28, 32

*San Francisco Arts and Athletics, Inc. v. United States. Olympic Committee*,
   483 U.S. 522 (1987) .................................................................................... 41

*Sculimbrene v. Reno*,
   158 F. Supp. 2d 26 (D.D.C. 2001) .............................................................. 29

*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012) ............................................................... 15

*Sierra Club v. Andrus*,
581 F.2d 895 (D.C. Cir. 1978) ............................................................... 28

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002) ........................................................ 10, 16

*Soucie v. David*,
448 F.2d 1067 (D.C. Cir. 1971) ..................................................... passim

*Spann v. Colonial Village, Inc.*,
899 F.2d 24 (D.C. Cir. 1990) ................................................................ 21

*Spartalj-Waters v. United States*,
No. 87-cv-1131-OG, 1987 WL 19626 (D.D.C. Oct. 30, 1987) ............... 15

*Stewart v. National Education Association*,
471 F.3d 169 (D.C. Cir. 2006) ............................................................... 10

*Sweetland v. Walters*,
60 F.3d 852 (D.C. Cir. 1995) ........................................................... 27, 28

*United States Department of Justice v. Reporters Committee for Freedom of Press*,
489 U.S. 749 (1989) ........................................................................ 13, 40

*United States v. Espy*,
145 F.3d 1369 (D.C. Cir. 1998) ............................................................. 36

*Warth v. Seldin*,
422 U.S. 490 (1975) .............................................................................. 10

*Washington Legal Foundation v. Leavitt*,
477 F. Supp. 2d 202 (D.D.C. 2007) ...................................................... 12

*Welborn v. IRS*,
218 F. Supp. 3d 64 (D.D.C. 2016) ........................................................ 14

*Wilson v. Libby*,
535 F.3d 697 (D.C. Cir. 2008) ......................................................... 31, 35

*Wolfe v. Weinberger*,
403 F. Supp. 238 (D.D.C. 1975) ........................................................... 33

*Wright v. Foreign Service Grievance Board*,
503 F. Supp. 2d 163 (D.D.C. 2007) ........................................................ 9

**Statutes**

5 U.S.C. app. 2 § 10 ................................................................................................ 8, 33

5 U.S.C. § 551(1) ..................................................................................................... passim

5 U.S.C. § 552(b)(7)(C) ........................................................................................... 40

5 U.S.C. § 552(f)(1) ................................................................................................. 26, 30

5 U.S.C. § 552a ........................................................................................................ 7

5 U.S.C. §§ 701-706 ................................................................................................ 8

5 U.S.C. § 701(b)(1) ................................................................................................ 9

5 U.S.C. § 702 .......................................................................................................... 8

5 U.S.C. § 706(1) ..................................................................................................... 8

5 U.S.C. § 706(2) ..................................................................................................... 8

7 U.S.C. § 2146 ........................................................................................................ 20

15 U.S.C. § 1023(c) ................................................................................................. 32

16 U.S.C. § 1533(b)(3)(B)(i)-(iii) ........................................................................... 17

16 U.S.C. § 1539 ...................................................................................................... 17

16 U.S.C. § 1539(c) ................................................................................................. 18

16 U.S.C. § 1539(d) ................................................................................................. 18

44 U.S.C. § 3502 ...................................................................................................... 7, 8

44 U.S.C. § 3502(1) ................................................................................................. 25, 30

52 U.S.C. § 20507(i)(1) ........................................................................................... 39

52 U.S.C. § 21083(c) ............................................................................................... 40

E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (2002)
    § 201 ...................................................................................................................7, 25
    § 208(a) ............................................................................................................... 7
    § 208(b)(1)(A)(i) ............................................................................................... 7
    § 208(b)(1)(A)(ii) ..............................................................................................7
    § 208(b)(1)(B)(iii) .............................................................................................7, 19
    § 208(b)(2)(B)(ii) ..............................................................................................7

**Rules**

Federal Rule of Civil Procedure 5.2(a)(1) ................................................................. 39

Federal Rule of Civil Procedure 8(a)(1) ................................................................... 15

Federal Rule of Civil Procedure 12(b)(1) ........................................................ 9, 10, 24

Federal Rule of Civil Procedure 12(b)(6) ................................................................. 40

**Other Authorities**

About EPIC, http://epic.org/epic/about.html (last visited September 1, 2017) ........................... 12

Charter, Presidential Advisory Commission on Election Integrity,
    https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/commission-charter.pdf .......... 31

EPIC, https://donatenow.networkforgood.org/epic (last visited September 1, 2017) ................. 12

Executive Order No. 12,028 (1977) ........................................................................... 35

Executive Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017) ..................................... passim

H.R. Rep. No. 93-1380 (1974) (Conf. Rep.) ................................................................. 26

Kobach Letter (July 26, 2017),
    https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/letter-vice-chair-kris-
    kobach-07262017.pdf ...................................................................................... 6, 43

Letter from John H. Merrill, Alabama Secretary of State, to Kris Kobach (July 5, 2017),
    https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/responses-
    public-officials.pdf ............................................................................................. 42

Memorandum on Establishing the Director of White House Information Technology
    and the Executive Committee for Presidential Information Technology (Mar. 19, 2015),
    https://www.gpo.gov/fdsys/pkg/DCPD-201500185/pdf/DCPD-201500185.pdf .............. 34, 35

National Conference of State Legislatures, The Canvass: States and Election Reform, *It's a
    Presidential Election Year: Do You Know Where Your Voter Records Are?* (Feb. 2016),
    http://www.ncsl.org/Documents/Elections/The_Canvass_February_2016_66.pdf ................. 39

https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/information-requests-
    to-states-06282017.pdf .......................................................................................... 5

## INTRODUCTION

Plaintiff Electronic Privacy Information Center ("EPIC") seeks to prevent the Presidential Advisory Commission on Election Integrity ("Commission") from collecting voter registration data that states already make available to the public under their own laws.  In its Second Amended Complaint, plaintiff first contends that the Commission – an entity established to advise and assist the President – may not collect such data without first creating and publishing a Privacy Impact Assessment, which the E-Government Act of 2002 requires of federal agencies (but not Presidential commissions) under certain circumstances.  Second, plaintiff contends that the Commission's collection of voter data violates the "informational privacy" rights of its "members," allegedly guaranteed to them by the Due Process Clause of the Fifth Amendment. Finally, plaintiff asserts that the Commission's collection of the requested data will deprive its members of a liberty interest in avoiding the disclosure of personal matters without due process of law, in violation of the procedural aspects of the Due Process Clause.  The Court should dismiss all of these claims, and accordingly dismiss plaintiff's Second Amended Complaint.

As a threshold matter, the Court lacks jurisdiction over the Second Amended Complaint because plaintiff has failed to establish its standing, either on behalf of its members (representational standing) or on its own behalf as an organization (organizational standing).  As to the first basis for standing, plaintiff has failed to demonstrate that it is a "membership" organization or that is the functional equivalent of a traditional membership organization permitted to sue on behalf of its members.  Its Advisory Board members, on whose behalf plaintiff is claiming to bring suit, are not members or the functional equivalent of members.  And even if the Court were to conclude that plaintiff could bring this suit on behalf of its Advisory Board members (which it cannot), plaintiff has also failed to satisfy its burden of demonstrating

that either the Commission's solicitation of publicly available voter data or its decision not to prepare a Privacy Impact Assessment has or will cause these asserted "members" a cognizable injury-in-fact.  First, the members are not injured simply by the transfer of public information from one sovereign to another.  Second, the Advisory Board members' concerns about a possible breach into the Commission's data repository at some point in the future by unknown third parties fall well short of an imminent and concrete injury that is traceable to the Commission and redressable by this Court.

Plaintiff also has not alleged any facts establishing that the organization itself has suffered an injury sufficient to give it standing to sue on its own behalf.  First, the doctrine of informational standing does not apply where, as here, the publication of the document plaintiff purports to seek is, where required, scheduled to occur at the conclusion of the agency's review process and is not intended to facilitate public participation in that process.  Second, plaintiff has not established standing based on an injury to its programmatic activities because the efforts that plaintiff claims as "injury" constitute the very activities it routinely engages in to advance its mission.

Even assuming the Court had jurisdiction over this action, plaintiff lacks any viable claims.  Plaintiff contends that the E-Government Act requires the Commission to conduct a Privacy Impact Assessment.  However, the Administrative Procedure Act ("APA"), on which plaintiff must rely for a cause of action, and the E-Government Act of 2002, which allegedly creates the substantive duty, apply only to "agencies."  The Commission is not an "agency" within the meaning of these statutes because its sole purpose is to advise the President and it does not exercise substantial independent authority.  Nor are any of the other significant actors "agencies" – the only defendants that are "agencies," the General Services Administration and

2

the Department of Defense, provide only non-substantive administrative support (and in DOD's

case, that support has ceased and it no longer plays any role in the Commission's activities,

thereby mooting out any claims against it).

Finally, plaintiff's claims that the voluntary collection of publicly available voter

information violates its members' constitutional rights under the Due Process Clause of the Fifth

Amendment is similarly without legs (even assuming the Court has jurisdiction over these

claims, which it does not).  Neither the Supreme Court nor the D.C. Circuit has held that a

substantive right to "informational privacy" exists under the Due Process Clause.  And even if

such a right did exist, it would not apply to information that is already publicly available.

Similarly, plaintiffs' members have not identified a liberty or property interest implicated in the

transfer of data, which would entitle it to the procedural protections of the Due Process Clause,

again, because the Commission has asked only for publicly available information.  In any event,

any deprivation of privacy involved in the data transfer would be caused by the states who placed

such information in the public domain and/or who transferred such data to the Commission and

not by the federal government.  Accordingly, plaintiff has no viable constitutional claim against

the federal defendants.

## **BACKGROUND**

## I.    **FACTUAL BACKGROUND**

The President established the Presidential Advisory Commission on Election Integrity in

Executive Order No. 13,799.  82 Fed. Reg. 22,389 (May 11, 2017) [hereinafter Exec. Order No.

