**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ELECTRONIC PRIVACY INFORMATION CENTER

      Plaintiff,

      v.

PRESIDENTIAL ADVISORY COMMISSION ON
ELECTION INTEGRITY, *et al.*,

      Defendants.

Civ. Action No. 17-1320 (CKK)

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................iv

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

    A.  The Establishment of the Commission ...........................................................2

    B.  The Role of the General Services Administration ............................................3

    C.  The Role of Other Government Agencies and Officials....................................3

    D.  The Commission's Original Demand for State Voter Records ......................4

    E.  Defendants' Failure to Conduct a Privacy Impact Assessment ....................6

    F.  Many States Have Opposed the Commission's Request ................................7

    G.  Subsequent Developments ................................................................................8

STANDARDS OF REVIEW ....................................................................................................9

    A.  12(b)(1) Standard of Review .............................................................................9

    B.  12(b)(6) Standard of Review .............................................................................9

ARGUMENT .........................................................................................................................10

I.    The Court has jurisdiction under Article III to redress informational, organizational, and constitutional injuries to EPIC and EPIC's members caused by the Commission's collection of personal voter data.........................................................11

    A.  EPIC has established informational standing. ................................................11

    B.  EPIC has established organizational standing. ..............................................15

    C.  EPIC has established associational standing....................................................17

II.    Congress has provided for judicial review of final actions by "each authority of the Government," including the Commission and the other Defendants, with only narrow exceptions that do not apply in this case............................................................21

    A.  The Court has authority to set aside unlawful agency action under the APA. .............22

    B.  The President, Vice President, and their advisors are not immune from the Court's injunctive authority. ...................................................................................24

    C.  There is no "clear and convincing" evidence that Congress intended to preclude judicial review of the Commission's compliance with the E-Government Act. ..........27

    D.  EPIC has plausibly alleged that Defendant EOP and its subcomponents are also agencies under the *Soucie* test.........................................................................31

III.  EPIC has stated a claim under the APA that the Commission's failure to publish a
      Privacy Impact Assessment violates the E-Government Act and the FACA. ...................33

      A.  The Government has conceded that, if the E-Government Act and APA apply,
          EPIC has stated a claim for relief. ...............................................................................33

      B.  The Commission is an establishment of the government subject to the Paperwork
          Reduction Act and the E-Government Act. ..................................................................35

      C.  The Defendant GSA, which is an agency, has a mandatory, nondiscretionary duty
          to participate in the Commission's collection activities. ...............................................37

IV.   EPIC has stated a claim that Commission's collection of personal data violates EPIC
      members' right to informational privacy, which is firmly grounded in Supreme Court
      precedent. ..............................................................................................................................38

      A.  The Commission's actions violate the right to informational privacy.........................38

      B.  The Commission's actions violate the right to due process of law...............................42

CONCLUSION .............................................................................................................................43

# TABLE OF AUTHORITIES

**Cases**

*2910 Georgia Ave. LLC v. D.C.*,
234 F. Supp. 3d 281 (D.D.C. 2017).................................................................42

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006).........................................................................17

*Am. Farm Bureau v. EPA*,
121 F. Supp. 2d 84 (D.D.C. 2000)....................................................................12

*Am. Fed'n of Gov't Emps., AFL-CIO v. HUD*,
118 F.3d 786 (D.C. Cir. 1997)....................................................................38, 41

*Am. Friends Serv. Comm. v. Webster*,
720 F.2d 29 (D.C. Cir. 1983)...........................................................................14

*Am. Historical Ass'n v. NARA*,
516 F. Supp. 2d 90 (D.D.C. 2007)....................................................................14

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991).........................................................23, 25, 26, 27

*Armstrong v. Exec. Office of the President*,
90 F.3d 553 (D.C. Cir. 1996).....................................................................28, 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................9

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
997 F.2d 898 (D.C. Cir. 1993).........................................................................29

*Ass'n of Flight Attendants- CWA, AFL-CIO v. U.S. Dep't of Transp.*,
564 F.3d 462 (D.C. Cir. 2009).........................................................................18

*AT&T Info. Sys., Inc. v. GSA*,
810 F.2d 1233 (D.C. Cir. 1987).......................................................................38

*Banneker Ventures, LLC v. Graham*,
798 F.3d 1119 (D.C. Cir. 2015).......................................................................10

*Barr v. Clinton*,
370 F.3d 1196 (D.C. Cir. 2004).........................................................................9

*Byrd v. EPA*,
174 F.3d 239 (D.C. Cir. 1999).........................................................................12

*Caminetti v. United States*,
242 U.S. 470 (1917).........................................................................................22

*CREW v. Office of Admin.*,
559 F. Supp. 2d 9 (D.D.C. 2008), *aff'd*, 566 F.3d 219..............................30, 33

*CREW v. Exec. Office of President*,
587 F. Supp. 2d 48 (D.D.C. 2008)...................................................................29

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013).........................................................................................21

*Council on Am.-Islamic Relations v. Gaubatz*,
667 F. Supp. 2d 67 (D.D.C. 2009)...................................................................21

*Ctr. for Biological Diversity v. EPA*, No. 14-1036,
2017 WL 2818634 (D.C. Cir. June 30, 2017)..................................................18

*Ctr. for Law & Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005).......................................................................16

*Cutler v. HHS*,
   797 F.3d 1173 (D.C. Cir. 2015)......................................................................................20
*Delaware Dep't of Health & Soc. Servs. v. HHS*, No. CV 16-1734 (CKK),
   2017 WL 3412077 (D.D.C. Aug. 8, 2017) ........................................................................9
*Doe v. City of N.Y.*,
   15 F.3d 264 (2d Cir. 1994)............................................................................................40
*DOJ v. Reporters Comm. For Freedom of Press*,
   489 U.S. 749 (1989)..........................................................................................20, 39, 43
*Dong v. Smithsonian Institute*,
   125 F.3d 877 (D.C. Cir. 1997).................................................................................30, 31
*Energy Research Foundation v. Def. Nuclear Facilities Safety Bd.*,
   917 F.2d 581 (D.C. Cir. 1990)......................................................................................32
*Fanin v. Dep't of Veteran Affairs*,
   572 F.3d 868 (11th Cir. 2009) ......................................................................................38
*FEC v. Akins*,
   524 U.S. 11 (1998)........................................................................................................11
*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)......................................................................................................25
*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
   129 F.3d 826 (5th Cir. 1997) ........................................................................................18
*Fund Democracy, LLC v. SEC*,
   278 F.3d 21 (D.C. Cir.  2002) .......................................................................................18
*Haddon v. Walters*,
   43 F.3d 1488 (D.C. Cir. 1995) ........................................................................................9
*Hamandi v. Chertoff*,
   550 F. Supp. 2d 46 (D.D.C. May 6, 2008)....................................................................37
*Hawaii v. Trump*,
   859 F.3d 741 (9th Cir. 2017), *cert. granted sub nom. Trump v. Int'l Refugee Assistance
   Project*, 137 S. Ct. 2080 (2017) ...................................................................................25
*Heckler v. Chaney*,
   470 U.S. 821 (1985)......................................................................................................23
*Hosp. Staffing Sols., LLC v. Reyes*,
   736 F. Supp. 2d 192 (D.D.C. 2010) ..............................................................................21
*Hunt v. Wash. State Apple Adver. Comm'n*,
   432 U.S. 333 (1977)......................................................................................................18
*In re Fidelity Mortgage Investors*,
   690 F.2d 35 (2d Cir. 1982)............................................................................................35
*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
   45 F. Supp. 3d 14 (D.D.C. 2014) ..................................................................................20
*Int'l Refugee Assistance Project v. Trump*,
   857 F.3d 554 (4th Cir. 2017), *cert. granted sub nom. Trump v. Int'l Refugee Assistance
   Project*, 137 S. Ct. 2080 (2017) ...................................................................................25
*Kissinger v. Reporters Comm. for the Freedom of the Press*,
   445 U.S. 136 (1980)................................................................................................28, 35
*Kuzma v. U.S. Postal Serv.*,
   798 F.2d 29 (2d Cir. 1986)......................................................................................35, 36

*Legal Aid Soc. of Alameda County v. Brennan*,
   608 F.2d 1319 (9th Cir. 1979) ....................................................................................... 37
*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchack*,
   567 U.S. 209 (2012) ....................................................................................................... 23
*McKinney v. Caldera*,
   141 F. Supp. 2d 25 (D.D.C. 2001) ........................................................................... 30, 31
*Meyer v. Bush*,
   981 F.2d 1288 (D.C. Cir. 1993) .......................................................................... 25, 30, 31
*Mistick PBT v. Chao*,
   440 F.3d 503 (D.C. Cir. 2006) ....................................................................................... 23
*NASA v. Nelson*,
   562 U.S. 134 (2011) ........................................................................................... 39, 40, 41
*Nat'l Ass'n of Home Builders v. EPA*,
   667 F.3d 6 (D.C. Cir. 2011) ...................................................................................... 15, 17
*Nat'l Consumer League v. Gen. Mills, Inc.*,
   680 F. Supp. 2d 132 (D.D.C. 2010) ............................................................................... 16
*Nat'l Parks & Conservation Ass'n v. Kleppe*,
   547 F.2d 673 (D.C. Cir. 1976) ....................................................................................... 28
*Nat'l Sec. Archive v. Archivist of the U.S.*,
   909 F.2d 541 (D.C. Cir. 1990) ....................................................................................... 29
*Nat'l Taxpayers Union, Inc. v. United States*,
   68 F.3d 1428 (D.C. Cir. 1995) ....................................................................................... 17
*Nat'l Treasury Empls. Union v. United States*,
   101 F.3d 1423 (D.C. Cir. 1996) ..................................................................................... 15
*Nixon v. Administrator of Gen. Servs.*,
   433 U.S. 425 (1977) ....................................................................................................... 38
*Norton v. S. Utah Wildlife Alliance*,
   542 U.S. 55 (2004) ......................................................................................................... 37
*Oregon Advocacy Ctr. v. Mink*,
   322 F.3d 1101 (9th Cir. 2003) ....................................................................................... 19
*Pac. Legal Found. v. Council on Envtl. Quality*,
   636 F.2d 1259 (D.C. Cir. 1980) ..................................................................................... 29
*Peavey v. United States*,
   128 F. Supp. 3d 85 (D.D.C. 2015) ................................................................................. 10
*PETA v. USDA*,
   797 F.3d 1087 (D.C. Cir. 2015) ..................................................................... 12, 14, 16, 17
*Pub. Citizen v. DOJ*,
   491 U.S. 440 (1989) .................................................................................................. 13, 14
*Pub. Citizen v. U.S. Trade Representative*,
   5 F.3d 549 (D.C. Cir. 1993) ........................................................................................... 29
*Puerto Rico v. Franklin California Tax-free Trust*,
   136 S. Ct. 1938 (2016) .............................................................................................. 22, 35
*Resident Advisory Bd. v. Rizzo*,
   425 F. Supp. 987 (E.D. Pa. 1976), *modified on other grounds*, 564 F.2d 126 (3d Cir.
   1977) ............................................................................................................................... 19

*Rushforth v. Council of Econ. Advisers,*
  762 F.2d 1038 (D.C. Cir. 1985) ............................................................................28, 29
*Senior Execs. Ass'n v. United States,*
  891 F. Supp. 2d 745 (D. Md. 2012) ...............................................................................38
*Shane v. Buck,*
  658 F. Supp. 908 (D. Utah 1985) ...................................................................................35
*Sierra Club v. FERC,*
  827 F.3d 59 (D.C. Cir. 2016) ........................................................................................18
*Soucie v. David,*
  448 F.2d 1067 (D.C. Cir. 1971) .......................................................................27, 28, 30, 31
*State of Connecticut Office of Prot. & Advocacy for Persons with Disabilities v.*
  *Connecticut,*
  706 F. Supp. 2d 266, 284 (D. Conn. 2010) ...................................................................19
*Sweetland v. Walters,*
  60 F.3d 852 (D.C. Cir. 1995) ........................................................................................30
*U.S. Army Corps of Engineers v. Hawkes Co., Inc.,*
  136 S. Ct. 1807 (2016) ..................................................................................................23
*United States v. District of Columbia,*
  44 F. Supp. 2d 53 (D.D.C. 1999) ..................................................................................38
*United States v. Espy,*
  145 F.3d 1369 (D.C. Cir 1998) ...........................................................................27, 35, 37
*United States v. Hite,*
  769 F.3d 1154 (D.C. Cir. 2014) ....................................................................................22
*Wash. Legal Found. v. Leavitt,*
  477 F. Supp. 2d 202 (D.D.C. 2007) ...................................................................17, 18, 20
*Wash. Research Proj., Inc. v. HEW,*
  504 F.2d 238 (D.C. Cir. 1974) ......................................................................................31
*Welborn v. IRS,*
  218 F. Supp. 3d 64 (D.D.C. 2016) ................................................................................20
*Whalen v. Roe,*
  429 U.S. 589 (1977) ...........................................................................................38, 41, 42
*White v. Hilton Hotels Ret. Plan,* No. CV 16-856 (CKK),
  2017 WL 3588929 (D.D.C. Aug. 18, 2017) ....................................................................9
*Whitman v. Am. Trucking Ass'n,*
  531 U.S. 457 (2001) ......................................................................................................26
*Zivotofsky v. Sec'y of State,*
  444 F.3d 614 (D.C. Cir. 2006) ......................................................................................12

