**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, <br><br>     Plaintiff, <br><br> v. <br><br> PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY, *et al.*, <br><br>     Defendants. | Civil Action No. 1:17-cv-1320 (CKK) |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 3

I.   PLAINTIFF LACKS STANDING. ............................................................... 3

    A.  Plaintiff Lacks Standing to Sue in a Representational Capacity......................... 3

    B.  Plaintiff Also Lacks Standing to Sue on its Own Behalf Based on Alleged
        Programmatic Injury. ........................................................................... 7

    C.  Plaintiff Lacks Informational Standing Because the E-Government Act Does Not
        Create a Cognizable Informational Interest in Publication of a Privacy Impact
        Assessment....................................................................................... 9

II.  PLAINTIFF'S E-GOVERNMENT AND FACA CLAIMS FAIL TO STATE A CLAIM
    UPON WHICH RELIEF CAN BE GRANTED. .................................................. 12

    A.  The Requirements of the E-Government Act Do Not Apply to the President, the
        Commission, the Director of White House Information Technology, or Any Other
        Relevant Entity or Official. ................................................................... 12

    B.  Plaintiff Likewise Fails to Establish a Cause Of Action Under the APA, Which Applies
        Only to Agencies............................................................................... 18

    C.  The Commission Is Not Required to Use GSA (an Agency) for Data Storage. ........ 21

III. PLAINTIFF FAILS TO STATE A VIABLE CONSTITUTIONAL CLAIM........................ 22

    A.  There is No Constitutional Right to Informational Privacy in Publicly Available
        Voter Information. ............................................................................. 22

    B.  Advisory Board Members' Procedural Due Process Rights Are Not Implicated............ 24

CONCLUSION................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967)................................................................................. 20

*\*Alexander v. FBI,*
    691 F. Supp. 2d 182 (D.D.C. 2010) ....................................................15

*\*American Legal Foundation v. FCC,*
    808 F.2d 84 (D.C. Cir. 1987)................................................................. 4

*Armstrong v. Bush,*
    924 F.2d 282 (D.C. Cir. 1991) .............................................................. 21

*Armstrong v. Executive Office of the President,*
    90 F.3d 553 (D.C. Cir. 1996) ................................................................ 21

*Byrd v. EPA,*
    174 F.3d 239 (D.C. Cir. 1999) .............................................................. 10

*Citizens for Responsibility and Ethics in Washington v. Executive Office of the President,*
    587 F. Supp. 2d 48 (D.D.C 2008)......................................................... 21

*\*Citizens for Responsibility and Ethics in Washington v. Office of Administration,*
    566 F.3d 219 (D.C. Cir. 2009).............................................................. 16

*Council on American-Islamic Relations v. Gaubatz,*
    667 F. Supp. 2d 67 (D.D.C. 2009)......................................................... 7

*Cox Broadcasting Corp. v. Cohn,*
    420 U.S. 469 (1975).............................................................................. 24

*Dong v. Smithsonian Institute,*
    125 F.3d 877 (D.C. Cir. 1997) .............................................................. 15

*\*Electronic Privacy Information Center v. Department of Education,*
    48 F. Supp. 3d 1 (D.D.C. 2014) ............................................................. 8

*Environmental Defense v. Duke Energy Corp.,*
    549 U.S. 561 (2007).............................................................................. 20

*Energy Research Foundation v. Defense Nuclear Facilities Safety Board,*
    917 F.2d 581 (D.C. Cir. 1990) .............................................................. 18

*Filebark v. United States Department of Transportation,*
    542 F. Supp. 2d 1 (D.D.C. 2008) .......................................................... 20

*Food & Water Watch, Inc. v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) ............................................................ 1, 8

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ............................................................................ 18

*Friends of Animals v. Jewell,*
  828 F.3d 989 (D.C. Cir. 2016) .......................................................... 9, 10

*Friends of Animals v. Salazar,*
  626 F. Supp. 2d 102 (D.D.C. 2015) ...................................................... 12

*Fund Democracy, LLC v. SEC,*
  278 F.3d 21 (D.C. Cir. 2002) ................................................................. 4

*Gustafson v. Alloyd Co., Inc.,*
  513 U.S. 561 (1995) ............................................................................ 20

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ............................................................................ 20

*Hopkins v. Women's Division, General Board of Global Ministries,*
  284 F. Supp. 2d 15 (D.D.C. 2003) ......................................................... 3

*Hospital Staffing Solutions, LLC v. Reyes,*
  736 F. Supp. 2d 192 (D.D.C. 2010) ....................................................... 7

*Hunt v. Washington State Apple Advertising Commission,*
  432 U.S. 333 (1977) .............................................................................. 6

*IBP, Inc. v. Alvarez,*
  546 U.S. 21 (2005) .............................................................................. 19

*Kissinger v. Reporters Committee for Freedom of the Press,*
  445 U.S. 136 (1980) ..................................................................... passim

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
  547 U.S. 71 (2006) .............................................................................. 14

*Meyer v. Bush,*
  981 F.2d 1288 (D.C. Cir. 1993) ...................................................... 14, 17

*National Association of Home Builders v. EPA,*
  667 F.3d 6 (D.C. Cir. 2011) ................................................................... 9

*National Consumers League v. General Mills, Inc.,*
  680 F. Supp. 2d 132 (D.D.C. 2010) ....................................................... 8

*People for the Ethical Treatment of Animals v. United States Department of Agriculture*,
   787 F.3d 1087 (D.C. Cir. 2015) ......................................................................... 8

*Public Citizen Health Research Group v. Commissioner, Food and Drug Administration*,
   724 F. Supp. 1013 (D.D.C. 1989) ....................................................................... 21

*Public Citizen v. Department of Justice*,
   491 U.S. 440 (1989) ............................................................................................ 10

*Scheetz v. The Morning Call, Inc.*,
   946 F.2d 202 (3rd Cir. 1991) ............................................................................. 24

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971) ................................................................ *passim*

*United States Department of Justice v. Reporters Committee for Freedom of the Press*,
   489 U.S. 749 (1989) ........................................................................................ 6, 24

*United States v. Espy*,
   145 F.3d 1369 (D.C. Cir. 1998) ...................................................................... 16, 20

*Washington Legal Foundation v. Leavitt*,
   477 F. Supp. 2d 202 (D.D.C. 2007) ................................................................... 4, 5

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) ........................................................................... 15

