**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ELECTRONIC PRIVACY INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009

     Plaintiff,

     v.                                          Civ. Action No. 17-1320 (CKK)

PRESIDENTIAL ADVISORY COMMISSION ON
ELECTION INTEGRITY; MICHAEL PENCE, in his
official capacity as Chair of the Presidential Advisory
Commission on Election Integrity; KRIS KOBACH, in his
official capacity as Vice Chair of the Presidential Advisory
Commission on Election Integrity; CHARLES C.
HERNDON, in his official capacity as Director of White
House Information Technology; EXECUTIVE OFFICE
OF THE PRESIDENT OF THE UNITED STATES;
OFFICE OF THE VICE PRESIDENT OF THE UNITED
STATES; EXECUTIVE COMMITTEE FOR
PRESIDENTIAL INFORMATION TECHNOLOGY;
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

GENERAL SERVICES ADMINISTRATION; M.
VIRGINIA WILLS, in her official capacity as Committee
Management Officer of the General Services
Administration and Presidential Advisory Commission on
Election Integrity;
1800 F Street, N.W.
Washington, D.C. 20405

     Defendants.

**THIRD AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

1.     This is an action under the Administrative Procedure Act ("APA"); 5 U.S.C. §§ 551–706,

the Federal Advisory Committee Act ("FACA"); 5 U.S.C. app. 2, the Mandamus and Venue Act,

28 U.S.C. § 1361; the Declaratory Judgment Act, 28 U.S.C. § 2201(a); and the United States

Constitution for injunctive and other appropriate relief to halt the collection of state voter data by

the Presidential Advisory Commission on Election Integrity (the "PACEI" or the

"Commission"), by officers of the Commission, and by the agencies which oversee and facilitate

the activities of the Commission, including the Department of Defense.

2.      The Electronic Privacy Information Center ("EPIC") challenges the Defendants' intent to

collect the personal data of millions of registered voters and to publish partial SSNs as an

unconstitutional invasion of privacy and a violation of the obligation to conduct a Privacy Impact

Assessment ("PIA").

## Jurisdiction and Venue

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 5

U.S.C. § 702, and 5 U.S.C. § 704. This Court has personal jurisdiction over Defendants.

4.      Venue is proper in this district under 5 U.S.C. § 703 and 28 U.S.C. § 1391.

## Parties

5.      Plaintiff EPIC is a nonprofit organization incorporated in Washington, D.C., and

established in 1994 to focus public attention on emerging privacy and civil liberties issues.

Central to EPIC's mission is oversight and analysis of government activities. EPIC's Advisory

Board members include distinguished experts in law, technology, public policy, and

cybersecurity who participate actively in EPIC's work, support the organization, and derive

benefit from their participation in the organization. Second Decl. by Marc Rotenberg, ECF No.

52-1. EPIC has a long history of working to protect voter privacy and the security of election

infrastructure. EPIC has specific expertise regarding the misuse of the Social Security Number

("SSN") and has sought stronger protections for the SSN for more than two decades.

6.      EPIC's Members include registered voters in California, the District of Columbia, Florida, Maryland, Massachusetts, Minnesota, New Jersey, New York, Pennsylvania, Rhode Island, Texas, and Washington.

7.      Defendant PACEI is an advisory committee of the U.S. government within the meaning of FACA, 5 U.S.C. app. 2 § 10. Defendant PACEI is also an agency within the meaning of 44 U.S.C. § 3502 and the APA, 5 U.S.C. § 701.

8.      Defendant Michael Pence is the Vice President of the United States and the Chair of the PACEI.

9.      Defendant Kris Kobach is the Secretary of State of Kansas and the Vice Chair of the PACEI.

10.     Defendant Charles C. Herndon is the Director of White House Information Technology.

11.     Defendant Executive Office of the President of the United States ("EOP") is an agency within the meaning of 44 U.S.C. § 3502 and the APA, 5 U.S.C. § 701.

