**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER<br><br>    Plaintiff,<br><br>    v.<br><br>PRESIDENTIAL ADVISORY COMMISSION ON<br>ELECTION INTEGRITY, et al.<br><br>    Defendants. | Civ. Action No. 17-1320 (CKK) |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE A THIRD
AMENDED COMPLAINT**

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................................................6

*Byrd v. EPA,*
174 F.3d 239 (D.C. Cir. 1999) ...............................................................................4

*Council on American-Islamic Relations Action Network, Inc. v. Gaubatz,*
891 F. Supp. 2d 13 (D.D.C. 2012) ................................................................1, 9, 11

*Ctr. for Biological Diversity v. Tidwell,*
239 F. Supp. 3d 213 (D.D.C. 2017) ........................................................................6

*Kuzma v. U.S. Postal Serv.,*
798 F.2d 29 (2d Cir. 1986)....................................................................................10

*Meyer v. Bush,*
981 F.2d 1288 (D.C. Cir. 1993) ..........................................................................5, 6

*Nat'l Treasury Emps. Union v. Nixon,*
492 F.2d 587 (D.C. Cir. 1974) ..............................................................................10

*NRDC v. Johnson,*
488 F.3d 1002 (D.C. Cir. 2007) ..............................................................................8

*Shane v. Buck,*
658 F. Supp. 908 (D. Utah 1985)...........................................................................11

*Williams v. Lew,*
819 F.3d 466 (D.C. Cir. 2016) ................................................................................9

**Statutes**

44 U.S.C. § 3501...................................................................................................11

44 U.S.C. § 3502(1) ..............................................................................................10

5 U.S.C. § 552(b) ....................................................................................................8

5 U.S.C. § 552(f).....................................................................................................8

5 U.S.C. §§ 701 *et seq.*...........................................................................................6

All Writs Act, 28 U.S.C. § 1651(a)..........................................................................9

E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (codified at 44 U.S.C. § 3501
note) .......................................................................................................................6

Federal Advisory Committee Act, Pub. L. 92–463, 86 Stat. 770 (1972) (codified as amended
at 5 U.S.C. app. 2).

5 U.S.C. app. 2 § 10(b) ....................................................................................7

5 U.S.C. app. 2 § 10(e).....................................................................................3

5 U.S.C. app. 2 § 15(b) ....................................................................................8

5 U.S.C. app. 2 § 8(b)...................................................................................4, 5

5 U.S.C. app. 2 § 8(b)(1)..................................................................................5

**Regulations**

41 C.F.R. § 102-3.25...........................................................................................2, 4

41 C.F.R. § 102-3.70...............................................................................................4

41 C.F.R. § 102-3.70(b).........................................................................................2

41 C.F.R. § 102-3.105.............................................................................................3

41 C.F.R. § 102-3.110..........................................................................................2, 3

41 C.F.R. § 102-3.115..........................................................................................3, 4

41 C.F.R. § 102-3.120 ...........................................................................................2, 3, 4
41 C.F.R. § 102-3.170 .................................................................................................7
41 C.F.R. § 102-3.175 .................................................................................................3
41 C.F.R. § 102-3.175(b) ............................................................................................6

**Other Authorities**

Charter, Commission on Enhancing National Cybersecurity (Mar. 25, 2016)..........................5
Charter, Global Development Council (Feb. 25, 2015)..............................................5
Charter, Presidential Advisory Commission on Election Integrity (June 23, 2017)...............4, 5
Charter, The President's Management Advisory Board (Dec. 20, 2012)...................5
Exec. Order No. 13,328, 69 Fed. Reg. 6,901 (Feb. 6, 2004) ..........................................2
Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017) ...................................2
*Federal Advisory Committee Act (FACA) Database*, Data.gov (May 10, 2016)........................6
Presidential Advisory Comm'n on Election Integrity, *By-Laws and Operating Procedures*
(July 19, 2017) ...................................................................................................3

## INTRODUCTION

As this Court has recognized, leave to amend "should be liberally granted," and "the party opposing bears the burden of coming forward with a colorable basis for denying leave to amend." *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 13, 22 (D.D.C. 2012). The Commission largely ignores this standard in its opposition, and instead attempts to dispute the facts that Plaintiff has laid out in the amended pleadings. The Commission's arguments do not satisfy the burden of showing that this Court should reject the amended pleadings. In particular, the Court should grant a motion to amend where, as here, the opposing party cannot show any "undue delay, bad faith, or prejudice." *Gaubatz*, 891 F. Supp. 2d at 31.