13,799]; Second Am. Compl. ¶ 17, ECF No. 33; *see also* Mem in Opp'n to Pl.'s Emergency

TRO, Declaration of Kris W. Kobach ("First Kobach Decl.") ¶ 3 & Ex. 1, ECF No. 8-1.  The

Commission is charged with "study[ing] the registration and voting processes used in Federal

elections," "consistent with applicable law."  Exec. Order No. 13,799, § 3.  The Executive Order

specifies that the Commission is "solely advisory," and that it shall disband 30 days after

submitting a report to the President on three areas related to "voting processes" in federal

elections.  *Id.* §§ 3, 6.

Vice President Pence is the Chairman of the Commission.  Exec. Order No. 13,799, § 2.

Kansas Secretary of State Kris Kobach is the Vice Chair.  Second Am. Compl. ¶ 9; First Kobach

Decl. ¶ 2.  The other members of the Commission include Christy McCormick of the Election

Assistance Commission (the "EAC"), who is currently the only federal agency official serving

on the Commission.  Mem. Op. at 4, ECF No. 40; Defs.' Resp. to Court's July 5, 2017, Order,

Second Declaration of Kris W. Kobach ("Second Kobach Decl.") ¶ 1, ECF No. 11-1.  However,

McCormick is not serving in her official capacity as a member of the EAC.  Mem. Op., at 4;

Second Kobach Decl. ¶ 2.  The Executive Order also provides that the General Services

Administration ("GSA"), a federal agency, will "provide the Commission with such

administrative services, funds, facilities, staff, equipment, and other support services as may be

necessary to carry out its mission on a reimbursable basis," and that other federal agencies "shall

endeavor to cooperate with the Commission."  Exec. Order No. 13,799, § 7.

In furtherance of the Commission's mandate, on June 28, 2017, the Vice Chair sent

letters to the states and the District of Columbia requesting publicly available data from state

voter rolls and feedback on how to improve election integrity.  Second Am. Compl. ¶ 21; First

Kobach Decl. ¶ 4.  Among other things, the letters sent by the Vice Chair requested:

> the *publicly-available* voter roll data for [the State], including, *if*
> *publicly available under the laws of your state*, the full first and
> last names of all registrants, middle names or initials if available,
> addresses, dates of birth, political party (if recorded in your state),
> last four digits of social security number if available, voter history
> (elections voted in) from 2006 onward, active/inactive status,

4

cancelled status, information regarding any felony convictions,
information regarding voter registration in another state,
information regarding military status, and overseas citizen
information.

https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/information-requests-to-states-

06282017.pdf (emphasis added).  The Vice Chair originally requested responses by July 14,

2017.  Second Am. Compl. ¶ 25.  For data files, which would be too large to send via email, the

letter proposed that states could use the Department of Defense's ("DOD") Safe Access File

Exchange ("SAFE") file transfer system.  *Id.*

On July 3, 2017, plaintiff filed the present suit, seeking to enjoin the Commission's

collection of voter roll data and requesting both a temporary restraining order and/or preliminary

injunction.  Compl., ECF No. 1.  On July 10, 2017, the Commission sent the states a follow-up

communication requesting that the states not submit any data until the Court ruled on plaintiff's

motion.  Second Am. Compl. ¶ 27; Defs.' Suppl. Br. Regarding DOD, Third Declaration of Kris

W. Kobach ("Third Kobach Decl.") ¶ 2, ECF No. 24-1.  The letter further announced that the

Commission no longer intends to use the DOD SAFE system to receive information from the

states; instead, it intends to use alternative means of receiving that data.  Third Kobach Decl. ¶ 2;

Mem. Op. at 8.

The Court ruled on EPIC's motion for injunctive relief on July 24, 2017, denying

(without prejudice) the motion for a temporary restraining order and preliminary injunction.  *See*

Mem. Op. at 35.  Plaintiff subsequently appealed this decision to the U.S. Court of Appeals for

the D.C. Circuit.  The case is being briefed there on an expedited schedule, with plaintiff's reply

brief due on September 22, 2017.

On July 26, 2017, Vice Chair Kobach sent a further letter to the states and the District of

Columbia, renewing his request for voter roll data and directing the recipients of the letter to

contact a Commission staff member for instructions as to how to submit the data securely.  *See*

https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/letter-vice-chair-kris-kobach-

07262017.pdf.  Mr. Kobach further advised the states that, as he had stated in the earlier letter, he

was seeking only information that is already publicly available under state law, "which is

information that States regularly provide to political candidates, journalists, and other interested

members of the public."  *Id.*  Further, Mr. Kobach explained that "the Commission will not

publicly release any personally identifiable information regarding any voter or any group of

voters from the voter registration records" submitted and that "[t]he only information that will be

made public are statistical conclusions drawn from the data, other general observations that may

be drawn from the data, and any correspondence that you may send to the Commission in

response to the narrative questions enumerated in [his] June 28 letter."  *Id.*  Mr. Kobach stated

that "individuals' voter registration records will be kept confidential and secure throughout the

duration of the Commission's existence," and that, "[o]nce the Commission's analysis is

complete, the Commission will dispose of the data as permitted by federal law."  *Id.*

The system that will receive the voter roll data is run by the Director of White House

Information Technology ("DWHIT").  Second Am. Compl. ¶ 31; Mem. in Opp'n to Pl.'s Am.

Mot. for TRO & Prelim. Inj., Declaration of Charles Christopher Herndon ("Herndon Decl.")

¶¶ 3-5, ECF No. 38-1.  The system allows the states to directly and securely upload the data to a

server within the White House domain.  Mem. Op. at 9.  No federal agency will play a role in

this data collection, and the only people involved will be the DWHIT and a limited number of

technical staff from the White House Office of Administration.  *Id.*; *see also* Herndon Decl. ¶ 6.

## II.      LEGAL BACKGROUND

### A.      The E-Government Act of 2002

The E-Government Act of 2002 requires federal agencies to perform a Privacy Impact

Assessment ("PIA") when "developing or procuring information technology that collects,

maintains, or disseminates information that is an identifiable form," or when "initiating a new

collection of information" that "will be collected, maintained, or disseminated using information

technology" and "includes any information in an identifiable form permitting the physical or

online contacting of a specific individual."  Pub. L. 107-347, § 208(b)(1)(A)(i), (ii), 116 Stat.

2899, 2921 (2002).  "The purpose of this section is to ensure sufficient protections for the

privacy of personal information as agencies implement citizen-centered electronic Government."

*Id.* § 208(a).

Among other things, the PIA is to address "what information is to be collected," "why the

information is being collected," "the intended use of the agency of the information," "with whom

the information will be shared," "what notice or opportunities for consent would be provided to

individuals regarding what information is collected and how that information is shared," "how

the information will be secured," "and whether a system of records is being created under" 5

U.S.C. § 552a (commonly referred to as the "Privacy Act").  Pub. L. No. 107-347,

§ 208(b)(2)(B)(ii).  After completion of the PIA, the agency is directed to, "if practicable, . . .

make the privacy impact assessment publicly available through the website of the agency,

publication in the Federal Register, or other means."  *Id.* § 208(b)(1)(B)(iii).

This provision of the E-Government Act uses the definition of "agency" from 44 U.S.C.

§ 3502.  *See* Pub. L. No. 107-347, § 201.  "Agency" thus "means any executive department,

military department, Government corporation, Government controlled corporation, or other

establishment in the executive branch of the Government (including the Executive Office of the

President), or any independent regulatory agency," with some exceptions listed.  44 U.S.C. §

3502.

**B.     The Federal Advisory Committee Act**

Among other things, the Federal Advisory Committee Act ("FACA") provides that

> the records, reports, transcripts, minutes, appendixes, working
> papers, drafts, studies, agenda, or other documents which were
> made available to or prepared for or by each advisory committee
> shall be available for public inspection and copying at a single
> location in the offices of the advisory committee or the agency to
> which the advisory committee reports until the advisory committee
> ceases to exist.

5 U.S.C. app. 2, § 10(b).  FACA does not contain a provision for judicial review.  *See Judicial*

*Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 33 (D.D.C. 2002) ("FACA

creates no private right of action."); *see also Int'l Brominated Solvents Ass'n v. Am. Conf. of*

*Governmental Indus. Hygienists, Inc.* ("*IBSA*"), 393 F. Supp. 2d 1362, 1377-78 (M.D. Ga. 2005).

In the absence of a private right of action, a claim to enforce FACA's requirements may only be

brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.  See Judicial*

*Watch*, 219 F. Supp. 2d at 33-34; *IBSA*, 393 F. Supp. 2d at 1378; *Colo. Envtl. Coal. v. Wenker*,

353 F.3d 1221, 1234-35 (10th Cir. 2004).

**C.     The Administrative Procedure Act**

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, establishes a waiver of

sovereign immunity and a cause of action for injunctive relief for parties adversely affected

either by agency action or by an agency's failure to act.  *See* 5 U.S.C. §§ 702, 706(1)-(2); *see*

*also Heckler v. Chaney*, 470 U.S. 821, 828 (1985).  These provisions apply only to "agency"

action.   "[A]gency" is defined as "each authority of the Government of the United States,

whether or not it is within or subject to review by another agency," with certain exceptions.  5

U.S.C. §§ 551(1), 701(b)(1).  This definition does not include the President of the United States,

*Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), or the Vice President, *Meyer v. Bush*,

981 F.2d 1288, 1295 (D.C. Cir. 1993).

## STANDARDS OF REVIEW

Defendants seek dismissal of this case (1) under Federal Rule of Civil Procedure

12(b)(1), on the ground that the Court lacks subject-matter jurisdiction because plaintiff lacks

standing, and (2) under Rule 12(b)(6), on the ground that plaintiff fails to state a claim upon

which relief may be granted.  When a defendant files a motion under Rule 12(b)(1), the plaintiff

bears the burden of demonstrating the existence of subject-matter jurisdiction.  *See Lujan v. Defs.*

*of Wildlife*, 504 U.S. 555, 561 (1992).  Courts should "presume that [they] lack jurisdiction

unless the contrary appears affirmatively from the record."  *Renne v. Geary*, 501 U.S. 312, 316

(1991) (internal quotation marks and citations omitted).  "Although a court must accept as true

all the factual allegations contained in the complaint when reviewing a motion to dismiss

pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in

resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."

*Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (citations

omitted).  The Court "may consider materials outside the pleadings in deciding whether to grant

a motion to dismiss for lack of jurisdiction."  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d

1249, 1253 (D.C. Cir. 2005).