**Statutes**
28 U.S.C. § 1331 .................................................................................................................10
5 U.S.C. § 552(f) ...................................................................................................22, 32, 41
E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 .......................6, 10, 14, 33
  44 U.S.C. § 3502(1) ..............................................................................................21, 35, 36
  § 208 ............................................................................................................................6, 34, 38
  § 208(b) ......................................................................................................................13, 33
  § 208(b)(2)(B)(ii) .....................................................................................................6, 7, 34
Federal Advisory Committee Act, Pub. L. 92–463, 86 Stat. 770 (1972)........................14

5 U.S.C. app. 2 ................................................................................................................10
5 U.S.C. app. 2 § 10(b) .............................................................................7, 14, 33, 34, 40
Federal Reports Act of 1942, Pub. L. No. 77-831, § 7(a), 56 Stat. 1078 ...........................36
Government Organization and Employees, Pub. L. 89-554, 80 Stat. 387 (1966) ..........10
    5 U.S.C. §§ 551 *et seq* .............................................................................................24
    5 U.S.C. §§ 701 *et seq*.................................................................................23, 25, 26
    5 U.S.C. § 701(a) ...................................................................................................22, 23
    5 U.S.C. § 701(b)(1) .................................................................................21, 22, 24, 26
    5 U.S.C. § 701(b)(2) ...................................................................................................24
    5 U.S.C. § 702 .............................................................................................................23
    5 U.S.C. § 703 .............................................................................................................23
    5 U.S.C. § 704 .............................................................................................................23
    5 U.S.C. § 706 .............................................................................................21, 23, 25
    5 U.S.C. § 706(1) ..................................................................................................14, 37

**Rules**
Federal Rule of Civil Procedure 12(b)(1) .............................................................................9
Federal Rule of Civil Procedure 12(b)(6) .............................................................................9
Federal Rule of Civil Procedure 8(a)(2) .............................................................................10

**Other Authorities**
48 Fed. Reg. 13666 (1983) .................................................................................................36
Black's Law Dictionary (7th Ed. 1999) ...............................................................................22
Charter, Presidential Advisory Commission on Election Integrity .......................................3
Def. Logistics Agency, *Defense Logistics Agency Instruction 6303* at 9, 14 (2009) .............5
EPIC, *About EPIC* (2017)............................................................................................15, 18
EPIC, Comment Letter on U.S. Election Assistance Commission Proposed Information
    Collection Activity (Feb. 25, 2005) ..............................................................................15
Erika Harrell, Bureau of Justice Statistics, *Victims of Identity Theft, 2014* at 1 (Sept. 2015) .........5
Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017).........................2, 3, 22, 37
Gen. Serv. Admin., *Privacy Impact Assessments* (Apr. 13, 2017) .....................................3
H.R. Rep. No. 1980 (1946).................................................................................................24
H.R. Rep. No. 96-835 (1980)..............................................................................................36
Jason Molinet, *ISIS Hackers Call for Homegrown 'Jihad' Against U.S. Military, Posts
    Names and Addresses of 100 Service Members*, N.Y. Daily News (Mar. 21, 2015)...................5
Letter from EPIC et al. to Nat'l Ass'n of State Sec'ys (July 3, 2017)............................16
Memorandum on Establishing the Director of White House Information Technology and
    the Executive Committee for Presidential Information Technology, 2015 Daily Comp.
    Pres. Doc. 185 (Mar. 19, 2015)....................................................................................32
Soc. Sec. Admin., *Identity Theft and Your Social Security Number*  (Feb. 2016)............................4
Staff of S. Comm. on the Judiciary, 79th Cong., Rep. on Administrative Procedure
    (Comm. Print 1945) ....................................................................................................24
U.S. Digital Serv., *Report to Congress — December 2016* (2016) ...................................4
U.S. Pacific Fleet, *Report of the Court of Inquiry* (2001)..................................................5
*Voter Privacy and the PACEI*, EPIC.org (2017) ..............................................................17
*Voting Privacy*, EPIC.org (2017).......................................................................................15

## INTRODUCTION

This suit arises from an unprecedented attempt by an authority of the federal government to obtain the personal data of registered voters from across the United States in violation of laws that protect the privacy of Americans and ensure the integrity of the voting system. The Presidential Advisory Commission on Election Integrity ("Commission" or "PACEI") undertook this effort to gather state voter records at a time of rampant data theft and with full knowledge that a foreign adversary had targeted the nation's voting systems. The Commission has already demonstrated an inability to securely receive state voter records. As a consequence of this suit, the Commission suspended its data collection activities, ended the use of a government server it originally designated for this project, and deleted state voter records it had wrongfully obtained. After this Court ruled against Plaintiff's emergency motion for a temporary restraining order, the Commission resumed its data collection activities. Now the Defendants have filed a Motion to Dismiss seeking to end further judicial oversight of the Commission's activities and to avoid a final determination on the merits.

In the Second Amended Complaint, EPIC has plausibly asserted claims against the Defendants under the E-Government Act, the Federal Advisory Committee Act ("FACA"), and the Due Process Clause of the Fifth Amendment. This Court has already detemined that it has jurisdiction to hear the statutory claims, and EPIC has standing to assert these claims based on informational and organizational injuries. EPIC also contends that it has associational standing to assert constitutional claims for EPIC's members resulting from the Commission's unauthorized collection of their personal information. EPIC has provided additional declarations in support of its associational standing claim, and EPIC intends to undertake discovery to provide record evidence in support of the Court's final determination of the matter.

The allegations in EPIC's complaint and declarations submitted in support of EPIC's motions clearly establish that EPIC and EPIC's members have been injured by the Commission's collection of personal voter information and failure to comply with the E-Government Act and FACA.

The Commission's collection of personal voter data, without a Privacy Impact Assessment ("PIA"), is also facially unreasonable and violates the constitutional rights of registered voters across the country, including EPIC's members. The Supreme Court has recognized that individuals have a right to informational privacy that is protected by the Due Process Clause of the Fifth Amendment. The Commission's failure to provide protections for and limit the scope of collection of the sensitive personal information of American voters clearly violates this right. Since passage of the Privacy Act in 1974, no court has authorized the collection of personal data by a federal government entity without legal safeguards. The Commission has disavowed all privacy obligations for the personal data it seeks to collect. Because EPIC has plausibly stated a claim in the Second Amended Complaint for violation of its members' statutory and constitutional rights, the Commission's motion to dismiss should be denied.

## BACKGROUND

### A.  The Establishment of the Commission

The Presidential Advisory Commission on Election Integrity was established by executive order on May 11, 2017. Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017), ECF No. 8-1, Ex. 1; Second Am. Compl. ¶ 17, ECF No. 21. The Vice President is named as the Chair of the Commission, "which shall be composed [sic] of not more than 15 additional members." 82 Fed. Reg. at 22,390. Additional members are appointed by the President, and the Vice President may select a Vice Chair of the Commission from among the members. *Id*. Vice President Pence has named Kansas Secretary of State Kris Kobach to serve as Vice Chair of the Commission.

The Commission was asked to "*study* the registration and voting processes used in Federal elections." *Id.* (emphasis added). The Commission was further asked to identify "(a) those laws, rules, policies, activities, strategies, and practices that enhance the American people's confidence in the integrity of the voting processes used in Federal elections; (b) those laws, rules, policies, activities, strategies, and practices that undermine the American people's confidence in the integrity of the voting processes used in Federal elections; and (c) those vulnerabilities in voting

systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting." *Id*.

There is no authority in the Executive Order to undertake investigations, to demand the production of state voter records, or to assemble a federal database of personal data obtained from state election officials. *Id*.

### B.   The Role of the General Services Administration

The Executive Order provides that the General Services Administration ("GSA") "shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis." 82 Fed. Reg. at 22,390; Second Am. Compl. ¶ 15. The Commission Charter designates the GSA as the "Agency Responsible for Providing Support," and similarly orders that the GSA "shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis." Charter, Presidential Advisory Commission on Election Integrity ¶ 6, ECF No. 8-1, Ex. 2 ("Charter"); First Kobach Decl., ECF No. 8-1.

The GSA routinely conducts and publishes PIAs when it collects, maintains, and uses personal information concerning individuals. Gen. Servs. Admin., *Privacy Impact Assessments* (Apr. 13, 2017), ECF No. 35-3, Ex. 18. There is no authority in the Executive Order of the Commission Charter for any entity other than the GSA to provide "administrative services," "facilities," or "equipment" to "carry out [the Commission's] mission." Charter ¶ 6.

### C.   The Role of Other Government Agencies and Officials

The Director of White House Information Technology Charles C. Herndon ("D-WHIT") is in charge of "repurposing an existing system" within the "White House Information Technology enterprise" to store personal voter data. Def.'s Supp. Br. 2, ECF No. 24; Second Am. Compl. ¶ 31. The "information resources and information systems" in the Executive Office of the President ("EOP"), which the Director has primary authority to oversee, include the resources of the U.S. Digital Service ("USDS"), an entity housed within the Office of Management and

Budget. U.S. Digital Serv., *Report to Congress — December 2016* at 4 (2016), ECF No. 35-5, Ex. 36. The USDS is responsible for "improving performance and cost-effectiveness of important government digital services." *Id.* The D-WHIT, the Executive Committee for Presidential Information Technology, and the USDS are all components within the EOP. In addition, Commission member Christy McCormick is a member of the Election Assistance Commission ("EAC")—itself an agency under the Administrative Procedure Act—and is therefore subject to the E-Government Act. Kobach Second Decl. 2, ECF No. 11-1.

### D.  The Commission's Original Demand for State Voter Records

On June 28, 2017, the Commission undertook an unprecedented effort to collect detailed voter records from all fifty states and the District of Columbia. For example, the Commission sent a letter to North Carolina Secretary of State Elaine Marshall. Letter from Kris Kobach, Vice Chair, PACEI, to Elaine Marshall, Secretary of State, North Carolina (June 28, 2017), ECF No. 35-3, Ex. 3 ("First Commission Letter"); Second Am. Compl. ¶¶ 19–25. In the letter, Kobach asked Marshall to provide to the Commission

> [T]he full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information.

First Commission Letter 1–2.

The Commission's attempts to gather state voter records raise many privacy concerns. *See* Second Am. Compl. ¶¶ 2, 5, 42, 78. For example, the First Commission Letter requested disclosure of the "last four digits of social security number" for every voter. First Commission Letter 1–2. The improper collection and use of Social Security Numbers ("SSNs") is a major contributor to identity theft in the United States. Soc. Sec. Admin., *Identity Theft and Your Social Security Number*  (Feb. 2016).[1] "An estimated 17.6 million Americans—about 7% of U.S. residents age 16 or older—were victims of identity theft in 2014." Erika Harrell, Bureau of Justice

---

[1] https://www.ssa.gov/pubs/EN-05-10064.pdf.

Statistics, *Victims of Identity Theft, 2014* at 1 (Sept. 2015).[2] U.S. victims of identity theft lost a collective total of $15.4 billion in the same year. *Id.* at 7.

Collecting and publishing the home addresses of current and former military personnel, whose records are maintained in state election rolls, also poses privacy and security risks. The U.S. Military routinely redacts "names, social security numbers, personal telephone numbers, home addresses and personal email addresses" of military personnel in published documents, "since release would constitute a clearly unwarranted invasion of their personal privacy." U.S. Pacific Fleet, *Report of the Court of Inquiry* (2001);[3] *see also* Def. Logistics Agency, *Defense Logistics Agency Instruction 6303* (2009)[4] (noting that military home addresses are "For Official Use Only" and must be redacted prior to public release of documents); Jason Molinet, *ISIS Hackers Call for Homegrown 'Jihad' Against U.S. Military, Posts Names and Addresses of 100 Service Members*, N.Y. Daily News (Mar. 21, 2015, 5:34 PM).[5]

In the First Commission Letter, Vice Chair Kobach stated that "any documents that are submitted to the full Commission w[ould] also be made available to the public." First Commission Letter 2. Kobach later stated that "the Commission intends to de-identify any such data prior to public release of the documents." First Kobach Decl. ¶ 5. However, the Commission has given "no identification or description of the process or technique, no explanation of what the Commission hopes to protect and how they can ensure they have done so, and no description of the reason for publishing anything." Decl. of Cynthia Dwork ¶ 7, ECF No. 35-4, Ex. 23.