*Zivotofsky v. Secretary of State*,
   444 F.3d 614 (D.C. Cir. 2006) ............................................................................. 9

## Statutes

5 U.S.C. app. 2 § 10(b) ............................................................................................. 12

5 U.S.C. § 551(1) ...................................................................................... 13, 18, 19, 20

5 U.S.C. § 552(f) ................................................................................................... 13, 14

5 U.S.C. § 552(f)(1) .............................................................................................. 13, 16

5 U.S.C. § 701(a) ................................................................................................. 20, 21

5 U.S.C. § 701(b) ................................................................................................. 20, 21

5 U.S.C. § 701(b)(1) ............................................................................................. 18, 19

5 U.S.C. § 706 .......................................................................................................... 13

iv

44 U.S.C. § 3502 .................................................................................................. 13

44 U.S.C. § 3502(1) ....................................................................................... 13, 14

Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 378 ..................................... 19

E-Government Act § 2(b)(9), Pub L. No. 107-347, 116 Stat 2899................................ 11

E-Government Act § 204(a), Pub L. No. 107-347, 116 Stat 2899 ............................... 11

E-Government Act § 201, Pub L. No. 107-347, 116 Stat 2899 .................................. 13

E-Government Act § 207(a), Pub L. No. 107-347, 116 Stat 2899 ................................11

E-Government Act § 208, Pub L. No. 107-347, 116 Stat 2899 ................................... 13

E-Government Act § 208(a), Pub L. No. 107-347, 116 Stat 2899 ............................... 10

E-Government Act § 208(b), Pub L. No. 107-347, 116 Stat 2899 ............................... 13

E-Government Act § 208(b)(1)(B)(iii), Pub L. No. 107-347, 116 Stat 2899 .............................. 10

## Executive and Legislative Materials

Executive Order No. 13,799, 82 Fed. Reg. 22,389 (May 1, 2017)........................................ 17, 21

H.R. Rep. No. 93-1380 ............................................................................................ 9

## Other Materials

Lauren McGaughy, *Texas Won't Release Private Voter Info to Trump Administration*, Dallas News (June 30, 2017),
https://www.dallasnews.com/news/elections/2017/06/30/texas-will-releasevoters-private-info-trump-election-commission ..........................................................................................23

*Raimondo: R.I. Will Not Supply Data Requested by Trump after Voter Fraud Commission*, Providence Journal (June 30, 2017),
http://www.providencejournal.com/news/20170630/raimondo-ri-will-not-supply-data-requested-by-trump-voter-fraud-commission .........................................................................23

**INTRODUCTION**

Plaintiff's claims that it has standing and that it has stated a claim upon which relief can be granted against the Presidential Advisory Commission on Election Integrity ("Commission") are without merit.  First, as to standing, the additional declarations plaintiff submits from individuals on its Advisory Board do not bolster its claim to have standing to sue as a representative of its "members."  These new declarations do not contravene the conclusion that plaintiff is not a traditional membership organization or the functional equivalent of one given that, as its website states, it admittedly "ha[s] no clients, no customers, and no shareholders[.]"  About EPIC, http://epic.org/epic/about.html (last visited Sept. 20, 2017).  Plaintiff also has not provided sufficient new argument to establish that it has standing to sue on its own behalf based on injury to its programmatic activities.  The efforts it identifies as having to expend in response to the Commission's activities, submitting and litigating requests under the Freedom of Information Act ("FOIA") constitute the very activities plaintiff routinely engages in to advance its mission and therefore do not incur "operational costs beyond those normally expended." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015).  And plaintiff lacks informational standing because its asserted injury does not constitute the type of harm that Congress sought to avert through section 208 of the E-Government Act, requiring a Privacy Impact Assessment.  The purpose of that section is to ensure that agencies protect individual privacy and properly document those efforts, not to provide information to the public, including organizations such as plaintiff, to facilitate public participation in the agency's decision-making process.

Second, plaintiff's opposition fails to establish that it has stated a viable claim upon which relief can be granted.  Plaintiff's claim under the E-Government Act fails because, as this Court has already concluded, the Presidential Advisory Commission on Election Integrity is an advisory

body and not an agency.   As discussed in defendants' opening brief, the Supreme Court has squarely held that under the FOIA definition of "agency," which is materially indistinguishable from the definition applicable to the E-Government Act, the President and "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President are not included within the term 'agency.'"   *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (quotation marks omitted).   Since the Commission exercises no substantial independent authority, it is not an agency for these purposes.   There is no basis for plaintiff's apparent view that identical language in different statutory provisions should be interpreted differently, and such an argument runs counter to the rules of statutory interpretation.   Plaintiff also fails to state a viable constitutional claim, as, whether or not a constitutional right to privacy exists (which it does not), plaintiff's members can have no expectation of privacy in the voter roll information at issue, which is publicly available.

Finally, plaintiff's opposition supports defendants' position, as they have argued in their motion to stay, ECF No. 48, that further proceedings in this case, including the present motion to dismiss, should be stayed pending the outcome of the appeal of the denial of plaintiff's motion for preliminary injunction.   Plaintiff's opposition makes clear that it views the issues before the Court on the pending motion to dismiss as purely legal issues concerning standing and the definition of "agency," and plaintiff has not asserted that it needs further factual development to resolve these issues.   These are precisely the issues that are presently before the Court of Appeals, and that court's resolution of those issues will bind this Court.   Therefore, it would be a waste of judicial resources for this Court to deliberate and rule on these issues at this time.

## ARGUMENT

## I.   PLAINTIFF LACKS STANDING.

### A.   Plaintiff Lacks Standing to Sue in a Representational Capacity.

Defendants explained in their opening memorandum that the Court properly concluded plaintiff lacks associational standing to bring this lawsuit on behalf of its Advisory Board members.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 11-15, ECF No. 49-1; Mem. Op. at 11-15, ECF No. 40.  In response, plaintiff submits four additional declarations[1] to support its contention that it is a traditional membership organization because its Advisory Board members and its Directors[2] consider themselves to be "members" and, even if that "were not so," it is the functional equivalent of a membership organization.  Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n"), at 18, ECF No. 52.  Plaintiff's additional declarations fail to show that it is either a traditional membership organization or the functional equivalent of one.[3]

Plaintiff's assertion that it is a traditional membership organization by virtue of the fact that three of its Advisory Board members view themselves as members is unavailing.  Plaintiff

---

[1] Plaintiff supplemented the record with declarations from its Executive Director and several Advisory Board members prior to the Court's July 24, 2017, ruling.  *See* Reply in Supp. of Pl.'s Emergency Mot. for Temp. Restraining Order & Affirmation of Marc Rotenberg with attachments (July 6, 2017), ECF Nos. 13, 13-2; Pl.'s Sur-Surreply & Ex. 1 Declaration of Marc Rotenberg (July 7, 2017), ECF Nos. 19, 19-2.