12.     Defendant Executive Committee for Presidential Information Technology consists of the following officials or their designees: the Assistant to the President for Management and Administration; the Executive Secretary of the National Security Council; the Director of the Office of Administration; the Director of the United States Secret Services; and the Director of the White House Military Office. The Executive Committee is an agency within the meaning of 44 U.S.C. § 3502 and the APA, 5 U.S.C. § 701.

13.     Defendant Office of the Vice President of the United States ("OVP") is a subcomponent of EOP and an agency within the meaning of 44 U.S.C. § 3502 and the APA, 5 U.S.C. § 701.

14.     Defendant General Services Administration ("GSA") is an agency within the meaning of 44 U.S.C. § 3502 and the APA, 5 U.S.C. § 701. The PACEI is part of, and under the control of, the GSA.

15.     Defendant M. Virginia Wills is the Committee Management Officer of the GSA and of the PACEI.[1]

### Facts

### The Commission's Unprecedented Collection of State Voter Data

16.     The Commission was established by Executive Order on May 11, 2017 ("Commission Order"). Ex 1.[2]

17.     The Commission is charged with "study[ing] the registration and voting processes used in Federal elections." Ex. 1.[3] The Commission Order contains no authority to gather personal data or to undertake investigations.[4]

18.     On June 28, 2017, the Vice Chair of the Commission undertook to collect detailed voter histories from all fifty states and the District of Columbia. Such a request had never been made by any federal official in the history of the country. The Vice Chair stated during a phone call with Commission members that "a letter w[ould] be sent today to the 50 states and District of

---

[1] *See General Services Administration*, FACA Database, https://www.facadatabase.gov/agency/agency.aspx?aid=74 (last visited Oct. 12, 2017); *FACA Members Report*, FACA Database, https://www.facadatabase.gov/rpt/membersbyagency.asp (specify "GSA" in the "Choose Agency" field; toggle "Name" under "Sort on"; click the "Members By Agency or Group" button; then scroll to the far right of the resulting page, where Ms. Wills is listed at the Commission's CMO) (last visited Oct. 12, 2017).
[2] 82 Fed. Reg. at 22,389; *see also Voter Privacy and the PACEI*, EPIC.org (June 30, 2017), https://epic.org/privacy/voting/pacei/.
[3] 82 Fed. Reg. at 22,389.
[4] *See generally id.*

Columbia on behalf of the Commission requesting publicly-available data from state voter rolls .
. . ." Ex. 2.[5]

19.     According to the U.S. Census, state voter rolls include the names, addresses, and other

personally identifiable information of at least 157 million registered voters.[6]

20.     One of the letters from the Commission, dated June 28, 2017, was sent to North Carolina

Secretary of State Elaine Marshall. Ex. 3.[7]

21.     In the letter ("Commission Letter"), the Vice Chair urged the Secretary of State to

provide to the Commission the "full first and last names of all registrants, middle names or

initials if available, addresses, dates of birth, political party (if recorded in your state), last four

digits of social security number if available, voter history (elections voted in) from 2006 onward,

active/inactive status, cancelled status, information regarding any felony convictions,

information regarding voter registration in another state, information regarding military status,

and overseas citizen information." Ex. 3.[8]

22.     The Commission Letter also asked "[w]hat evidence or information [the state had]

regarding instances of voter fraud or registration fraud" and "[w]hat convictions for election-

related crimes ha[d] occurred in [the] state since the November 2000 federal election." Ex. 3.[9]

23.     The Commission Letter stated that "any documents that are submitted to the full

Commission w[ould] also be made available to the public." Ex. 3.[10]

---

[5] Press Release, Office of the Vice President, Readout of the Vice President's Call with the
Presidential Advisory Commission on Election Integrity (June 28, 2017).
[6] U.S. Census Bureau, *Voting and Registration in the Election of November 2016* at tbl. 4a (May
2017), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-
580.html.
[7] Letter from Kris Kobach, Vice Chair, PACEI, to Elaine Marshall, Secretary of State, North
Carolina (June 28, 2017).
[8] *Id.* at 1–2.
[9] *Id.* at 1.