Plaintiff has shown that the proposed amendments are relevant and material to the claims in this case. First, the amended pleadings show that the Commission is subordinate to the GSA, and thus undeniably part of an agency. Second, the amended pleadings show that the Commission itself has conceded its status as an agency subject to FOIA. Third, the amended pleadings show that EPIC Members' data has already been collected by the Commission. And finally, the amended pleadings outline alternative forms of relief that Plaintiff is entitled seek if this Court finds that there is no "adequate alternative remedy."

## ARGUMENT

### A.  EPIC's proposed amendments demonstrate that the Commission is subordinate to the GSA.

Defendants labor to characterize the GSA's role as mere "support" to the Commission, Defs.' Opp'n 5–6, ECF No. 55, but Plaintiff's proposed amendments—and the law itself—make clear that Commission is both part of and under the control of the GSA.

As an initial matter, Defendants erroneously try to exempt the Commission from many FACA requirements by declaring that it is an "independent Presidential advisory committee." Defs.' Opp'n 6, ECF No. 55. But as Defendants are surely aware, that designation applies solely to committees "not assigned by the Congress in law, or by President or the President's delegate, to an agency for administrative and other support." 41 C.F.R. § 102-3.25. The Commission fails to meet this definition because—as Defendants note—it is assigned to the GSA for "administrative services, funds, facilities, staff, equipment, and other support services." Defs.' Opp'n 6 (quoting Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017)). Plainly, then, the Commission cannot rely on provisions that apply exclusively to independent advisory committees. *See id.* at 6-7 (inaccurately citing to 41 C.F.R. §§ 102-3.110, 102-3.120).

Perhaps the Defendants *could* have established the Commission as an "independent Presidential advisory committee." As an example: the Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction was formed "independent from any executive department or agency" and assigned to the Executive Office of the President, Exec. Order No. 13,328, 69 Fed. Reg. 6,901 (Feb. 6, 2004)—an office which Defendants strenuously insist is not an agency. Mem. Supp. Defs.' Mot. Dismiss 37, ECF No. 49-1. But that is not how Defendants *actually* structured the Commission, which is instead assigned to the GSA.

Because the Commission is not "independent," it is bound by FACA regulations like any other advisory committee associated with an agency.[1] There is no third flavor of advisory

---

[1] FACA regulations do include three provisions that apply to "Presidential advisory committee[s]" generally, none of which help the Commission. First, 41 C.F.R. § 102-3.70(b) states that "the date of establishment for a Presidential advisory committee is the date the charter is filed with the Secretariat." This provision merely confirms that the GSA did, in fact, establish the Commission upon filing the Commission's charter. *See infra* pp. 4–5. Second, under 41 C.F.R. § 102-3.120(b), the requirement that the Designated Federal Officer (DFO) approve the

committee which would permit the Commission to operate outside of the ordinary FACA framework. Moreover, the law is far from "silent" on the management of *non-independent* advisory committees. Defs.' Opp'n 6. FACA regulations place such committees squarely under the control of a Committee Management Officer (here, Virginia Wills of the GSA). 41 C.F.R. § 102-3.115. Ms. Wills, as the CMO of the GSA and Commission, is thus obligated to "carry out all responsibilities delegated by the [GSA Administrator]"; to "ensure that section 10(b), 12(a), and 13 of the [FACA] are implemented by the [GSA] to provide for appropriate recordkeeping"; and to maintain "[c]opies of the information provided as the [GSA]'s portion of the annual comprehensive review." *Id.*