In order to withstand a motion to dismiss under Rule 12(b)(6), a complaint must "state a

claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must contain "more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do." *Twombly*, 550 U.S. at 555.  The plaintiff must, accordingly, plead facts that allow the court

"to draw the reasonable inference that the defendant is liable for the misconduct alleged" and

offer "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at

678.  "In determining whether a complaint states a claim, the court may consider the facts

alleged in the complaint, documents attached thereto or incorporated therein, and matters of

which it may take judicial notice." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir.

2006).

## ARGUMENT

### I.      PLAINTIFF LACKS STANDING.

Plaintiff has failed to establish the necessary Article III standing to bring this suit, and

accordingly the case should be dismissed for lack of subject matter jurisdiction pursuant to

Federal Rule of Civil Procedure 12(b)(1).  The doctrine of standing, an essential aspect of the

Article III case-or-controversy requirement, demands that a plaintiff have "a personal stake in the

outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction."

*Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted).  At its "irreducible constitutional

minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to

establish three elements:  (1) a concrete and particularized injury-in-fact, either actual or

imminent, (2) a causal connection between the injury and defendants' challenged conduct, and

(3) a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan*, 504

U.S. at 560.  Facts demonstrating each of these elements "must affirmatively appear in the

record" and "cannot be inferred argumentatively from averments in the [plaintiff's] pleadings."

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citation omitted); *see also Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002).

The same rigorous standard applies to organizational plaintiffs suing either on behalf of their members or on their own behalf. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)). Plaintiff brings this lawsuit both as a representative of its purported members and on its own behalf. *See* Second Am. Compl. ¶¶ 65, 70, 75, 79, 84. However, notwithstanding the fact that plaintiff has had multiple opportunities to supplement the record, plaintiff has not satisfied its burden of establishing that it has standing to sue either in a representational capacity or on its own behalf.

### A.      Plaintiff Lacks Standing to Sue in a Representational Capacity.

Plaintiff contends that it has representational standing "by virtue of representing the interests of its Advisory Board members, many of whom face certainly impending injury as a result of the Commission's collection of personal voter data." Pl.'s Sur-Surreply in Supp. of Pl.'s Emergency Mot. for TRO ("Pl.'s Sur-Surreply"), at 1, ECF No. 19-1. To establish representational standing (or as it is sometimes referred to, associational standing), an organization must demonstrate that "its members would otherwise have standing to sue in their own right[.]" *Ass'n of Flight Attendants—CWA v. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009) (citation omitted). Thus, in short, the organization has to have members, who themselves have standing. In addition, an organizational plaintiff must demonstrate that "the interests it seeks to protect are germane to the organization's purpose" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id*.

11

As this Court has already recognized, Mem. Op. at 11-15, plaintiff's claim to representational standing fails here because it is neither a membership organization nor the functional equivalent of one, and because its alleged members do not have standing in their own right.  First, plaintiff does not have "members."  Plaintiff alleges its Advisory Board members are "formal[]" members of the organization.  *See* Pl.'s Sur-Surreply, at 2.  But plaintiff's website does not support this allegation, stating that it "ha[s] no clients, no customers, and no shareholders[.]"  *See* About EPIC, http://epic.org/epic/about.html (last visited Sept. 1, 2017).  Further, plaintiff's website does not instruct visitors on how to become a member.  Nor does it have a webpage dedicated specifically to its members.  Rather, the website simply invites visitors to "support" the organization by providing a monetary donation with no mention of joining the organization.  *See* EPIC, https://donatenow.networkforgood.org/epic (last visited Sept. 1, 2017).

Accordingly, because EPIC "has no members in the traditional sense," the inquiry, as the Court previously found, turns to "whether the organization is the functional equivalent of a traditional membership organization."  *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002); *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977); Mem. Op. at 12-13.  "Three main characteristics must be present for an entity to meet the test of functional equivalency:  (1) it must serve a specialized segment of the community; (2) it must represent individuals that have all the 'indicia of membership' . . . ; and (3) its fortunes must be tied closely to those of its constituency."  *Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007) (citation omitted).  Plaintiff does not possess any of these characteristics.

First, plaintiff does not appear to serve a specialized segment of the community.  Rather, as a "public interest research center," it pursues a "wide range of activities" designed to "educate the public" regarding the protect[ion of] privacy, the First Amendment, and other constitutional

values."  Mem. in Supp. of Pl.'s Am. Mot. for a TRO & Prelim. Inj. ("EPIC Am. TRO Mem."),

Ex. 38, Rotenberg Decl. ¶ 2, ECF No. 35-4.   Nor do plaintiff's Advisory Board Members

possess sufficient indicia of membership – as the Court previously observed (Mem. Op. at 13),

"[t]here is no evidence that [Advisory Board] members are *required* to finance the activities of

the organization; that they have any role in electing the leadership of the organization; or that

their fortunes, as opposed to their policy viewpoints, are 'closely tied' to the organization."

Absent members or their functional equivalent, plaintiff has not established that it can avail itself

of representational standing.  *See also Elec. Privacy Info. Ctr. v. Dep't of Educ.*, 48 F. Supp. 3d

1, 22 (D.D.C. 2014) ("defendant raises serious questions about whether EPIC is an association

made up of members that may avail itself of the associational standing doctrine").

Even if plaintiff could proceed as a representative of its Advisory Board members, those

members' allegations of imminent injury caused by a feared "disclosure" of their personal

information, *see* EPIC Am. TRO Mem., Exs. 7-15, ECF No. 35-3, are not sufficient to establish

that they would have the necessary standing to sue in their own capacities to confer

representational standing on plaintiff.  Mem. Op. at 13.  First, "these individuals are registered

voters in states that have declined to comply with the Commission's request for voter roll

information, and accordingly, they are not under imminent threat of either the statutory or

Constitutional harms alleged by [p]laintiff."  *Id.*  Second, plaintiff's declarants have not

established that any possible harm from the transfer of information to the Commission, even if

such a transfer were to occur, is more than speculative.  Plaintiff's declarants overlook the fact

that the Commission only requested from the states information that is already publicly available.

The transfer of public information from one sovereign to another does not create a concrete

injury.  Nor does the aggregation of the voter roll information into one database create a separate

injury.  Unlike in *United States Department of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 765 (1989), each individual's information remains unchanged in the transfer – there is no aggregation of "scattered . . . bits of information" pertaining to one individual, that made the disclosure of rap sheets at issue in *Reporters Committee* problematic.  Further, the Commission has explained that, "voter rolls themselves will not be released to the public" and that any information derived therefrom will be de-identified before release.  Defs.' Surreply in Opp'n to Pl.'s Emergency Mot. for a TRO ("Defs.' Surreply") at 4, ECF No. 16-1; Mem. Op. at 13.

As this Court therefore recognized, plaintiff's fears largely boil down to concerns that, assuming their respective states decide to comply with the Commission's request in the future, their already publicly available information would be rendered more easily accessible to a data breach by virtue of its consolidation on the computer systems used by the Commission.  Mem. Op. at 14-15 ("At most, [p]laintiff has shown that its members will suffer an increased *risk* of harm if their already publicly available information is collected by the Commission.").  However, the amorphous fear of a future data breach by unknown bad actors does not establish imminent and concrete injury sufficient to confer standing.  *See In re Sci. Applications Int'l Corp. Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 26 (D.D.C. 2014) (increased risk of identity theft alone does not confer standing in data-breach cases); *see also Welborn v. IRS*, 218 F. Supp. 3d 64, 77 (D.D.C. 2016) (holding that even an "objectively reasonable likelihood" of future breach cannot support standing) (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147-48 (2013)), *appeal dismissed by* No. 16-5365, 2017 WL 2373044 (D.C. Cir. Apr. 18, 2017).

The D.C. Circuit's recent decision in *Attias v. CareFirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017), is not to the contrary.  There, the court held that plaintiffs had adequately pled a concrete and particularized injury sufficient for Article III standing when health insurer suffered a data breach whereby sensitive financial information sufficient to allow for future identity theft (including social security numbers and credit card numbers) was stolen.  *See id.* at 627-28.  Here, by contrast, there has been no data breach, nor has the plaintiff established that any information that could be obtained from the transferred voter roll data in any such data breach would plausibly allow for future injury.  Accordingly, as this Court concluded, the sequence of events that plaintiff relies on for its allegations of injury "is simply too attenuated to confer standing." Mem. Op. at 15.

### B.      Plaintiff Lacks Informational Standing to Sue on its Own Behalf.

Plaintiff also asserts that, as an organization, it "would suffer an informational injury from nondisclosure" of a Privacy Impact Assessment under the E-Government Act of 2002, giving it sufficient standing to pursue this lawsuit on its own behalf.  Pl.'s Supp. Br. on Informational Standing, at 1, ECF No. 17.  This argument also fails.[1]

As an initial matter, plaintiff has failed to sufficiently *plead* organizational standing despite the fact that it twice amended its complaint *after* the parties briefed the issue in the

---

[1] Defendants recognize that, in its July 24, 2017, decision denying plaintiff's request for emergency injunctive relief, the Court found that plaintiff had standing on this basis, as well as on a theory of injury to its programmatic interests (addressed in the next subsection).  Mem. Op. at 16-26.  The Court can reconsider these holdings, however, which may not have been based on a "fully developed record" and "fully developed consideration of the issue," in light of the short timeframe involved in reaching the July decision.  *Sherley v. Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012) (discussing when the preliminary-injunction exception to the law-of-the-case preclusion doctrine applies).  In any event, to the extent the Court declines to reconsider, defendants include the arguments contesting plaintiff's organizational and informational standing to preserve them for a possible appeal.

context of its first motion requesting preliminary relief.  Under Federal Rule of Civil Procedure

8(a)(1), plaintiffs are required to plead "a short and plain statement of the grounds for the court's

jurisdiction," and this includes the essential facts of standing.  *See Al-Owhali v. Ashcroft*, 279 F.