Kobach stated that he expected a response from the states by July 14, 2017—approximately ten business days after the date of the request—and instructed that state officials could submit their responses "electronically to ElectionIntegrityStaff@ovp.eop.gov or by utilizing the Safe Access File Exchange" system. *Id*. Neither the email address nor the file exchange

---

[2] https://www.bjs.gov/content/pub/pdf/vit14.pdf.
[3] http://www.cpf.navy.mil/subsite/ehimemaru/legal/GREENEVILLE_FOIA_exemption.pdf.
[4] http://www.dla.mil/Portals/104/Documents/J5StrategicPlansPolicy/PublicIssuances/i6303.pdf.
[5] http://www.nydailynews.com/news/national/isis-hackers-call-jihad-u-s-military-article-1.2157749.

system proposed by the Commission provided a secure mechanism for transferring sensitive personal information. In fact, an attempt to access the File Exchange system linked in the letter led to a warning screen with a notification that the site is insecure. *See* Second Decl. of Harry R. Lewis, ECF No. 35-3, Ex. 17; Screenshot: Google Chrome Security Warning for Safe Access File Exchange ("SAFE") Site (July 3, 2017 12:02 AM), ECF No. 35-3, Ex. 6.

Similar letters were sent to election officials in the other 49 states and the District of Columbia. First Kobach Decl. ¶ 4.

### E. Defendants' Failure to Conduct a Privacy Impact Assessment

Under the E-Government Act of 2002, any agency "initiating a new collection of information that (I) will be collected, maintained, or disseminated using information technology; and (II) includes any information in an identifiable form permitting the physical or online contacting of a specific individual" is required to complete a Privacy Impact Assessment *before* initiating such collection. Pub. L. No. 107–347, 116 Stat. 2899, Title II § 208 (codified as amended at 44 U.S.C. § 3501 note). The agency must:

> (i) [C]onduct a privacy impact assessment; (ii) ensure the review of the privacy impact assessment by the Chief Information Officer, or equivalent official, as determined by the head of the agency; and (iii) if practicable, after completion of the review under clause (ii), make the privacy impact assessment publicly available through the website of the agency, publication in the Federal Register, or other means.

*Id.* The Privacy Impact Assessment would require the agency to state:

> (I)     what information is to be collected;
> (II)    why the information is being collected;
> (III)   the intended use of the agency of the information;
> (IV)    with whom the information will be shared;
> (V)     what notice or opportunities for consent would be provided to individuals regarding what information is collected and how that information is shared;
> (VI)    how the information will be secured; and
> (VII)   whether a system of records is being created under section 552a of title 5, United States Code, (commonly referred to as the ''Privacy Act'')

*Id.* § 208(b)(2)(B)(ii). That assessment is particularly important here because the E-Government Act also requires the agency to "ensure that":

> [A] privacy impact assessment is commensurate with the size of the information system being assessed, the sensitivity of information that is in an identifiable form

6

in that system, and the risk of harm from unauthorized release of that information; and

*Id.*

Conducting a PIA might have led to the conclusion that the Commission simply could not request and collect state voter record information. Moreover, under the FACA, the Defendants would have been required to make available the PIA to the public. 5 U.S.C. app. 2 § 10(b). But none of the Defendants have conducted a PIA for the Commission's proposed collection of state voter data or the D-WHIT's development of a system to collect the data. None of the Defendants have ensured review of a PIA by any Chief Information Officer or equivalent official. The Commission has not made any PIA available to the public. Second Am. Compl. ¶¶ 32–34.

### F.  Many States Have Opposed the Commission's Request

Many states have refused to turn over some or all of the voter data the Commission is seeking. *How States Are Handling Trump's Voter Information Request*, Associated Press (Aug. 2, 2017, 5:06 PM).[6] California Secretary of State Alex Padilla stated that "[t]he President's commission has requested the personal data and the voting history of every American voter– including Californians. As Secretary of State, it is my duty to ensure the integrity of our elections and to protect the voting rights and privacy of our state's voters." Press Release, Secretary of State Alex Padilla Responds to Presidential Election Commission Request for Personal Data of California Voters (June 29, 2017).[7] Nebraska Secretary of State John Gale stated on July 6, 2017 that "I also have a concern about data privacy. I have no clear assurances about the security that this national database will receive. In light of the domestic and foreign attacks in 2016 on state voter registration databases, the commission will need to assure my office of a high level of security." Press Release, Sec. Gale Issues Statement on Request for NE Voter Record Information (July 6, 2017).[8] Arizona Secretary of State Michele Reagan said:

---

[6] https://www.usnews.com/news/politics/articles/2017-08-02/how-states-are-handling-trumps-voter-information-request.
[7] http://www.sos.ca.gov/administration/news-releases-and-advisories/2017-news-releases-and-advisories/secretary-state-alex-padilla-responds-presidential-election-commission-request-personal-data-california-voters/.
[8] http://www.sos.ne.gov/admin/press_releases/pdf-2017/nr-20170707.pdf.

> I share the concerns of many Arizona citizens that the Commission's request implicates serious privacy concerns. […] Since there is nothing in Executive Order 13799 (nor federal law) that gives the Commission authority to unilaterally acquire and disseminate such sensitive information, the Arizona Secretary of State's Office is not in a position to fulfill your request. […]
>
> Centralizing sensitive voter registration information from every U.S. state is a potential target for nefarious actors who may be intent on further undermining our electoral process. […] Without any explanation how Arizona's voter information would be safeguarded or what security protocols the Commission has put in place, I cannot in good conscience release Arizonans' sensitive voter data for this hastily organized experiment.

Letter from Michele Reagan, Arizona Sec. of State, to Kris Kobach (July 3, 2017).

### G. Subsequent Developments

On July 3, 2017, EPIC filed the instant suit and moved for a temporary restraining order enjoining the Commission from collecting state voter data. Complaint, ECF No. 1; Mot. TRO, ECF No. 3. Following briefing, this Court held a hearing on EPIC's motion on July 7, 2017. Hr'g Tr., ECF No. 10. On July 10, 2017, the Commission informed the Court that it would disgorge the Arkansas voter data it had already received and that it would not collect any further voter data "pending this Court's resolution of the TRO motion." Resp. to Order, ECF No. 24. On July 11, 2017, this Court granted EPIC's motion for leave to file a second amended complaint and offered EPIC an opportunity to amend its motion for injunctive relief. Minute Order (July 11, 2017); Order, ECF No. 31. EPIC filed an amended motion for a temporary restraining order and preliminary injunction on July 13, 2017. ECF No. 35.

On July 24, 2017, this Court denied, without prejudice, EPIC's amended motion for a temporary restraining order and preliminary injunction. Order, ECF No. 41; Mem Op., ECF No. 40. The Court noted "paucity of the record before the Court" and stated that its determinations were based on "the present record evidence." Mem. Op. 13, 15, 27, 28, 30–31, 33. The Court also stated its expectation that the Defendants would "strictly abide by" its representations to the Court that "they are only collecting voter information that is already publicly available under the laws of the states where the information resides; that they have only requested this information and have not demanded it; and . . . that such information, to the extent it is made public, will be de-identified." Mem. Op. 14.

On July 26, 2017, the Commission renewed its demand to the states for personal voter data. *E.g.*, Letter from Kris Kobach, Vice Chair, PACEI, to N.Y. State Board of Elections (July 26, 2017) ("Second Commission Letter").[9]

## STANDARDS OF REVIEW

### A. 12(b)(1) Standard of Review

Where a "claim arises under the laws of the United States," the Court's jurisdiction is established—and a motion under Fed. R. Civ. P. 12(b)(1) defeated—"[u]nless the alleged claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction, or [is] wholly insubstantial and frivolous." *Haddon v. Walters*, 43 F.3d 1488, 1490 (D.C. Cir. 1995). Though "[p]laintiffs bear the burden of establishing that the Court has subject-matter jurisdiction over their claims," *White v. Hilton Hotels Ret. Plan*, No. CV 16-856 (CKK), 2017 WL 3588929, at *1 (D.D.C. Aug. 18, 2017) (citing *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007)), a court must "construe the complaint 'liberally,' granting plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). "In determining whether there is jurisdiction, the Court may 'consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Delaware Dep't of Health & Soc. Servs. v. HHS*, No. CV 16-1734 (CKK), 2017 WL 3412077, at *4 (D.D.C. Aug. 8, 2017) (quoting *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003)).

### B. 12(b)(6) Standard of Review

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint need only "contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating a motion to dismiss, the Court must "treat the complaint's factual allegations as true and must grant [plaintiff] the benefit of all inferences that can be

---

[9] https://epic.org/privacy/litigation/voter/epic-v-commission/Commission-letter-072617.pdf.

derived from the facts alleged." *Peavey v. United States*, 128 F. Supp. 3d 85, 89 (D.D.C. 2015) (quoting *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009)). The Federal Rules of Civil Procedure "do not require 'detailed factual allegations' for a claim to survive a motion to dismiss," *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678), but rather "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Though plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," it is not a "probability requirement." *Banneker Ventures*, 798 F.3d at 1129 (quoting *Iqbal*, 556 U.S. at 678). "A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A] well-pleaded complaint should be allowed to proceed 'even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

EPIC's claims in this case arise under federal law, and this court has jurisdiction pursuant to 28 U.S.C. § 1331. Specifically, EPIC has stated claims under the Substantive and Procedural Due Process Clauses of the Fifth Amendment to the U.S. Constitution as well as Chapter 7 of Government Organization and Employees, Pub. L. No. 89-554, 80 Stat. 387 (1966) ("the APA"). This Court has both subject matter jurisdiction and the authority to grant injunctive relief in this case for violations of law, including the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899; the FACA, 5 U.S.C. app. 2; and the constitutional right to informational privacy. Contrary to the arguments made by the Government in its Motion to Dismiss, none of the Defendants in this case are insulated from judicial review for their unlawful actions.

I.    **The Court has jurisdiction under Article III to redress informational, organizational, and constitutional injuries to EPIC and EPIC's members caused by the Commission's collection of personal voter data.**

The Defendants' standing arguments ignore the well-pled allegations in EPIC's Second Amended Complaint and the supplementary evidence provided in this case. Moreover, the Defendants misconstrue the D.C. Circuit's recent decision in *Friends of Animals v. Jewel*, 828 F.3d 989 (D.C. Cir. 2016) and misrepresent EPIC's structure, purpose, and relationship to its members. The record shows that EPIC has established informational standing, organizational standing, and associational standing on behalf of its members.

A.   **EPIC has established informational standing.**

The Court should reject—as it has done before—the Defendants' proposed interpretation of informational injury under Article III. Mem. Op. 16–24. The Defendants' argument is based on the flawed premise that no plaintiff can challenge an agency's failure to produce a record as required by law when the agency refuses to create it. Such a sweeping argument would be contrary to the Supreme Court's holding in *Public Citizen v. DOJ*, 491 U.S. 440 (1989) and is not supported by the D.C. Circuit's decision in *Friends of Animals*. Not only is the Defendants' view contrary to precedent; it also would undermine the purpose of the E-Government Act, which is to ensure the protection of personal data prior to its acquisition.

EPIC has properly asserted standing based on the well-pled allegation that Defendants' failure to release a Privacy Impact Assessment for the proposed collection of personal voter data would cause an informational injury to EPIC and directly impact EPIC's organizational mission and public education functions. Second Am. Compl. ¶¶ 5, 67–76.[10] An informational injury occurs when a plaintiff is denied information due to it under statute. *FEC v. Akins*, 524 U.S. 11, 21 (1998). The D.C. Circuit explained in *Friends of Animals*, 828 F.3d at 992, that:

---

[10] EPIC's Second Amended Complaint alleges adequate facts to establish informational standing. But even if this were not so, the Defendants note that "The Court 'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" Def.'s Mot. 9 (quoting *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)). The Defendants' fixation on EPIC's supposed failure to plead standing is thus misplaced.

A plaintiff suffers sufficiently concrete and particularized informational injury where the plaintiff alleges that: (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.