[2] Plaintiff's Second Amended Complaint (ECF No. 33) does not purport to bring claims on behalf of plaintiff's Directors.

[3] Plaintiff does not challenge defendants' contention (Defs.' Mem. at 24) that its claims against the Department of Defense ("DOD") are moot.  Therefore, plaintiff has conceded mootness as to those claims, and DOD should be dismissed from this action without further ado.  *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

cites no authority for the proposition that the question of whether an organization is a traditional membership organization turns on whether individuals associated with the organization view themselves as members.  *See* Pl.'s Opp'n at 17-18.  Moreover, plaintiff's argument is belied by its website which concedes that plaintiff "ha[s] no clients, no customers, and no shareholders[.]"  *See* About EPIC, http://epic.org/epic/about.html (last visited Sept. 20, 2017).  Plaintiff, therefore, has failed to show that it is a traditional membership organization.

Plaintiff's assertion in the alternative that it satisfies the "test of functional equivalency," *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002), is equally unavailing.  As defendants explained in their opening memorandum, "[t]hree main characteristics must be present for an entity to meet the test of functional equivalency: (1) it must serve a specialized segment of the community; (2) it must represent individuals that have all the 'indicia of membership' . . . ; and (3) its fortunes must be tied closely to those of its constituency."  *Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007) (citation omitted).

First, plaintiff contends it serves a specialized segment of the community because it is "a privacy organization whose core constituents [have] . . . expertise in law, technology, and public policy."  Pl.'s Opp'n at 18.  This argument ignores the declaration of plaintiff's Executive Director which states that plaintiff is more than just a privacy organization representing a limited number of individuals – it is a "public interest research center" that was "established to focus *public attention* on emerging civil liberties issues and to protect privacy, the First Amendment, and other constitutional values."  Second Declaration of Marc Rotenberg ("Second Rotenberg Decl.") ¶ 2, ECF No. 52-1 (emphasis added).  This statement suggests that plaintiff's mission is to serve the public at large.  Thus, contrary to plaintiff's contention, it is far from clear whether plaintiff "serves [a] discrete, stable group of persons with a definable set of common interests."  *Am. Legal Found.*

*v. FCC*, 808 F.2d 84, 90 (D.C. Cir. 1987) (concluding that an organization which "broadly" defined its mission as a "media watchdog" did not represent a specialized segment of the community because its "[constituency] of supporters is completely open-ended").

Second, plaintiff argues that the members of its Advisory Board "have all the 'indicia of membership'" because they participate in the organization's activities and its annual review, make monetary contributions to the organization, and, to the extent that an Advisory Board member also serves as a Director, elect the organization's leadership.  Pl.'s Opp'n at 19.  Although plaintiff's additional declarations do confirm that members of the Advisory Board annually review the organization's activities and that three Advisory Board members financially contribute to the organization, they do not confirm that members of the Advisory Board are *required* to make financial contributions.  *See* Mem. Op. at 13, ECF 40 (concluding plaintiff lacked standing because "there is no evidence that [Advisory Board] members are *required* to finance the activities of the organization"); *see also Wash. Legal Found.*, 477 F. Supp. 2d at 208-09 & n.5 (noting that the plaintiff organization did not represent individuals that have all the "indicia of membership" because the purported members are not, among other things, "required to pay dues").  Further, plaintiff's argument concedes that only a subset of its Advisory Board members participate in the election of its leadership.  Plaintiff has not, therefore, demonstrated that its Advisory Board members have all the "indicia of membership."

Third, plaintiff asserts that its fortunes are closely tied to those of its Advisory Board members because the organization "depends on the ongoing support of the Advisory Board members" and the members "attest" to the "importance" of its "work to protect their 'privacy rights[.]'"  Pl.'s Opp'n at 20.  Plaintiff misunderstands the "fortunes" prong of the functional equivalency test.  This prong evaluates the "financial nexus between the interests of the

[organization] and its constituents[,]" not the nexus between their policy viewpoints. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977) (concluding state commission's fortunes were closely tied to its constituency because the statute at issue, if it remained on the books, was likely to depress annual sales revenues, which in turn would lower assessments paid to the commission). Plaintiff has thus failed to demonstrate that it satisfies the test of functional equivalency and, as a result, has failed to show that it has associational standing.

In any event, even if plaintiff could proceed as a representative of its Advisory Board members, it has failed to demonstrate that those individuals have suffered or will suffer a concrete, imminent injury-in-fact. Plaintiff argues that the Commission's collection and aggregation of state-provided publicly available voter data, standing alone, constitutes an injury-in-fact. Pl.'s Opp'n at 20. But this argument is without merit. As defendants previously explained, *see* Defs.' Mem. at 14, the transfer of public information from one sovereign to another does not create a concrete injury. Nor does the aggregation of the voter roll information into one database create an injury. Unlike in *United States Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 765 (1989), each individual's information remains unchanged in the transfer – there is no aggregation of "scattered . . . bits of information" pertaining to one individual. Moreover, the Commission has explained that the "voter rolls themselves will not be released to the public" and that any information derived therefrom will be de-identified before release.[4] *See* Kobach Decl. ¶ 5, ECF No. 8-1; Mem. Op. at 13.

---

[4] Plaintiff also argues that the Commission's alleged violation of its Advisory Board members' constitutional right to informational privacy constitutes an injury-in-fact sufficient to confer standing. *See* Pl.'s Opp'n at 20. However, as this Court noted in its memorandum opinion, "the D.C. Circuit has expressed 'grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information.'" Mem. Op. at 15 n.4; *see also* Defs.' Mem. at 38-40. This allegation, therefore, is not sufficient to confer standing.