24.     The Commission asked for a response by July 14, 2017. Ex. 3.[11] The "SAFE" URL,

recommend by the Commission for the submission of voter data, leads election officials to a non-

secure site. Regarding this website, Google Chrome states: "Your connection is not private.

Attackers may be trying to steal your information from [the site proposed by the Commission]

(for example, passwords, messages, or credit cards)." Ex. 4.[12]

25.     As of July 7, 2017, the Department of Defense had received voter data from at least one

state, Arkansas, in the SAFE system.

26.     According to representations made by the Commission on July 10, 2017, the Commission

sent a "Follow-up Communication" to the States requesting that the States not submit any data

until this Court had ruled on EPIC's motion for a temporary restraining order.

27.     On July 10, 2017, the Commission also stated that it would not send further instructions

about how to use the new system pending the Court's resolution of EPIC's motion for a

temporary restraining order.

28.     On July 10, 2017, the Commission also stated that it would not download the data that

Arkansas had already transmitted via the DoD system, and that the data would be deleted from

the site. There has been no confirmation that the data has been deleted.

29.     According to representations made by the Commission, the Director of White House

Information Technology has "repurpos[ed]" a computer system to be used for collecting personal

voter data.

---

[10] *Id.* at 2.
[11] *Id.*
[12] Screenshot: Google Chrome Security Warning for Safe Access File Exchange ("SAFE") Site (July 3, 2017 12:02 AM).

30.     On July 26, 2017, following this Court's ruling on EPIC's motion for a temporary restraining order and preliminary injunction, the Commission sent a letter to the States renewing the request for state voter data.

31.     As of September 29, 2017, the Commission had collected personal voter data from at least nineteen states (Alaska, Arkansas, Colorado, Florida, Idaho, Iowa, Kansas, Missouri, Montana, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Washington state, and West Virginia) and one county (Kauai County, Hawaii).

32.     On July 31, 2017, Vice Chair Kris Kobach also received a letter from Lindsey Aston, General Counsel for the Texas Secretary of State, "containing instructions to request [voter] information from Texas databases."[13]

The General Services Administration's Control Over the Commission

33.     The Commission is part of and subject to the Control of the General Services Administration.[14]

34.     The Executive Order provides that the GSA "shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis" and perform "any functions of the President under [the FACA], except for those in section 6 of the Act[.]"[15]

35.     The Commission Charter designates the GSA as the "Agency Responsible for Providing Support," and similarly orders that the GSA "shall provide the Commission with such

---

[13] Document Index 7, *Lawyers' Comm. for Civil Rights Under Law,* No. 17-1354 (D.D.C. filed Sep. 29, 2017).
[14] *See, e.g.*, *General Services Administration – Committee List*, FACA Database, https://www.facadatabase.gov/committee/committees.aspx?aid=74 (last visited Oct. 12, 2017).
[15] 82 Fed. Reg. at 22,390.

administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis."[16]

36.      There is no authority in the Executive Order of the Commission Charter for any other entity to provide "administrative services," "facilities," or "equipment" to "carry out [the Commission's] mission."

37.      The Commission is under the legal authority of M. Virginia Wills, the Committee Management Officer ("CMO") employed by the GSA. Ms. Wills "must . . . exercise control and supervision over the establishment, procedures, and accomplishments" of any advisory committee for which she has been designated, including the Commission.[17]

38.      The GSA Administrator—the head of the GSA—has designated Ms. Wills as the CMO of both the GSA and the Commission. Moreover, Ms. Wills is subject to the control of the GSA Administrator and must "carry out all responsibilities delegated [to her] by [the GSA Administrator]."[18]

39.      Ms. Wills has in fact performed the functions of a CMO with respect to the Commission, including maintaining documents provided to the Commission and updating key records about the Commission.