Indeed, FACA regulations determine the entire chain of command for the Commission as a non-independent advisory committee. Andrew J. Kossack, who was appointed Designated Federal Officer "by the GSA Administrator, pursuant to 41 CFR § 102-3.105," exercises extensive control over the Commission's activities. *See* Presidential Advisory Comm'n on Election Integrity, *By-Laws and Operating Procedures* 1–2 (July 19, 2017)[2] ("*By-laws*"). (Defendants retroactively argue that Mr. Kossack's appointment was made under regulations governing independent Presidential advisory committees, Defs.' Opp'n 7 (citing 41 C.F.R. §§ 102-3.110, 102-3.120), but as noted, these provisions do not apply to the Commission. *See supra* pp. 1–2.) As the official who appointed Mr. Kossack under 41 C.F.R. § 102-3.105, the GSA Administrator is necessarily "[t]he head of . . . agency that establishes or utilizes" the Commission. *Id.* Mr. Kossack reports to both the GSA Administrator and Ms. Wills, 41 C.F.R. §§ 102-3.25, 102-3.120, who in turn also reports to the GSA Administrator. 41 C.F.R. § 102-

committee's agenda "does not apply to a Presidential advisory committee." However, the Commission's By-laws independently mandate that the DFO will "prepare all meeting agendas." *By-Laws* 1. Third, 41 C.F.R. § 102-3.175 imposes a special Congressional reporting requirement on Presidential advisory committees—a provision not relevant here.

[2] *Available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-bylaws_final.PDF.

3.115. There is little "ambiguity" in this command structure, Defs.' Opp'n 7, except in the eyes of a committee that is determined to evade GSA oversight and judicial review.

Despite the considerable authority granted to Ms. Wills by FACA regulations, Defendants additionally argue that Ms. Wills lacks *statutory* authority over the Commission because the Commission was not "established" by the GSA. Defs.' Opp'n 5–6. Defendants are mistaken. First, 5 U.S.C. app. 2 § 8(b) grants committee oversight powers to *all* CMOs designated by the "head of each agency which has an advisory committee." That includes the designated CMO of the GSA, which by any reasonable definition "has" the Commission as one of its advisory committees.

Second, *contra* the Defendants, Defs.' Opp'n 6, the GSA *did* establish the Commission. "[A]n advisory panel is 'established by an agency'" for the purposes of FACA if it is "actually formed by the agency." *Byrd v. EPA*, 174 F.3d 239, 246 (D.C. Cir. 1999). That is precisely what the GSA did when it filed the Commission's Charter—a power that is reserved exclusively to "the Committee Management Officer (CMO) designated in accordance with section 8(b) of the Act, or . . . another agency official designated by the agency head." 41 C.F.R. § 102-3.70; *see also* Charter, Presidential Advisory Commission on Election Integrity (June 23, 2017), ECF No. 8-1, Ex. 2 ("Charter"). The law is clear that the filing of the charter is the crucial event marking the formation of a presidential advisory committee. 41 C.F.R. § 102-3.70 ("[T]he date of establishment for a Presidential advisory committee *is the date the charter is filed with the Secretariat*." (emphasis added)). Thus even though the President's executive order created the legal basis for the formation of the Commission, the Commission was officially "established" for the purposes of FACA when—and only when—the GSA filed the Commission's Charter on June 23, 2017. Charter ¶ 14.

4

Two aspects of the Commission's Charter further underscore that the GSA, not the President, established the Commission under FACA. First, the Charter, filed by the GSA, states that the Commission "is established *in accordance with* Executive Order 13799"—not that it was established *by* that Executive Order. Charter ¶ 2. Simply stated, the GSA formed the Presidential Commission by filing the Charter for the Commission. Second, unlike many other charters of presidential advisory committees, the Commission Charter does not state that the Commission *reports* directly to the President—only that it "shall provide its advice and recommendations to the President." Charter ¶ 6. *Compare id*., *with* Charter, The President's Management Advisory Board (Dec. 20, 2012)[3] ("The PMAB reports to the President and the PMC."), *and* Charter, Global Development Council (Feb. 25, 2015)[4] ("The Council reports to the President through the National Security Staff and the National Economic Council."), *and* Charter, Commission on Enhancing National Cybersecurity (Mar. 25, 2016)[5] ("The Commission is established within the Department of Commerce and reports to the President.").