Supp. 2d 13, 20-21 (D.D.C. 2003); *Spartalj-Waters v. United States*, No. 87-cv-1131-OG, 1987

WL 19626, at *1 (D.D.C. Oct. 30, 1987).  In this case, the Second Amended Complaint identifies

no injury incurred by plaintiff, stating only that plaintiff is "adversely affected and aggrieved by

Defendants' actions."  *See* Second Am. Compl. ¶¶ 65, 70, 75.  Moreover, although plaintiff has

supplemented the record with a declaration from its President and Executive Director addressing

certain of its Advisory Board members, *see* EPIC Am. TRO Mem., Rotenberg Decl., Ex. 38,

ECF No. 35-4, the declaration does not identify any injuries plaintiff itself has or will suffer as a

result of the Commission's activities.  *See generally id.*  These deficiencies in the record cannot

be remedied by arguments made by counsel in briefs.  *See Sierra Club*, 292 F.3d at 900 ("When

the petitioner's standing is not self-evident, however, the petitioner must supplement the record

[with affidavits or other evidence] to the extent necessary to explain and substantiate its

entitlement to judicial review."); *see also id.* at 901 ("[M]ere allegations" in a brief and

"representations of counsel" are not evidence and thus are not sufficient to support standing).

For this reason alone, the Court should decline to exercise jurisdiction.

But even putting aside plaintiff's pleading deficiencies, it has not established, and cannot

not establish, the elements of an informational standing claim.  Informational standing is a

"narrowly defined" theory of standing.  *Common Cause v. FEC*, 108 F.3d 413, 420 (D.C. Cir.

1997).  It "arises only in very specific statutory contexts," *Ass'n of Am. Physicians & Surgeons,

Inc. v. FDA*, 539 F. Supp. 2d 4, 15 (D.D.C. 2008) (citation omitted), where plaintiffs establish

they "are being deprived of information . . . that will be of substantial value to them and to which

they are legally entitled." *Public Citizen v. FTC*, 869 F.2d 1541, 1546 (D.C. Cir. 1989).  Those

circumstances are not to be found here.

This Court's July 24, 2017, decision focused on *Friends of Animals v. Jewell*, 828 F.3d

989 (D.C. Cir. 2016).  The reasoning in *Jewell,* however, must be considered in light of the

reasoning in *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 106 (D.D.C. 2009).  Both cases

involved the Endangered Species Act ("ESA"), though different parts of that Act.  *Jewell*

involved a provision requiring the Secretary of the Interior to make certain findings within 12

months of receiving a petition to list or de-list a species and to then publish certain information

after making the finding.  16 U.S.C. § 1533(b)(3)(B)(i)–(iii).  Friends of Animals ("FoA") filed

suit before the Secretary had made the required finding.  The court accordingly found that FoA

lacked informational injury because "before the Secretary makes a 12-month finding, section

4(b)(3)(B) does not mandate the disclosure of any information whatsoever."  *Jewell*, 828 F.3d at

993.  The court reasoned that FoA "seeks to have the court order compliance with [the statute's]

deadline requirement, not its disclosure requirement."  *Id*.; *see also id.* ("By adopting this

sequential procedural structure, Congress placed the Secretary under no obligation to publish any

information in the Federal Register until after making a . . . finding.").

This holding could suggest, as this Court explained in its July 24 decision, that where the

agency has already incurred an obligation to disclose information (which is assumed in this case

for the purposes of the standing analysis), informational standing necessarily follows.  Mem. Op.

at 20.  But *Salazar* reveals that this is not inevitably the case, and the timing, purpose, and value

of the required disclosure must also be considered.  The statute at issue in *Salazar* (section 10 of

the ESA, 16 U.S.C. § 1539) governs applications for permits or exemptions applicable to

otherwise prohibited actions involving protected species.  Subsection 10(c) of this statute

17

provides that the Secretary must "publish notice in the Federal Register of each application for an exemption," and then allow for a thirty-day public comment period (where all information received "shall be [made] available to the public").  *Id*. § 1539(c).  If the Secretary decides to grant an exemption, subsection 10(d) requires that he "find[] and publish[] his finding[s] in the Federal Register."  *Id*. § 1539(d)).  The Secretary then issued a rule exempting certain antelope species from certain prohibitions of the ESA, meaning that those actions would not require application for permits under the section 10 process.  FoA argued that they had informational standing to challenge this new rule on the theory that eliminating the permit requirements for those species deprived FoA of the information required to be made public under 10(c) and 10(d).

The *Salazar* court held that FoA had informational standing under subsection 10(c) but *not* under 10(d).  The court found that subsection 10(c) conferred standing because the information required to be made available under 10(c) "is necessary for plaintiffs to meaningfully participate in the section 10 process, and therefore deprivation of that information causes a specific, concrete, actual and imminent injury."  *Salazar*, 626 F. Supp. 2d at 113.  In other words, because the statutory provision requires information be provided at the *beginning* of a process that contemplates public involvement, there is actual and imminent injury.  *Id.*

Not so with subsection 10(d).  That provision only required that information be published at the *end* of the process, and while publication was a necessary step before a legal action could go into effect, it did not create a concrete and particularized injury.

> While, to be sure, subsection 10(d) requires the Secretary to publish her findings, that is different from the subsection 10(c) requirement that information be made available to the public. Importantly, the information provided in subsection 10(c) is necessary for plaintiffs to meaningfully participate in the section 10 process, and therefore deprivation of that information causes a specific, concrete, actual and imminent injury.  By contrast, the findings in subsection 10(d) are published at the conclusion of the

> section 10 process following the mandated public process. . . .
> [T]his is not an injury to their ability to participate in the section 10
> process, but instead reveals a more general interest in the law being
> followed.

*Salazar*, 626 F. Supp. 2d at 113.  In other words, merely requiring publication as the final stage

of an agency decision process is not enough to create informational standing.  *See also Cary v.*

*Hall*, No. C 05-4363 VRW, 2006 WL 6198320, at *10 (N.D. Cal. Sept. 30, 2006) (expressing

skepticism that §10(d) allowed for informational standing).  Rather, in the absence of an ongoing

agency decisionmaking process, the deprivation of subsection 10(d) information impacted only

FoA's generalized interest in the enforcement of the law, which was not enough to confer

standing.  *Id.*; *see also Judicial Watch, Inc. v. FEC*, 180 F.3d 277, 278 (D.C. Cir. 1999) (holding

that an injury amounting to "no more than a generalized interest in [the] enforcement of the law"

does not support standing (internal quotation marks omitted)).

The informational statute at issue in this case is analogous to subsection 10(d), rather than

subsection 10(c).  Like subsection 10(d), the E-Government Act only requires disclosure of a

PIA at the *conclusion* of the agency's assessment and review.  *See* E-Government Act of 2002,

Pub. L. No. 107-347, § 208(b)(1)(B)(iii), 116 Stat. 2899 (2002) (stating that a PIA shall be made

publicly available, "if practicable," only "after completion of the review").  Publication is

designed merely to inform the public of a decision, not to solicit public input as part of an

ongoing agency decisionmaking process.  The failure to publish this information therefore does

not create informational standing.  To hold otherwise would mean that any statute requiring

government publication of information would automatically create informational standing.

However, this is not the rule.  *See, e.g.*, *Friends of Animals v. Jewell*, 115 F. Supp. 3d 107, 113

(D.D.C. 2015) ("FOA cites no case holding that . . . a generic publication requirement – without

more – creates an 'explicit [ ] . . . right to information'").  Rather, the information must be "both

useful . . . and required by Congress to be disclosed." *Common Cause*, 108 F.3d at 418.  Plaintiff

has not explained, in either the Second Amended Complaint or its other filings, how the

summary information included in the PIA would be of specific and substantial use to it.  *See*

Notice of Errata to Exs. of  Pl.'s Am. Mot. for a TRO & Prelim. Inj., Ex. 22, ECF No. 36-1

(sample PIA).  Accordingly, defendants' failure to publish a PIA does not confer informational

standing on plaintiff. [2]

### C.     Plaintiff Also Lacks Standing to Sue on its Own Behalf Based on Alleged Programmatic Injury.

Plaintiff also asserts that it has standing on its own behalf because the Commission's

failure to carry out a Privacy Impact Assessment and its "disregard for the informational privacy

rights of U.S. voters" have made plaintiff's "activities more difficult" by "forc[ing it] to expand

its long-running efforts to protect voter privacy," thereby "creating a direct conflict between the

[Commission's] conduct and [plaintiff's] mission."  Reply in Supp. of Pl.'s Emergency Mot. for

a TRO ("Pl.'s First TRO Reply"), at 20, ECF No. 13 (internal quotation marks omitted).

Plaintiff, however, fundamentally misunderstands the requirements of organizational standing

based on a programmatic injury.  Because the efforts to which plaintiff points constitute the very

---

[2]  The D.C. Circuit's holding in *People for the Ethical Treatment of Animals* ("*PETA*") *v. United States Department of Agriculture* ("*USDA*"), 797 F.3d 1087, 1095 (D.C. Cir. 2015), is not to the contrary.  As explained below, *see supra* § I.C, the D.C. Circuit concluded that PETA had *organizational* standing to bring its lawsuit against the USDA because it had alleged facts showing that the denial of specific, investigatory information directly conflicted with its mission of public education and cruelty investigations, thereby forcing the organization to expend significant resources to conduct its own cruelty investigations and submit complaints to local, state, and federal agencies – all of which would have been unnecessary if USDA had enforced Animal Welfare Act ("AWA") with respect to birds.  *Id.* at 1095-97.  But this holding was not based on any concept of informational standing.  Indeed, the investigation and inspection provision in the AWA does not require mandatory disclosure of any information related to USDA's investigatory and inspection activities.  *See* 7 U.S.C. § 2146.  As discussed in the text above, informational standing only exists when a statute expressly guarantees the public a right to information.

activities plaintiff routinely engages in to advance its mission, it has not established standing on this basis.

An organization asserting standing on its own behalf must demonstrate that it has suffered a "concrete and demonstrable injury to [its] activities – with [a] consequent drain on [its] resources – constitut[ing] . . . more than simply a setback to the organization's abstract social interests." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Havens Realty*, 455 U.S. at 378-79). Indeed, it has long been clear that "pure issue-advocacy," *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005), provides no more basis for an organization's standing than "generalized grievances about the conduct of Government" do for individual standing, *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (citation omitted). Thus, "conflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing." *Nat'l Treasury Emps. Union*, 101 F.3d at 1429; *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (finding that "frustrat[ion]" of an organization's objectives "is the type of abstract concern that does not impart standing").