"Anyone whose request for specific information has been denied has standing to bring an action; the requester's circumstances—why he wants the information, what he plans to do with it, what harm he suffered from the failure to disclose—are irrelevant to his standing." *Zivotofsky v. Sec'y of State*, 444 F.3d 614, 617 (D.C. Cir. 2006). Further, denial of "timely access" to information constitutes an "informational injury" to which the government can "make no serious challenge to the injury and causation elements . . . of standing." *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999).

EPIC has established that the Defendants' failure to release a PIA "directly conflict[s] with its mission of public education" and investigations into government privacy practices, just as the plaintiffs did in *PETA v. USDA*, 797 F.3d 1087, 1095 (D.C. Cir. 2015). Organizational and informational injury in this case is self-evident because EPIC's core mission is to "focus public attention on emerging privacy and civil liberties issues" by conducting "oversight and analysis of government activities," Second Am. Compl. ¶ 5; *see also* Mem. Op. 17 (quoting *About EPIC*, EPIC.org, https://www.epic.org/epic/about.html (last accessed July 20, 2017)) ("This injury is particular to Plaintiff, given that it is an organization that was 'established . . . to focus public attention on emerging privacy and civil liberties issues and to protect privacy, freedom of expression, and democratic values in the information age.'"). By refusing to release a PIA as required by law, the Defendants have forced EPIC to conduct its "oversight and analysis" in a more costly and resource-intensive way that would not otherwise be necessary. *See* Decl. of Eleni Kyriakides, ECF No. 39-1.

The cases cited in Defendant's motion are easily distinguishable. Both *Friends of Animals*, 828 F.3d at 992, and *American Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 94 (D.D.C. 2000), involved enforcement of "statutory deadline provision[s]" and not information disclosure provisions. The court in *Friends of Animals* went out of its way to draw this distinction. As the

court explained, the "Friends of Animals's complaint seeks to have the court order compliance with section 4(b)(3)(B)'s deadline requirement, not its disclosure requirement." *Friends of Animals,* 828 F.3d at 993. Unlike the Endangered Species Act at issue in *Friends of Animals*, the E-Government Act provision at issue in this case requires the creation and disclosure of a PIA by the agency *prior* to initiating the collection of personal information. E-Government Act § 208(b) ("An agency shall take actions described under paragraph (B) *before* . . . initiating a new collection of information . . . ." (emphasis added)); *see also* Mem. Op. 19 ("As this text makes clear, the statutorily prescribed sequence of events here is reversed from the sequence at issue in *Friends of Animals*."). Where, as here, Congress has required the creation of a document prior to a specifically defined agency action, and the agency has taken that action, a plaintiff in EPIC's position can assert an informational injury for failure to disclose the document.

Indeed, EPIC's informational injury is similar to the matter that was before the Supreme Court in *Public Citizen*: a failure to produce records from an advisory committee that gave rise to an informational injury, even though the records did not yet exist. *Pub. Citizen v. DOJ*, 491 U.S. 440, 447 (1989). In *Public Citizen*, the plaintiff-appellants sought to compel a committee to disclose, *inter alia*, (1) its charter and (2) advance notices of future committee meetings. *Id.* at 447–48. None of these putative government records existed at the time the plaintiff sought them because the committee disputed that it had any statutory obligation to record or file them. *Id.* Nonetheless, the Court held that the plaintiffs had Article III standing to demand their disclosure:

> Appellee does not, and cannot, dispute that appellants are attempting to compel [the defendants] to comply with [the Federal Advisory Committee Act]'s charter and notice requirements . . . . As when an agency denies requests for information under the Freedom of Information Act, refusal to permit appellants to scrutinize the ABA Committee's activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue.

*Id.* at 449. EPIC is in the same position as Public Citizen: seeking public disclosure of an advisory committee document which the Commission must by law record (here, a PIA). That the Commission has failed to record such a document is no bar to EPIC's information-based standing, just as it was no bar in *Public Citizen*. *Id.* at 449.

13

Notably, the court in *Public Citizen* found standing despite the Defendants' contention that a favorable decision "would likely [not] redress the [plaintiffs'] alleged harm because the . . . records they wish to review would probably be" unavailable to them. *Id.* at 449. Here, by contrast, a favorable decision would redress EPIC's informational injury by forcing the Commission to comply with its recording and disclosure obligations. Second Am. Compl. ¶¶ 67–76, p. 15 ¶ D. Even if the Commission seeks to duck its obligation to record a PIA—thereby denying EPIC the ability to review such a document—*Public Citizen* is explicit that EPIC's "potential gains [would] undoubtedly [be] sufficient to give [it] standing" to demand disclosure. *Pub. Citizen*, 491 U.S. at 451.

EPIC also easily satisfies the test in *Friends of Animals* for informational injury standing. First, EPIC has alleged that it was "deprived of information that . . . a statute requires the government . . . to disclose to it," *Friends of Animals*, 828 F.3d at 992. EPIC—by itself and through its members—was denied access to Commission information under the E-Government Act and the FACA, U.S.C. app. 2 § 10(b). Second Am. Compl. ¶¶ 5, 67–76; *see* 5 U.S.C. § 706(1); *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 57 (D.C. Cir. 1983) (finding plaintiffs in an APA suit "[met] the 'zone of interests' test for standing" because the agency's violations of a records statute obstructed the "public's expected access to records"). Second, the harm EPIC has suffered is one that "Congress sought to prevent": a denial of "citizen access to Government information." E-Government Act of 2002, Pub. L. No. 107–347, 116 Stat 2899, 2899; *see also* Federal Advisory Committee Act, Pub. L. No. 92–463, 86 Stat. 770, 770 (1972) ("[T]he public should be kept informed with respect to the . . . activities . . . of advisory committees[.]"). EPIC has thus alleged a valid informational injury. *See PETA*, 797 F.3d at 1095 (holding "denial of access to . . . information" was a "cognizable injury sufficient to support standing" in APA suit); *Am. Historical Ass'n v. NARA*, 516 F. Supp. 2d 90, 107 (D.D.C. 2007) ("Plaintiffs have standing to pursue their claim that the delay [in obtaining access to records] . . . violates the APA.").

### B. EPIC has established organizational standing.

Defendants' opposition to EPIC's organizational standing is fundamentally misplaced, as this Court previously concluded. Mem. Op. 24–27. EPIC has suffered a "concrete and demonstrable injury to [its] activities—with a consequent drain on [its] resources" that meets the test outlined in *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011). Specifically, EPIC has diverted resources to investigating the Commission's collection of all Americans' voter records, a program whose secrecy has directly impaired EPIC's mission. *See* Kyriakides Decl, ECF No. 39-1.

EPIC's core mission and activities—namely, "public education" and the "protect[ion of] privacy, free expression, [and] democratic values . . ."—are unquestionably harmed by the Defendants' behavior in this case. *See About EPIC*, EPIC. org (2017).[11] EPIC's mission includes, in particular, educating the public about the government's record on voter privacy and promoting safeguards for personal voter data. *See, e.g.*, *Voting Privacy*, EPIC.org (2017);[12] EPIC, Comment Letter on U.S. Election Assistance Commission Proposed Information Collection Activity (Feb. 25, 2005).[13] The Commission's failure to carry out a Privacy Impact Assessment and disregard for the informational privacy rights of U.S. voters have thus injured EPIC by making EPIC's "activities more difficult" and creating a "direct conflict between the [Commission's] conduct and [EPIC's] mission." *Nat'l Treasury Empls. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). "Indeed, Plaintiff has filed Freedom of Information Act requests in this jurisdiction seeking the disclosure of the same type of information, Privacy Impact Assessments, that it claims has been denied in this case." Mem. Op. 25 (citing *EPIC v. DEA*, 208 F. Supp. 3d 108, 110 (D.D.C. 2016)).

The cases cited by the Defendants in opposition are entirely distinguishable. Def.'s Mot. 21–24. EPIC's organizational injuries in this case bear no relationship to the "pure issue-advocacy" claims dismissed by prior courts. *See Nat'l Consumer League v. Gen. Mills, Inc.*, 680

---

[11] https://epic.org/about.
[12] https://epic.org/privacy/voting/.
[13] https://epic.org/privacy/voting/register/eac_comments_022505.html.

F. Supp. 2d 132, 136 (D.D.C. 2010); *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005). EPIC's interest in this case is in educating the public about the Commission's collection activities and promoting safeguards for personal voter data. Mem. Op. 25. EPIC's programmatic activities, including public education, have been "impaired by Defendants' alleged failure to comply" with the E-Government Act because "those activities routinely rely on access to information from the federal government." Mem. Op. 26. The decision in EPIC's prior challenge to changes in specific Department of Education regulations is similarly irrelevant. *EPIC v. Dep't of Educ.*, 48 F. Supp. 3d 1 (D.D.C. 2014). That case did not involve agency action that *inhibited* EPIC's ability to inform the public about emerging privacy issues or to conduct oversight of government activities. *EPIC*, 48 F. Supp. 3d at 23 (finding that challenging agency regulations was a part of EPIC's advocacy mission). Unlike the "advocacy" activities at issue in these earlier cases, Defendants' refusal to disclose information and the resulting burden to EPIC's public education and oversight mission in this case clearly creates a "concrete and demonstrable" injury similar to what the D.C. Circuit recently recognized in *PETA*.

Like the plaintiffs in *PETA*, EPIC has had to expend organizational resources "in response to, and to counteract, the effects of defendants' alleged [unlawful conduct]." *Id.* at 1097. Simply to preserve the status quo—wherein the federal government was *not* attempting to collect the voter records of nearly 200 million Americans, and wherein EPIC was better able to educate the public about the privacy safeguards in place on all major federal databases of personal information—EPIC has been forced to expend more resources on its long-running voter privacy campaign. For example, EPIC has had (1) to draft and seek expert sign-ons for a letter urging state election officials to "protect the rights of the voters . . . and to oppose the request from the PACEI," Letter from EPIC et al. to Nat'l Ass'n of State Sec'ys (July 3, 2017);[14] (2) to seek records from the Commission concerning its collection of voter data, *see* Kyriakides Decl.; (3) to develop a webpage with extensive information on the Commission's activities. *Voter Privacy and*

---

[14] https://epic.org/privacy/voting/pacei/Voter-Privacy-letter-to-NASS-07032017.pdf.

*the PACEI*, EPIC.org (2017); [15] and (4) respond to numerous requests from state election officials, citizen organizations, and news organizations concerned about the impact of the Commission's request for voter data on personal privacy. These are hardly mere "setbacks to the organization's abstract social interests," *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d at 11 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)), but rather "discrete programmatic concerns [that] are being directly and adversely affected" by the Defendants' actions. *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)

The Defendants' actions have directly impacted EPIC's mission and work and have imposed a strain on EPIC's ability to fulfill its public education and oversight mission. This is the type of "concrete and demonstrable injury to" EPIC's "organizational activities" that courts have long deemed sufficient for standing. *Havens*, 455 U.S. at 379; *see also PETA*, 797 F.3d 1087 (holding that a non-profit animal protection organization had standing under *Havens* to challenge the USDA's failure to promulgate bird-specific animal welfare regulations); *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006) (finding that a health advocacy organization had organizational standing under *Havens* to challenge an FDA regulation). EPIC has thus established organizational standing under Article III.

### C.  EPIC has established associational standing.

EPIC has also established associational standing. There is no doubt that EPIC's members, most of whom are registered voters in the United States, will suffer a concrete and particularized injury when the Defendants improperly collect their sensitive personal information. Based on the record in this case, EPIC satisfies both the traditional membership test and the "functional" three-part test under *Washington Legal Foundation v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007).

EPIC asserts associational standing on behalf of numerous EPIC Advisory Board members and EPIC Directors whose privacy is threatened by the Commission's unlawful collection of personal voter data. All of these declarants are officially designated as—and indeed,

---

[15] https://epic.org/privacy/voting/pacei/.

consider themselves to be—"members" of the EPIC organization. Second Decl. of Marc Rotenberg, Ex. 1; Decl. of Deborah C. Peel, Ex. 2; Decl. of Helen Nissenbaum, Ex. 3; Decl. of Robert Ellis Smith, Ex. 4. EPIC is thus a traditional membership organization capable of adequately representing its members' interests. *See Ass'n of Flight Attendants- CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009).

But even if that were not so, EPIC and its members comfortably satisfy the *Washington Legal Foundation* test. First, EPIC "serve[s] a specialized segment of the community." *Wash. Legal Found.*, 477 F. Supp. 2d at 208. EPIC is a privacy organization whose core constituents are "members" of the "distinguished advisory board, with expertise in law, technology, and public policy." EPIC, *About EPIC* (2017).[16] If EPIC does not serve a "specialized segment of the community," then it is not clear what membership organization does. The fact that EPIC does not leave membership open to the broader public only further supports its specialized nature.