Plaintiff's continued assertion that the Commission, notwithstanding its representations to this Court, will release all of the records it received from the states, even if it were true (which it is not), is insufficient to confer associational standing. The Commission has only asked the states to voluntarily provide publicly available voter roll information. The collection and disclosure of publicly available information does not constitute a concrete and imminent injury. Mem. Op. at 14-15 ("At most, [p]laintiff has shown that its members will suffer an increased *risk* of harm if their already publicly available information is collected by the Commission."). The cases plaintiff cites in support of its argument are not, as plaintiff concedes, to the contrary. *See* Pl.'s Opp'n at 21 (citing *Council on Am.-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 76 (D.D.C. 2009), and *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) for the proposition that the "disclosure of *confidential* information" constitutes an injury). Accordingly, plaintiff has failed to establish it has standing to sue in a representational capacity.

## B. Plaintiff Also Lacks Standing to Sue on its Own Behalf Based on Alleged Programmatic Injury.

As defendants explained in their opening memorandum, plaintiff also has not established that it has standing to sue on its own behalf because its programmatic activities have not been impaired by the Commission and the resources that it identifies as having to expend in response to the Commission constitute the very activities plaintiff routinely engages in to advance its mission. *See* Defs.' Mem. at 20-24.

Plaintiff argues that the absence of a Privacy Impact Assessment has made its activities, including its public education endeavors, "more difficult" because its activities "routinely rely on access to information from the federal government." Pl.'s Opp'n at 15-16. As a result, plaintiff has submitted Freedom of Information Act ("FOIA") requests to obtain the same type of information that would be included in the Privacy Impact Assessment. *See id.* But plaintiff's

7

FOIA requests cannot plausibly be compared to the organizational burden found sufficient in *People for the Ethical Treatment of Animals ("PETA") v. U.S. Department of Agriculture*, 787 F.3d 1087 (D.C. Cir. 2015), where the organizational plaintiff regularly relied on a particular category of agency report, and compensated for the absence of that report by engaging in its own investigations and research efforts. Unlike the organization in *PETA* which did not routinely engage in investigative and research activities in order to carry out its advocacy mission, plaintiff "makes frequent use of the [FOIA] . . . to obtain information from the government" and "routinely files lawsuits to force disclos[ure] of agency records." EPIC FOIA Cases, https://epic.org/foia (last visited Sept. 26, 2017). Because submitting and litigating FOIA requests is an integral component of its public education and advocacy activities, the submission of such requests does not constitute "operational costs beyond those normally expended." *Food & Water Watch, Inc.*, 808 F.3d at 919-20.

Further plaintiff's expanded activities – drafting a letter to state election officials, developing a webpage on the Commission's activities, and responding to numerous requests from state election officials, citizen organizations and news outlets – constitute the ordinary activities of its mission. *See Food & Water Watch, Inc.*, 808 F.3d at 919-20. Indeed, rather than impeding plaintiff's public education and advocacy practices, the Commission's actions have "fueled them" *Elec. Privacy Info. Ctr. v. Dep't of Educ.*, 48 F. Supp. 3d 1, 23 (D.D.C. 2014), by giving plaintiff an "opportunity to carry out its mission[,]" *Nat'l Consumers League v. Gen. Mills, Inc.*, 680 F. Supp. 2d 132, 136 (D.D.C. 2010), of raising public awareness of privacy issues. Plaintiff, therefore, has failed to demonstrate that it has suffered a "concrete and demonstrable injury to [its] activities – with [a] consequent drain on [its] resources – constitut[ing] . . . more than simply a

setback to the organization's abstract social interests" that is sufficient to confer organizational standing. *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011).

### C. Plaintiff Lacks Informational Standing Because the E-Government Act Does Not Create a Cognizable Informational Interest in Publication of a Privacy Impact Assessment

In its opposition memorandum, plaintiff focuses on informational standing, which was the basis for this Court's finding of standing at the preliminary injunction phase (and hence one of the issues squarely presented to the Court of Appeals). Pl.'s Opp'n at 11-14; *see* Appellee's Br. at 16-22, *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 17-5171 (D.C. Cir. filed Sept. 15, 2017). But plaintiff's analysis with respect to informational standing is incorrect. As discussed in defendants' opening memorandum, the E-Government Act's requirement (through section 208(b)) to prepare and (generally) publish a Privacy Impact Assessment was enacted to protect individual privacy, not to facilitate a role in the decisionmaking process by entities such as plaintiff. *See* Defs.' Mem. at 7, 18-19 (discussing that requiring publication as the final stage of an agency decision process is not enough to create informational standing because such publication is not intended to facilitate public participation in that process). Plaintiff's claim of a concrete injury from a failure to have access to a Privacy Impact Assessment, and hence its claim to "informational standing," therefore fails.

As this Court recognized, informational injuries are cognizable only if, "by being denied access to [the] information," the plaintiff suffers "the type of harm Congress sought to prevent by requiring disclosure." Mem. Op. at 16 (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)). Plaintiff argues that its informational injury here arises from the type of harm Congress sought to prevent by relying on *Zivotofsky v. Secretary of State*, 444 F.3d 614, 617 (D.C. Cir. 2006), which was referring to the requirements to establish standing under the Freedom of

Information Act, and *Public Citizen v. Department of Justice*, 491 U.S. 440, 447 (1989), and *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999), which addressed standing under the Federal Advisory Committee Act ("FACA").  Pl.'s Opp'n at 11-12, 13-14.  But plaintiff ignores the differences between, on the one hand, FOIA and the disclosure provisions of FACA, both of which are general open records statutes, and, on the other hand, section 208(b) of the E-Government Act, which is a more specific provision without a general "open records" purpose.  In *Friends of Animals v. Jewell*, the D.C. Circuit explained that, under FOIA and FACA, a plaintiff suffers the type of harm Congress sought to remedy when it simply "'s[eeks] and [is] denied specific agency records.'" 828 F.3d at 992 (citation omitted).  Under other types of statutory disclosure statutes, such as the one at issue here, though, the court made clear that "a plaintiff may need to allege that nondisclosure has caused it to suffer the kind of harm from which Congress, in mandating disclosure, sought to protect individuals or organizations like it."  *Id.*

Here, plaintiff is not seeking to redress the type of harm that Congress sought to prevent in section 208 of the E-Government Act.  That section indicates that it was designed to protect the privacy of those whose data is being collected, not to facilitate public participation in governmental data-gathering efforts.  Specifically, section 208 states explicitly that "[t]he purpose of this section is to ensure sufficient protections for the privacy of personal information as agencies implement citizen-centered electronic Government."  E-Government Act § 208(a), Pub. L. No. 107-347, 116 Stat. 2899, 2921 (2002).  These requirements are designed to improve the government's decision-making when determining information collection strategies, rather than being designed, as FOIA was, to create an informational interest in the general public.  The requirement that, "after completion of the review" by the Chief Information Officer or equivalent, an agency must make the assessment publicly available "if practicable," *id.* § 208(b)(1)(B)(iii), 116 Stat. at 2922, does

not alter the express purpose of the scheme or its intended beneficiaries.  Congress required agencies to prepare and publish privacy impact assessments in order to ensure that agencies will take account of potential effects on individual privacy in an organized and documented way, not to facilitate participation by the general public.