40.      The GSA and the Commission both identify Ms. Wills as the Commission's CMO, including in official documents on file with the GSA.

[16] Charter, Presidential Advisory Commission on Election Integrity ¶ 6.
[17] 5 U.S.C. app. 2 § 8(b).
[18] 41 C.F.R. §102-3.115.

41.    The GSA Administrator also designated the Commission's Designated Federal Officer

("DFO") under 41 CFR § 102-3.105—a power reserved to "[t]he head of each agency that

establishes or utilizes" an advisory committee.[19]

42.    The Commission's DFO, Andrew J. Kossack, exercises authority over the Commission.

43.    The Commission's DFO is affiliated with the GSA and reports to CMO M. Virginia

Wills and the GSA Administrator.

44.    The GSA filed the Commission's Charter, a power reserved exclusively to "the

Committee Management Officer (CMO) designated in accordance with section 8(b) of the Act,

or . . . another agency official designated by the agency head."[20]

45.    Since June 2017, the GSA has published all five Federal Register notices filed on the

Commission's behalf.

46.    The GSA, which is an agency within the meaning of 44 U.S.C. § 3502 and the APA, 5

U.S.C. § 70, routinely conducts and publishes Privacy Impact Assessments when it collects,

maintains, and uses personal information on individuals.[21]

<u>Many States Oppose the Commission's Demand for Personal Voter Data</u>

47.    In less than three days following the release of the Commission Letter, election officials

in twenty-four states said that they would oppose, partially or fully, the demand for personal

voter data.[22]

---

[19] 41 C.F.R. § 102-3.105.

[20] 41 C.F.R. § 102-3.70.

[21] *Privacy Impact Assessments*, GSA (Apr. 13, 2017),
https://www.gsa.gov/portal/content/102237.

[22] Philip Bump & Christopher Ingraham, *Trump Says States Are 'Trying to Hide' Things from His Voter Fraud Commission. Here's What They Actually Say*, Wash. Post (July 1, 2017),
https://www.washingtonpost.com/news/wonk/wp/2017/07/01/trump-says-states-are-trying-to-hide-things-from-his-voter-fraud-commission-heres-what-they-actually-say/.

48.     California Secretary of State Alex Padilla stated that he would "not provide sensitive voter information to a committee that has already inaccurately passed judgment that millions of Californians voted illegally. California's participation would only serve to legitimize the false and already debunked claims of massive voter fraud."[23]

49.     Kentucky Secretary of State Alison Lundergan Grimes stated that "Kentucky w[ould] not aid a commission that is at best a waste of taxpayer money and at worst an attempt to legitimize voter suppression efforts across the country."[24]

50.     Virginia Governor Terry McAuliffe stated that he had "no intention of honoring [Kobach's] request."[25]

51.     More than fifty experts in voting technology and twenty privacy organizations wrote to state election officials to warn that "[t]here is no indication how the information will be used, who will have access to it, or what safeguards will be established."[26]

### Failure to Conduct a Privacy Impact Assessment

52.     Under the E-Government Act of 2002,[27] any agency "initiating a new collection of information that (I) will be collected, maintained, or disseminated using information technology; and (II) includes any information in an identifiable form permitting the physical or online

---

[23] Press Release, Secretary of State Alex Padilla Responds to Presidential Election Commission Request for Personal Data of California Voters (June 29, 2017), http://www.sos.ca.gov/administration/news-releases-and-advisories/2017-news-releases-and-advisories/secretary-state-alex-padilla-responds-presidential-election-commission-request-personal-data-california-voters/.

[24] Bradford Queen, Secretary Grimes Statement on Presidential Election Commission's Request for Voters' Personal Information, Kentucky (last accessed July 3, 2017) http://kentucky.gov/Pages/Activity-stream.aspx?n=SOS&prId=129.