In sum, there is no basis to argue that the Ms. Wills lacks the ordinary oversight powers granted to CMOs under 5 U.S.C. app. 2 § 8(b) because, in fact, the Commission is under the supervision of the GSA. Like any other CMO, Ms. Wills must "exercise control and supervision over the establishment, procedures, and accomplishments" of the Commission. *Id.* § 8(b)(1).

Defendants also lay great stress on *Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993) for the proposition that the Commission's actions are immune from judicial review. That case, which did not even pertain to a FACA advisory committee, is wholly inapposite. *Id.* In *Meyer*, the Task Force on Regulatory Relief (a working group of cabinet officers) was found not to be an agency

---

[3] *Available at* https://www.gsa.gov/cdnstatic/SamplePresidentialCommitteeCharter-GSA-76701-12-21-2012.pdf.

[4] *Available at* https://www.gpo.gov/fdsys/pkg/FR-2015-02-25/pdf/2015-03807.pdf.

[5] *Available at* https://www.nist.gov/sites/default/files/documents/cybercommission/ATT2-Cybersecurity-signed-charter-3-25-16.pdf.

subject to FOIA even though the task force oversaw employees borrowed from the Office of Management and Budget. *Id.* at 1296. Here, the script is flipped: agency officers from the GSA (in particular, Ms. Wills and Mr. Horne) have *oversight of the Commission*. Thus even if the Commission were not an agency in its own right—which it is, Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss 21–33, ECF No. 52—Plaintiff has established that the Commission is subordinate to the GSA. In either case, the Commission is subject to judicial review under 5 U.S.C. §§ 701 *et seq.* and the Privacy Impact Assessment provisions of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (codified at 44 U.S.C. § 3501 note). *See Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 228 (D.D.C. 2017) (reaching an advisory committee's conduct through APA judicial review of the committee's parent agency).

Finally, Defendants fault Plaintiff for "scouring" an "informational database" that happens to include compelling evidence that the GSA exercises control over the Commission. Defs.' Opp'n 7. Defendants appear remarkably indifferent to the importance of the records in the FACA Database, a resource developed by the GSA pursuant to FACA and "used by the Congress to perform oversight of related Executive Branch programs[.]" *Federal Advisory Committee Act (FACA) Database*, Data.gov (May 10, 2016).[6] Moreover, the Commission is legally required to populate its FACA database records with "accurate and timely information," *id.*, which in turn forms the basis for the GSA's annual comprehensive review of federal advisory committees. 41 C.F.R. § 102-3.175(b). Though the Court must in any event assume the truth of Plaintiff's factual allegations on a motion to dismiss, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), Plaintiff notes that the FACA Database provides numerous official admissions that conclusively settle the matter of the Commission's agency identity.

---

[6] https://catalog.data.gov/dataset/federal-advisory-committee-act-faca-database-complete-raw.

In short, Defendants would have the Court reach the implausible conclusion that the

Commission can:

(1) be chartered by the GSA;
(2) be established by the GSA;
(3) report that it is part of the GSA;
(4) receive "administrative services, funds, facilities, staff, equipment, and other support services" from the GSA;
(5) be placed under the control of a Committee Management Officer of the GSA;
(6) be placed under the control of a Designated Federal Officer by the GSA, who in turn reports to the CMO and the Administrator of the GSA; and
(7) have all of its Federal Register notices posted by the GSA

—yet still not be *part of or controlled by* the GSA. This strains credulity. The Commission

cannot be allowed claim all of the benefits of agency status while evading all of the obligations.