Instead, "'the organization must allege that discrete programmatic concerns are being directly and adversely affected' by the challenged action." *Nat'l Taxpayers*, 68 F.3d at 1433 (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)). Thus, an organization may have standing when the defendant's action makes it harder for the organization to serve its clients. In *Havens Realty*, for example, the Supreme Court relied on the allegation that defendants' "practices have perceptibly impaired [plaintiff's] ability to provide counseling and referral services for low-and-moderate-income homeseekers." 455 U.S. at 379. And, as this Court discussed in its July 24, 2017, opinion, the D.C. Circuit recently concluded that an animal

21

advocacy organization had standing where the USDA's lack of investigative information regarding bird abuse prevented the organization from bringing violations of the Animal Welfare Act to the agency's attention, a key component of its advocacy activities. *PETA*, 797 F.3d at 1095; *see* Mem. Op. at 24-26.

The facts alleged here are quite different than those in *PETA*. In *PETA*, the court found that the information regarding bird abuse investigations was an essential tool for furthering the organization's advocacy and education activities, and that without the information, PETA's ability to advocate was limited absent expending significant resources to conduct its own investigations and file complaints alleging bird abuse. *See PETA*, 797 F.3d at 1095; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015) (noting that in *PETA*, "[t]he denial of access to an avenue for redress and denial of information" created organizational standing). Here, by contrast, plaintiff's advocacy and educational activities have not been limited or otherwise impeded by the absence of a PIA. Indeed, plaintiff has characterized those activities as having "expand[ed]." *See* Pl.'s First TRO Reply, at 20-21. Thus, plaintiff has not shown that its advocacy and educational activities have been injured by a lack of information.

Nor have plaintiff's expanded activities resulted in a significant drain on its resources. As an initial note, the mere expenditure of resources is not sufficient to establish standing. *See Food & Water Watch*, 808 F.3d at 919-20 ("Our precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury. Furthermore, an organization does not suffer an injury in fact where it expends resources to educate its members and others, unless doing so subjects the organization to operational costs beyond those normally expended." (internal citations and quotation marks omitted)). Plaintiff's expanded efforts range from drafting a letter urging state

22

election officials to not comply with the Commission's request for voter information, to seeking

records from the Commission concerning its collection of such data, to developing a webpage to

inform the public of the Commission's activities, and to responding to "numerous" requests

expressing concern about the impact of the Commission's activities.  Pl.'s First TRO Reply, at

20-21; *see also* Reply in Supp. of Pl.'s Am. Mot. for TRO & Prelim. Inj., Declaration of Eleni

Kyriakides*, ECF No. 39-1.  But the mere spending of funds is not enough, Mem. Op. at 26; EPIC

must show – and it does not – that defendants' action have "forced [it] to expend resources in a

manner that keeps [it] from pursuing its true purpose of monitoring the government's

[information] practices."  *Nat'l Taxpayers Union*, 68 F.3d at 1434; *see also id.* ("NTU cannot

convert its ordinary program costs into an injury in fact.").

Like any other advocacy or lobbying organization, the expenditures to which plaintiff

points constitute the ordinary activity of its mission.  Indeed, another member of this Court

reached this very conclusion in a similar action brought by the same plaintiff.  In that case, in

which EPIC challenged a regulation implementing the Family Educational Rights and Privacy

Act, the court found that EPIC lacked organizational standing because the regulation did "not

impede[] EPIC's programmatic concerns and activities, but fueled them."  *Elec. Privacy Info.*

*Ctr.*, 48 F. Supp. 3d at 23.  Judge Berman Jackson explained that the "expenditures that EPIC has

made in response to the [new regulation] have not kept it from pursing its true purpose as an

organization but have contributed to its pursuit of its purpose."  *Id.*; *see also id.* at 5 (holding that

EPIC has not alleged an injury in fact and thus did not have organizational standing to challenge

the new regulation because defendant's promulgation of the regulation merely "prompted [EPIC]

to engage in the very sort of advocacy that is its raison d'etre").  *Cf. Nat'l Consumers League v.*

*Gen. Mills, Inc.*, 680 F. Supp. 2d 132, 136 (D.D.C. 2010) ("Challenging conduct like General

Mills' alleged mislabeling is the very purpose of consumer advocacy organizations. As such,

General Mills' alleged conduct does not hamper NCL's advocacy effort[s]; if anything it gives

NCL an opportunity to carry out its mission."). There, as here, plaintiff had thus asserted

"nothing more than an abstract injury to its interest that is insufficient to support standing."

*Food & Water Watch,* 808 F.3d at 921.

>        **D.      Plaintiff's Claims Against DOD are Moot.**

Plaintiff has sued the Department of Defense. However, it does not allege that DOD is

currently collecting data for the Commission. Second Am. Compl. ¶¶ 56-61. It also

acknowledges that the Commission has stated that data that had been collected from any DOD-

operated system will be deleted, and it has. *Id.* ¶ 33; Mem. Op. at 9; Herndon Decl.

¶ 7. Accordingly, any past injury arguably in which DOD may have been involved is now moot,

there is no present injury, and there is no prospect of future injury that could justify the

injunctive relief requested in plaintiff's complaint. *See, e.g.*, *City of L.A. v. Lyons*, 461 U.S. 95,

105-06 (1983). Claims against DOD should therefore be dismissed on the ground of mootness.

In sum, plaintiff lacks standing to bring this lawsuit either on its own behalf or on behalf

of its Advisory Board members. Accordingly, the Court lacks jurisdiction and the Second

Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

At a minimum, defendant DOD should be dismissed.

> **III.    NEITHER THE COMMISSION NOR THE DIRECTOR OF WHITE HOUSE
> INFORMATION TECHNOLOGY IS AN AGENCY SUBJECT TO THE APA AND
> E-GOVERNMENT ACT, AND ACCORDINGLY PLAINTIFF'S E-
> GOVERNMENT AND FACA CLAIMS FAIL TO STATE A CLAIM UPON
> WHICH RELIEF CAN BE GRANTED.**

Even if the Court finds that it has jurisdiction, plaintiff's claims should be dismissed

pursuant to Rule 12(b)(6) for failure to state a claim. First, plaintiff has failed to state claims for

violations of the E-Government Act or of FACA (Counts 1-3), both categories of which must be brought under the APA.  The APA and the E-Government Act only apply to "agencies."  *See* 5 U.S.C. § 551(1) (APA); 44 U.S.C. § 3502(1) (E-Government Act).[3]  As this Court has already concluded, and as discussed below, the Commission and the various Executive Office of the President ("EOP") components named as defendants in this suit are not "agencies" under these definitions.  Mem. Op. at 26-35.  Accordingly, plaintiff has no valid claim under the APA, which it must use to establish a cause of action, as neither FACA nor the E-Government Act provides a private right of action.  *See Greenspan v. Admin. Office of the U.S. Courts*, No. 14-cv-2396, 2014 WL 6847460, at *8 (N.D. Cal. Dec. 4, 2014) (E-Government Act); *Judicial Watch.*, 219 F. Supp. 2d at 33 ("FACA creates no private right of action.").

### A.     Entities Within the Executive Office of the President Are Agencies Only if They Exercise Substantial Independent Authority.

The Supreme Court and this Circuit have consistently recognized that while the statutory definition of "agency" may be broad, it does not encompass entities within the Executive Office of the President that do not exercise substantial independent authority.  In *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), for example, the court considered the definition of "agency" under the APA which then, as now, is defined as any "authority of the Government of the United States, whether or not it is within or subject to review by another agency."  *Id.* at 1073 (quoting 5 U.S.C. § 551(1)).  This circuit concluded that the APA "apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." *Id.*  Following this reasoning, the court held that the Freedom of Information Act ("FOIA"), which at the time incorporated the APA's definition of "agency," applied to the Office of

---

[3]  Section 201 of the E-Government Act, Pub. L. No. 107-347, 116 Stat. 2899, adopts the definition of "agency" set out in 44 U.S.C. § 3502(1).

Science and Technology Policy ("OSTP"), which is an entity within the Executive Office of the President. *Soucie*, 448 F.2d at 1073-74.  It reasoned that OSTP's function was not merely to "advise and assist the President," but it also had an "independent function of evaluating federal programs," and therefore was an agency with substantial independent authority that was therefore subject to the APA.  *Id.* at 1075.

The Supreme Court has confirmed the principle that entities that "advise and assist the President" are not "agencies."  In *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980), the Supreme Court considered the scope of FOIA, whose definition of "agency" had been amended in 1974 to its current version, where "'agency' as defined in [5 U.S.C. §] 551(1) . . . includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (*including the Executive Office of the President*), or any independent regulatory agency."  5 U.S.C. § 552(f)(1) (emphasis added).  The Court concluded that, despite this language, "[t]he legislative history is unambiguous . . . in explaining that the 'Executive Office' does not include the Office of the President."  *Kissinger*, 445 U.S. at 156.  Rather, Congress did not intend "agency" to encompass "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President."  *Id.* (quoting H.R. Rep. No. 93-1380, at 15 (1974) (Conf. Rep.)).  That Conference Report further specified that "with respect to the meaning of the term 'Executive Office of the President' the conferees intend[ed] the result reached in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)." H.R. Rep. No. 93-1380, at 14-15; *see Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1040 (D.C. Cir. 1985); *see also Meyer*, 981 F.2d at 1291 n.1 (explaining Congress had codified the D.C. Circuit's analysis of EOP entities in *Soucie* in the 1974 FOIA Amendments).

The controlling question in determining whether an entity within the Executive Office of the President is an "agency," therefore, is whether "the entity in question 'wield[s] substantial authority independently of the President.'" *Citizens for Responsibility & Ethics in Wash.* ("*CREW*") *v. Office of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) (quoting *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995)); *see* Mem. Op. at 27 ("The most important consideration appears to be whether the 'entity in question wielded substantial authority independently of the President.'" (quoting *CREW*, 566 F.3d at 222).   This principle is rooted in separation of powers concerns.   The Supreme Court has expressly held that the President's actions are not subject to the APA, as such a review would infringe upon a coordinate branch. *See Franklin*, 505 U.S. at 800-01; *see also Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85, 99-100 (D.D.C. 2016) (separation of powers concerns "bar review [of the President's actions] for abuse of discretion" in performance of statutory duties (citation omitted)).   These concerns are equally present when exempting entities within the Executive Office of the President that have the sole function of advising and assisting the President, as such an exemption "may be constitutionally required to protect the President's executive powers." *See Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909-10 (D.C. Cir. 1993). The D.C. Circuit has repeatedly looked to whether EOP entities "wielded substantial authority independently of the President."[4] *CREW*, 566 F.3d at 222 (quoting *Sweetland*, 60 F.3d at 854).