Second, members of EPIC's Advisory Board qualify as "members" for the purposes of Article III standing because they "have all the 'indicia of membership'" and fulfill the functions as the "members" that have repeatedly supported associational standing in this Circuit. *Wash. Legal Found.*, 477 F. Supp. 2d at 208; *see also Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016); *Ctr. for Biological Diversity v. EPA*, No. 14-1036, 2017 WL 2818634, at *6 (D.C. Cir. June 30, 2017). These EPIC members play a functional role in "selecting [EPIC's] leadership, guiding its activities, [and] financing those activities." *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 26 (D.C. Cir.  2002); *see also Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) (holding that the Washington State Apple Advertising Commission had standing to file suit on behalf of apple growers and dealers because it was the "functional equivalent of a traditional membership organization"); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997) (holding that nonprofit environmental protection corporation with no legal members under the corporate laws of the District of Columbia had standing to file suit on behalf of

---

[16] https://epic.org/epic/about.html.

individuals who voluntarily identified as "members" and played a role in funding and selecting the corporation's leadership).

Members of the EPIC Advisory Board commit to the mission of the organization and participate in the work of the organization by—for example—"signing on to amicus briefs filed by EPIC, assisting in EPIC's advocacy/litigation on matters of health privacy and broad human and civil rights efforts, speaking at EPIC conferences, and contributing to EPIC publications and books." Peel Decl. ¶ 8. Further, these members participate in the Advisory Board's annual meeting and the annual review process of EPIC's program activities. Nissenbaum Decl. ¶ 9; Peel Decl. ¶ 9; Smith Decl. ¶ 9. EPIC Advisory Board Members also provide financial support to the organization through regular monetary contributions. Second Rotenberg Decl. ¶ ¶ 8–12; Nissenbaum Decl. ¶ 10; Peel Decl. ¶ 10 Smith Decl. ¶ 10. Finally, those members of the Advisory Board who serve as Directors participate in the election of EPIC leadership and fellow board members. Nissenbaum Decl. ¶ 7; Peel Decl. ¶ 7.

Defendants have placed considerable weight on the term "advisory" in the titles of EPIC's members, but this distinction is meaningless for Article III standing purposes. First, emphasis on this term ignores the direct and material role that advisory board members play in EPIC's operation, as described above. Moreover, the word "advisory" is not a magic talisman that strips an organization of associational standing where the organization would otherwise enjoy it. *See, e.g.*, *Resident Advisory Bd. v. Rizzo*, 425 F. Supp. 987, 1010 (E.D. Pa. 1976) ("Resident *Advisory Board*" enjoyed associational standing to sue on behalf of members (emphasis added)), *modified on other grounds*, 564 F.2d 126 (3d Cir. 1977); *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1110–1112 (9th Cir. 2003) (holding that beneficiaries of organization's work were the "the functional equivalent of members for purposes of associational standing" where they "composed more than 60 percent of the *advisory council*" of that organization (emphasis added)); *State of Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 284 (D. Conn. 2010) (holding that state office enjoyed associational standing to sue on behalf of the beneficiaries of its work given that those beneficiaries comprised least 60 percent of

the "*Advisory Council*"; given the "specified functions of the *Advisory Council*"; and given "the

influence of the *Advisory Council*" over the office's work (emphasis added)).

Third, EPIC and its members satisfy the *Washington Legal Foundation* test because their

"fortunes [are] tied closely" together. *Wash. Legal Found.*, 477 F. Supp. 2d at 208. As noted, the

organization depends on the ongoing support of the Advisory Board members, and EPIC's

members attest to the special importance of EPIC's work to protect their "privacy rights and

[their] freedom of expression." *See* Nissenbaum Decl. ¶ 11; Peel Decl. ¶ 11; Smith Decl. ¶ 11.

EPIC's Advisory Board members and Directors thus satisfy the "functional" member test,

permitting EPIC to represent their legal interests in the instant suit without their direct

participation.

Finally, EPIC's members have suffered—or will necessarily suffer—injuries in fact as the

Commission continues to carry out its data collection plans. The unconstitutional aggregation of

state voter data, standing alone, constitutes an injury-in-fact. The Supreme Court has made clear

that a government actor diminishes individuals' privacy as soon as it *collects* their "hard-to-

obtain" personal information in a central repository—not merely when it *redistributes* that data:

> [T]he issue here is whether the compilation of otherwise hard-to-obtain
> information alters the privacy interest implicated by disclosure of that
> information. Plainly there is a vast difference between the public records that
> might be found after a diligent search of courthouse files, county archives, and
> local police stations throughout the country and a computerized summary located
> in a single clearinghouse of information.

*DOJ v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 764 (1989). *In re Sci.*

*Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14 (D.D.C. 2014),

and *Welborn v. IRS*, 218 F. Supp. 3d 64 (D.D.C. 2016), are not to the contrary. The standing of

EPIC's members, unlike that of the plaintiffs *SAIC* and *Wellborn*, rests on the Commission's

violation of an individual constitutional right to informational privacy. Such a violation of

constitutional right constitutes an injury-in-fact and requires no further showing of harm. *Cutler v.*

*HHS*, 797 F.3d 1173, 1180 (D.C. Cir. 2015). Furthermore, EPIC has credibly alleged that the

Commission will, in fact, disclose personal voter data, based in large part on the Commission's

express promise to publish all records shared with the Commission by state officials. Second Am. Compl. ¶ 24. This further compounds the injury. *Council on Am.-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 76 (D.D.C. 2009) (holding that the wrongful disclosure of confidential information is a form of injury); *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) ("This Court has recognized that the disclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature."). Thus, the injuries that EPIC has alleged to its members are "certainly impending" or have already come to pass. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 (2013).

This Court consequently has jurisdiction to decide this case under Article III.

**II.   Congress has provided for judicial review of final actions by "each authority of the Government," including the Commission and the other Defendants, with only narrow exceptions that do not apply in this case.**

In response to EPIC's Complaint, the Government argues that EPIC cannot state a claim for injunctive relief for violations of the E-Government Act and FACA because the Commission is not an "agency." Def.'s Mot. 24–25. The Government's argument rests on a false premise, and the cases cited in their Motion are entirely irrelevant to the central statutory interpretation issues in this case. EPIC's claims in this case do not relate to or rely on the "Administrative Procedure" chapter of the APA, 5 U.S.C. § 551 *et seq.*, or the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The definitions contained in those sections, and all cases interpreting them, have no bearing on the scope of judicial review available under 5 U.S.C. § 706. The Court should deny the Government's motion to dismiss EPIC's APA and E-Government Act claims because (1) the Presidential Election Commission is both an "authority" and an "establishment" of the Government under the plain text of 5 U.S.C. § 701(b)(1) and 44 U.S.C. § 3502(1); (2) the "substantial independent authority" test established in the FOIA does not limit the APA's sovereign immunity waiver or the scope of the Paperwork Reduction Act ("PWRA") and E-Government Act; and (3) the D.C. Circuit has already held that agencies within the Executive Office of the President that do not meet the "substantial independent authority" test can nevertheless be sued for injunctive relief under the APA.

The most fundamental principle of statutory interpretation is that a court's analysis must begin "with the language of the statute itself" and that, "where the statute's language is plain," that "is also where the inquiry should end." *Puerto Rico v. Franklin California Tax-free Trust*, 136 S. Ct. 1938, 1946 (2016) (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989)). If the language of a statute "is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485 (1917). The Government has not even attempted to analyze the statutory text at issue in 5 U.S.C. § 701 or 44 U.S.C. § 3502. Instead, their brief focuses on the "legislative history" of the FOIA and cases interpreting the FOIA's definition of "agency," 5 U.S.C. § 552(f), which is entirely unrelated to EPIC's claim.

### A. The Court has authority to set aside unlawful agency action under the APA.

The text of the APA judicial review provisions is plain, and the "sole function of the courts is to enforce" such plain text "according to its terms." *United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014). The "agency" question therefore must turn on whether the Commission and its co-defendants are an "authority of the Government of the United States." 5 U.S.C. § 701(b)(1). Authority is defined as "[t]he right or permission to act legally on another's behalf; the power delegated by a principal to an agent." Black's Law Dictionary 127 (7th Ed. 1999). There can be no question that the President has delegated the Commission and its officers the power to act on his behalf. *See* Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017). Under the clear statutory text, the Defendants are subject to suit under the APA except where "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

The Government correctly notes that the APA provides "a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected either by agency action or by an agency's failure to act." Def.'s Mot. 8. The APA "generally waives the Federal Government's immunity from a suit 'seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or

under color of legal authority." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchack*, 567 U.S. 209, 215 (2012). The "evident intent" of Congress "when enacting the APA [was to] 'make agency action presumptively reviewable.'" *Id.* at 225 (quoting *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399 (1987)); *see also Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991) [hereinafter *Armstrong I*].

Chapter 7 of the APA, 5 U.S.C. §§ 701 *et seq.*, commonly referred to as "the judicial review provisions of the APA,"[17] *Heckler v. Chaney*, 470 U.S. 821, 825 (1985), provide a "right of review" to any "person suffering legal wrong because of agency action . . . within the meaning of a relevant statute," 5 U.S.C. § 702. The statute provides that "Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement." 5 U.S.C. § 703. Any "final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. In an APA suit, the court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," and shall "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right," and "without observation of procedure required by law." 5 U.S.C. § 706.

The presumption of judicial review attaches to all "final agency action," and most disputes over the scope of judicial review have turned on whether the action under review is "final." *See, e.g.*, *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1813 (2016) (reciting the test for finality as articulated in *Bennett v. Spear*, 520 U.S. 154 (1997)). Other disputes have focused on the limited exceptions to judicial review provided in 5 U.S.C. § 701(a) where "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." *See, e.g.*, *Mistick PBT v. Chao*, 440 F.3d 503, 509 (D.C. Cir. 2006) (finding no "clear and convincing evidence" that Congress intended to preclude judicial review of the Secretary of

---

[17] The judicial review provisions are separate and distinct from the "Administrative Procedure" provisions contained in Chapter 5 of the statute, codified at 5 U.S.C. §§ 551 *et seq.*

Labor's compliance with conformance regulations). But in this case, the Government has not contested the finality of the action at issue—the collection by the Commission of private voter data from the states. Instead, the Government has argued that no "agency will play a role in this data collection." Def.'s Mot. 6. This defense raises the rarely-litigated question of whether the actions of certain authorities within the executive branch are exempt from judicial review.

The term "agency" is defined for the purposes of Chapter 7 of the APA as "means each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 701(b)(1). Notably, Congress chose to include a definition of "agency" in § 701 that is separate and distinct from the definition of "agency" applicable to the "Administrative Procedure" provisions in 5 U.S.C. §§ 551 *et seq. See* 5 U.S.C. § 701(b)(2) (adopting the definitions in § 551 for several terms, but not adopting the same definition of "agency"). Congress made clear in the lead-up to the passage of the APA that "Whoever has the authority is an agency, whether within another agency or in combination with other persons." H.R. Rep. No. 1980, at 252–53 (1946). The term "authority," key to the definition in § 701, "means any officer or board, whether within another agency or not, which by law has authority to take final and binding action with or without appeal to some superior administrative authority." Staff of S. Comm. on the Judiciary, 79th Cong., Rep. on Administrative Procedure 13 (Comm. Print 1945). It is therefore the ability to take final action, not the degree of "independence," that determines the availability of judicial review under Chapter 7.

### B. The President, Vice President, and their advisors are not immune from the Court's injunctive authority.

Few cases have turned on the meaning of the term "agency" in § 701, yet the Government contends that the "definition does not include the President of the United States . . . or the Vice President." Def.'s Mot. 9. This statement, as written, is not true and is not supported by the cases the Government cites in passing. Neither the Supreme Court nor the D.C. Circuit has ever answered the question of whether the Vice President is subject to judicial review under Chapter 7, and courts have only had occasion to conclude that judicial review of the President's actions is

limited in certain narrow contexts. The D.C. Circuit held in *Meyer v. Bush*, 981 F.2d 1288 (D.C.

Cir. 1993), that a Task Force chaired by the Vice President was not an "agency" under the FOIA.

*Meyer*, 981 F.2d at 1295. The court in *Meyer* expressly deferred on the question of whether the

Vice President himself "could ever be the head of a FOIA agency." *Id*. at 1295 n.7. The court in

*Meyer* did not consider or decide whether final actions of the Vice President are subject to judicial

review under 5 U.S.C. §§ 701 *et seq*.