In its prior decision, the Court did not address the purposes of section 208 specifically, instead citing the general purpose section of the E-Government Act as a whole, which describes, among many other purposes, an effort "[t]o make the Federal Government more transparent and accountable."  *See* Mem. Op. at 16 (alteration in original) (quoting E-Government Act § 2(b)(9), 116 Stat. at 2901).  Some provisions of the E-Government Act were indeed designed to increase transparency.  Thus, the Act requires certain agency officials to "promote an integrated Internet-based system of providing the public with access to Government information and services," E-Government Act § 204(a)(1), 116 Stat. at 2913, and contains a section designed "to improve the methods by which Government information, including information on the Internet, is organized, preserved, and made accessible to the public," *id.* § 207(a), 116 Stat. at 2916.  However, the present case has nothing to do with those provisions.  Instead, the provision at issue references only the necessity of ensuring "sufficient protections for personal privacy," with no indication that transparency to the public was the specific goal of this provision.

Plaintiff cannot compensate for the lack of a cognizable injury relating to the purposes of section 208 by asserting that its inability to review a Privacy Impact Assessment has produced a concrete, information-based injury by causing it to conduct its "oversight and analysis" in a more costly and resource-intensive way.  Pl.'s Opp'n at 12 (citing Decl. of Eleni Kyriakides, ECF No. 39-1).  Plaintiff's declarant asserts that these more "costly and resource-intensive" efforts involved submitting five FOIA requests.  Kyriakides Decl. ¶ 6.  But, as discussed in section B above,

plaintiff's claim that its submission of FOIA requests is "costly" or burdensome rings hollow. Plaintiff admits that it routinely uses FOIA "to obtain information from the government" and "routinely files lawsuits to force disclos[ure] of agency records" in the course of carrying out its mission to educate the public and advocate for privacy interests. The addition of five FOIA requests to the to-do lists of plaintiff's expert FOIA requestors cannot therefore create a sufficient organizational injury to support a finding of informational standing (nor does this same allegation support organizational standing, as discussed in section B above).

Nor does FACA aid plaintiff here. Pl.'s Opp'n at 14. The disclosure provisions of FACA might apply if the Commission had prepared a Privacy Impact Assessment and failed to publish it, but, in the absence of such a document, FACA has no role to play. *See* 5 U.S.C. app. 2 § 10(b) (referencing only documents "made available to or prepared for or by" a committee).

In sum, section 208 of the E-Government Act was designed to protect personal privacy, not to facilitate plaintiff's efforts to educate the public. Notably, section 208 gives the plaintiff (or members of the public generally) no participative role in the Commission's data collection process, or in its development of a Privacy Impact Assessment. Plaintiff's complaint of lack of access to a Privacy Impact Assessment is thus not based on a genuine injury, "but instead reveals a more general interest in the law being followed." *Friends of Animals v. Salazar*, 626 F. Supp. 2d at 113. Such a general interest is insufficient to confer informational standing.

## II.     PLAINTIFF'S E-GOVERNMENT AND FACA CLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

### A.     The Requirements of the E-Government Act Do Not Apply to the President, the Commission, the Director of White House Information Technology, or Any Other Relevant Entity or Official.

In its prior decision, the Court properly concluded that the Presidential Advisory Commission on Election Integrity is an advisory body and not an agency. That conclusion

forecloses plaintiff's claim for two related but independent reasons. First, the substantive requirements on which plaintiff relies apply only to agencies. *See* E-Government Act § 208, 116 Stat. at 2921-22. Second, plaintiff's cause of action is under the Administrative Procedure Act, which also only applies to agency action. *See* 5 U.S.C. § 706. Although the Court expressly addressed only the APA issue, the logic of its decision forecloses plaintiff's arguments under the E-Government Act as well. Most of plaintiff's arguments in its opposition are relevant only to the APA; but plaintiff needs to prevail on both issues to prevail on the merits.

Turning first to the E-Government Act, it is undisputed that the requirements of the E-Government Act apply only to "agenc[ies]." E-Government Act § 208(b), 116 Stat. at 2921-22. The E-Government Act adopts the definition of agency contained in the Paperwork Reduction Act, *see id.* § 201, 116 Stat. at 2910 (adopting definition in 44 U.S.C. § 3502), which, as relevant here, defines "agency" to mean "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 44 U.S.C. § 3502. This definition is materially indistinguishable from the definition that appears in the FOIA, 5 U.S.C. § 552(f)(1).[5] As discussed in defendants' opening brief, the Supreme Court has squarely held that under the FOIA definition, the President and "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist

---

[5] *Compare* 44 U.S.C. § 3502(1) ("the term 'agency' means any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency, but does not include [certain entities not relevant here]"), *with* 5 U.S.C. § 552(f) ("'agency' as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.").

the President are not included within the term 'agency.'" *Kissinger*, 445 U.S. at 156 (quotation

marks omitted).   Entities within the Executive Office of the President may qualify as agencies only

if they exercise "substantial independent authority." *Meyer v. Bush*, 981 F.2d 1288, 1291-92 (D.C.

Cir. 1993).   Since the Commission exercises no "substantial independent authority," it is not an

agency for these purposes.

Plaintiff rests its opposition on the premise that these essentially identical definitions

should be interpreted differently.   *See* Pl.'s Opp'n at 35-37.   As discussed in defendants' opening

brief, Defs.' Mem. at 30-31, this is not so.   The Paperwork Reduction Act, which provides the E-

Government Act's definition, was passed in 1980, after the FOIA was amended to include its

current definition of "agency," which, then, as now, excludes entities within the Executive Office

of the President that do not exercise "substantial independent authority." *Kissinger*, 445 U.S. at

156; *Bush*, 981 F.2d at 1291-92.   "[W]hen judicial interpretations have settled the meaning of an

existing statutory provision, repetition of the same language in a new statute indicates, as a general

matter, the intent to incorporate its judicial interpretations as well." *Merrill Lynch, Pierce, Fenner*

*& Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (alteration and citation omitted).