[25] Terry McAuliffe, *Governor McAuliffe Statement on Request from Trump Elections Commission* (June 29, 2017), https://governor.virginia.gov/newsroom/newsarticle?articleId=20595.

[26] Letter from EPIC et al. to Nat'l Ass'n of State Sec'ys (July 3, 2017), https://epic.org/privacy/voting/pacei/Voter-Privacy-letter-to-NASS-07032017.pdf.

[27] Pub. L. 107–347, 116 Stat. 2899 (codified as amended at 44 U.S.C. § 3501 note).

contacting of a specific individual" is required to complete a Privacy Impact Assessment ("PIA")

<u>before</u> initiating such collection.[28]

53.     The agency must "(i) conduct a privacy impact assessment; (ii) ensure the review of the

privacy impact assessment by the Chief Information Officer, or equivalent official, as determined

by the head of the agency; and (iii) if practicable, after completion of the review under clause

(ii), make the privacy impact assessment publicly available through the website of the agency,

publication in the Federal Register, or other means."[29]

54.     The Commission is an agency subject to the E-Government Act because it is an

"establishment in the executive branch of the Government."[30]

55.     The Commission has conceded that it is an agency by asserting record disclosure

exemptions under the Freedom of Information Act that are reserved strictly for agencies.[31]

56.     The Commission has conceded that it is an agency by admitting that the Commission's

work is not limited to the sole function of providing advice to the President.[32]

57.     The Executive Office of the President is an agency subject to the E-Government Act.

58.     The U.S. Digital Service is an agency subject to the E-Government Act.

59.     The Director of White House Information Technology is subject to the E-Government

Act.

---

[28] 44 U.S.C. § 3501 note ("Privacy Impact Assessments").

[29] *Id.*

[30] 44 U.S.C. § 3502(1).

[31] *See* Third Decl. of Andrew J. Kossack ¶ 11, *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1354 (D.D.C. filed Sep. 29, 2017); 5 U.S.C. § 552(a), (f)(1).

[32] *See* Third Decl. of Andrew J. Kossack ¶ 3, *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1354 (D.D.C. filed Sep. 29, 2017) (asserting that some components of the Commission "do not advise the President directly").

60.     The Director of White House Information Technology was established in 2015 and has

"the primary authority to establish and coordinate the necessary policies and procedures for

operating and maintaining the information resources and information systems provided to the

President, Vice President, and EOP."[33] This authority includes:

> providing "policy coordination and guidance for, and periodically review[ing], all
> activities relating to the information resources and information systems provided
> to the President, Vice President, and EOP by the Community, including
> expenditures for, and procurement of, information resources and information
> systems by the Community. Such activities shall be subject to the Director's
> coordination, guidance, and review in order to ensure consistency with the
> Director's strategy and to strengthen the quality of the Community's decisions
> through integrated analysis, planning, budgeting, and evaluating process.[34]

The Director may also "advise and confer with appropriate executive departments and agencies,

individuals, and other entities as necessary to perform the Director's duties under this

memorandum."[35]

61.     The Director has the independent authority to oversee and "provide the necessary advice,

coordination, and guidance to" the Executive Committee for Presidential Information

Technology, which "consists of the following officials or their designees: the Assistant to the

President for Management and Administration; the Executive Secretary of the National Security

Council; the Director of the Office of Administration; the Director of the United States Secret

Service; and the Director of the White House Military Office."[36]

62.     A Privacy Impact Assessment for a "new collection of information" must be

"commensurate with the size of the information system being assessed, the sensitivity of

information that is in an identifiable form in that system, and the risk of harm from unauthorized

---

[33] Memorandum on Establishing the Director of White House Information Technology and the
Executive Committee for Presidential Information Technology § 1, 2015 Daily Comp. Pres. Doc.
185 (Mar. 19, 2015), attached as Ex. 5.
[34] *Id.* § 2(c).
[35] *Id.* § 2(d).
[36] *Id.* § 3.

release of that information."[37] The PIA must specifically address "(I) what information is to be collected; (II) why the information is being collected; (III) the intended use of the agency of the information; (IV) with whom the information will be shared; (V) what notice or opportunities for consent would be provided to individuals regarding what information is collected and how that information is shared; [and] (VI) how the information will be secured . . . ."[38]

63.     Under the FACA, "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by [an] advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist."[39]

64.     None of the Defendants have conducted a Privacy Impact Assessment for the Commission's collection of state voter data.