The Court should grant Plaintiff leave to amend the Complaint to establish the Commission's

relationship with the GSA.

**B. EPIC's proposed amendments demonstrate that the Commission has conceded it is an agency.**

In its motion, Plaintiff makes the seemingly self-evident point that a federal entity cannot

claim protection under the Freedom of Information Act if it is not actually subject to the FOIA.

Pl.'s Mot. Leave to File Third Am. Compl. ¶¶ 43–48, ECF No. 54. Defendants, fighting this

simple axiom, reply that "section 10(b)'s reference to FOIA does not intend to incorporate all the

procedural and substantive requirements of FOIA"—just the FOIA exemptions. Defs.' Opp'n 8-

9. This is both wrong as a matter of law and a misrepresentation of Plaintiff's argument.

Plaintiff certainly does not contend that 5 U.S.C. app. 2 § 10(b) incorporates *all* of the

FOIA's provisions, a view which is expressly foreclosed by FACA regulations. 41 C.F.R. § 102-

3.170 ("[A]gencies may not require members of the public or other interested parties to file

requests for non-exempt advisory committee records under the request and review process

established by section 552(a)(3) of FOIA."); *see also NRDC v. Johnson*, 488 F.3d 1002, 1003

7

(D.C. Cir. 2007) ("[T]he government's obligation to make documents available under FACA does not depend on whether someone has filed a FOIA request for those documents."). Plaintiff's argument, rather, is that § 10(b)'s command to affirmatively disclose advisory committee records is "[s]ubject [only] to section 552 of title 5, United States Code." Defendants offer no explanation as to why the words "subject to" would secretly refer to the parts of the FOIA that the Commission likes, *e.g.*, 5 U.S.C. § 552(b) (listing exemptions), and exclude the parts that it doesn't like, *e.g.*, 5 U.S.C. § 552(f) (defining the range of "agenc[ies]" that the FOIA applies to).

Nor does *NRDC v. Johnson* support Defendants' inexplicable argument: the committee in that case was under the Environmental Protection Agency, and thus part of an agency subject to the FOIA. *NRDC*, 488 F.3d at 306–07. Of course the Commission, too, is part of such an agency. But the Commission cannot be allowed concede agency status through the assertion of FOIA exemptions while simultaneously evading all of the statutory obligations, such as undertaking and publishing a Privacy Impact Assessment prior to the collection of personal data, that attach to agencies. Had Congress intended to extend FOIA exemptions to non-agency advisory committees, it could have used the more explicit language found in the section of FACA concerning the National Academy of Sciences. 5 U.S.C. app. 2 § 15(b)(5) ("The Academy shall make available to the public its final report, at reasonable charge if appropriate, unless the Academy determines that the report would disclose *matters described in section 552(b) of title 5, United States Code*."); *see also* §§ 15(b)(3), (4). But Congress did not do so.

## C.  EPIC's proposed amendments relating to the injuries of its members are clearly appropriate and not futile.

The new allegations about board member injuries contained in Plaintiff's Third Amended Complaint are clearly relevant to the standing inquiry in this case, and the Commission's arguments to the contrary are based on a misreading of both the law and the facts. Defs.' Opp'n

10. The Court specifically relied upon the residency and status of EPIC's Advisory Board members when it considered the representational standing issue in the Preliminary Injunction Order. Mem. Op. 13, ECF No. 40. Therefore it is clearly relevant whether EPIC Members are "registered voters" in "states that have" complied with the Commission's voter data request. *Id*.

The Court must also "accept all 'well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor'" at the motion to dismiss stage. *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016). So the Commission's attempts to mischaracterize EPIC's membership structure and the nature of the voter data transferred by the states are irrelevant. Defs.' Opp'n 10. Plaintiff's proposed Third Amended Complaint includes factual allegations that support Plaintiff's associational, informational, and organizational standing claims. Third Am. Compl. ¶¶ 5–6, 16–32, ECF No. 54-2. Plaintiff has also set out the constitutional basis for its members' injuries. Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss 17–21. The Commission has not met its burden to show a "colorable basis for denying leave" to add new facts relevant to the associational standing issue. *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 13, 31 (D.D.C. 2012).