---

[4]   The D.C. Circuit has used various tests to formulate its inquiry:   "These tests have asked, variously, 'whether the entit[ies] exercise[] substantial independent authority,' 'whether . . . the entit[ies'] sole function is to advise and assist the President,' and in an effort to harmonize these tests, 'how close operationally the group is to the President,' 'whether it has a self-contained structure,' and 'the nature of its delegate[d] authority.'   However the test has been stated, common to every case in which we have held that an EOP unit is [an agency] . . . has been a finding that the entity in question 'wielded substantial authority independently of the President.'"   *CREW*, 566 F.3d at 222-23 (internal citations omitted).

Courts have looked to whether these EOP entities have independent regulatory or funding powers or are otherwise imbued with significant statutory responsibilities. For example, as previously mentioned, OSTP was determined to be an agency because it had independent authority to initiate, fund, and review research programs and scholarships. *Soucie*, 448 F.2d at 1073-75. Other courts have found the Council for Environmental Quality ("CEQ") to be an agency because it has the power to issue guidelines and regulations to other federal agencies, *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980), and the Office of Management and Budget ("OMB") to be an agency because it has a statutory duty to prepare the annual federal budget, as well as a Senate-confirmed Director and Deputy Director. *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978) ("Congress signified the importance of OMB's power and function, over and above its role as presidential advisor, when it provided[] . . . for Senate confirmation of the Director and Deputy Director of OMB."), *rev'd on other grounds*, 442 U.S. 347 (1979).

But many other EOP entities – including those sued here – lack such independent authority. For example, President Reagan's Task Force on Regulatory Relief, which was comprised of senior White House staffers and cabinet officials who headed agencies, was not itself an agency because, while it reviewed proposed rules and regulations, it could not itself *direct* others to take action. *Meyer*, 981 F.2d at 1294 ("[W]e see no indication that the Task Force, *qua* Task Force, directed anyone . . . to do anything."). The Council of Economic Advisors ("CEA") similarly lacks regulatory or funding power, and therefore is not an agency. *Rushforth*, 762 F.2d at 1042. Nor is the National Security Council ("NSC") an agency, because it only advises and assists the President in coordinating and implementing national security policy. *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 560-61 (D.C. Cir. 1996). The

28

Office of Administration ("OA"), which provides "operational and administrative support of the work of the President and his EOP staff," including IT support, is not an agency, *CREW*, 566 F.3d at 24-25, nor is the Executive Residence Staff, which supports the President's ceremonial duties, *see Sweetland*, 60 F.3d at 854.  The White House Office is similarly not an agency, *see Sculimbrene v. Reno*, 158 F. Supp. 2d 26, 35-36 (D.D.C. 2001), and neither is the White House Counsel's Office, *Nat'l Sec. Archive v. Archivist of the U.S.*, 909 F.2d 541, 545 (D.C. Cir. 1990), which is within the White House Office.  In short, under this Circuit's authority, EOP entities that implement binding regulations (CEQ), grant funding (OSTP), or have important statutorily defined functions (OMB) constitute agencies; those that advise the President (CEA, Task Force), coordinate policy among different entities (NSC), provide administrative support for the President's activities (OA, Executive Residence), or constitute his closest advisors (White House Office) do not.

      **B.**       **The "Substantial Independent Authority" Test Applies to Both the APA and the E-Government Act.**

The "substantial independent authority" definition of agency – and its construction – applies to the APA and the E-Government Act.  To begin, *Soucie* itself was a case interpreting the *APA's* definition of "agency."  *See Soucie*, 448 F.2d at 1073 ("The statutory definition of 'agency' is not entirely clear, but *the APA* apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." (emphasis added)).  The D.C. Circuit has since made clear that this definition applies to the APA generally. *See Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997) ("Our cases . . . requir[e] that an entity exercise substantial independent authority before it can be considered an agency for [5 U.S.C.] § 551(1) purposes."); *McKinney v. Caldera*, 141 F. Supp. 2d 25, 32 n.14 (D.D.C. 2001) ("As the D.C. Circuit explained in a later case, the 'substantial independent authority' standard

29

derives from both the statutory language of the APA and the legislative history characterizing the type of authority required ('final and binding')." (citing *Dong*, 125 F.3d at 881)).  Plaintiff's attempt to characterize *Soucie* as applying only to FOIA, EPIC's Am. TRO Mem. at 24-26, cannot be squared with the actual holding of the case, much less its subsequent history, which makes clear that the rule it established applies to the APA writ large.  *See* Mem. Op. at 31 n.5.

Nor do plaintiff's remaining efforts to limit *Soucie* to FOIA alone fare any better.  It cites *Alexander v. FBI*, 971 F. Supp. 603, 606 (D.D.C. 1997), for the proposition that the Privacy Act and the FOIA (which share the same textual definition of "agency") need not be construed similarly because the statutes serve "very different purposes."  EPIC's Am. TRO Mem. at 26. What plaintiff fails to mention, however, is that this holding has been explicitly overturned. Thirteen years after issuing the opinion plaintiff cites, Judge Lamberth reconsidered and reversed his earlier decision, holding that "[s]ubsequent case law now makes clear that this Court's prior interpretation of the Privacy Act in [the 1997 *Alexander* decision] is no longer the correct one." *Alexander v. FBI*, 691 F. Supp. 2d 182, 189 (D.D.C. 2010), *aff'd*, 456 F. App'x 1 (D.C. Cir. 2011).  Rather, "[t]he Court of Appeals made clear in *Dong v. Smithsonian* that the Privacy Act's definition of 'agency' is to be interpreted coextensively with the term as used in FOIA."  *Id.* at 189-90 (citing *Dong*, 125 F.3d at 878-89).  In other words, the purpose of the statutes does not control how "substantial independent authority" is defined.

Finally, the E-Government Act's definition of "agency" should follow the same definition as the APA, FOIA, and the Privacy Act.  As plaintiff acknowledges, the E-Government Act, which borrows the definitions established in the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3502(1), has essentially the same definition as the FOIA.  EPIC Am. TRO Mem. at 29; *compare* 5 U.S.C. § 552(f)(1) *with* 44 U.S.C. § 3502(1).  The PRA was passed in

1980, six years after the FOIA was amended to include its current definition of "agency," which,

as mentioned previously, incorporated the *Soucie* "substantial independent authority" test.

"[W]hen judicial interpretations have settled the meaning of an existing statutory provision,

repetition of the same language in a new statute indicates, as a general matter, the intent to

incorporate its judicial interpretations as well." *Merrill Lynch, Pierce, Fenner & Smith Inc. v.

Dabit*, 547 U.S. 71, 85 (2006) (alteration and citation omitted); *see also Morales v. Trans World

Airlines, Inc.*, 504 U.S. 374 384 (1992) (applying same interpretation to identical words in

similar statutes).  Here, the PRA, Privacy Act, and FOIA all serve similar purposes – they

manage government access to and control over information, and the PRA adopts essentially the

same language as the FOIA, which by the time of adoption had a settled judicial construction.

Accordingly, this Court should apply the same definition of "agency" to the E-Government Act

as it does to the APA.  In any event, because it is undisputable that the E-Government Act lacks

a private cause of action, plaintiff can proceed only through the APA.  Accordingly, it is the

APA's definition of agency that controls here, and the D.C. Circuit has definitively spoken to

that definition in *Soucie*.

### C.      The Presidential Commission is Not an Agency.

The Commission is not an agency subject to the APA and the E-Government Act,

because it lacks "substantial independent authority in the exercise of specific functions."  *Soucie*,

448 F.2d at 1073.  The Commission reports directly to the President and is "solely advisory."

Exec. Order No. 13,799, § 3; *see also* Charter, Presidential Advisory Commission on Election

Integrity ¶ 4, https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/commission-

charter.pdf ("The Commission will function solely as an advisory body."); Mem. Op. at 27.  It is

chaired by the Vice President (Exec. Order No. 13, 799 § 2a), a constitutional officer who is also

not an agency.  *See Wilson v. Libby*, 535 F.3d 697, 707-08 (D.C. Cir. 2008) (holding that the

Office of the Vice President was not an agency under the Privacy Act); *Dong*, 125 F.3d at 878

(Privacy Act definitions incorporates FOIA definitions).  Its purpose is to "submit a report to the

President" that identifies rules and activities that enhance and undermine the "American people's

confidence in the integrity of the voting process used in Federal elections" and to identify

"vulnerabilities in voting systems . . . that could lead to improp[rieties]."  Exec. Order No.

13,799, § 3(a)-(c).  It will then disband.  *Id.* § 6.  The Commission has no regulatory, funding, or

enforcement powers, nor does it have any independent administrative responsibilities.  Instead, it

exists solely to provide research and advice to the President.  "No independent authority is

imbued upon the Commission by the Executive Order, and there is no evidence that it has

exercised any independent authority that is unrelated to its advisory mission."  Mem. Op. at 27-

28.  It is not, therefore, an "agency."

 This conclusion accords with controlling D.C. Circuit case law.  The Council of

Economic Advisors, like the Commission, gathers information, develops reports, and makes

recommendations to the President.  *See* 15 U.S.C. § 1023(c).  The Council is not an agency, as it,

like the Commission, "has no regulatory power under the statute," "[i]t cannot fund projects

based on [its] appraisal, . . . nor can it issue regulations."  *Rushforth*, 762 F.2d at 1043.  And in

*Meyer*, the D.C. Circuit held that the President's Task Force on Regulatory Relief, which, like

this Commission, was chaired by the Vice President, was not an agency, because while it

reviewed federal regulations and made recommendations, it did not have the power to "direct[]

anyone . . . to do anything."  981 F.2d at 1294.  The Commission here is situated the same way.