The Supreme Court held in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), that the

President's actions "are not reviewable for *abuse of discretion* under the APA" because "an

express statement by Congress" would be required to authorize such review "[o]ut of respect for

the separation of powers and the unique constitutional position of the President. *Franklin*, 505

U.S. at 801–802 (emphasis added). The Court in *Franklin* made clear that "the President's actions

may still be reviewed for constitutionality," but did not have the occasion to address whether the

President's actions could be enjoined under the APA if they were "otherwise contrary to law."

The D.C. Circuit in *Armstrong I* found that the President's disposition of files under the

Presidential Records Act ("PRA") could not be subject to judicial review under the APA both

because the PRA "precludes judicial review of the President's recordkeeping practices and

decisions" and because "an analysis of several factors" weighed against treating the President as

an "'agency' within the meaning of the APA." *Armstrong I*, 924 F.2d 282, 288–91. But, courts

have recently exercised jurisdiction to review claims that the President's Executive Order on

immigration was contrary to law under 5 U.S.C. § 706. *See, e.g.*, *Int'l Refugee Assistance Project

v. Trump*, 857 F.3d 554 (4th Cir. 2017); *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017), *cert.

granted sub nom. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017).

Contrary to the Government's arguments based on cases interpreting § 552(f), Def.'s Mot.

25–31, there is no carve-out in § 701(b)(1) for the President's advisors or other entities within the

Executive Office of the President that lack "independence" from the President. The D.C. Circuit's

decision in one of the few cases to ever consider this issue, *Armstrong I*, makes clear that even the

President's closest advisors can be sued under the APA for acting contrary to law. In *Armstrong I*,

25

a group of plaintiffs sued then-President (and former Vice President) George H. W. Bush, as well as the Archivist of the United States and National Security Council ("NSC"), seeking an injunction to prohibit the destruction of material stored on the NSC computer system during the final weeks of the Reagan Administration. *Armstrong I*, 924 F.2d at 284. In particular, the plaintiffs alleged that the NSC's electronic backup procedure, under which the agency would erase backup tapes every two weeks, was contrary to the PRA and the Federal Records Act ("FRA"). *Id*. at 286–87. The court noted that "[b]ecause NSC advises the President and has statutory obligations, it creates both presidential and federal records." *Id*. at 286 n.2. The Government argued that the court could not review NSC's compliance with either the PRA or the FRA, but the court rejected that argument and held that "there is APA review of the NSC's recordkeeping guidelines and instructions." *Id*. at 291. The court held that the intent and structure "of the FRA differ[s] significantly from the PRA," and that the Government had not shown "the 'clear and convincing evidence' necessary to overcome the presumption in favor of judicial review." *Id.* at 291.

Exempting the President's advisors from judicial review and from the waiver of sovereign immunity in 5 U.S.C. §§ 701 *et seq.* would not only be contrary to the plain text of the statute, it would produce absurd results. The Vice President and the officers of the Commission could openly flout the law, even refusing to post any notices or hold open meetings in violation of the FACA, and the court would have no power to enjoin their actions. The NSC could roll back their record retention guidelines and begin deleting backups every two weeks as they had prior to *Armstrong I.* The § 702 waiver of sovereign immunity would not reach those in the President's orbit, and the basic structural balance built into our current tripartite system would be upended. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001). In this case, there is not even a mousehole; instead, there is a presumption of judicial review of all final actions by "authorities of the Government." 5 U.S.C. § 701(b)(1).

**C. There is no "clear and convincing" evidence that Congress intended to preclude judicial review of the Commission's compliance with the E-Government Act.**

Rather than address the "clear and convincing" evidence standard applied by the D.C. Circuit or argue that the Commission's actions in this case are not "final," the Government rests entirely on the argument that the Commission and the D-WHIT are not agencies under the "substantial independent authority" test established in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), a FOIA case that did not involve judicial review under 5 U.S.C. §§ 701 *et seq.*[18] The basic (yet unstated) premise of the Government's argument is that the legislative history of the FOIA amendments passed in 1974 can be used to interpret a statutory provision passed in 1966 in a way that directly contradicts the plain text of the statute. The Government does not even attempt to justify this complete inversion of the basic principle of statutory interpretation. Indeed, the D.C. Circuit rejected similar logic in *United States v. Espy*, 145 F.3d 1369 (D.C. Cir 1998), when it held that the definition of "agency" in 18 U.S.C. § 6 is not analogous to the FOIA definition.

> *Espy's* analogy to FOIA does not work. The Supreme Court defined "agency" narrowly under FOIA on the assumption that Congress would not have wished to chill discussion between close presidential advisors. It is by no means obvious that Congress, for analogous policy reasons, would have wished a similarly narrow definition of agency for purposes of § 1001. Indeed, the independent counsel argues that a broad definition would more likely serve the policy of this statute by protecting the Executive Office against false statements in the course of its investigations.

*Espy*, 145 F.3d at 1373. The court in *Espy* made clear that agency is not defined so narrowly outside of the FOIA context.

The only way the action of a government "authority" can be exempt from judicial review under 5 U.S.C. §§ 701 *et seq.* is if (1) there is "clear and convincing evidence" that Congress intended to preclude judicial review or (2) the action is "committed to agency discretion by law." *Armstrong I*, 924 F.2d at 47–49. The Government has not provided any evidence that Congress intended to preclude judicial review of the Commission's compliance with the E-Government

---

[18] The Government repeatedly references 5 U.S.C. § 551(1) in its Motion. That definition applies to the FOIA and the "Administrative Procedure" provisions contained in 5 U.S.C. §§ 551 *et seq*. The definition relevant in this case, 5 U.S.C. § 701(b)(1), is not the same as § 551(1).

Act, and the PIA requirements are non-discretionary, so the presumption of judicial review should stand.

In *Soucie*, the court held that a subcomponent of the EOP, the Office of Science and Technology ("OST"), was an agency subject to the FOIA because it possessed "substantial independent authority in the exercise of specific functions."[19] *Soucie*, 448 F.2d at 1073, 1075. Wary of potential conflicts between the FOIA's presumption of openness and the President's power to assert executive privilege, the Court added a narrow caveat in dicta: "If the OST's sole function were to advise and assist the President, that might be taken as an indication that the OST is part of the President's staff and not a separate agency." *Id.* at 1071 n.9, 1075 (emphasis added). The Supreme Court and the D.C. Circuit subsequently held, based on the "unambiguous" legislative history, that Congress intended to adopt the *Soucie* test in the FOIA's definition of agency, 5 U.S.C. § 552(f). *See Kissinger v. Reporters Comm. for the Freedom of the Press*, 445 U.S. 136, 156 (1980); *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1040 (D.C. Cir. 1985); *Meyer v. Bush*, 981 F.2d 1288, 1291 n.1 (1993).

Yet the *Soucie* test, which was adopted in a case concerning the FOIA, has no bearing on the availability of judicial review under APA §§ 702, 704, and 706. As this Court's precedents illustrate, a subcomponent of the Executive Office of the President may be sued under the APA even if it does not have "substantial independent authority" under the *Soucie* test. *Compare Armstrong I*, 924 F.2d at 297 ("[W]e affirm the district court's decision that the APA authorizes judicial review of plaintiffs' claim that the [National Security Council] ("NSC") recordkeeping guidelines and directives are arbitrary and capricious."), *with Armstrong v. Exec. Office of the President* (*Armstrong III*), 90 F.3d 553, 557–66 (D.C. Cir. 1996) (holding that the NSC is not an "agency" under the FOIA because it fails the *Soucie* test). This Court's holdings in *Armstrong I*

---

[19] In the early years of the FOIA, the statute was sometimes characterized as a subpart of the APA because it was codified in 5 U.S.C. §§ 551 *et seq. E.g., Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 678 n.16 (D.C. Cir. 1976) (citing Statement by the President Upon Signing Bill Revising Public Information Provisions of the Administrative Procedure Act, Weekly Comp. Pres. Doc. 895 (July 4, 1966)).

and *Armstrong III* would be logically impossible if—as the lower court assumed—the *Soucie* test limited APA judicial review of EOP subcomponents. It does not.

Following in *Armstrong I*'s footsteps, this Court has repeatedly declined to apply the *Soucie* test in APA suits against the EOP or to otherwise exempt EOP offices from judicial review. *See, e.g.*, *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 550 (D.C. Cir. 1993) (subjecting the U.S. Trade Representative ("USTR") to APA judicial review without invoking *Soucie* test); *CREW v. Exec. Office of President*, 587 F. Supp. 2d 48, 57–58, 63 (D.D.C. 2008) (subjecting the EOP to APA judicial review without invoking *Soucie* test); *Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 724 F. Supp. 1013, 1023 (D.D.C. 1989) (applying APA judicial review to the Office of Management and Budget ("OMB") without invoking *Soucie* test).

The Government seems to imply that "entities within the Executive Office of the President that have the sole function of advising and assisting the President" must be subject to an "exemption" from judicial review "to protect the President's executive powers." Def.'s Mot. 27. In support of this point, the Government cites *Association of American Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909–10 (D.C. Cir. 1993), another case that did not involve an interpretation or analysis of 5 U.S.C. §§ 701 *et seq*. The court in *Association of American Physicians* instead held that a task force created by the President was not subject to FACA because all the members, including the First Lady, were "full-time officer[s] or employee[s] of the government" under FACA. 997 F.2d at 910–11.

The other cases cited by the Government are similarly irrelevant because they concern the definition of "agency" in 5 U.S.C. § 552(f), which has both a different text and different legislative history than § 701(b)(1). *See Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980) (concerning a petition brought under the Government in Sunshine Act, which "incorporates by reference" the definition in § 552(f)); *Rushforth*, 762 F.2d 1038, 1042 (D.C. Cir. 1985) (holding that the Council of Economic Advisers is not subject to FOIA or the Sunshine Act); *Nat'l Sec. Archive v. Archivist of the U.S.*, 909 F.2d 541, 545 (D.C. Cir. 1990)

(holding the White House Counsel's Office was not subject to FOIA); *Meyer*, 981 F.2d 1288, 1294 (holding that a task force chaired by the Vice President was not subject to FOIA); *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995) (holding that the Executive Residence is not subject to FOIA); *Armstrong III*, 90 F.3d 553, 560–61 (holding that the NSC is not subject to FOIA); *CREW v. Office of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) (holding that the Office of Administration is not subject to FOIA); *Sculimbrene v. Reno*, 158 F. Supp. 2d 26, 35–36 (D.D.C. 2001) (holding that the White House Office was not subject to the Privacy Act, which incorporates the definition of agency in § 552(f)).

The Government argues that "*Soucie* itself was a case interpreting the *APA's* definition of 'agency.'" Def.'s Mot. 29 (emphasis in original). But the court in *Soucie* did not consider the definition of "agency" in § 701(b)(1). Instead, the court considered and concluded that the Office of Science and Technology could be "subject to the public information provisions of the APA, *i.e.,* the Freedom of Information Act." *Soucie,* 448 F.2d at 1073. Congress subsequently clarified the FOIA definition of agency, codified it in § 552(e) (now § 552(f)), and incorporated the *Soucie* test by "unambiguous" reference in the legislative history. So while it is true that the court in *Soucie* was considering an APA definition of agency, the Government fails to recognize that the APA contains two different definitions of agency, and the definition in § 701 is broader because the presumption in favor of judicial review applies.

The Government similarly misreads *Dong v. Smithsonian Institute*, 125 F.3d 877 (D.C. Cir. 1997), which invokes the *Soucie* test while evaluating a claim brought under the Privacy Act—a statute that explicitly incorporates the definition of "agency" in § 552(f). The court's holding in *Dong* is also not relevant because the question was not whether the Smithsonian was "substantially independent," but rather whether it exercised government authority at all, or whether it was instead analogous to a "private research university" or "private museum." *Dong*, 125 F.3d at 882.

The one case cited by the Government that actually concerned the scope of judicial review under the APA, *McKinney v. Caldera*, 141 F. Supp. 2d 25 (D.D.C. 2001), is a district court

decision that is easily distinguishable. The court in *McKinney* considered a suit brought by a Sergeant Major against the Secretary of the Army and the Judge Advocate General of the Army ("TJAG"). The court discussed both the *Soucie* "substantial independent authority" standard (applicable in FOIA and Privacy Act cases) without any explanation of why that standard should apply to § 701 or any discussion of the text or purpose of the APA judicial review provisions. The court noted that the TJAG serves a quasi-judicial function and reasoned that if the court-martial process was subject to judicial review under the APA, then "the court's review could potentially extend to all" other phases of that review and "would fundamentally alter the relationship between civilian and military courts, and would, in essence, defy the presumption against civilian-court review of military-court decisions." *McKinney*, 141 F. Supp. 2d at 34.