Plaintiff offers no reason to rebut this intent here.   First, it argues that "the definition of

'agency' in 44 U.S.C. § 3502(1) is clearly different than the definition[] in [5 U.S.C. § 552(f).]   To

begin with, the definition in the [Paperwork Reduction Act] does not include the term 'authority,'

but instead uses the term 'establishment.'" Pl.'s Opp'n at 35.   These two sentences simply do not

follow – both the Paperwork Reduction Act and the FOIA definition incorporated at 5 U.S.C.

§ 552(f) use the identical phrase "other establishment in the executive branch of the Government

(including the Executive Office of the President)."   And as discussed repeatedly, that provision

14

does not include entities, like the Commission, that do not exercise "substantial independent authority."

Second, plaintiff argues that the *Kissinger*'s holding is merely an "atextual gloss on the FOIA," based on that statute's "peculiar and 'unambiguous' legislative history," Pl.'s Opp'n at 35, which was intended "to avoid chilling discussion between the President and his close advisors." *Id.* at 37.   The D.C. Circuit has, however, explicitly rejected the argument that *Kissinger*'s definition of "agency" should be limited only to the FOIA.   As shown in defendants' opening brief, "[t]he Court of Appeals made clear in *Dong v. Smithsonian* that the Privacy Act's definition of 'agency' is to be interpreted coextensively with the term as used in FOIA."   *Alexander v. FBI*, 691 F. Supp. 2d 182, 189 (D.D.C. 2010) (citing *Dong v. Smithsonian Inst.*, 125 F.3d 877, 878-79 (D.C. Cir. 1997)), *aff'd*, 456 F. App'x 1 (D.C. Cir. 2011).   And this definition excludes entities within the White House that do not exercise substantial independent authority.   *Wilson v. Libby*, 535 F.3d 697, 708 (D.C. Cir. 2008).   Plaintiff's argument that the FOIA's legislative history is unique, therefore, is incorrect.   *See Alexander*, 691 F. Supp. 2d at 189 (concluding that its previous belief that "the different purposes of the FOIA and the Privacy Act counseled against extending case law that had exempted EOP components from FOIA disclosure requirements in light of the statute's plain language . . . . is no longer the correct one").   Plaintiff offers no reason why this holding would not apply to the Paperwork Reduction Act, which, like the Privacy Act, shares a materially identical definition to the FOIA.

Applying the consistent definition of "agency" that has been in force since the 1970s, the requirement to conduct a Privacy Impact Assessment has no applicability to the President, who established the Commission (or the Vice President, who chairs the Commission). The requirement also does not apply to the Director of White House Information Technology, whose responsibilities

"amount to providing operational and administrative support services for information technology used by the President, Vice President, and close staff."   Mem. Op. at 31; *see* Presidential Memorandum Establishing the Director of White House Information Technology and the Executive Committee for Presidential Information Technology § 2.a. (the Director is "responsible for the information resources and information systems provided to the President, Vice President, and [Executive Office of the President] by the Presidential Information Technology Community"). As the Court explained, for all relevant purposes, with respect to the Director of White House Information Technology, this case is on all fours with *Citizens for Responsibility and Ethics in Washington v. Office of Administration*, 566 F.3d 219 (D.C. Cir. 2009), in which the D.C. Circuit held that the Office of Administration lacked substantial independent authority because it does not "perform tasks other than operational and administrative support for the President and his staff," *id.* at 224.  *See* Mem. Op. at 31-32.  Plaintiff makes no attempt to distinguish this precedent or take issue with the Court's reasoning.

Plaintiff fares no better in suggesting that the Executive Office of the President, in its entirety, should be considered an agency.  "[I]t has never been thought that the whole Executive Office of the President could be considered a discrete agency under FOIA." *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998).  And the Supreme Court has made clear that even though "[t]he FOIA does render the 'Executive Office of the President' an agency subject to the Act," *Kissinger*, 445 U.S. at 156 (quoting provision now codified at 5 U.S.C. § 552(f)(1)), the statutory definition should not be interpreted to include "units in the Executive Office whose sole function is to advise and assist the President," *id.*

Plaintiff's attempt to characterize the Commission itself as an "agency" fails at every turn. The sole purpose of the Commission is to provide advice.  That is the nature of a typical advisory

committee.   Indeed, the Executive Order that created the Commission specified that the Commission would be "solely advisory."  Exec. Order No. 13,799, § 3, 82 Fed. Reg. 22,389 (May 11, 2017).  The Commission has been vested with no other authority.

This case is far simpler than *Meyer v. Bush*, for example.  In *Meyer*, the court addressed a Task Force on Regulatory Relief that was authorized to provide guidance to the Director of the Office of Management and Budget and to address disagreements between the Office of Management and Budget and other agencies, either by resolving them or by presenting them to the President. 981 F.2d at 1290.  The court assessed the degree to which the Task Force could exercise authority independent of the President, and ultimately concluded that the Task Force did not act with sufficient independence of the President to render it an agency within the meaning of FOIA.  *See id.* at 1294-95.  This case requires the same result because here, the Commission does not exercise *any* authority other than merely to advise the President.  For the same reason, this case presents none of the difficulties that sometimes arise in determining whether an entity within the Executive Office of the President exercises independent authority.  *See Meyer*, 981 F.2d at 1292 (discussing distinction between Council of Economic Advisors, which was not a FOIA agency, and Council on Environmental Quality, which was a FOIA agency because it had authority to perform functions beyond providing advice and assistance to the President).  Plaintiff suggests that the act of data collection transforms an advisory committee into an agency, stating that data collection is not "incidental to [the Commission's] advisory role."  Pl.'s Opp'n at 33.  But the Commission has no role other than advising the President.  It is collecting data in order to be informed to provide such advice, not in furtherance of any other function.