65.     None of the Defendants have ensured review of a PIA by any Chief Information Officer or equivalent official.

66.     The Commission has not published a PIA or made such an assessment available for public inspection.

The DoD's Privacy Impact Assessment Does Not Permit
the Collection of Personal Information from The General Public

67.     The DoD last approved a PIA for the Safe Access File Exchange system in 2015.[40]

68.     The 2015 PIA indicates that the SAFE system may "collect, maintain, use and/or disseminate PII" about only "federal personnel and/or federal contractors."[41]

---

[37] 44 U.S.C. § 3501 note ("Privacy Impact Assessments").
[38] *Id.*
[39] 5 U.S.C. app. 2 § 10(b).
[40] Army Chief Information Officer, U.S. Dep't of Def., *Privacy Impact Assessments* (April 27, 2016), http://ciog6.army.mil/PrivacyImpactAssessments/tabid/71/Default.aspx.

69.     The 2015 PIA specifically indicates that the SAFE system may <u>not</u> be used to "collect,

maintain, use and/or disseminate PII" from "members of the general public."[42]

70.     According to the 2015 PIA, the SAFE system may not be used to collect the data set out

in the June 28, 2017, from Vice Chair Kobach, directing state election officials to provide voter

roll data.

71.     The DoD has not issued a PIA for the collection of personal data from the general public.

72.     The DoD has not issued a PIA that would permit the receipt of data specified in the June

28, 2017, Kobach letter.

## Count I

### Violation of APA: Unlawful Agency Action

73.     Plaintiff asserts and incorporates by reference paragraphs 1–72.

74.     Defendants' collection of state voter data prior to creating, reviewing, and publishing a

Privacy Impact Assessment, 44 U.S.C. § 3501 note, is arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(a) and short of

statutory right under 5 U.S.C. § 706(2)(c).

75.     Defendants' decision to initiate collection of voter data is a final agency action within the

meaning of 5 U.S.C. § 704.

76.     Plaintiff, by itself and as a representative of its members, is adversely affected and

aggrieved by Defendants' actions.

77.     Plaintiff has exhausted all applicable administrative remedies.

## Count II

### Violation of APA: Agency Action Unlawfully Withheld

---

[41] EPIC Supp. Ex. 5, ECF No. 20-1, at 1.
[42] EPIC Supp. Ex. 5, ECF No. 20-1, at 1.

78.     Plaintiff asserts and incorporates by reference paragraphs 1–72.

79.     Defendants have failed to create, review, and/or publish a privacy impact assessment for Defendants' collection of voter data, as required by 44 U.S.C. § 3501 note and 5 U.S.C. app. 2 § 10(b).

80.     Defendants' failure to take these steps constitutes agency action unlawfully withheld or unreasonably delayed in violation of 5 U.S.C. § 706(1).

81.     Plaintiff, by itself and as a representative of its members, is adversely affected and aggrieved by Defendants' actions and inaction.

82.     Plaintiff has exhausted all applicable administrative remedies.

## Count III

**Violation of FACA: Failure to Make Documents Available for Public Inspection**

83.     Plaintiff asserts and incorporates by reference paragraphs 1–72.

84.     Defendants have failed to make available for public inspection a privacy impact assessment for the collection of voter data.

85.     Defendants' failure to make available for public inspection a PIA required by law is a violation of 5 U.S.C. app. 2 § 10(b).

86.     Plaintiff, by itself and as a representative of its members, is adversely affected and aggrieved by Defendants' actions and inaction.