### D. EPIC's proposed amendments establish alternative forms of relief and would not be futile.

Contrary to the Commission's bare assertion, the addition of claims for two alternative forms of relief—mandamus under the All Writs Act, 28 U.S.C. § 1651(a), and declaratory relief under 28 U.S.C. § 2201—would clearly "add [something] to plaintiff's case." Defs.' Opp'n 11. These remedies would provide an independent means to grant the relief that Plaintiff seeks if the Court were to find no "adequate alternative remedy" under the APA. Both mandamus and declaratory relief are available to a plaintiff that establishes an entitlement to mandamus relief.

*Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (issuing a declaratory

judgment that the President had a clear duty to act under the Federal Pay Comparability Act).

    None of the cases cited by the Commission are to the contrary. In fact, the only defense

that the Commission could make to Plaintiff's claim for mandamus and declaratory relief would

be to argue that the E-Government Act does not apply to the collection at issue. Defs.' Opp'n 11.

But, as Plaintiff already explained in opposition to the Commission's motion to dismiss, there is

no evidence or authority to support the Commission's narrow construction of the E-Government

Act. *See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss 35–37. Indeed, the statutory and

legislative history both clearly support Plaintiff's view that the E-Government Act applies to

presidential commissions, especially those organized under the authority of the GSA.

    The definition of "agency" incorporated into the E-Government Act is simply not the

same as the FOIA definition interpreted by the D.C. Circuit in *Soucie* and in subsequent cases.

The applicable definition under the E-Government Act is:

> any executive department, military department, Government corporation,
> Government controlled corporation, or *other establishment* in the executive
> branch of the Government (including the Executive Office of the President), or
> any independent regulatory agency . . .

44 U.S.C. § 3502(1) (emphasis added). Establishment is defined as an "institution or place of

business." Black's Law Dictionary 566 (7th Ed. 1999). The Government does not contest that the

Commission is an "establishment" of the Government. Therefore, the Commission is subject to

the E-Government Act by the plain text of the Paperwork Reduction Act, 44 U.S.C. § 3502(1).

The only cases limiting the scope of the Paperwork Reduction Act definition are those finding

that Congress expressly intended to exclude an executive branch entity. *See, e.g.*, *Kuzma v. U.S.

Postal Serv.*, 798 F.2d 29, 32 (2d Cir. 1986) (holding that the Postal Service is not an "agency"

under § 3501 based on Congress's expressed intent in the Postal Reorganization Act of 1970 to

exclude the Post Office from such administrative requirements); *Shane v. Buck*, 658 F. Supp. 908, 914–15 (D. Utah 1985) (same).

The application of the E-Government Act to a presidential commission is an issue of first impression that this Court should decide based on the unambiguous statutory text and the purpose of the statute. The Commission has failed to respond on either point and cites no authority that would shield it from the clear obligations of the E-Government Act.

It is the Commission's burden, as the party opposing Plaintiff's motion to amend, to demonstrate that denial is justified based on "undue delay, bad faith on the part of the moving party, or undue prejudice to the opposing party." *Gaubatz*, 891 F. Supp. 2d at  31. The Commission has not provided the Court with any "colorable basis for denying leave" to add claims for mandamus and declaratory relief. *Id*. at 34.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion for Leave to File a Third Amended Complaint.

Respectfully Submitted,

/s/ Marc Rotenberg
MARC ROTENBERG, D.C. Bar # 422825
EPIC President and Executive Director

ALAN BUTLER, D.C. Bar # 1012128
EPIC Senior Counsel

CAITRIONA FITZGERALD*
EPIC Policy Director

JERAMIE D. SCOTT, D.C. Bar # 1025909
EPIC Domestic Surveillance Project
Director

ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*

Dated: November 2, 2017                  *\* Appearing pro hac vice*