Plaintiff focuses on the fact that the Commission will "investigate[]", "evaluate[]", and "make[]

32

recommendations." EPIC's Am. TRO Mem. at 28.[5]  But so did the Council of Economic

Advisors and the Task Force on Regulatory Reform.  What those entities lacked, as the

Commission lacks here, was independent authority beyond their presidential advisory roles.

In any event, even apart from the functional test establishing that the Commission exists

to advise and assist the President, and is therefore not an "agency" under the APA or E-

Government Act, it is clear that an entity cannot be at once both an advisory committee (as

plaintiff claims the Commission is) and an agency.  *See Heartwood, Inc. v. U.S. Forest Serv.*,

431 F. Supp. 2d 28, 36 (D.D.C. 2006) (noting that an "advisory committee cannot have a double

identity as an agency" (quoting *Wolfe v. Weinberger*, 403 F. Supp. 238, 242 (D.D.C. 1975)).

Nor does the involvement of federal officials or federal agencies in an advisory committee

transform that committee into an "agency."  In *Meyer*, the Presidential Task Force at issue

included "various cabinet members . . . [who were] unquestionably officers who wielded great

authority as heads of their departments."  981 F.2d at 1297.  But that did not turn the Task Force

into an agency; the relevant inquiry is the function exercised, not the job title.  The court of

appeals concluded that "there is no indication that when *acting as the Task Force* they were to

exercise substantial independent authority . . . .  Put another way, the whole does not appear to

equal the sum of its parts."  *Id.* (emphasis added).

Similarly, the mere presence of a federal agency that provides some administrative

support – but does not exercise "substantial independent authority" – does not transform an

---

[5]  Plaintiff draws this language from *Energy Research Foundation v. Defense Nuclear Facilities Safety Board*, 917 F.2d 581 (D.C. Cir. 1990).  But in that case, unlike here, the board "ha[d] at its disposal the full panoply of investigative powers commonly held by other agencies of government," had the power to "force[] public decisions about health and safety," and "ha[d] the additional authority to impose reporting requirements on the Secretary of Energy.  *Id.* at 584-85.  The Commission has no such powers.

otherwise non-agency "whose sole function is to advise and assist" into an agency. *Meyer*, 981

F.2d at 1297-98. Were it otherwise, every advisory committee that received support from federal

employees or agencies – *i.e.*, all of them, *see* 5 U.S.C. app. 2 § 10(e) (requiring advisory

committees to have support from a designated federal officer or employee) – would be an

agency, a conclusion impossible to square with this Circuit's precedent. *See, e.g.*, *Meyer*, 981

F.2d at 1296 (Presidential Task Force on Regulatory reform was not an agency); *Judicial Watch,*

*Inc. v. Dep't of Energy*, 412 F.3d 125, 127 (D.C. Cir. 2005) (Vice President Cheney's National

Energy Policy Development Group was not an agency). Consistent with these decisions, this

Court similarly concluded that the Commission is not an agency, meaning that plaintiff cannot

invoke the APA's cause of action, and the E-Government Act's requirements do not apply.

### D.     The Director of White House Information Technology is Not an Agency.

The Director of White House Information Technology is also not an agency. The

DWHIT "on behalf of the President, shall have the primary authority to establish and coordinate

the necessary policies and procedures for operating and maintaining the information resources

and information systems provided to the President, Vice President, and EOP." Memorandum on

Establishing the Director of White House Information Technology and the Executive Committee

for Presidential Information Technology [hereinafter "DWHIT Mem."] § 1 (Mar. 19, 2015),

https://www.gpo.gov/fdsys/pkg/DCPD-201500185/pdf/DCPD-201500185.pdf. The DWHIT is a

member of the White House Office, *id.* § 2(a)(ii), and reports to the Deputy Chief of Staff for

Operations, *id.* § 2(b). The DWHIT is responsible for providing IT services to the President,

Vice President, and their staffs. *See id.* § 2(c) ("The Director shall ensure the effective use of

information resources and information systems provided to the President, Vice President, and

EOP in order to improve mission performance, and shall have the appropriate authority to

promulgate all necessary procedures and rules governing these resources and systems.").  The DWHIT is also charged with providing "coordination and guidance" for IT use by other entities serving the President.  *See id.* §§ 2(c), 3.

Fundamentally, the DWHIT is not an agency because, as plaintiff acknowledges, the DWHIT is part of the White House Office.  EPIC's Am. TRO Mem. at 21 n.18; *see also* DWHIT Mem. § 2(a)(ii).  Controlling authority holds that the White House Office is not an agency. *Wilson*, 535 F.3d at 708; *see also Alexander*, 691 F. Supp. 2d at 190.  Even if this Court looks to the DWHIT's functional responsibilities, rather than his organizational status, the conclusion is the same.  The DWHIT provides IT support for the President and his staff.  As this Circuit has held in the context of the EOP's Office of Administration, an entity that provides "operational and administrative" support for the President is not an agency.  *See CREW*, 566 F.3d at 224.  "As its name suggests, everything the Office of Administration does is directly related to the operational and administrative support of the work of the President and his EOP staff."  *Id.*  This included, at the time, "information services." *Id.* (quoting Exec. Order No. 12,028 (1977)).  Such tasks were quintessential advice and assist functions.  So too, here – the DWHIT, like OA, provides IT services to "the President and his EOP staff."  *Id.*  Thus, "[g]iven the nature of the DWHIT's responsibilities and its proximity to the President and Vice President, it is not an agency for the reasons specified by the D.C. Circuit in *CREW* with respect to the Office of Administration."  Mem. Op. at 31.

Nor does it matter that the DWHIT may coordinate IT activities with other entities that may themselves be agencies.  *See* DWHIT Mem. §§ 2(c), 3; EPIC's Am. TRO Mem. at 21-22. The *CREW* court specifically rejected this argument.  *See CREW*, 566 F.3d at 224 ("CREW contends that OA's support of non-EOP entities – including the Navy, the Secret Service, and the

General Services Administration – undermines the government's argument. But those units only receive OA support if they work at the White House complex in support of the President and his staff.  Assisting these entities in these activities is consistent with OA's mission.").  It is also consistent with the DWHIT's mission.  Moreover, even to the extent that the DWHIT provides coordination to other agencies in support of the President, such coordination, as this Circuit held in the context of the National Security Council, does not transform the entity into an agency. *Armstrong*, 90 F.3d at 565.

Finally, plaintiff also brings suit against the Executive Committee for Presidential Information Technology and the U.S. Digital Service.  Second Am. Compl. ¶¶ 12, 13.  Plaintiff does not allege, however, that either of these entities has any involvement with the Commission's work, or that they will be involved with the management of the collected data.  *Id*. ¶¶ 12, 13, 47.  Therefore an order against them could not remedy any injury supposedly faced by plaintiff.

### E.    The Executive Office of the President is Not a Discrete "Agency."

Plaintiff also argues that even if the individual subcomponents of the EOP did not qualify as agencies, "the EOP would be answerable for their actions under the APA because it is a parent agency."  EPIC's Am. TRO Mem. at 23.  The D.C. Circuit has specifically rejected the claim that the EOP is the proper unit of analysis for determining whether an EOP entity is an "agency." "[I]t has never been thought that the whole Executive Office of the President could be considered a discrete agency under FOIA."  *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998); *see also Int'l Counsel Bureau v. CIA*, No. 09-2269 (JDB), 2010 WL 1410561 (D.D.C. Apr. 2, 2010); Mem. Op. at 32-33.  Indeed, were it otherwise, none of the D.C. Circuit's *Soucie* case law would make sense: if a party could simply sue the "EOP," there would be no need for a

component-by-component analysis.  And given that the APA and the E-Government Act use the

same definition, the *Espy* holding applies equally here.

**F.    GSA is Not Obligated to Provide the Commission Data Storage, Nor Does the Fact that GSA Is an Agency Transform an EOP Component Into an Agency.**

Finally, plaintiff argues that because GSA is an agency, if GSA had collected personal

voter data, it would have been obligated to conduct a PIA under the E-Government Act.  EPIC's

Am. TRO Mem. at 30.  But plaintiff has not alleged that GSA has or plans to collect any voting

data.  *See* Second Am. Compl. ¶¶ 34-37.  Plaintiff never explains how something that a federal

agency did not do and has no plans to do transforms an advice and assist EOP component into an

agency.  Instead, plaintiff avoids that question, and argues that the Executive Order requires that

GSA be responsible for collecting any data.  The Executive Order imposes no such requirement.

Instead, it merely states that GSA will provide the Commission administrative services "as may

be necessary."  Exec. Order No. 13,799, § 7(a).  But nothing in that Executive Order says that *all*

services must be provided through GSA, or which service must be provided through GSA.

Rather, the Executive Order states that "[t]he Commission shall have staff to provide support for

its functions," *id.* § 5, and that other federal entities "shall endeavor to cooperate with the

Commission," *id.* § 7(b).  Again, even if GSA could have collected data, it has not done so, and

plaintiff provides no explanation for how an action not taken by an agency transforms a non-

agency entity into an agency.

**IV.    PLAINTIFF'S CLAIMS THAT ITS MEMBERS' ALLEGED CONSTITUTIONAL RIGHTS HAVE BEEN VIOLATED SHOULD BE DISMISSED.**

Plaintiff's claims that its members' constitutional rights have been violated (Counts IV

and V) also must be dismissed.  First, the Court lacks jurisdiction over these claims, which are

based on the alleged individual harm to plaintiff's Advisory Board members (Second Am.

37

Compl. ¶¶ 78-79).  However, as discussed above in section I, the Advisory Board members have not asserted a sufficiently concrete and imminent injury from the Commission's actions to give them Article III standing to pursue their own claims.  In addition, plaintiff is not authorized to represent these Advisory Board members in this suit because these are not "members" or the functional equivalent of members.  Accordingly, plaintiff's constitutional claims should be dismissed for lack of subject-matter jurisdiction.  In the alternative, they should be dismissed for failure to state a claim, for the reasons set forth below.