### D. EPIC has plausibly alleged that Defendant EOP and its subcomponents are also agencies under the *Soucie* test.

The EOP, the Commission, and the D-WHIT do far more than just "advise and assist the President." *Soucie*, 448 F.2d at 1075. Thus, even if the *Soucie* test did control the meaning of "agency" in the APA's judicial review provisions, these entities would still fit within the statutory definition. Under the *Soucie* test, "the APA inquiry into agency status is . . . focused on the functions of the entity, and flexible enough to encompass the 'myriad organizational arrangements for getting the business of government done. . . .'" *Meyer*, 981 F.2d at 1304 (quoting *Wash. Research Project, Inc. v. HEW*, 504 F.2d 238, 246 (D.C. Cir. 1974)). "The important consideration is whether [an entity] has any authority in law to make decisions," *Wash. Research Project, Inc. v. HEW*, 504 F.2d at 248, and whether the entity is a "center of gravity in the exercise of administrative power." *Dong*, 125 F.3d at 881–82 (quoting *Lombardo v. Handler*, 397 F. Supp. 792, 796 (D.D.C. 1975)).

The EOP, as noted, carries out a wide array of functions that extend well beyond the immediate needs of the President. The EOP consists of numerous subcomponents that oversee and carry out vital government functions, many of which—including the NSC, the OMB, and the USTR—have been deemed agencies under the APA in their own right. Moreover, the EOP is

31

*expressly named* as an agency by the FOIA definition from which the *Soucie* test arises. 5 U.S.C. § 552(f). The EOP thus satisfies the APA's definition of "agency."

The same is true of the D-WHIT. As noted, the Director and his staff enjoy "*primary authority* to establish and coordinate the necessary policies and procedures for operating and maintaining the information resources and information systems provided to the President, Vice President, *and EOP*." Memorandum on Establishing the Director of White House Information Technology and the Executive Committee for Presidential Information Technology § 1, 2015 Daily Comp. Pres. Doc. 185 (Mar. 19, 2015) (emphases added). An entity that has primary authority to set policy and procedures for an *agency* is doing far more than just assisting the President. The D-WHIT's authority even extends beyond the EOP. The D-WHIT is required to "provide policy coordination and guidance for, and periodically review, all activities relating to the information resources and information systems provided to" both the EOP and the Presidential Information Technology Community ("the Community"), including "expenditures for, and procurement of, information resources and information systems by the Community." *Id.* § 2(c). The Community, in turn, consists of multiple high-level officials: "the Assistant to the President for Management and Administration; the Executive Secretary of the National Security Council; the Director of the Office of Administration; the Director of the United States Secret Service; and the Director of the White House Military Office." *Id.* Notably, the Director of the Secret Service is a Department of Homeland Security official. *Overview*, United States Secret Service.[20] Given the broad, interagency reach of the D-WHIT's oversight authority, the "sole function" exception is likewise inapplicable to his office.

Finally, the Commission's functions also extend well beyond "advis[ing] and assist[ing]" the President. Here, as in *Energy Research Foundation v. Defense Nuclear Facilities Safety Board*, the Commission satisfies the definition of "agency" because it (1) investigates, (2) evaluates, and (3) makes recommendations. 917 F.2d 581, 585 (D.C. Cir. 1990) (citing *Soucie*,

---

[20] https://www.secretservice.gov/about/overview/ (last visited June 13, 2017).

448 F.2d at 1075) ("The Board of course performs precisely these functions. It investigates, evaluates and recommends[.]"); *see* Kobach Decl. ¶¶ 1, 3 (Commission is charged with "studying registration and voting processes"), ECF No. 8-1; Kobach Decl. ¶ 1 (Commission's report is to identify "which laws, rules, policies, activities, strategies, and practices that enhance or undermine Americans' confidence in the integrity of the federal election process"). Of course, the Commission does a great deal more than that. It has announced plans to collect, store, and publish the personal data of every registered voter in the country, thereby implicating every voter's individual privacy rights. Kobach Decl. ¶ 4. The Commission cannot credibly characterize this behavior as incidental to its advisory role: it is acting with the force and effect of an agency. "The record evidence regarding [the Commission]'s actual functions" proves it to be so. *Citizens for Responsibility & Ethics in Washington (CREW) v. Office of Admin.*, 559 F. Supp. 2d 9, 26 (D.D.C. 2008), *aff'd*, 566 F.3d 219.

### III.   **EPIC has stated a claim under the APA that the Commission's failure to publish a Privacy Impact Assessment violates the E-Government Act and the FACA.**

#### A.   **The Government has conceded that, if the E-Government Act and APA apply, EPIC has stated a claim for relief.**

The Government does not contest that the E-Government Act requires every government agency to "conduct a privacy impact assessment" and "make the privacy impact assessment publicly available" before "initiating any new collection of information" in "identifiable form." E-Government Act § 208(b); Mem. Op. 19. The Government does not contest that the June 28 letter sent by Defendant Kobach on behalf of the Commission is a "collection of information" triggering the PIA requirement. The Government does not contest that the Commission has not made a PIA publicly available as required under the FACA. 5 U.S.C. app. 2 § 10(b). The Government's entire motion to dismiss EPIC's statutory claims therefore rests on the premise that neither the Commission nor any of the other Defendants are an "agency" under the E-Government Act.

Section 208 of the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, requires that any federal agency "initiating a new collection of information that (I) will be

collected, maintained, or disseminated using information technology; and (II) includes any information in an identifiable form permitting the physical or online contacting of a specific individual" complete a PIA *before* initiating such collection. E-Government Act § 208 (codified at 44 U.S.C. § 3501 note).

> A Privacy Impact Assessment must include:
>
> (I)     what information is to be collected;
> (II)    why the information is being collected;
> (III)   the intended use of the agency of the information;
> (IV)    with whom the information will be shared;
> (V)     what notice or opportunities for consent would be provided to individuals regarding what information is collected and how that information is shared;
> (VI)    how the information will be secured; and
> (VII)   whether a system of records is being created under section 552a of title 5, United States Code, (commonly referred to as the ''Privacy Act'')

*Id.* § 208(b)(2)(B)(ii).

Given the sensitivity of voter data and the fact that adversaries have targeted U.S. voter registration records, a PIA may well have led to the conclusion that the Commission simply should not collect state voter record information as proposed. A PIA would also have triggered obligations under the federal Privacy Act that would have established procedural safeguards against adverse determinations arising from computer matching programs undertaken by a federal agency. Moreover, under the FACA, the Commission would have been required to make available the PIA to the public. 5 U.S.C. app. 2 § 10(b).

None of the defendant agencies have conducted a PIA for the Commission's proposed collection of state voter data. None of the defendant agencies have ensured review of a PIA by any Chief Information Officer or equivalent official. The Commission has not made any PIA available to the public.

The E-Government Act should be read according to its plain text and stated purpose, which are both clearly broad enough to include the type of information collection initiated by the Commission and at issue in this case. Because the Commission is subject to the E-Government Act and the FACA, EPIC has plausibly stated a claim in this case.

### B. The Commission is an establishment of the government subject to the Paperwork Reduction Act and the E-Government Act.

The Government's only defense to EPIC's E-Government Act claim is that the Defendants are not agencies under the *Soucie* test and that the E-Government Act definition of "agency" should "follow" the FOIA definition. Def.'s Mot. 30. The Government's argument has no basis in the text of the E-Government Act or the Paperwork Reduction Act, any cases in the D.C. Circuit interpreting those statutes, or any of the legislative history of those statutes. The Government merely asserts that the definition of "agency" from the FOIA should apply because it is "essentially the same" as 44 U.S.C. § 3502(1). But the definitions are not the same. Even if they were, the "substantial independent authority" test is an atextual gloss on the FOIA which (1) is based on the FOIA's peculiar and "unambiguous" legislative history, *Kissinger v. Reporters Comm. for the Freedom of the Press*, 445 U.S. 136, 156 (1980), and (2) serves a unique constitutional purpose, *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir 1998).

The question of whether the Vice President and other officers and authorities within the Executive Office of the President are "agencies" for the purposes of the PWRA and, therefore, the E-Government Act, is an issue of first impression. In fact, only a handful of cases in other circuits have discussed the § 3502(1) "agency" definition at all. *See, e.g.*, *In re Fidelity Mortgage Investors*, 690 F.2d 35, 38 (2d Cir. 1982) (noting in passing that the judiciary is not subject to the PWRA); *Kuzma v. U.S. Postal Serv.*, 798 F.2d 29, 32 (2d Cir. 1986) (holding that the Postal Service is not subject to the PWRA based on Congress' expressed intent in the Postal Reorganization Act of 1970 to exclude the Post Office from such administrative requirements); *Shane v. Buck*, 658 F. Supp. 908, 914–15 (D. Utah 1985) (same).

An interpretation of the term "agency" in the PWRA must begin "with the language of the statute itself," and, "where the statute's language is plain," that "is also where the inquiry should end." *Puerto Rico v. Franklin California Tax-free Trust*, 136 S. Ct. 1938, 1946 (2016). The definition of "agency" in 44 U.S.C. § 3502(1) is clearly different than the definitions in 5 U.S.C. §§ 701(b)(1), 551(1), and 552(f). To begin with, the definition in the PWRA does not include the term "authority," but instead uses the term "establishment."

the term "agency" means any executive department, military department, Government corporation, Government controlled corporation, or *other establishment* in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency . . .

44 U.S.C. § 3502(1) (emphasis added). Establishment is defined as an "institution or place of business." Black's Law Dictionary 566 (7th Ed. 1999). The Commission was "established" by the President in Executive Order No. 13,799. 82 Fed. Reg. 22,389 (May 11, 2017) ("**Section 1**. *Establishment*. The Presidential Advisory Commission on Election Integrity (Commission) is hereby established."). The Government does not contest that the Commission is an "establishment" of the Government. Therefore, the Commission is subject to the E-Government Act by the plain text of the PWRA, 44 U.S.C. § 3502(1).

The Government has not offered any evidence or authority that would contradict the plain text of the statute. The fact that the PWRA "was passed in 1980," Def.'s Mot. 30–31, is simply not relevant. The 1980 bill was to expand the scope of the Federal Reports Act of 1942, Pub. L. No. 77-831, § 7(a), 56 Stat. 1078, to "expand and strengthen Federal information management activities," H.R. Rep. No. 96-835, at 1 (1980). Congress chose the Office of Management and Budget, an establishment within the Executive Office of the President, to oversee compliance with the PWRA, and the OMB regulations implementing the PWRA describe the statute in similarly expansive terms. "The purpose of the Paperwork Reduction Act and of this rule is to protect the public." 48 Fed. Reg. 13666, 13670 (1983). The implementing regulations promulgated by OMB made clear that "it would be entirely contrary to the spirit and intent of the Act to make its fundamental public notification mechanisms depend upon legal distinctions . . . that are in no way discernable on the face of the form or regulation." *Id.* It would certainly not be reasonable to read in to the PWRA definition of "agency" an atextual gloss imported from an entirely different statute based on an entirely different legislative history.

Absent clear and convincing evidence of Congressional intent to exclude a particular establishment from the PWRA, the Court should not limit the scope of that statute or of the E-Government Act. *Kuzma*, 798 F.2d at 31. The Court should be especially wary of importing the

FOIA definition of "agency" into the E-Government Act because the FOIA definition was narrowed to serve a specific constitutional purpose, to avoid chilling discussion between the President and his close advisors. *Espy*, 145 F.3d at 1373. There is no reason to import an analogous limitation into the PWRA context. The Court should therefore deny the Government's motion to dismiss EPIC's E-Government Act claims.

### C. The Defendant GSA, which is an agency, has a mandatory, nondiscretionary duty to participate in the Commission's collection activities.

None of the above analysis would be necessary if the General Services Administration had provided the equipment and facilities for the Commission's proposed data collection as required under both the Executive Order and the Commission's Charter. The court has jurisdiction under 5 U.S.C. § 706(1) to compel GSA to conduct and publish a PIA because the agency has a "mandatory, nondiscretionary duty" to take part in the Commission's proposed collection, which triggers the requirements of Section 208 of the E-Government Act. *See Hamandi v. Chertoff*, 550 F. Supp. 2d 46 (D.D.C. May 6, 2008) (compelling adjudication where USCIS had a "mandatory, nondiscretionary duty" to act). The Charter states that the GSA is the "Agency Responsible for Providing Support" to the Commission. Charter ¶ 6, ECF No. 8-1, Ex. 2. This is consistent with the Executive Order, which assigns to the GSA—and no other entity—responsibility for providing "facilities," "equipment," and "other support services" as "may be necessary to carry out [the Commission's] mission." Order § 7(a), ECF No. 8-1, Ex. 1. As the "Agency Responsible for Providing Support" to the Commission, it is the GSA, not the White House, that should be facilitating collection and storage of any data that the Commission obtains.