Plaintiff is likewise mistaken in asserting that the Commission is acting "with the force and effect of an agency."  Pl.'s Opp'n at 33.  Plaintiff does not suggest that the Commission was provided

any authority to compel the production of documents or to exercise any other traditional functions of an agency.  Nothing would stop any purely non-governmental entity from making a request to States similar to that made by the Commission; the Commission was not acting pursuant to any grant of independent authority that would render it an agency.  In contrast, in *Energy Research Foundation v. Defense Nuclear Facilities Safety Board*, 917 F.2d 581 (D.C. Cir. 1990), relied on by plaintiff, the Board at issue "ha[d] at its disposal the full panoply of investigative powers commonly held by other agencies of government."  *Id.* at 584. In particular, the Board could "compel testimony, require the production of documents, . . . promulgate its own regulations," and "require the Secretary to report to it classified information and other information protected from disclosure." *Id.* at 582.

**B.      Plaintiff Likewise Fails to Establish a Cause Of Action Under the APA, Which Applies Only to Agencies.**

The APA defines "agency," with certain exceptions not relevant here, as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency."  5 U.S.C. §§ 551(1), 701(b)(1).  The Supreme Court has held that the President, who established the Commission, is not an "agency" for purposes of the APA. *See Franklin v. Massachusetts,* 505 U.S. 788, 800-01 (1992).  The D.C. Circuit has similarly held that "agency," as defined by the APA, does not include entities with "substantial independent authority" separate from their role in "advis[ing] and assist[ing] the President." *Soucie v. David*, 448 F.2d 1067, 1075 (D.C. Cir. 1971).  For the reasons given above, an advisory committee established for the sole purpose of advising the President is likewise not an agency.

In 1971, the definition of agency applicable to the substantive requirements of the APA was also applied to the FOIA.  The D.C. Circuit interpreted that provision in *Soucie v. David*, 448 F.2d at 1067, and concluded that for purposes of the APA and the FOIA, an "agency" was an

"administrative unit with substantial independent authority in the exercise of sufficient functions." *Id.* at 1073; *see* Mem. Op. at 31 n.5 (discussing that history).  In 1974, Congress amended the definition of "agency" that applies to the FOIA, but Congress did not abrogate the D.C. Circuit's holding in *Soucie*; rather, Congress codified the holding.  *See* H.R. Rep. No. 93-1380, at 15; *Kissinger*, 445 U.S. at 156.  And most relevant for present purposes, the 1974 amendments left the APA definition untouched.  This circuit's decision in *Soucie* thus squarely controls the issue of whether an entity can be an agency for purposes of the APA even though it does not exercise substantial independent authority.  In short, the Commission does not qualify as an agency because it is an advisory committee that lacks independent authority, and that principle controls this case.

Plaintiff is mistaken to suggest that the requirement that an agency exercise independent authority does not apply to the definition used for purposes of the APA's judicial-review provisions.  *See* Pl.'s Opp'n at 24, 27.  The APA contains two identical definitions of "agency," one for purposes of the statute's substantive requirements and another for purposes of the judicial-review provisions.  *See* 5 U.S.C. §§ 551(1), 701(b)(1).  Moreover, as plaintiff recognizes, a single definition of "agency" originally governed the entire APA.  *See* Pl.'s Opp'n at 28.  It was subsequently reproduced in two separate subchapters when Title 5 was codified in 1966.  Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 378.  That codification, which was designed to be "without substantive change," H.R. Rep. No. 89-901, at 1 (1965), provides no basis for differentiating between the two definitions.

There is no basis for plaintiff's apparent view that these two identical provisions of the same statute should be interpreted differently, and such an argument runs counter to the rules of statutory interpretation.  *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("identical words used in different parts of the same statute are generally presumed to have the same meaning").  Moreover,

while this presumption may yield "whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent," *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (citation omitted), there is no basis for such a conclusion here. The identical language is used in both provisions to define what entities are subject to APA provisions, without any textual indication that different interpretations should be applied. *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570 (1995).

In arguing against this presumption, plaintiff focuses on the doctrine that "only upon a showing of 'clear and convincing evidence' . . . should the courts restrict access to judicial review." *Abbott Labs v. Gardner*, 387 U.S. 136, 141 (1967); Pl.'s Opp'n at 27. But this requirement applies only to the limitations set out in 5 U.S.C. § 701(a), which discusses exceptions to judicial review. *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (contextualizing "clear and convincing" requirement in the context of § 701(a)); *see also Filebark v. U.S. Dep't of Transp.*, 542 F. Supp. 2d 1, 6 (D.D.C. 2008). It does not apply to section *701(b)*, which contains the definition of "agency." Said differently, while there is a presumption that agency action is reviewable, there is no presumption that a given entity is an "agency" as defined under the APA. The "clear and convincing" doctrine has no application here.

Plaintiff's remaining arguments fall short. It first relies on *United States v. Espy* for the proposition that "agency" can be broadly defined outside the FOIA context. Pl.'s Opp'n at 27. But that case involved two *substantively* different definitions of agency, one in Title 18 and one in Title 5, and concluded that an interpretation given to the Title 5 definition would not apply to the Title 18 definition. 145 F.3d at 1373. This is a different issue altogether from the question of whether the interpretation that the D.C. Circuit applied to 5 U.S.C. § 551 in *Soucie* also applies to

20

the identically phrased definition in the same statute.  Plaintiff also cites this Circuit's decision in *Armstrong v. Bush*, 924 F.2d 282, 291 (D.C. Cir. 1991) for the argument that there is APA review of certain aspects of the National Security Council ("NSC").  Pl.'s Opp'n at 26.  But that case considered whether judicial review was precluded by 5 U.SC. § 701(a), it did not consider whether the NSC was an "agency" under section 701(b).  And, indeed, the D.C. Circuit later held that the NSC was not an agency for purposes of the FOIA, *Armstrong v. Executive Office of the President*, 90 F.3d 553 (D.C. Cir. 1996), which, as has been discussed previously, uses the same *Soucie* definition of "substantial independent authority."[6]

### C.    The Commission Is Not Required to Use GSA (an Agency) for Data Storage.

Plaintiff correctly notes that the Executive Order contemplates that GSA will provide support services for the commission.  *See* Exec. Order No. 13,799, § 7(a) (stating that GSA will "provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission").  On this basis, plaintiff argues that GSA has a "mandatory, nondiscretionary duty" to facilitate the collection and storage of any data the Commission obtains, and points out that, as an agency, GSA would be required to complete a Privacy Impact Assessment before such collection.  Pl.'s Opp'n at 37-38.  But, while the Executive Order authorizes the Commission to use GSA as "may be necessary," the Order does not make the GSA the *exclusive* source of support for the Commission or purport to preclude the

---

[6]    In addition, plaintiff relies (Opp'n at 29) on cases in which there were multiple defendants, some of which were indisputably agencies, so the question of the status of the other defendants in those cases was not discussed.  *See Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) (Archivist of the United States was a defendant); *Citizens for Responsibility & Ethics in Wash. v. Executive Office of the President*, 587 F. Supp. 2d 48 (D.D.C. 2008) (National Archives and Records Administration and Archivist were defendants); *Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 724 F. Supp. 1013 (D.D.C. 1989) (Commissioner of the Food and Drug Administration and Department of Health and Human Services were defendants).