87.     Plaintiff has exhausted all applicable administrative remedies.

## Count IV

**Violation of Fifth Amendment: Substantive Due Process/Right to Informational Privacy**

88.     Plaintiff asserts and incorporates by reference paragraphs 1–72.

89.     Defendants, by seeking to assemble an unnecessary and excessive federal database of

sensitive voter data from state records systems, have violated the informational privacy rights of

millions of Americans, including members of the EPIC Advisory Board, guaranteed by the Due

Process Clause of the Fifth Amendment. *See* U.S. Const. amend. V; *NASA v. Nelson*, 562 U.S.

134, 138 (2011); *Nixon v. Administrator of General Services*, 433 U.S. 425, 457 (1977); *Whalen

v. Roe*, 429 U.S. 589, 599–600 (1977).

90.     Plaintiff, as a representative of its members, is adversely affected and aggrieved by

Defendants' actions.

## Count V

### Violation of Fifth Amendment: Procedural Due Process

91.     Plaintiff asserts and incorporates by reference paragraphs 1–72.

92.     Defendants, by seeking to assemble an unnecessary and excessive federal database of

sensitive voter data from state records systems, have deprived EPIC's members of their liberty

interest in avoiding the disclosure of personal matters. U.S. Const. amend. V; *NASA v. Nelson*,

562 U.S. 134, 138 (2011); *Nixon v. Administrator of General Services*, 433 U.S. 425, 457

(1977); *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977).

93.     Defendants have done so without providing notice to EPIC's members, without providing

EPIC's members an opportunity to challenge the collection of their personal data, and without

providing for a neutral decisionmaker to decide on any such challenges brought by EPIC's

members.

94.     Defendants have violated EPIC's members Fifth Amendment right to due process of law.

U.S. Const. amend. V.

95.     Plaintiff, as a representative of its members, is adversely affected and aggrieved by

Defendants' actions and inaction.

## Count VI

### Claim in the Alternative: Relief in the Nature of Mandamus

96.     Plaintiff asserts and incorporates by reference paragraphs 1–72.

97.     Plaintiff, in the alternative to the claims set forth in Counts I-III, is entitled to a writ of

mandamus compelling Defendants to create, review, and/or publish a privacy impact assessment

for Defendants' collection of voter data prior to the transfer of any personally identifiable

information, as required by 44 U.S.C. § 3501 note and 5 U.S.C. app. 2 § 10(b).

98.     Should relief be unavailable under Counts I-III, Plaintiff will have no adequate remedy at

law.

## Count VII

### Claim for Declaratory Relief

99.     Plaintiff asserts and incorporates by reference paragraphs 1–72.

100.    Plaintiff is entitled under 28 U.S.C. § 2201(a) to a declaration of the rights and other legal

relations of the parties with respect to the claims set forth in Counts I-VI.

## Requested Relief

WHEREFORE, Plaintiff requests that this Court:

   A.  Hold unlawful and set aside Defendants' authority to collect personal voter data from the

       states;

   B.  Order Defendants to halt collection of personal voter data;

   C.  Order Defendants to securely delete and properly disgorge any personal voter data

       collected or subsequently received;

D.  Order Defendants to promptly conduct and disclose a privacy impact assessment prior to

the collection of personal voter data;

E.  Award EPIC costs and reasonable attorney's fees incurred in this action; and

F.  Grant such other relief as the Court may deem just and proper.

Respectfully Submitted,

/s/ Marc Rotenberg
MARC ROTENBERG, D.C. Bar # 422825
EPIC President and Executive Director

ALAN BUTLER, D.C. Bar # 1012128
EPIC Senior Counsel

CAITRIONA FITZGERALD*
EPIC Policy Director

JERAMIE D. SCOTT, D.C. Bar # 1025909
EPIC Domestic Surveillance Project
Director

ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*

Dated: October 12, 2017                           * *Pro hac vice motion pending*