### A.      There is no Constitutional Right to Informational Privacy

Even if the Court were to determine it had jurisdiction over plaintiff's claim to a violation of constitutional informational privacy rights (Count IV), neither the Supreme Court nor the D.C. Circuit has held that a federal constitutional right to informational privacy exists, and the Court should decline to do so here.  Although the Supreme Court has assumed, without deciding, that the Constitution protects the individual "interest in avoiding disclosure of personal matters," *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 138 (2011) (citation omitted), the Court has not specifically held that a supposed constitutional right to informational privacy actually exists.[6]  For its part, the D.C. Circuit has expressed "grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information."  *Am. Fed'n of Gov't Emps. v. Dep't of Hous. & Urban Dev.,* 118 F.3d 786, 791 (D.C. Cir. 1997).

---

[6]  At least two justices have criticized that approach and expressly questioned the existence of a constitutional right to informational privacy.  *See Nelson*, 562 U.S. at 159-60 (Scalia, J., concurring in the judgment) ("'[I]nformational privacy' seems like a good idea . . . [b]ut it is up to the People to enact those laws, to shape them, and, when they think it appropriate, to repeal them.  A federal constitutional right to 'informational privacy' does not exist."); *id.* at 169 (Thomas, J., concurring in the judgment) ("I agree with Justice Scalia that the Constitution does not protect a right to informational privacy.  No provision in the Constitution mentions such a right." (citation omitted)).

Even assuming such a right exists, plaintiff's claim would still fail because the Commission has only requested information that is "publicly available," Second Am. Compl., Ex. 3, much, if not all, of it pursuant to the National Voter Registration Act, 52 U.S.C. § 20507(i)(1), or through public access laws of individual states. *See* Nat'l Conference of State Legislatures, The Canvass: States and Election Reform, *It's a Presidential Election Year: Do You Know Where Your Voter Records Are?* (Feb. 2016), http://www.ncsl.org/Documents/ Elections/The_Canvass_February_2016_66.pdf (discussing availability of voter information under state laws); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012) (holding that 52 U.S.C. § 20507(i)(1) "unmistakably encompasses completed voter registration applications").  Whatever the bounds of a supposed constitutional right to informational privacy, it does not extend to matters already in the public record.  Indeed, courts have repeatedly held that "there is no question that an individual cannot expect to have a constitutionally protected privacy interest in matters of public record." *Doe v. City of N.Y.*, 15 F.3d 264, 268 (2d Cir. 1994) (citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 493-96 (1975)); *Lewis v. Delarosa*, No. C-15-2689 MC (PR), 2015 WL 5935311, at *3 (N.D. Cal. Oct. 13, 2015) ("Plaintiff's allegations that his right to informational privacy was violated when his non-private identification information was published on the internet is not included in even the outer confines of a federal right to informational privacy."); *Jones v. Lacey*, 108 F. Supp. 3d 573, 584-85 (E.D. Mich. 2015) (no right to informational privacy with respect to information that had been publicly released); *Pelosi v. Spota*, 607 F. Supp. 2d 366, 373 (E.D.N.Y. 2009) (same).

Plaintiff has not pled – much less established – that the Commission's explicit request only for "publicly-available voter roll data," Second Am. Compl., Ex. 3, encompasses *private* sensitive personal information not already available to the general public as a matter of public

record.[7]  Nor has plaintiff challenged the states' collection of that voter data or their designation

of that information as publicly available.  Because the Commission has only requested public

information from the states, plaintiff could never show that a constitutional right to informational

privacy – even if it were to exist – has been violated.[8]  Therefore, this claim should be dismissed

pursuant to Federal Rule of Civil Procedure 12(b)(6).

---

[7]  The last four digits of a social security number are not generally considered private information.  For example, Federal Rule of Civil Procedure 5.2(a)(1) provides that filings on a public docket may include "the last four digits of the social-security number."  Fed. R. Civ. P. 5.2(a)(1).  Furthermore, 52 U.S.C. § 21083(c), which governs computerized statewide voter registration list requirements as part of the Help America Vote Act, states that the last four digits of a social security number may be used as part of the voter registration process for an election for Federal Office without running afoul of the Privacy Act.

[8]  The Supreme Court's decision in *U.S. Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989), is not to the contrary. There, the Court held that for purposes of the Freedom of Information Act's statutory limitation on the release of information that "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C), federal "rap sheets" need not be disclosed.  The Court concluded that "[a]lthough much rap-sheet information is a matter of public record, the availability and dissemination of the actual rap sheet to the public is limited."  *Reporters Comm.*, 489 U.S. at 753.  Additionally, the fact that there was a "web of federal statutory and regulatory provisions that limits the disclosure of rap-sheet information," *id.* at 764-65, combined with "the fact that most States deny the general public access to their criminal-history summaries," *id.* at 767, permitted an agency to withhold the requested information under FOIA.

The *Reporters Committee* Court was explicit, however, that "[t]he question of the statutory meaning of privacy under the FOIA is, of course, not the same as . . . the question [of] whether an individual's interest in privacy is protected by the Constitution."  *Id.* at 762 n.13 (citing *Paul v. Davis*, 424 U.S. 693, 712-14 (1976) (no constitutional privacy right affected by publication of name of arrested but untried shoplifter)).  Following this direction, courts have "repeatedly stressed that *Reporters' Committee* is inapposite on the issue of those privacy interests entitled to protection under the United States Constitution." *A.A. v. New Jersey*, 176 F. Supp. 2d 274, 305 (D.N.J. 2001) (citing *E.B. v. Verniero*, 119 F.3d 1077, 1100 n.21 (3d Cir. 1997)), *aff'd in part, remanded in part sub nom. A.A. ex rel. M.M. v. New Jersey*, 341 F.3d 206 (3d Cir. 2003); *see also Cutshall v. Sundquist*, 193 F.3d 466, 481 (6th Cir. 1999) (holding that *Reporters Committee* did not establish a constitutional right to prevent disclosure).

In any event, the instant case may be distinguished on its facts.  Here, the Commission requested only publicly available information from the states, and plaintiff has not pled, much less proved, that such information is restricted or available to the public only for limited access.

**B.      Advisory Board Members' Procedural Due Process Rights Are Not Implicated**

Plaintiff's claim that its members have been deprived of a liberty interest in avoiding the disclosure of personal matters, without due process of law, should also be dismissed for failure to state a claim.  Plaintiff has not stated a valid claim to a violation of procedural due process by the federal government here.

The procedural part of the Due Process Clause of the Fifth Amendment protects against "(1) a deprivation [by the government]; (2) of life, liberty, or property; (3) without due process of law." *Lightfoot v. Dist. of Columbia*, 273 F.R.D. 314, 319 (D.D.C. 2011) (citing *Propert v. Dist. of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991)).  Thus, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.'  Only after finding the deprivation of a protected interest do we look to see if the [government's] procedures comport with due process." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (alteration in original) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).  And to evoke the protections of the Fifth Amendment, plaintiff must identify action by the federal government that threatens his protected interest.  *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 n.21 (1987) (recognizing that the Fourteenth Amendment applies to state actions, whereas the Fifth Amendment applies to actions by the federal government and its agencies).

To establish a protected liberty or property interest, the plaintiff must demonstrate that the Constitution or a federal or state statute grants him a protected right.  *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1124 (D.C. Cir. 1985) ("[T]he interests that are comprehended within the meaning of either liberty or property, as covered by the due process clause of the Constitution, are those interests which have 'attain[ed] constitutional status by virtue of the fact that they have

41

been initially recognized or protected by state law' or federal law." (quoting *Paul v. Davis*, 424

U.S. 693, 710, 712 (1976)).  For the reasons stated in the foregoing section, plaintiffs' members

have not identified a constitutionally protected liberty or property interest here.  Nor have they

identified a statutory protection or right applicable to the situation – the transfer of publicly

available information from one sovereign to another.  Specifically, the Commission has asked

only for publicly available information.  Therefore, to the extent that states limit what voter

information may be publicly disclosed and thereby have created a "liberty interest" in the

protected information, the Commission has not asked for the protected information, and such

information will therefore be transferred only if the states – in violation of their own laws – send

that information.  However, absent evidence to the contrary, courts "presume [that a public

entity] follows its statutory commands and internal polices in fulfilling its obligations." *Garner*

*v. Jones*, 529 U.S. 244, 256 (2000) (citation omitted).  Indeed, the available evidence indicates

that states only intend to send the Commission information that can be shared pursuant to state

law.  *See, e.g.*, Letter from John H. Merrill, Alabama Secretary of State, to Kris Kobach (July 5,

2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/responses-public-

officials.pdf (stating that "Alabama Code § 17-4-38 does not allow me to simply send Alabama's

voter data," and further noting that "[p]ublicly available voter roll data does not include social

security numbers, driver's license numbers, political party affiliation, felony convictions,

information regarding for whom an individual voted, or any information on a voter previously

removed from the active rolls" (emphasis omitted).

In addition to failing to identify a protected liberty interest at issue here, plaintiff has also

failed to show that the relevant action its members challenge is attributable to the federal

government.  The information plaintiff's members are concerned about is in the hands of the

states.  If individual members did suffer an injury because that information was made public, that injury would be caused by the states whose laws put such information in the public domain and/or who transferred such data to the Commission.  The Commission itself has committed to "not publicly release any personally identifiable information regarding any individual voter or any group of voters from the voter registration records" submitted and that "individuals' voter registration records will be kept confidential and secure throughout the duration of the Commission's existence."  Kobach Letter (July 26, 2017), https://www.whitehouse.gov/sites/ whitehouse.gov/files/docs/letter-vice-chair-kris-kobach-07262017.pdf.  Accordingly, there is no federal action at issue here, and no viable claim under the Fifth Amendment.

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiff's Second Amended

Complaint.

Dated:  September 5, 2017                            Respectfully submitted,

                                                     CHAD A. READLER
                                                     Acting Assistant Attorney General
                                                     Civil Division

                                                     BRETT A. SHUMATE
                                                     Deputy Assistant Attorney General

                                                     ELIZABETH J. SHAPIRO
                                                     Deputy Director

                                                     */s/ Carol Federighi*
                                                     CAROL FEDERIGHI
                                                     Senior Trial Counsel
                                                     KRISTINA A. WOLFE
                                                     JOSEPH E. BORSON
                                                     Trial Attorneys
                                                     United States Department of Justice
                                                     Civil Division, Federal Programs Branch
                                                     P.O. Box 883
                                                     Washington, DC 20044
                                                     Phone: (202) 514-1903
                                                     Email: carol.federighi@usdoj.gov

                                                     *Counsel for Defendants*

44