The APA authorizes this Court to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). Such a claim may proceed "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wildlife Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original). The GSA is obligated to comply with the Executive Order. *See Legal Aid Soc. of Alameda County v. Brennan*, 608 F.2d 1319 (9th Cir. 1979) (agency's noncompliance with an executive order is subject to judicial review under the APA). Under the

Executive Order, the GSA is required to facilitate the collection of data for the Commission. As the GSA is undeniably an agency, it must conduct a PIA before initiating the collection. *AT&T Info. Sys., Inc. v. GSA*, 810 F.2d 1233 (D.C. Cir. 1987) (applying both the APA and the FOIA to the GSA); E-Government Act § 208. An agency's failure to comply with the PIA requirements of the E-Government Act is reviewable under both provisions of 5 U.S.C. § 706. *Fanin v. Dep't of Veteran Affairs*, 572 F.3d 868, 875 (11th Cir. 2009).

**IV.    EPIC has stated a claim that Commission's collection of personal data violates EPIC members' right to informational privacy, which is firmly grounded in Supreme Court precedent.**

EPIC has plausibly alleged that the Commission's collection of personal voter data violates EPIC members' constitutional right to informational privacy. Because the Commission is collecting personal voter data without any of the privacy and security protections required by law, the Commission has also deprived EPIC members of their right to due process of law. The Court should thus deny the Commission's motion to dismiss EPIC's constitutional claims.

**A.    The Commission's actions violate the right to informational privacy.**

The Supreme Court has long recognized that individuals have a constitutionally protected interest in "avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589 (1977); *accord Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425 (1977). The constitutionality of a "government action that encroaches upon the privacy rights of an individual is determined by balancing the nature and extent of the intrusion against the government's interest in obtaining the information it seeks." *United States v. District of Columbia*, 44 F. Supp. 2d 53, 60–61 (D.D.C. 1999); *see also Senior Execs. Ass'n v. United States*, 891 F. Supp. 2d 745 (D. Md. 2012) (granting a motion for a preliminary injunction to prohibit disclosure of financial information from executive branch and military officials under the STOCK Act). The "individual interest in protecting the privacy of information sought by the government" is especially strong where the information can be "disseminated publicly." *Am. Fed'n of Gov't Emps., AFL-CIO v. HUD*, 118 F.3d 786, 793 (D.C. Cir. 1997) [hereinafter *AFGE*] (assuming without concluding that the right exists).

In *NASA v. Nelson*, Justice Alito, writing for the Court, said:

> As was our approach in *Whalen*, we will assume for present purposes that the Government's challenged inquiries implicate a privacy interest of constitutional significance. 429 U.S., at 599, 605. We hold, however, that whatever the scope of this interest, it does not prevent the Government from asking reasonable questions of the sort included on SF-85 and Form 42 in an employment background investigation that is subject to the Privacy Act's safeguards against public disclosure.

*NASA v. Nelson,* 562 U.S. 134, 147–48 (2011). The actual holding in *Nelson* is significant in this matter for several reasons. First, the Court in *Nelson* observed that in *Whalen,* "the Court pointed out that the New York statute contained 'security provisions' that protected against "[p]ublic disclosure" of patients' information." 562 U.S. at 145. "The [*Whalen*] Court thus concluded that the statute did not violate 'any right or liberty protected by the Fourteenth Amendment.'" *Id.* (citing *Whalen*, 429 U.S. at 606). Second, the Court in *Nelson* relied on the Privacy Act's safeguards prohibiting public disclosure when deciding that the collection could be permitted. Third, the Supreme Court in both *Whalen* and in *Nelson* deemed the request for information to be "reasonable."

EPIC's Complaint plausibly alleges—consistent with *Whalen*, *Nixon*, and *Nelson*—a violation of EPIC members' right to informational privacy. First, EPIC has supplied ample facts to demonstrate that the data sought by the Commission, which includes felony convictions and partial SSNs, is on par with the personal information at issue in *Whalen* and *Nelson*. Second Am. Compl. ¶¶ 20–24. Contra the Commission, Def.'s Mot. 39–40, voters' constitutional privacy rights in their personal data do not simply vanish when that data is collected by particular state officials for a particular state purpose. As the Supreme Court has explained, "one d[oes] not necessarily forfeit a privacy interest in matters made part of the public record." *DOJ v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 764 n.15 (1989). "Almost every such fact, however personal or sensitive, is known to someone else. Meaningful discussion of privacy, therefore, requires the recognition that ordinarily we deal not with an interest in total nondisclosure but with an interest in selective disclosure" *Id.* at 764 n.14 (quoting Kenneth L. Karst, *"The Files": Legal Controls Over the Accuracy and Accessibility of Stored Personal Data*, 31 Law & Contemp.

Prob. 342, 343–44 (1966)). In other words: citizens do not agree to the use of their personal data for *all purposes* by *all government actors* merely by registering to vote in a given state. *Cf. Doe v. City* of N.Y., 15 F.3d 264, 268 (2d Cir. 1994) ("In sum, we hold that Doe has a right to privacy (or confidentiality) in his HIV status, because his personal medical condition is a matter that he is normally entitled to keep private. We also hold that Doe's HIV status did not, as a matter of law, automatically become a public record when he filed his claim with the Commission and entered into the Conciliation Agreement."). Rather, they retain a privacy interest in that information, diminished only to the extent necessary for the state to administer its elections. The Commission's request plainly violates this specified state use of personal voter data, and by extension the informational privacy rights of EPIC's members.

Second, EPIC has alleged that personal voter data is at risk of unrestricted public disclosure by the Commission. Second Am. Compl. ¶¶ 24, 52. Contrary to the security methods mandated by the state statute in *Whalen*, the Commission (1) has failed to establish that the system it is using to collect sensitive data is sufficiently secure, and (2) has disclaimed any responsibility to undertake a Privacy Impact Assessment. Most critically, the Commission has given no indication that its data collection practices are subject to the strictures of the Privacy Act, which was the key reason in *Nelson* that the Court did not reach the informational privacy claim. As Justice Alito explained in the holding for the Court:

> In light of the protection provided by the Privacy Act's nondisclosure requirement, and because the challenged portions of the forms consist of reasonable inquiries in an employment background check, we conclude that the Government's inquiries do not violate a constitutional right to informational privacy.

*Nelson*, 562 U.S. at 764–65. Indeed, the Commission may even have a legal *obligation* to disclose the personal voter data in its possession. The Commission contends that it is not an "agency," and thus not subject to the FOIA. *See* 5 U.S.C. § 552(f). Under that theory, the Commission would find no relief from the FACA's records disclosure mandate. 5 U.S.C. app. 2 § 10(b). Rather, the

Commission would be obligated to make all of the personal voter data that it collects available for public inspection—exactly what it promised the Court it would not to do. Mem. Op. 5, 14.[21]

The Government has previously survived right to informational privacy challenges where it implemented measures to protect the confidentiality and security of the personal information that it was collecting or there was a federal law that provided substantial protection. *See AFGE*, 118 F.3d 786 (upholding collection of personal information by HUD on the SF 85P form); *Nelson*, 562 U.S. 134, 156 (2011). But when no such safeguards exist—when the Government has not "evidence a proper concern" for individual privacy—the individual's interest in prohibiting the collection of their information by an agency is strongest. *Nelson*, 562 U.S. at 156. That is especially true when the data includes identifying and sensitive information such as addresses, date of birth, SSNs, and political affiliations.

Finally, EPIC has adequately alleged that collection of the data is "unnecessary and excessive," and thus unreasonable. Second Am. Compl. ¶¶ 78, 81. The Commission has presented this Court with informational privacy risks comparable to those that were before the Supreme Court in *Whalen* and *Nelson*, but with none of the privacy safeguards or practices to suggest that the request is "reasonable." These are the circumstances where the claim of informational privacy are most compelling. The Supreme Court explained in *Whalen* that the "interest in avoiding disclosure of personal matters" is an aspect of the right of privacy, and intimated "a sufficiently grievous threat" may establish a "constitutional violation." *Whalen*, 429 U.S. at 599–600. Without a "successful effort to prevent abuse and limit access to the personal information at issue," which the disclosure amounts to to "a deprivation of constitutionally protected privacy interests"

---

[21] *Center for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213 (D.D.C. 2017), is of no help to the Commission. The advisory committee in *Tidwell* did not dispute that it was part of an "agency." Thus, the committee was able to invoke applicable FOIA exemptions. *See* § 10(b) ("Subject to section 552 of title 5…"). But the Presidential Election Commission categorically denies that it is part of an agency. If that is so, the FOIA and its nine exemptions—which apply solely to agencies—offer the Commission no grounds to withhold aggregated voter data from public inspection. *See* 5 U.S.C. § 552(f). The Commission cannot deny agency status in one breath and claim it in the next.

requiring the state to prove the measures are "necessary to promote a compelling state interest." *Id.* at 607 (Brennan, W., concurring).

If there were any information worthy of a constitutional shield from disclosure, it is personal information shared for the limited purpose of exercising of the right to vote. The right to vote is referenced by the U.S. Constitution five times, more than any other right. U.S. Const. amends. XIV § 5, XV § 1, XIX, XXIV § 1, XXVI § 1. The right to vote, secured only through robust voter privacy measures, is foundational to American democracy. That the Commission attempts to collect personal *voter* data en masse raises the constitutional stakes. And, without a "successful effort prevent abuse and limit access to" that data, the state must demonstrate to the Court the "necess[ity]" of the collection "to promote a compelling state interest." *Whalen*, 429 U.S. at 607. A proposal to establish a national database of sensitive voter data, gathered contrary to state privacy law, and with no assurance of privacy protection makes clear the right of informational privacy. There is little in the Supreme Court's decisions in *Nelson* and *Whalen*, or even the D.C. Circuit's *AFGE* opinion, to suggest otherwise. And regardless of whether the Commission considers itself outside of the FACA or the APA, it is not beyond the reach of the federal Constitution.

## B.  The Commission's actions violate the right to due process of law.

Just as the Commission deprived EPIC members of their right to informational privacy, it also deprived them of their right to due process of law under the Fifth Amendment. "A procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections." *2910 Georgia Ave. LLC v. D.C.*, 234 F. Supp. 3d 281, 315 (D.D.C. 2017) (quoting *Atherton v. D.C. Office of Mayor, 567 F.3d 672*, 689 (D.C. Cir. 2009)). "The three basic elements of a procedural due process claim are (1) a deprivation, (2) of life, liberty, or property, (3) without due process of law." *Id.* (quoting *Morris v. Carter Glob. Lee, Inc.*, 997 F. Supp. 2d 27, 35–36 (D.D.C. 2013)).

These elements are plainly satisfied by EPIC's Complaint. First, EPIC has identified the protected liberty interest violated by the Commission's collection of state voter data: EPIC

42

members' right to informational privacy in their personal information. *See* Second Am. Compl. ¶¶ 77–78; *supra* Part III.A. Second, EPIC has alleged that Defendants violated this liberty interest by taking scattered state voter data collected for one purpose and unlawfully amassing it into a single, nationwide database built for an entirely different purpose. Second Am. Compl. ¶¶ 77–78. Though the Commission attempts to blame state officials for the privacy harms at issue, Def.'s Mot. 42-41, EPIC's suit challenges the Commission's *collection* of voter data—not state officials' disclosure thereof. Unreasonable government aggregation of personal data, standing alone, can represent a violation of a protected liberty interest in informational privacy. *See Reporters Comm.*, 489 U.S. at 764 ("Plainly there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information."). Finally, EPIC has alleged that the Commission failed to provide the "due process of law" necessary to sustain the deprivation of liberty at issue. Second Am. Compl. ¶ 82. Indeed, the Commission does not even attempt to argue that it provided voters with procedural recourse before collecting their personal data. Thus, EPIC has plausibly stated a claim for the deprivation of EPIC members' right to due process of law.

## CONCLUSION

For the foregoing reasons, the Court should deny the Government's motion to dismiss.

/s/ Marc Rotenberg
MARC ROTENBERG, D.C. Bar # 422825
EPIC President and Executive Director

ALAN BUTLER, D.C. Bar # 1012128
EPIC Senior Counsel

CAITRIONA FITZGERALD*
EPIC Policy Director

JERAMIE D. SCOTT, D.C. Bar # 1025909
EPIC Domestic Surveillance Project Director

ELECTRONIC PRIVACY INFORMATION
CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*

*\* Appearing pro hac vice*

Dated: September 19, 2017