Commission from relying on other entities, such as the White House staff, in collecting and storing data. There is thus no plausible legal theory that would *require* GSA to provide support for the Commission's data collection and, unsurprisingly, plaintiff cites no support for this contention.

## III.   PLAINTIFF FAILS TO STATE A VIABLE CONSTITUTIONAL CLAIM.

Defendants previously argued that the Court lacked standing to address plaintiff's constitutional claims because plaintiff has failed to identify a single individual whose data has been or will be transmitted from a state to the Commission. Plaintiff has now identified three Advisory Board members who are registered voters in states that may be transmitting some data to the Commission (New Jersey, Rhode Island, and Texas). *See* Peel, Nissenbaum, Smith Decls., ECF Nos. 52-2, 52-3, 52-4. However, even assuming plaintiff has surmounted the threshold standing requirements of Article III, it has still failed to state a plausible claim upon which relief can be granted, and dismissal is therefore warranted under Rule 12(b)(6).

### A.   There is No Constitutional Right to Informational Privacy in Publicly Available Voter Information

Whatever the contours of a constitutional right to informational privacy (and defendants maintain there is no such right), it would not extend to the federal government's collection of data *that is already publicly available from the states*. As defendant explained previously, in requesting voter roll data from the states, Vice Chair Kobach specified that the states were to send only that data that is publicly available under state law. *See* Letters from Kris W. Kobach, Vice Chair, Presidential Advisory Comm'n on Election Integrity, to various state government officials (July 26, 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/letter-vice-chair-kris-kobach-07262017.pdf. Mr. Kobach explained that the Commission was therefore requesting only that information that the states "regularly provide to political candidates, journalists, and other interested members of the public." *Id.*

The states in which the identified Advisory Board members are registered to vote appear to be abiding by this instruction.  Specifically, New Jersey has stated that it will be providing publicly available information "consistent with" its Open Public Records Act, which will be "limited generally to the registrant's name, address, date of birth, political party affiliation, and voting history."  Letter from Robert Giles, Director, N.J. Div. of Elections, to Kris W. Kobach, Vice Chair, Presidential Advisory Comm'n on Election Integrity (Aug. 16, 2017), https://www.scribd.com/document/356669129/Giles-Voter-Data-Letter-Aug-18-2017. The Texas Secretary of State has said that it "will provide the Election Integrity Commission with public information and will protect the private information of Texas citizens."  Lauren McGaughy, *Texas Won't Release Private Voter Info to Trump Administration*, Dallas News (June 30, 2017), https://www.dallasnews.com/news/elections/2017/06/30/texas-will-releasevoters-private-info-trump-election-commission (last visited Sept. 25, 2017).  The Rhode Island Secretary of State announced that she "will safeguard the privacy of Rhode Island voters . . . and respond only with data that is already publicly available.  [She] will not release social security information or any information that was requested by Secretary Kobach regarding felony status, military status, or overseas citizen information."  *Raimondo: R.I. Will Not Supply Data Requested by Trump after Voter Fraud Commission*, Providence Journal (June 30, 2017), http://www.providencejournal.com/news/20170630/raimondo-ri-will-not-supply-data-requested-by-trump-voter-fraud-commission (last visited Sept. 25, 2017).

Accordingly, because the information the states intend to transfer to the Commission is publicly available, plaintiff's members have no valid expectation of privacy in such information. In contrast, in *United States Department of Justice v. Reporters Committee for Freedom of thw Press*, 489 U.S. 749, 763-64 (1989), the Supreme Court found "a strong privacy interest" because

the information at issue was not "freely available." (And, as noted earlier, *Reporters Committee* made clear that it was only deciding the issue under the FOIA, it was not deciding "whether an individual's interest in privacy is protected by the Constitution." *Id.* at 762 n.13). *See also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-495 (1975) ("[E]ven the prevailing law of invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record."); *Scheetz v. The Morning Call, Inc.*, 946 F.2d 202, 207 (3rd Cir. 1991). Plaintiff nevertheless suggests that voters have some sort of expectation of privacy because they intend that the information they provide when they register to vote be used only "to the extent necessary for the state to administer its elections." Pl.'s Opp'n at 40. But voters cannot insist on, or expect, privacy of information a state is required to make publicly available under state and federal law. Indeed, Rhode Island's website advises that "[a]ll of the information on a voter registration form is public record except driver's license and social security numbers," with "an exception for victims of domestic violence or voters living with victims of domestic violence." Voter Registration, http://sos.ri.gov/divisions/elections/Voters/voter-registration (last visited Sept. 25, 2017). Plaintiff's members can have no expectation of privacy in such information, and for this reason cannot state a viable claim that their constitutional right to privacy, even if such a right exists (which it does not), has been violated.

### B.   Advisory Board Members' Procedural Due Process Rights Are Not Implicated

Plaintiff's procedural due process claim fares no better. Plaintiff complains that its Advisory Board members' due process rights have been violated by the Commission's collection of information without adequate safeguards. Plaintiff's argument relies exclusively on the claim that it has a protected liberty interest in its "members' right to informational privacy in their personal information." Pl.'s Opp'n at 43. But as discussed above and in defendants' opening

memorandum, plaintiff has failed to show how a request for publicly available information violates an individual's right to informational privacy.  Accordingly, without a defining a cognizable liberty interest, plaintiff's procedural due process claim necessarily fails.

### CONCLUSION

For the foregoing reasons and the reasons stated in defendants' opening memorandum, the Court should dismiss plaintiff's Second Amended Complaint.

Dated:  September 26, 2017

<div style="margin-left: 40%;">

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Carol Federighi*
CAROL FEDERIGHI
Senior Trial Counsel
KRISTINA A. WOLFE
JOSEPH E. BORSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 514-1903
Email: carol.federighi@usdoj.gov

*Counsel for Defendants*

</div>